AB

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JAMES L. McDONOUGH, SR. and CAROL
McDONOUGH, individually and on behalf of
all others similarly situated,

                             Plaintiffs,

    v.

TOYS "R" US  d/b/a Babies "R" Us, and
BABIES "R" US, INC.

                          Defendants.

No.

**06 : 0242**

## CLASS ACTION COMPLAINT

       Plaintiffs, James L. McDonough, Sr. and Carol McDonough, individually and on behalf of

all others similarly situated, for their Complaint, alleges as follows based upon personal

knowledge, the investigation of their counsel, information and belief, and publicly available

information:

### I.  NATURE OF THE ACTION

      1.      Plaintiffs are consumers and purchasers of high-end baby and juvenile products

("Baby Products").  Plaintiffs paid supracompetitive prices for their purchases of Baby Products

because Toys "R" Us, Inc., doing business as Babies "R" Us and Babies "R" Us, Inc. (collectively,

"BRU" or "Defendants"), a dominant, multibrand retailer, agreed with manufacturers  Britax

International Ltd. ("Britax"), Kids Line Inc. ("Kids Line"), Medela Inc. ("Medela"), a Babybjorn

AB ("Baby Bjorn"), by and through its former United States agent Regal Lager Inc. ("Regal

Lager") and its current United States agent BabySwede LLC ("BabySwede"); and Maclaren USA

Inc. ("Maclaren"), (collectively, "Manufacturers") to enter into, maintain, and enforce minimum

resale price maintenance agreements with retailers of Baby Products (the "Retailers").[1]  These

---

[1] The agreements between BRU and the Manufacturers that the Manufacturers would impose minimum resale price
maintenance agreements upon the Retailers shall hereinafter be referred to as the "BRU-Manufacturer Agreements."
The agreements between the Manufacturers and the Retailers to maintain minimum resale prices shall hereinafter be
referred to as the "Manufacturer-Retailer Agreements."  Where appropriate, both types of agreements relevant here
shall be referred to collectively as "the Agreements."

agreements prevented the Retailers, on penalty of termination (i.e., being refused supply), from charging prices that were lower than the agreed minimum prices for the Baby Products.

2.      Both the BRU-Manufacturer Agreements and the resulting Manufacturer-Retailer Agreements are *per se* illegal under Section 1 of the Sherman Act. Alternatively, they unreasonably restrain trade in the relevant market(s) (defined below), causing substantial anticompetitive effects and inflated prices to consumers. And, given the substantial market power of BRU, by the Agreements and other anticompetitive conduct, Defendants have illegally maintained and enhanced their monopoly power, and conspired to illegally maintain and enhance their monopoly power in the relevant market(s).

3.      Absent Defendants anti-competitive conduct, Plaintiffs and the other Class members would have paid less for each of the Baby Products purchased during the Class Period. But for the exclusionary conduct, prices to members of the Class for the Baby Products would have been lower. As a result of Defendants unlawful conduct, Plaintiffs and the other Class members have been overcharged on their purchases of the Baby Products throughout the Class Period. Plaintiffs thus seek damages and equitable relief under, inter alia, Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2.

## II.  JURISDICTION AND VENUE

4.      Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for BRU's violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331 and 1337, because the action arises under the laws of the United States.

5.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 139(b) and (c) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of events giving rise to Plaintiffs claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

6.      The Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

## III.  PARTIES

7.     Plaintiffs James L. McDonough, Sr. and Carol McDonough are residents of Minocqua, Wisconsin and purchased one or more Baby Products from Defendants during the Class Period, and were thus injured by Defendants conduct.

8.     Defendant Babies "R" Us, Inc. is a corporation duly organized and existing under the law of the State of Delaware, with a principal place of business located at One Geoffrey Way, Wayne, NJ  07470.  According to its website, Babies "R" Us is "one of the premier baby product retailers – the largest baby product specialty store chain in the world and a leader in the juvenile industry."  At the start of 2005, Babies "R" Us stores numbered more than 2000.

9.     Toys "R" Us is a corporation duly organized and existing under the law of the State of Delaware, with a principal place of business located at One Geoffrey Way, Wayne, NJ  07470. Accordingly to its website, Toys "R" Us is "an $11 billion dollar company with approximately 1,500 stores worldwide.  The company is a market share leader in both the U.S. and Japan.  In the U.S., its largest market, it operates the largest free-standing destination toy and baby specialty stores."

10.     Toys "R" Us, Inc., doing business as Babies "R" Us, and Babies "R" Us, Inc. shall hereinafter be referred to collectively as "BRU."

## IV.  AGENTS AND CO-CONSPIRATORS

11.     The acts alleged in this Complaint to have been done by the Defendants were authorized, ordered and condoned by its parent companies and authorized, ordered and performed by their officers, directors, agents, employees and representative while engaged in the management, direction, control or transaction of their business affairs.  Defendants and their subsidiaries, partnerships, business ventures or joint ventures constitute a single enterprise and function both as alter egos and agents of each other.  The allegations made in this complaint are wrongs that Defendants perpetrated through their agents or subsidiaries, which serve as instrumentalities acting on their collective behalf.

12.     Various persons and/or firms, not named as Defendants herein, may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

3

## V.  INTERSTATE TRADE AND COMMERCE

13.     The activities of Defendants, and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected, interstate commerce.

14.     During the time period covered by this Complaint, Defendants sold and distributed Baby Products throughout the United States.

15.     Defendants have manufactured, sold and shipped substantial qualities of Baby Products in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which the Defendants produced Baby Products.

## VI.  FACTS

16.     BRU is a dominant, multibrand retailer of baby and juvenile products, which opened its first stores in 1996.  As of January 2005, BRU operated over 200 Babies "R" Us stores throughout the Untied States.  In its most recent Form 10-Q filing with the United States Securities and Exchange Commission, BRU stated that it considers itself the "largest specialty retailer of baby-juvenile products in the United States and the "only specialty retailer in its category that operates on a national U.S. scale."

17.     BRU sells juvenile furniture, such as cribs, dressers, changing tables; bedding and related accessories; baby gear, such as play yards, booster seats, high chairs stroller sand car seats; toddler and infant plush toys; gifts; clothing; infant feeding supplies; health and beauty aids; and infant care products.  In addition to its stores, BRU retails over the internet, at www.babiesrus.com, a site administered by and with Amazon.com.

18.     Relative to BRU, internet based retailers such as Babyage.com, Inc. ("Babyage") and The Baby Club of America, Inc. ("Baby Club") are small companies that compete in the relatively new trade channel known variously as "electronic commerce," "e-commerce," "e-tailing," "internet retail" *etc.*  Specifically, Babyage and Baby Club are internet retailers of high-end baby and juvenile products.[2]  They are highly efficient competitors because, among other reasons, their operating expenses are low.  This allows them to compete vigorously on price, both with other internet retailers and with retailers in other trade channels, such as BRU.

---

[2] The term "high-end" is meant to include the highest quality, higher price-point models of the baby and juvenile products sold by the Baby Product Manufacturers.

19.     BRU has known for quite some time that the increasing popularity of "e-commerce," with its associated increase in price competition, would pose a substantial threat to BRU's sales and profits.  For example, recently BRU has made public statements admitting its fear of price competition from efficient competitors.  In January of 2005, BRU wrote in a Form 10-K filing that "[s]ome of our competitors may have greater financial resources, lower merchandise acquisition costs, and lower operating expenses than our Company.  If we fail to compete successfully, we could face lower net sales and may decide to offer **greater discounts to our guests**, which could result in **decreased profitability**" (emphasis added).

20.     The tremendous pressure upon a dominant retailer (like BRU) in a traditional trade channel (like the "brick and mortar" trade channel) to react anticompetitively to threats to its pricing freedom, such as those posed by retailers in a new and efficient trade channel have been the subject of study by, and recent testimony before, the Federal Trade Commission ("FTC").  As one participant in the FTC's 2002 public workshop, entitled "Possible Anticompetitive Efforts to Restrict Competition to the Internet," stated"

> The promise of the world of electronic commerce is to create an environment where consumers can freely shop between various competitive alternatives.  By reducing transaction costs and improving transparency, the Internet offers the potential of dramatically improving competition in various retail markets.
>
> *** **[But]** *as new market forces arise, . . . "traditional" competitors often respond to the threat by trying to create barriers to thwart those new entrants.*

See David A. Balto, Testimony Before the FTC, Office of Policy Planning, Public Workshop on E-Commerce, at 1-2 (October 10, 2002) (emphasis added).

21.     In particular, because suppliers of products (like the Baby Product Manufacturers) depend on retailers (like BRU) to sell their products, it is not surprising that a dominant retailer in a traditional trade channel like BRU would use that dominance to protect against price competition by coercing suppliers like the Baby Product Manufacturers into disadvantaging retailers (like Babyage and Baby Club) in the new, efficient trade channel.  For instance, speaking at that same FTC public workshop, FTC Commissioner Shiela Anthony underscored the potential threat to competition posed by a dominant retailer (like BRU), whom suppliers (like the Baby Product Manufacturers) cannot do without.  The concern is that a dominant retailer like BRU could use its

market power to coerce key suppliers into disadvantaging competing retailers (like Babyage and

Baby Club), and thereby protect and preserve its market dominance:

> Competition among distributors for a given manufacturer's favor is almost certainly healthy.   But problems may arise where distributors in one channel exercise their market power to disadvantages distributors in another channel. ***[C]an Internet distribution even gain a strong foothold in some product areas where the entrenched distribution channel, members who manufacturers cannot do without, at least until e-commerce matures, use hardball tactics to make sure that the transition period never begins?

*See* FTC, Public Workshop:  Possible Anticompetitive Effects to Restrict Competition on the

Internet, transcript of proceedings, at 797:12-16, 799:7-12 (October 10, 2002) (remarks of

Commissioner Shiela Anthony).

22.     Rather than be forced to offer greater discounts and thus suffer decreased

profitability, BRU reacted aggressively to this threat and sought to avoid such competitive

constraints on its ability to garner inflated prices.  Indeed, because of BRU's position as a

dominant multibrand retailer in the relevant market(s), BRU was able to, and did, require the

creation of the BRU-Manufacturer Agreements.  Among the relevant provisions of the BRU-

Manufacturer Agreements was that, in consideration of BRU's continuing to stock and sell the

Manufacturers' products, the Manufacturers had to ensure that Retailers would charge a minimum

resale price for the Manufacturers' products.

23.     The Manufacturers then entered into the Manufacturer-Retailer Agreements with

Retailers.  These Agreements prohibited, if the Manufacturers were to continue to supply the

Retailers with product, the Retailers from lowering, past a certain price floor, the prices at which

they sold Manufacturers' goods to consumers on penalty of termination.

24.     According to BRU's competitors BabyAge.com and The Baby Club of America,

Inc.,[3] the Manufacturers, by and through their various representatives, met with and negotiated

with Retailers, on an individualized basis, concerning the prices at which the Retailers sold their

products, sought the Retailers' acquiescence to and assurances of compliance with the terms of the

Manufacturer-Retailer Agreements, and threatened the Retailers with termination for

---

[3] As alleged by BabyAge.com, Inc. and The Baby Club of America, Inc. in *BabyAge.com, Inc. and The Baby Club of America, Inc. v. Toys "R" Us, Inc., et al.*, No. 2:05cv06792 (E.D. Pa. Filed December 29, 2005) (Judge Brody).

noncompliance.  For instance:

    **a.**    **Britax**

    (i)    In or around November 2003, representatives of Britax visited Babyage's Moonachie, New Jersey facility to seek agreement that Babyage would raise its prices on Britax products and not thereafter lower its prices below a certain level.  Babyage acquiesced in and agreed to Britax's sought minimum pricing for fear that Britax would otherwise terminate Babyage;

    (ii)    Between approximately December 2004 and January 2005, representatives of Britax contacted Babyage several times concerning Babyage's subsequent noncompliance with minimum pricing, seeking Babyage's cooperation with minimum pricing;

    (iii)    In or around June 2005, representatives of Britax contacted Babyage, again seeking its agreement to raise prices, and attempted to use Babyage's pending request for additional credit from Britax to negotiate Babyage's acquiescence in its demands that Babyage raise its prices;

    (iv)    From December 2003 through February 2004, representatives of Britax contacted Baby Club several times, seeking Baby Club's cooperation with and acquiescence in minimum pricing, and threatening the cancellation of orders if Baby Club did not so agree.

    **b.**    **Peg Perego**

    (i)    In or around October 2003, representatives of Peg Perego contacted Babyage, seeking Babyage's agreement to raise prices on a particular stock keeping unit ("SKU");

    (ii)    After Babyage agreed to, and did, raise its prices on the particular SKU and then lowered the price again, in or around November 2003 representatives of Peg Perego contacted Babyage, again seeking Babyage's acquiescence to raise its price to the agreed-upon levels;

(iii)    In or around February 2004, a representative of Peg Perego contacted Babyage, threatening that if Babyage did not raise its prices on Peg Perego products to the manufacturer's suggested retail price ("MSRP") level, Peg Perego would terminate Babyage as a dealer of Peg Perego products;

(iv)    In or around the year 2000, a representative of Peg Perego informed Baby Club of the identity of Peg Perego SKUs that BRU would carry that year so that Baby Club would know that, as to those SKUs, it was required to maintain minimum pricing;

(v)    In or around June 1999, a representative of Peg Perego contacted Baby Club, seeking Baby Club's agreement to raise prices, and explaining that termination would result otherwise.  In response, Baby Club acquiesced in Peg Perego's demand by raising its prices;

**c.    Kids Line**

(i)    In or around May 2005, in response to an inquiry from Babyage, representatives of Kids Line stated that it would consider permitting Babyage to price lower than minimum resale price, inasmuch as BRU was doing so;

(ii)    In or around June 2005, a representative of Kids Line told Babyage that Babyage should not consider lowering its prices past minimum agreed resale prices to match BRU prices, because it would force Kids Line to choose between Babyage and BRU;

(iii)    In or around November 2005, Kids Line contacted its manufacturer's representative for Babyage, and instructed him to obtain Babyage's acquiescence in raising its prices to the agreed minimum resale price, and the manufacturer's representative did so;

(iv)    In or around December 2005, a representative of Kids Line, in response to an inquiry from Babyage about increasing its credit line with Kids Line, told Babyage that Babyage would first have to

increase prices on certain products;

(v)     In, among other years, 2003 and 2004, a representative of Kids Line personally visited Baby Club approximately twice a year, each time seeking Baby Club's acquiescence in Kids Line's minimum pricing agreements, to which requests Baby Club ultimately agreed;

**d.     Baby Bjorn**

Between 1999 and 2001, representatives of Regal Lager and Baby Bjorn met with Baby Club several times, seeking Baby Club's agreement to raise prices on various Baby Bjorn products, to which requests Baby Club agreed;

**e.     Maclaren**

At several times during the year 2005, a representative of Maclaren contacted Baby Club by telephone and email, seeking Baby's Club's agreement to raise its prices to the MSRP.

25.     The acquiescence and compliance by Retailers in minimum pricing, was, to the Manufacturers, preferable to termination of or non-supply to noncompliant Retailers, because the Manufacturers wanted and profited from sales to the Retailers.

26.     The Manufacturers:

a.     refrained from selling to uncongenial Retailers;

b.     suggested resale prices that were widely followed;

c.     sanctioned and/or terminated Retailers who failed to maintain a minimum resale price; and

d.     announced and enforced policies of sanctioning and/or terminating Retailers who failed to maintain a minimum resale price.

27.     For example, certain Retailers were terminated (that is, refused supply) by certain of the Manufacturers because of, pursuant to, and as a part of the Manufacturer-Retailer Agreements, and for no other (non-pretextual) reason.  For example, (a) in or around February, 2004, Peg Perego terminated Babyage as a retailer of its products; (b) in or around March 2005, Medela terminated Babyage as a retailer of its products; and (c) in other around July 2002, Medela

terminated BabyClub as a retailer of its products.

28.    The Agreements represent a conscious commitment to a common scheme, designed to achieve an unlawful objective, between BRU and the Manufacturers and the Manufacturers and the Retailers.  The Agreements were intended to, and did, benefit BRU, the Manufacturers and the Retailers.

## VII.  MONOPOLY/MARKET POWER

29.    The relevant product market in this case is retail sales of high-end baby and juvenile strollers, breast pumps, bedding, car seats, and infant carriers.  Alternatively, there are several relevant product markets pertinent to this case, including the separate markets for retail sales of high-end baby and juvenile strollers; for retail sales of high-end breast pumps; for retail sales of high-end baby bedding; for retail sales of high-end car seats; and for retail sales of infant carriers.

30.    The relevant geographic market in this case is the United States of America.

31.    By virtue of its power to control prices and exclude competition in the relevant market(s), BRU possessed monopoly power in the relevant market(s).  Moreover, at all relevant times, BRU possessed dominant shares of the market(s) for retail sales of high-end baby and juvenile strollers, breast pumps, bedding, car seats, and infant carriers, respectively, and was a critical outlet for the Manufacturers.

32.    Likewise, the Manufacturers at all relevant times each possessed substantial market power in the market(s) for their respective products, due, in part, to the high level of product differentiation in this industry.  Specifically, the Manufacturers: (a) sold their respective high-end baby and juvenile strollers, breast pumps, bedding, car seats, and infant carriers at prices in excess of marginal costs, (b) enjoyed high profit margins thereon, (c) sold such products substantially in excess of marginal costs, (d) enjoyed high profit margins thereon, (e) sold such products substantially in excess of the competitive price, and (f) enjoyed substantial barriers to market entry and growth.

33.    There is substantial concentration among the firms that manufacture Baby Products.

## VIII.   MARKET EFFECTS OF DEFENDANTS' CONDUCT

34.     The overall effect of the various acts in Defendants anti-competitive, exclusionary scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced Baby Products.  As alleged above, had Defendants not improperly foreclosed or stifled actual or potential competitors from competing in the retail market for the Baby Products, other actual or potential rival retailers would have achieved much greater sales than they actually did (or threatened to do), given the cheaper prices that they charged (or could have charged upon entry), and would have posed a far greater competitive threat to BRU. Additionally, absent Defendants exclusionary conduct, barriers to entry to each of the markets would have been lower, which: (a) would have made it easier for existing or new competitors to enter or expand their position in the market for the Baby Products, and (b) would have caused existing or potential competitors to be attracted to the Baby Product market because of the supra-competitive prices that BRU was charging.  As a result, absent Defendants misconduct, Defendants would have rationally perceived that there was a greater threat of potential competition in each of the relevant markets and sub-markets if Defendants allowed lower prices.

35.     The presence of unfettered competition from actual or potential competitors, which were selling lower-priced Baby Products, would have forced Defendants to allow lower prices for Baby Products in order to remain competitive and/or to counter a perceived threat of additional entry.

36.     During the relevant period, Plaintiffs and the other members of the Class purchased Baby Products directly from BRU.  As a result of Defendants alleged illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the Baby Products they purchased.  Plaintiffs would have been able to, *inter alia,* purchase less-expensive Baby Products had potential competitors been able to engage in unfettered competition.  The prices that Plaintiffs and the other Class members paid for Baby Products during the Class Period were substantially greater than the prices that Plaintiffs and the Class members would have paid absent the illegal conduct alleged herein because:  (1) the prices of all Baby Products were artificially inflated by Defendants illegal conduct; and (2) Class members were deprived of the opportunity to purchase Baby Products at substantially lower prices.  Thus, Plaintiffs and the Class have, as a consequence, sustained substantial losses and damages in the form of overcharges.

## IX.    CLASS ACTION ALLEGATIONS

37.    Plaintiffs bring this action individually and on behalf of a Class defined as follows:

> All persons who purchased one or more Baby Products from Toys "R" Us, Inc. d/b/a Babies "R" Us, or Babies "R" Us, Inc. and manufactured by Britax International Ltd, Kids Line Inc., Peg Perego USA, Inc. Medela Inc., Babybjorn AB or Maclaren USA Inc. during the period 1999 to the present.

38.    **Numerosity:** Joinder of all Class members is impracticable.  While the size of the Class is not yet known with certainty, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that the Class numbers potentially in the thousands, if not millions. Class members are geographically dispersed throughout the United States.  The Class members are identifiable from information and records in Defendants possession, as well as warranty and other records.

39.    *Commonality*: Questions of law and fact are common to the Class, including, but not limited to:

a.    whether Defendants obtained and maintained monopoly power in the markets for the Baby Products in the United States;

b.    whether Defendants obtained and/or maintained monopoly power in the relevant markets through anti-competitive and unlawful activity;

c.    whether Defendants engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition and limiting purchaser access to competing and lower-priced Baby Products;

d.    whether Defendants unreasonable anti-competitive contracts, combinations, and conspiracies have caused Plaintiffs and the other members of the Class to suffer antitrust injury in the nature of overcharges;

e.    whether Defendants unlawful conduct caused Plaintiffs and the other Class members to pay more for the Baby Products than they otherwise would have paid;

f.    the appropriate Class-wide measure of damages; and

g.    whether Defendants anti-competitive conduct is continuing, thus entitling

the Class to injunctive relief to promote unrestrained trade and free and fair competition.

40.     *Typicality*:  Plaintiffs' claims are typical of the claim of the members of the Class. Plaintiffs and other Class members are purchasers of the Baby Products and were overcharged and thus injured by the same wrongful conduct of Defendants.  Defendants violation of the antitrust laws, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiffs and the other Class members.

41.     *Predominance*:  The questions of law and the fact that are common to the members of the Class predominate over any questions affecting only individual Class members.  Whatever possible difficulties may exist in the management of the class action are greatly outweighed by the advantages of the class action procedure.  Those advantages include, but are not limited to, providing Class members with a method for redress of claims that might otherwise not warrant individual litigation.

42.     *Superiority*:  Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treat will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  A class action enables injured persons or entities to obtain redress on claims that might not be practicable to pursue individually.  Class treatment also eliminates the potential for inconsistent adjudication.

## X.     TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS.

43.     Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until immediately prior to commencing this civil action.

44.     Any applicable statutes of limitations have been tolled by Defendants affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

45.     Because of the self-concealing nature of Defendants actions and their affirmative

acts of concealment, Plaintiffs and the Class assert the tolling of any applicable statute of limitations affecting the claims raised herein.

46.    Defendants continue to engage in the deceptive practices.  Consequently, unwary consumers are injured on a daily basis by Defendants unlawful conduct.  Therefore, Plaintiffs and the Class submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of the Class purchases a Baby Product constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

47.    Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

48.    Defendants conduct was and is, by its nature, self-concealing.  Still, Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct and have actively foreclosed Plaintiffs and the Class from learning of their illegal, anti-competitive, unfair and/or deceptive acts.

49.    By reason of the foregoing, the claims of Plaintiffs and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## COUNT I

## VIOLATION 15 U.S.C. § 1 (AGREEMENT RESTRAINING TRADE)

50.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

51.    The Agreements and their enforcement, constitute contracts, combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiffs thereby.

52.    The Agreements cover a sufficiently substantial percentage of relevant market(s) to harm competition.

53.    Defendants are *per se* liable for the creation, maintenance and enforcement of the Agreements.

54.    Alternatively, Defendants are liable for the creation, maintenance and enforcement

of the Agreements under a "quick look" and/or rule of reason standard.

55.    There is no legitimate, procompetitive business justification for the Agreements, or any of them, that outweighs their harmful effect. Even if there were some conceivable justification, the Agreements are broader than necessary to achieve such a purpose.

56.    Plaintiffs and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Defendants substantial foreclosure and exclusion of competition and monopolization of the relevant markets. Without limiting the generality of the foregoing, Plaintiffs and the other members of the Class have been forced to pay higher prices for Baby Products than they would have paid in the absence of Defendants unlawful conduct.

## COUNT II

## VIOLATION OF 15 U.S.C. § 2 (MONOPOLIZATION AND MONOPOLISTIC SCHEME)

57.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

58.    At all relevant times, Defendants possessed monopoly power in the relevant market(s). Defendants possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market(s).

59.    By the Agreements, Defendants willfully maintained monopoly power in the relevant market(s) using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiffs thereby. It was Defendants conscious object to further their dominance in the relevant market(s) by and through the Agreements.

60.    Defendants conduct, including the BRU-Manufacturer Agreements, the Manufacturer-Retailer Agreements, and their enforcement, constitutes an anticompetitive scheme to acquire and maintain monopoly power in the relevant market(s).

61.    Defendants' willful maintenance of monopoly power has made it difficult or impossible for competitors to engage in fair competition.

62.    Plaintiffs and members of the Class were injured in their business or property by Defendants monopolization of the relevant markets. Without limiting the generality of the

foregoing, Plaintiffs and the other members of the Class have been forced to pay higher prices for Baby Products in the relevant markets than they would have paid in the absence of Defendants unlawful conduct.

## COUNT III

## VIOLATION OF 15 U.S.C. § 2 (ATTEMPTED MONOPOLIZATION)

63.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

64.     The Agreements were unreasonably exclusionary.

65.     By the BRU-Manufacturer Agreements, Defendants induced Retailers to enter in the Manufacturer-Retailer Agreements, with the specific intent to achieve monopoly power in the relevant market(s).

66.     The natural and probable consequence of the Agreements, which was plainly foreseeable to Defendants, was to give Defendants control over the process and/or to exclude or destroy competition in the relevant market(s), or any of them, to the extent it has not already succeeded.

67.     There is a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Defendants will succeed in and achieve their goal of obtaining monopoly power in the relevant market(s).

68.     Plaintiffs and members of the Class were injured in their business or property by Defendants attempted monopolization of the relevant markets.  Without limiting the generality of the foregoing, Plaintiffs and the other members of the Class have been forced to pay higher prices for Baby Products in the relevant markets than they would have paid in the absence of Defendants unlawful conduct.

## COUNT IV

## VIOLATION OF 15 U.S.C. §§ 1 AND 2 (CONSPRIRACY TO MONOPOLIZE)

69.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

70.     Through the Agreements, Defendants conspired to maintain and enhance their monopoly in the relevant market(s)

71.     Defendants knowingly and intentionally entered into the Agreements.

72.     Defendants specifically intended that the Agreements would maintain BRU's monopoly power in the relevant market(s) and injured Plaintiffs thereby.

73.     Defendants committed at least one overt act in furtherance of the conspiracy.

74.     Plaintiffs and members of the Class were injured in their business or property by Defendants conspiracy to monopolize the relevant markets.  Without limiting the generality of the foregoing, Plaintiffs and the other members of the Class have been forced to pay higher prices for Baby Products in the relevant markets than they would have paid in the absence of Defendants unlawful conduct.

## XI.     REQUEST FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the Class, respectfully request that:

A.     The Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rule of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23, be given to the Class;

B.     The acts alleged herein be adjudged and decreed to be unlawful acts in violation of Sections 1 and 2 of the Sherman Act;

C.     Each member of the Class recover threefold the damages determined to have been sustained by each of them, and that judgment be entered against Defendant in favor of the Class;

D.     The Class recover its costs of suit, including reasonably attorneys' fees and costs as provided by law; and

E.     The Class be granted such other appropriate relief as may be determined to be just, equitable, and proper by this Court.

## XII.     JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  January 19, 2006

Respectfully submitted,

_____
William R. Kane (PA ID # 59705)
Ellen Meriwether (PA ID #45210)
Michael S. Tarringer (PA ID #71876)
**MILLER FAUCHER and
    CAFFERTY LLP**
One Logan Square, Suite 1700
18th and Cherry Streets
Philadelphia, PA  19103
(215) 864-2800 (t)
(215) 864-2810 (f)

Mary Jane Fait
**WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
(312) 984-0000 (t)
(312) 984-0001 (f)

Ann D. White
**ANN D. WHITE LAW OFFICES, P.C**
One Pitcairn Place, Suite 2400
165 Township Line Road
Jenkintown, PA 19046
215-481-0274 (t)
215-481-0271 (f)