# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

CAROL M. MCDONOUGH, SARA SHUCK,  )
LAWRENCE B. MCNALLY, EVELIA Y.  )
RAGSDALE, JENNIFER SULLIVAN, SARAH L.  )
OTAZO, AMY GALVIN GROGAN, ERIN M.  )
HALL, MELISSA NUTTALL, JULIE LINDEMANN,  )
STEPHANIE BOZZO, DARCY TRZUPEK, and  )
YOSSI ZARFATI, INDIVIDUALLY AND ON  )
BEHALF OF ALL OTHERS SIMILARLY SITUATED,  )
)
                Plaintiffs,  )
)
       v.  )   No. 2:06-cv-242-AB
)
TOYS "R" US, INC., d/b/a BABIES "R" US, BABIES  )
"R" US, INC., TOYS "R" US-DELAWARE, INC.,  )
BABYBJÖRN, AB, BRITAX CHILD SAFETY, INC.,  )
KIDS LINE, LLC, MACLAREN USA, INC.,  )
MEDELA, INC., PEG PEREGO U.S.A., INC., and  )
REGAL LAGER, INC.,  )
                Defendants.  )
_____)

## DEFENDANTS' JOINT SUR-REPLY IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

I. THE THIRD CIRCUIT'S DECISION IN *HYDROGEN PEROXIDE* ESTABLISHES A STANDARD FOR CLASS CERTIFICATION THAT PLAINTIFFS HAVE NOT MET AND CANNOT MEET ...............................................1

    A. The Third Circuit Squarely Rejected Each Proposition That Plaintiffs Argued Should Govern Consideration Of Their Motion .......................................1

    B. Plaintiffs Cannot Avoid The Third Circuit's Total Rejection Of Their Position By Misstating The Holdings Of *Hydrogen Peroxide* ..............................4

        1. *Hydrogen Peroxide* Requires A District Court To Weigh All Evidence Relevant To The Rule 23 Analysis And To Resolve Any Conflicts................................................................................................4

        2. *Hydrogen Peroxide* Holds That A District Court May Not Merely "Consider" The Parties' Expert Opinions But Also It Must Weigh The Opinions And Choose Between Them .................................5

        3. *Hydrogen Peroxide* Holds That A District Court Must Resolve All Relevant Factual And Legal Disputes, Regardless Of Any Overlap With The Merits Of Plaintiffs' Case............................................6

        4. *Hydrogen Peroxide* Rejects Any Presumption In Favor Of Class Certification In Antitrust Cases ................................................7

        5. *American Seed* Does Not Support Plaintiffs' Position ...............................7

II. PLAINTIFFS' REPLY FAILS TO ESTABLISH THAT COMMON ISSUES WILL PREDOMINATE UNDER THE *HYDROGEN PEROXIDE* TEST ........................9

    A. Plaintiffs' Reply Does Not Help Them Establish That Common Issues Predominate With Respect To The Conspiracies That They Allege Even If The Question Is Considered With Respect To Six Separate Classes.....................9

    B. Plaintiffs' Reply Brief Does Not Demonstrate, By A Preponderance of The Evidence, That They Have A Methodology That Will Use Common Proof To Show Class-Wide Impact ......................................................................12

        1. Dr. Comanor's Rebuttal Opinion Does Not Identify An Economic Method Of Proving That BRU Instigated The Other Defendants' Price Policies, The Essential Predicate Of His Opinion On Class-Wide Impact.............................................................................................12

2.      Dr. Comanor's Theory That Distributor Instigated Resale Price Maintenance Has Only Anticompetitive Effects Is Inconsistent With Supreme Court Precedent And Mainstream Economic Thought ................................................................................................15

3.      Dr. Comanor's Statistical Exercises Do Not Constitute A Plausible Method Of Proving His Theory .................................................18

4.      Dr. Comanor Has Not Proposed Any Reliable Method That Would Establish That BRU Would Uniformly Lower Its Prices In The Absence Of The Alleged Conspiracies ......................................19

5.      Dr. Comanor's Rebuttal Does Not Contain Any Method That Will Use Common Evidence To Show The Effect Of The Alleged Conspiracies On The Price Setting Mechanism In Any Relevant Market ........................................................................................24

C.      A Class Action Would Not Be Manageable ..........................................26

III.    PLAINTIFFS HAVE FAILED TO PROPOSE A WORKABLE METHODOLOGY TO PROVE DAMAGES ON A CLASS-WIDE BASIS ..................27

A.      Plaintiffs Must Demonstrate That The Methods They Have Identified For Proving Damages Will Work In This Case............................................27

B.      Plaintiffs' Proposed Methodologies To Calculate Damages Are Fatally Flawed And Are Contrary To Real-World Evidence .............................................28

1.      Plaintiffs Have No Method Of Proving The Actual Prices Paid By Class Members Given the Unavailability Of Evidence ............................28

2.      Plaintiffs Have No Viable Method Of Proving The Prices That BRU Would Have Charged In The "But For" World................................29

C.      Plaintiffs Have Failed to Meet their Burden of Validating a Workable Method of Proving Damages On A Class Wide Basis ..........................................32

IV.     THE NAMED PLAINTIFFS WILL NOT FAIRLY AND ADEQUATELY REPRESENT THE CLASS ................................................................................33

A.      Class Plaintiffs Are Inadequate Because Of The Inherent Conflicts In The Aggregated Classes They Propose, Their Close Relationships To Class Counsel, And Their Vulnerability To Unique Defenses.........................................33

1.      The Evidence Reveals Unaligned And Competing Interests Among The Proposed Class Representatives And Putative Class Members..........34

2.      The Personal And Professional Relationships Of The Class Representatives To Class Counsel Disqualify Them..................................38

3.      The Proposed Class Representatives Are Subject to Unique Defenses That Will Pre-Occupy the Class.................................................39

V.      CONCLUSION................................................................................................................41

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alabama v. Blue Bird Body Co.*,
573 F.2d 309 (5th Cir. 1978) ................................................................... 10

*Allied Orthopedic Appliances, Inc. v. Tyco*,
247 F.R.D. 156 (C.D. Cal. 2007) ............................................................ 32

*Alston v. Virginia High School League, Inc.*,
184 F.R.D. 574 (W.D. Va. 1999) ............................................................ 37

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ............................................................................ 34, 35

*Am/Comm Systems, Inc. v. AT&T Co.*,
101 F.R.D. 317 (E.D. Pa. 1984) ............................................................. 37

*American Seed Co., Inc. v. Monsanto Co.*,
238 F.R.D. 394 (D.Del. 2006) ............................................................... 7, 8

*American Seed Co., Inc. v. Monsanto Co.*,
2008 U.S. App. Lexis 6963 (3d Cir. Apr. 1, 2008) ..................................... 8

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006) ........................................................ 34, 39, 40

*Bogosian v. Gulf Oil Corp.*,
561 F.2d 434 (3d Cir. 1977) ..................................................................... 8

*Butt v. Allegheny Pepsi-Cola Bottling Co.*,
116 F.R.D. 486 (E.D. Va. 1987) ............................................................. 29

*Chestnut Fleet Rentals Inc. v. Hertz Corp.*,
72 F.R.D. 541 (E.D. Pa. 1976) ............................................................... 17

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1999) ............................................................... 14

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ................................................................. 19

*East Tex. Motor Freight System, Inc. v. Rodriguez*,
431 U.S. 395 (1977) .............................................................................. 34

*Funeral Consumers Alliance, Inc. v. Service Corp. Int'l*,
No. 05-3394 (S.D. Tex. Nov. 24, 2008) .................................................. 31

*Gary Plastic Packaging Corp. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990) ................................................................................. 39

*General Telephone Co. of the Sw. v. Falcon*,
  457 U.S. 147 (1982) ............................................................................................. 41

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
  423 F.3d 374 (3d Cir. 2005) ................................................................................. 19

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ...................................................................... 25

*In re Hotel Telephone Charges*,
  500 F.2d 86 (9th Cir. 1974) .................................................................................. 17

*In re Hydrogen Peroxide Antitrust Litig.*,
  240 F.R.D. 163 (E.D. Pa. 2007) ............................................................................. 2

*In re Hydrogen Peroxide Antitrust Litig.*,
  No. 07-1689, 2008 U.S. App. Lexis 26871 (3d Cir. Dec. 30, 2008) ................... passim

*In re Initial Public Offering Securities Litigation*,
  471 F.3d 24 (2d Cir. 2006) ............................................................................. 2, 3, 4

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002) ................................................................................... 8

*In re Medical Waste Servs. Antitrust Litig.*,
  2006 WL 538927 (D. Utah Mar. 3, 2006) ........................................................... 32

*In re Microsoft Corp. Antitrust Litig.*,
  214 F.R.D. 371 (D. Md. 2003) ............................................................................. 38

*In re Monster Worldwide, Inc. Sec. Litig.*,
  251 F.R.D. 132 (S.D.N.Y. 2008) ......................................................................... 39

*In re Plastics Additives Antitrust Litig.*,
  No. 03-2038, 2006 U.S. Dist. Lexis 69105 (E.D. Pa. Sep. 1, 2006) ................... 12

*In re Plastics Additives Antitrust Litig.*,
  Nos. 07-2159, 07-2418, 2009 U.S. App. Lexis 2177 (3d Cir. Jan. 27, 2009) ...... 12

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
  No. 03-MDL-1556, 2007 U.S. Dist. Lexis 85466 (M.D. Pa. Nov. 19, 2007) ..... 4, 5

*In re Transit Co. Tire Antitrust Litig.*,
  67 F.R.D. 59 (W.D. Mo. 1975) ............................................................................. 17

*J.H. Cohn & Co. v. Am. Appraisal Assocs.*,
   628 F.2d 994 (7th Cir. 1980) .................................................................... 39

*Jamsports & Entertainment, LLC v. Paradama Productions, Inc.*,
   No. 02-C-2298, 2005 WL 14917 (N.D. Ill. Jan. 3, 2005) ......................... 14

*Kendler v. Federated Dep't Stores, Inc.*,
   88 F.R.D. 688 (S.D.N.Y. 1981) ................................................................. 11

*Langbecker v. Electronic Data Sys. Corp.*,
   476 F.3d 299 (5th Cir. 2007) .................................................................... 37

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
   127 S. Ct. 2705 (2007) ....................................................................... 16, 25

*London v. Wal-Mart Stores, Inc.*,
   340 F.3d 1246 (11th Cir. 2003) ........................................................... 38, 39

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) .................................................................................. 16

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
   100 Fed. Appx. 296 (5th Cir. 2004) .................................................... 32, 33

*Rodney v. Northwest Airlines, Inc.*,
   146 Fed. Appx. 783 (6th Cir. 2005) ............................................. 17, 19, 32

*Stand Energy Corp. v. Columbia Gas Transmission Corp.*,
   2008 U.S. Dist. Lexis 63913 (S.D. W. Va. Aug. 19, 2008) ..................... 11

*Susman v. Lincoln Am. Corp.*,
   561 F.2d 86 (7th Cir. 1997) ............................................................... 38, 39

*Wolgin v. Magic Marker Corp.*,
   82 F.R.D. 168 (E.D. Pa. 1979) ................................................................. 40

## RULES

Fed. R. Civ. P. 23 ................................................................................... passim

Fed. R. Civ. P. 23(a)(2) .................................................................................. 39

Fed. R. Civ. P. 23(a)(3) ............................................................................ 38, 39

Fed. R. Civ. P. 23(a)(4) ............................................................................ 33, 34

Fed. R. Civ. P. 23(b)(3) .................................................................................. 29

I.    **THE THIRD CIRCUIT'S DECISION IN *HYDROGEN PEROXIDE* ESTABLISHES A STANDARD FOR CLASS CERTIFICATION THAT PLAINTIFFS HAVE NOT MET AND CANNOT MEET**

A.    **The Third Circuit Squarely Rejected Each Proposition That Plaintiffs Argued Should Govern Consideration Of Their Motion**

Plaintiffs, in their opening brief, laid out a legal standard for class certification that defendants have already demonstrated was incorrect. Plaintiffs asserted that they "need only make a threshold showing" that common issues will predominate. Memorandum in Support of Plaintiffs' Motion for Class Certification ("Pls.' Mem.") at 13. They argued that the mere "allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions," and that "predominance is a test that is 'readily met' in antitrust cases." *Id*. at 12-13. They further claimed that Rule 23 does "not permit [a district court] to credit Plaintiffs' evidence over Defendants' or vice versa." *Id*. at 6. Defendants, by contrast, argued that "[p]laintiffs must satisfy each element of Rule 23 by a preponderance of the evidence," which requires much more than a "threshold showing." Defendants' Corrected Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Defs.' Opp.") at 24. Defendants cited cases requiring that this Court "weigh the parties' competing evidence as to whether plaintiffs have a methodology that will establish all elements of their claims using common proof" and "resolve disputes regarding the significance of the evidence," including "choos[ing] between competing expert opinions." *Id*. at 24-25. Defendants also explained that there is no "presumption" in favor of class certification in antitrust cases. *Id*. at 25-27.

The Third Circuit's recent decision in *Hydrogen Peroxide* emphatically rejects plaintiffs' view of the law and confirms that defendants' articulation of the standard that this Court must apply in assessing plaintiffs' motion for class certification is correct. *In re Hydrogen Peroxide Antitrust Litig.*, No. 07-1689, 2008 U.S. App. Lexis 26871 (3d Cir. Dec. 30, 2008) ("*Hydrogen*

*Peroxide*").  There, plaintiffs alleged that makers of hydrogen peroxide engaged in a horizontal conspiracy to fix prices over an eleven-year period.  *Id.* at *7.  They moved to certify a class of direct purchasers of those chemicals.  *Id.*  In support of their motion, plaintiffs offered the opinion of Dr. Beyer, an economist.  Dr. Beyer opined that, if plaintiffs' conspiracy allegations were true, the structure of the market and the nature of the product was such that all buyers would have paid an overcharge.  Defendants offered the opinion of their own economist who demonstrated with empirical evidence that pricing in the hydrogen peroxide market did not operate as Dr. Beyer had opined.  *Id.*  The parties' experts "disagreed on the key disputed predominance issue—whether antitrust impact was capable of proof at trial through evidence common to the class."  *Id.* at *19.

The district court certified the class on the basis of Dr. Beyer's opinion.  *In re Hydrogen Peroxide Antitrust Litig.*, 240 F.R.D. 163 (E.D. Pa. 2007).  It held that the Third Circuit authority merely required plaintiffs to make a threshold showing that the element of impact will predominately involve generalized proof.  *Id.* at 174.  The district court declined to weigh the defendants' expert's opinion against that of plaintiffs' expert, and granted plaintiffs' certification motion on the ground that plaintiffs' expert's opinion was sufficient to establish the predominance of common issues.  *Id.* at 171.  The court specifically declined to follow the Second Circuit's opinion in *In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006) ("*IPO*"), that required such a weighing of expert opinions.  *Id.* at 170, & n.6.

On appeal, the Third Circuit vacated the district court's class certification order and remanded the case, holding that the district court's analysis "reflect[ed] application of incorrect standards."  *Hydrogen Peroxide*, 2008 U.S. App. Lexis 26871, at *50, *59-60.  The Third Circuit explained that, on a motion for class certification, antitrust plaintiffs may not rest merely on a

"threshold showing," but rather must establish by a preponderance of the evidence that each Rule 23 factor is satisfied. *Id*. at *3. This standard requires a district court to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Id*. In other words, "to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *Id*. at *44-45. A district court's obligation to resolve all factual and legal disputes extends to disputes between the parties' experts that touch on such issues: "Resolving expert disputes in order to determine whether a class certification requirement has been met is always a task for the court," and the court must make findings regarding "all relevant evidence and arguments, including relevant expert testimony of the parties." *Id*. at *55-56, *59. The Court of Appeals specifically embraced the Second Circuit's *IPO* decision as "consistent with a proper application of this Circuit's standards." *Id*. at *55 n. 24. Finally, a party moving for certification receives no "deference or a presumption in its favor." *Id*. at *47.

The Third Circuit's decision in *Hydrogen Peroxide* thus pulled the plug on plaintiffs' entire legal framework and confirmed that defendants' articulation of the legal standard is correct. Plaintiffs are wrong to think that they need to make only a "threshold showing"; they are wrong to argue that this Court should not resolve the competing expert opinions; they are wrong to claim that plaintiffs need not establish each Rule 23 element by a preponderance of the evidence; and they are wrong to rely on "presumptions" and "assumptions" that this Court should grant class certification merely because this is an antitrust case. On each and every aspect of the governing legal standard, *Hydrogen Peroxide* establishes that plaintiffs' legal arguments are wrong, and that their submissions are insufficient as a matter of law.

**B.**   **Plaintiffs Cannot Avoid The Third Circuit's Total Rejection Of Their Position By Misstating The Holdings Of *Hydrogen Peroxide***

Despite the clarity that *Hydrogen Peroxide* imparted to Third Circuit class certification standards, plaintiffs attempt to save their motion by misrepresenting the *Hydrogen Peroxide* opinion in their reply.

**1.**   ***Hydrogen Peroxide* Requires A District Court To Weigh All Evidence Relevant To The Rule 23 Analysis And To Resolve Any Conflicts**

Plaintiffs claim that the required "rigorous analysis does not permit the court to credit Plaintiffs' evidence over Defendants' or vice versa." Reply in Support of Plaintiffs' Motion For Class Certification ("Pls.' Reply") at 5 (quotation omitted). That argument cannot be squared with *Hydrogen Peroxide*. The Third Circuit made clear in *Hydrogen Peroxide* that "a district court exercising proper discretion in deciding whether to certify a class will resolve factual disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is met or is not met." *Hydrogen Peroxide*, 2008 U.S. App. Lexis 26871, at *45-46. The court held that "because each requirement of Rule 23 must be met, a district court errs as a matter of law when it fails to resolve a genuine legal or factual dispute relevant to determining the requirements." *Id.* at *44. There is no way for the Court to perform those tasks without weighing plaintiffs' evidence against defendants' evidence.

In support of their contrary position, plaintiffs rely on *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 03-MDL-1556, 2007 U.S. Dist. Lexis 85466 (M.D. Pa. Nov. 19, 2007), a district court opinion that predates *Hydrogen Peroxide* and is no longer good law. Indeed, the district court in *Pressure Sensitive Labelstock* expressly declined to follow the Second Circuit's decision in *IPO*, and refused to consider the evidence of defendants' expert in reaching its decision. *Id.* at *28-29, *54 ("The parties have presented a classic 'battle of the experts,' which need not and will not be resolved at the class certification stage. It suffices at this point that there

is a factual basis for [plaintiffs' expert's] analysis.").  The Third Circuit's *Hydrogen Peroxide* opinion, however, embraced *IPO* as consistent with the Third Circuit's standards.  *Hydrogen Peroxide*, 2008 U.S. App. Lexis 26871, at *55 n.24.  *Pressure Sensitive Labelstock* therefore is no longer an accurate statement of Third Circuit law.[1]

> ### 2.    *Hydrogen Peroxide* Holds That A District Court May Not Merely "Consider" The Parties' Expert Opinions But Also It Must Weigh The Opinions And Choose Between Them

Plaintiffs contend in their reply brief that this Court need not weigh the parties' expert opinions and resolve conflicts between them.  Pls.' Reply 1, 4.  Instead, plaintiffs argue that, under *Hydrogen Peroxide*, "the Court merely has to demonstrate that the expert's testimony had been considered in [] making a determination."  *Id*. at 1.  *Hydrogen Peroxide* holds unequivocally, however, that Rule 23 requires far more than mere "consideration" of expert opinions.  It requires the Court to resolve all relevant expert disputes.  2008 U.S. App. Lexis 26871, at *52-59.  The Third Circuit explained that "resolving expert disputes … is *always* a task for the court—no matter whether a dispute might appear to implicate the 'credibility' of one or more experts."  *Id*. at *55-56 (emphasis added).  *Hydrogen Peroxide* requires a district court to (1) consider all evidence relevant to the Rule 23 requirements, (2) resolve any evidentiary disputes, and (3) make specific findings by a preponderance of the evidence as to whether each Rule 23 element is satisfied.  *Id*. at *3.  The necessary implication of those requirements is that, if the parties' expert opinions conflict on issues relevant to the class certification decision, then this Court must decide between the parties' competing expert opinions in fulfilling its duty under *Hydrogen Peroxide*.  *Id*. at *55-56.

---

[1]    The defendants in *Pressure Sensitive Labelstock* have moved to decertify the class.  *See* Dkt. Nos. 432-433 in No. 3:03-MDL-1556 (M.D. Pa.).

Plaintiffs also claim that this Court need not resolve conflicts between the expert opinions in this case, relying on a quote from *Hydrogen Peroxide* that states, "That weighing expert opinions is proper does not make it necessary in every case or unlimited in scope."  Pls.' Reply 4 (quoting *Hydrogen Peroxide*, 2008 U.S. App. Lexis 26871, at *56).  Plaintiffs miss the point. The Third Circuit specifically held that a district court "may not decline to resolve a genuine legal or factual dispute. … Genuine disputes with respect to the Rule 23 requirements must be resolved, after considering all relevant evidence submitted by the parties."  2008 U.S. App. Lexis 26871, at *57.  Here, there is a direct conflict between the experts that goes to the core of the class certification requirements, and this Court therefore "may not decline to resolve" that conflict.  *Id.*

> **3.**    ***Hydrogen Peroxide* Holds That A District Court Must Resolve All Relevant Factual And Legal Disputes, Regardless Of Any Overlap With The Merits Of Plaintiffs' Case**

Plaintiffs misstate defendants' position as arguing that "this Court must resolve every merits-related question … at this juncture" and "must make a wholesale choice between Plaintiffs' expert and Defendants' expert on every issue regardless of its Rule 23 connection." Pls.' Reply 3, 8.  That is not defendants' position, and plaintiffs conveniently provide no citation to support their mischaracterization.  Rather, what defendants argue, and what *Hydrogen Peroxide* holds, is that "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action."  2008 U.S. App. Lexis 26871, at *3.  The Third Circuit made it clear that "an overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met."  2008 U.S. App. Lexis 26871, at *32-33.  This means that plaintiffs must "have a methodology to establish each of the[] four elements [of their claim] using common

proof, and 'establish by a preponderance of the evidence' that the common issues will predominate under Rule 23(b)(3)." Defs' Opp. 24, 27.

### 4. *Hydrogen Peroxide* Rejects Any Presumption In Favor Of Class Certification In Antitrust Cases

Finally, plaintiffs' continued insistence that they are entitled to a presumption in favor of class certification because this case involves antitrust claims is directly rejected in *Hydrogen Peroxide*. *See* Pls.' Reply 22 ("predominance is a test that is 'readily met' in antitrust cases"). The Third Circuit held in no uncertain terms in *Hydrogen Peroxide* that a district court cannot "relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims [involve violations of the antitrust laws]." 2008 U.S. App. Lexis 26871, at *49. The court held that "actual, not presumed, conformance with the Rule 23 requirements remains necessary," and that a district court "should not suppress 'doubt' as to whether a Rule 23 requirement is met—no matter the area of substantive law." *Id*. at *48-50. In an antitrust case, just as in any other case, a court must resolve all genuine legal and factual disputes relevant to the requirements of Rule 23 and make corresponding findings by a preponderance of the evidence. *Id*. at *44-45.

### 5. *American Seed* Does Not Support Plaintiffs' Position

Plaintiffs, apparently recognizing the significant challenge that the *Hydrogen Peroxide* standard makes for them, spend a considerable amount of their brief arguing that this Court should accept Dr. Comanor's opinion because he did the types of analyses that another district court found wanting in denying certification of a class. *See Am. Seed Co., Inc. v. Monsanto Co.*, 238 F.R.D. 394, 400-01 (D.Del. 2006). Plaintiffs argue that, in affirming the denial of class certification there, "the Third Circuit quoted with approval the district court's review of the types of evidence and analysis required to meet Rule 23 and how the plaintiff class failed to submit

that evidence." Reply 30. Plaintiffs claim that this Court should certify the class because they have presented the evidence here that was missing in *American Seed*.

First, it is important to understand the Third Circuit's holding in *American Seed*. There, plaintiffs argued that they were entitled to a presumption of impact under *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977). The district court decided, based on the Third Circuit's later opinion in *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002), that "[t]he *Bogosian* presumption of impact does not support class certification where there is no additional evidence of class-wide impact." *Am. Seed*, 238 F.R.D. at 398. The district court then detailed the complete absence of factual support in plaintiffs' expert's opinion as a basis for its conclusion that plaintiffs had failed to satisfy *Linerboard*.[2]

The Third Circuit, in an unpublished "Not Precedential Opinion Under Third Circuit Rule 5.7," affirmed. *Am. Seed Co. v. Monsanto Co.*, 2008 U.S. App. Lexis 6963 (3d Cir. Apr. 1, 2008). The court of appeals held that the transcript of the class certification hearing revealed that plaintiffs believed, as a matter of law, that they could establish that common issues predominated based solely on a presumption of impact. It found that the district court did not abuse its discretion in reaching the conclusion to deny plaintiffs' motion on that basis. *Id.* at *10. However, the court went on to note that "because this alone warranted denial of certification, we need not address the District Court's other reasons in support of its holding." *Id.* at *11 n.2. Thus, *American Seed* does not establish a standard of the evidence that would be sufficient to support class certification in this Circuit.

---

[2] The Third Circuit in *Hydrogen Peroxide* distinguished the standard set out in *Linerboard* on the ground that *Linerboard* did not involve a set of competing expert opinions. *Hydrogen Peroxide*, 2008 U.S. App. Lexis 26871, at *58-60.

In summary, *Hydrogen Peroxide* confirms defendants' articulation of the standard that this Court must employ in considering plaintiffs' class certification motion.  Under that standard, plaintiffs fail to establish by a preponderance of the evidence that they will use common proof to establish all elements of their claim.

## II.     PLAINTIFFS' REPLY FAILS TO ESTABLISH THAT COMMON ISSUES WILL PREDOMINATE UNDER THE *HYDROGEN PEROXIDE* TEST

### A.     Plaintiffs' Reply Does Not Help Them Establish That Common Issues Predominate With Respect To The Conspiracies That They Allege Even If The Question Is Considered With Respect To Six Separate Classes

Plaintiffs moved only for a single, combined class of "all persons nationwide who purchased products manufactured or distributed" by the manufacturer defendants from BRU.  Pls.' Motion at 1.  Defendants' opposition brief demonstrated that plaintiffs could not articulate a method of common proof that would establish any of the elements of their claim as to such a broad class.

In a complete about-face, plaintiffs' reply brief does not attempt to defend their initial argument that the one large class that they had sought to certify could employ common proof to establish the six separate conspiracies that they allege.[3]  Instead, they now argue that the Court should certify six separate classes, each defined as the consumers who bought the products of each defendant from BRU.[4]  Pls.' Reply 25.  Plaintiffs' silence about their broader class constitutes an implicit concession that it fails.  But, in any event, they still have not articulated how they will prove each conspiracy with proof common to the classes of buyers of all products

---

[3]   Plaintiffs also do not address defendants' argument that plaintiffs have not articulated a method of proving impact to members of the broad classes they sought to certify, or an adverse effect on each relevant market involved.  *See* Defs' Opp. 32-48.

[4]   Plaintiffs never moved for separate classes.  *See* Pls.' Motion for Class Certification 1.  Rather, they merely suggested six subclasses "if the Court determines that Subclasses … are necessary."  Pls.' Mem. 2.

from each supplier defendant.  They make a cursory suggestion that, so long as they rely on separate subclasses, defendants' argument that plaintiffs cannot prove the individual conspiracies using common proof "is resolved."  Pls.' Reply 25.  But this is wrong.

The six separate classes that plaintiffs now seek to certify encompass consumers who purchased any of the products of a particular defendant manufacturer or distributor from BRU. These six separate classes create their own set of problems for plaintiffs, because plaintiffs cannot use evidence common to any class to prove their claims.  For example, Medela's price policy applied only to certain models in its Pump in Style line of breast pumps.  Proof of a conspiracy between BRU and Medela to implement that price policy is not proof common to consumers who purchased different Medela products not subject to that policy.  Similarly, Britax's policy for many years applied only to its Roundabout model car seat.  Proof of a conspiracy to implement a policy on the Roundabout car seat is not evidence that would be common to purchasers of other Britax models, or different products altogether such as Britax strollers.  The class of consumers who bought Peg Perego products from BRU includes consumers who purchased products that had price policies, such as strollers, as well as consumers who purchased toys, which were not subject to any price policy.  Certification of such a class on the basis of evidence of a conspiracy regarding strollers would not establish that consumers who purchased toys (which are in a different market) would be entitled to damages because of any conspiracy as to those products.

Plaintiffs attempt to distinguish *Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir. 1978), on the ground that that case involved separate alleged conspiracies; they claim that if the court certifies the defendant-specific classes that they "suggest," *Blue Bird* would not apply. Pls.' Reply 26.  But the point of *Blue Bird* is that the court rejected the notion that common

issues would predominate because, although the plaintiffs invoked the term "conspiracy," they in fact had alleged multiple separate conspiracies.  Here, even plaintiffs' proposed defendant-specific classes would require proof of multiple separate conspiracies.  Similarly, plaintiffs argue that *Kendler v. Federated Dep't Stores, Inc.*, 88 F.R.D. 688 (S.D.N.Y. 1981), is distinguishable, but they succeed only in showing that *Kendler* is different in scope, not in kind.  *Kendler* involved alleged vertical conspiracies between suppliers and thousands of buyers.  Perhaps the scale of *Kendler* is even more egregious than the problem here, but the point remains the same, that separate alleged conspiracies require separate proof.

Finally, plaintiffs' effort to distinguish *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 2008 U.S. Dist. Lexis 63913 (S.D. W. Va. Aug. 19, 2008), is unavailing.  Plaintiffs argue that the problem in *Stand Energy* was that the plaintiffs could not trace their injury to a particular defendant.  Pls.' Reply 28.  But the district court did not rest on that finding.  Rather, it went on to hold that when plaintiffs allege that "various defendants enter into separate agreements with a common defendant" then "each of the vertical conspiracies is a separate conspiracy and each must be demonstrated to result in an unreasonable restraint on trade."  2008 U.S. Dist. Lexis 63913, at *48, *52-53 (quotation omitted).  The court denied class certification because plaintiffs' "proof must show how each conspiracy resulted in injury to competition."  *Id*. at *53.  This means that plaintiffs here must offer a methodology using common evidence to prove a conspiracy as to each product, and prove how each conspiracy harmed competition in a relevant market.  This they cannot do.  Just as the plaintiffs in this case attempt to blur the problem by making broad proclamations such as that "the price-fixing scheme was effected nationwide," Pls.' Reply 26, the court in *Stand Energy* rejected that argument because "this is a

cumulative effect, not an analysis of the individual effect of each conspiracy on the market." 2008 U.S. Dist. Lexis 63913, at *54.

The Third Circuit has already applied its *Hydrogen Peroxide* decision in similar circumstances and vacated a decision that had certified six separate classes.  *In re Plastics Additives Antitrust Litig.*, Nos. 07-2159, 07-2418, 2009 U.S. App. Lexis 2177 (3d Cir. Jan. 27, 2009).  In that case, purchasers of plastics additives alleged that the defendants, manufacturers of six distinct varieties of plastics additive chemicals, had engaged in a horizontal price-fixing conspiracy.  *In re Plastics Additives Antitrust Litig.*, No. 03-2038, 2006 U.S. Dist. Lexis 69105, at *5 (E.D. Pa. Sep. 1, 2006).  The district court declined to certify a single class consisting of all purchasers of plastics additives because the six varieties of chemicals were non-interchangeable and no defendant sold products in each segment.  *Id.* at *21-23.  However, the district court certified six separate classes, despite defendants' expert's demonstration that plaintiffs' expert's theory was contradicted by actual pricing in the industry even within the segments.  *Id.* at *38-40 & n.6.  The Third Circuit summarily vacated the certification of separate classes in light of *Hydrogen Peroxide*.  This Court similarly cannot certify even plaintiffs' six separate classes consistent with the *Hydrogen Peroxide* standard on the issue of conspiracy.

**B.**     **Plaintiffs' Reply Brief Does Not Demonstrate, By A Preponderance of The Evidence, That They Have A Methodology That Will Use Common Proof To Show Class-Wide Impact**

   **1.**     **Dr. Comanor's Rebuttal Opinion Does Not Identify An Economic Method Of Proving That BRU Instigated The Other Defendants' Price Policies, The Essential Predicate Of His Opinion On Class-Wide Impact**

Dr. Comanor's opinion in his opening report that impact would be class-wide was based on his repeated assertion that he was asked to assume the truth of plaintiffs' proffer that BRU

induced each other defendant's price policy, Comanor Tr. (A-3584-86; A-3592),[5] and his insistence, as a matter of his personal economic theory, that "distributor induced" resale price maintenance has only anticompetitive effects. *Id*. (A-3677-78). In Dr. Comanor's mind, this stratagem permitted him to presume harm to competition and to avoid articulating a methodology that would take into account the procompetitive effects of defendants' pricing policies that vary by class member. *But see* Myslinki Decl. ¶ 110 (A-45-46) (citing testimony of consumer plaintiffs some of whom valued gift registries, others who valued return policies, and still others who valued breadth of product selection). However, even Dr. Comanor agreed that consumers may value BRU services differently. At his second deposition, Dr. Comanor conceded that some consumers value BRU and would continue to shop there and pay a higher price even if internet retailers were free to discount. Comanor Tr. (SA-200-201).

But, despite having placed such emphasis on the relationship between the instigator of the price policies and their necessary impact, Dr. Comanor neither identified nor performed any economic analysis that would use common proof to establish that BRU had instigated each price policy, a necessary predicate of his opinion. Instead, he assumed such facts on the basis of the plaintiffs' proffer of evidence, which he was asked to accept. Thus, like the expert in *American Seed*, he had effectively presumed class-wide impact, a presumption clearly insufficient to support class certification even before *Hydrogen Peroxide*.

Dr. Comanor's rebuttal attempts to address this fatal deficiency in his opening submission, but he again fails. This time, he reviewed evidence that he had received from plaintiffs' lawyers that, he said, gave him the necessary predicate to conclude that BRU

---

[5]   Citations to A- refer to the Appendix filed with defendants' opposition brief. Citations to SA- refer to the Sur-reply Appendix filed with this brief.

instigated each price policy of each other defendant.[6]  Comanor Tr. (SA-71).  He described this

exercise as a "factual exploration more than it is one which bases on the underlying economics."

*Id*. (SA-75).  But reviewing factual evidence and coming to conclusions about coercion is exactly

what a jury will do; Dr. Comanor's role is to identify an economic methodology that he will use

to aid the jury in that determination, not to recite documentary evidence and tell the jury how to

think about it.  *See, e.g., City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 565, 567 n.27

(11th Cir. 1999) (excluding experts' opinions as to inferences to be drawn from documentary

evidence); *Jamsports & Entertainment, LLC v. Paradama Productions, Inc.*, No. 02-C-2298,

2005 WL 14917, at *10 (N.D. Ill. Jan. 3, 2005) (same) ("There is nothing in [the economic

expert's] expertise that suggests that he is any more competent than the average juror in

interpreting these communications or in divining from them the intent of [defendant] and

others.").

Dr. Comanor admits that he did not identify any objective test that he had applied to the

facts to support his conclusion that BRU instigated the price policies.  Comanor Tr. (SA-70).  He

could not articulate an economic test that he had used to reach his preliminary conclusion.  *Id*.

(SA-76-79).  He agreed that the necessary implication of his preliminary conclusion that BRU

had coerced each other defendant to adopt price policies was that it was not in the manufacturer's

self-interest to do so, *id*. (SA-77), and admitted that there are tests that an economist could

employ to reach this conclusion.  *Id*. (SA-115).  But, while he agreed that the appropriate

---

[6]   Dr. Comanor could not recall how he had gone about getting this evidence or how he
selected what to use.  Comanor Tr. (SA-70).  However, the statements about the evidence
that he makes in the report, when compared to the evidence he cites in support, do not
remotely support his factual conclusion that BRU had anything to do with instigating these
policies.  For example, several witnesses emphatically testified that BRU had nothing to do
with their price policies, yet Dr. Comanor refused even to consider such evidence.  *See* Oaks
Tr. (SA-366-370); Moore Tr. (A-4157-59).

methodology that an economist would use to test whether resale price maintenance was in a manufacturer's self-interest (and therefore not coerced by a dominant retailer) was its effect on quantities sold, Comanor Tr. (SA-108-110), he had not attempted to define the parameters of an output study, *id.* (SA-187), and admitted that he "did not know" how he would do one. *Id.* (SA-115).

For example, Dr. Comanor did not explain what method he would use to project what a given manufacturer's sales would have been in the absence of unlawful RPM. Myslinski Reply Decl. ¶ 54 (SA-25). He did not opine whether it would be appropriate to test this proposition model by model, or for aggregate product lines, by units or dollars, or how he would control for all other market factors. Comanor Tr. (SA-187, SA-109-110). He admitted that he had no method to address this central question, and that he might not ever be able to do such a test. Comanor Tr. (SA- 469, SA-109-110).

In contrast, Dr. Myslinski has concluded that the statistical evidence is actually consistent with defendants adopting a resale price policy as a procompetitive business strategy. Myslinski Reply Decl. ¶¶ 51, 55 (SA-22, SA-25). Each defendant supplier experienced dramatic sales growth at BRU during the time in which they had resale price maintenance policies as to some or all of their products. *Id.* ¶ 55 (SA-25).

Plaintiffs thus have not proposed any methodology that will use common proof to establish the essential predicate of Dr. Comanor's impact opinion, and their motion fails on this basis alone.

### 2. Dr. Comanor's Theory That Distributor-Instigated Resale Price Maintenance Has Only Anticompetitive Effects Is Inconsistent With Supreme Court Precedent And Mainstream Economic Thought

Recognizing the critical importance of his theory that distributor-induced resale price maintenance has only anticompetitive effects to his opinion that impact would be class-wide, Dr.

Comanor spends considerable space in his rebuttal report arguing that Dr. Myslinski is wrong that there is no support in economics for Dr. Comanor's extreme view. Comanor Rebuttal ¶¶ 12-26. But none of the articles that Dr. Comanor discusses address the issue that he is studying, *i.e.*, the question whether an allegedly dominant retailer's desire for resale price maintenance produces only anticompetitive effects. At his deposition, Dr. Comanor attempted to support his theory by arguing that the economic literature does not contain "any arguments that RPM, when instigated by a distributor, has procompetitive justifications." Comanor Tr. (SA-71-72). He described the evidence in this case as fitting this model because it supposedly shows that manufacturers adopted their price policies "in response to complaints from [their] primary distributor" and therefore resulted in only anticompetitive effects. Comanor Tr. (SA-229-230).

First, Dr. Comanor's theory that a manufacturer's adoption of a price policy is anticompetitive when it acts in response to distributor complaints is flatly inconsistent with the Supreme Court's central holdings in *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984), and *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 127 S. Ct. 2705 (2007). In *Monsanto*, a jury had concluded that Monsanto conspired to impose resale price maintenance and terminated a discounting retailer on the basis of complaints it had received from its full price distributors. The Court held that "[p]ermitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct." 465 U.S. at 763. The Court thus overturned the jury verdict, holding that evidence showing that a supplier acted in response to distributor complaints was not evidence from which a jury can infer conspiracy. *Id*. at 763-64. In *Leegin*, the Supreme Court held that "it is essentially undisputed that minimum [RPM] can have procompetitive effects," and held that courts must weigh all effects under the rule of reason.

127 S. Ct. at 2714-15, 2718 (quotations omitted).  Dr. Comanor's view that only anticompetitive effects would flow from a manufacturer's adoption of resale price maintenance in response to complaints from BRU cannot be squared with these precedents and so cannot support class certification.

Moreover, Dr. Comanor's assertion that the economic literature does not contain arguments that RPM when instigated by a distributor has any procompetitive justifications is incorrect.   To the contrary, the economic literature contains substantial rejection of Dr. Comanor's views, and substantial discussion of the concept that the source of the restraint is not dispositive in assessing its competitive effects.  Myslinski Reply Decl. ¶¶ 32-42 (SA-13-19).  A certification of the class here based on of the view that plaintiffs do not have to propose a method that will balance the procompetitive and anticompetitive effects of the price policies on members of the classes is not supportable either in law or economics.

Plaintiffs' argument that it is defendants who must articulate a methodology for providing procompetitive effects on this Motion, Pls.' Reply 41, 48, is flat wrong.  Whatever the ultimate burden of proof of procompetitive effects, plaintiffs, as class certification movants, must establish that common issues will predominate at a trial.  That burden includes the obligation to establish that individual issues presented by defendants' defenses will not outweigh the common issues.  *See Rodney v. Northwest Airlines, Inc.*, 146 Fed. Appx. 783, 788-89 (6th Cir. 2005) (plaintiff must show that common issues will predominate in light of both plaintiff's case-in-chief and defendants' likely rebuttal evidence); *In re Hotel Telephone Charges*, 500 F.2d 86, 89 (9th Cir. 1974) (denying class certification because defendants' evidence would compel individual determinations); *Chestnut Fleet Rentals Inc. v. Hertz Corp.*, 72 F.R.D. 541, 548 (E.D. Pa. 1976) (denying class certification because defenses that defendants would likely assert at trial

would require individualized analysis); *In re Transit Co. Tire Antitrust Litig.*, 67 F.R.D. 59, 73

(W.D. Mo. 1975) (same).

### 3. Dr. Comanor's Statistical Exercises Do Not Constitute A Plausible Method Of Proving His Theory

In an attempt to factually demonstrate that BRU is a "dominant distributor" with power to

coerce each supplier—the essential predicate to his theory that plaintiffs can show impact using

common proof—Dr. Comanor did some minimal statistical work in his rebuttal report. First, he

measured BRU's share of four of the manufacturer defendants' sales. *See* Comanor Rebuttal,

Apx. A. From this exercise he concluded that "this evidence clearly indicates that BRU is the

dominant distributor of all the leading products sold by these manufacturers/suppliers."

Comanor Rebuttal ¶ 36. However, this exercise does not establish BRU's market dominance.

Myslinski Reply Decl. ¶¶ 47-52 (SA-21-24). BRU is only the third largest retailer of baby

products in the United States. *Id*. ¶ 48 (SA-21). Indeed, the largest retailer of baby products in

the U.S., Wal-Mart, is also Peg Perego's largest customer, *id*. ¶ 49 (SA-21-22), and thus it cannot

be coincidental that Dr. Comanor failed to report any data regarding Peg Perego in his effort to

show BRU's "dominance."

In any event, Dr. Comanor does not explain what constitutes "dominance" in the context

of his argument. In 2000, for example, BRU accounted for only 19.6 percent of Medela's breast

pump sales. Myslinski Reply Decl. ¶ 50 (SA-22). Dr. Comanor does not explain how BRU

wielded dominance over Medela when 4 out of 5 sales dollars came from retailers other than

BRU. *Id*.[7]

---

[7] Dr. Comanor also sought to measure whether Target was a reasonably substitutable retailer for BRU (apparently in an attempt to suggest that Target would not be a viable alternative for defendants not willing to give in to BRU's supposed demands for resale price maintenance policies). But his own study establishes that BRU and Target sold the exact same products

But the more fundamental problem with Dr. Comanor's exercise is that it does not establish anything about BRU's dominance in any relevant market. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 n.20 (4th Cir. 2002) (showing that a defendant is "among the largest distributors of Microsoft's products … says nothing of a firm's ability to affect competition in that market."). Dr. Comanor admits that he has not identified or analyzed the many other manufacturers of baby products, nor the many other retailers of baby products. Comanor Tr. (SA-145-148). His analysis of the shares of six particular manufacturers is not at all equivalent to an analysis of broader market shares. *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("plaintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of a *relevant product market*, of the alleged monopolist's dominant share *of that market*, and of high barriers to entry" (emphasis added)). Because Dr. Comanor's work is completely untethered to any relevant market, his analysis says literally nothing that would support his conclusion that BRU is a dominant distributor in a relevant market regardless of the significance (or lack thereof) of such a finding.[8]

### 4. Dr. Comanor Has Not Proposed Any Reliable Method That Would Establish That BRU Would Uniformly Lower Its Prices In The Absence Of The Alleged Conspiracies

Dr. Comanor's view that BRU would lower its prices in all cases in the absence of resale price maintenance, and therefore that all class members necessarily suffered impact, was based, in his first report, on pure theory and several assumptions: (1) without resale price maintenance, vendors would sell to internet retailers in unlimited quantities; (2) internet retailers would have

---

and bought them at the same wholesale price. The difference in their weighted average prices merely reflects a different sales mix of those products. *See* Myslinski Reply Decl. ¶ 52, & n.54 (SA-23-24).

discounted defendants' products all the time; and (3) BRU would have dropped all its prices to avoid losing business to the internet sellers. Defs.' Opp. 37-42. A necessary corollary of his theory is that if BRU refused to lower its prices in the "but for" world, consumers would shift all of their purchases to other retailers.

Dr. Comanor's theory that all prices would converge to a single, discounted price is questionable even in the case of highly fungible commodity goods, but it is wholly implausible with respect to the products in this case. Many of defendants' products are big-ticket items, purchased infrequently. Consumers demonstrate that they are interested in a wide variety of accompanying services such as viewing arrays of products on the shelf, touching and feeling the products, and asking questions of store personnel, and they are willing to pay for such services. Myslinski Decl. ¶¶ 112, 102 (A-46-47, A-42). Buying a car seat or a stroller is not like buying sugar, for which a consumer typically pays little attention to features and quality. Rather, purchasers of the manufacturer defendants' products are making a significant expenditure, and they value retail services in individual degrees not capable of generalization. *Id.* ¶¶ 97, 112 (A-40, A-46-47). Dr. Comanor is taking a theory that is more applicable to purchases of bar soap and applying it to a market more like the sales of automobiles and electronic equipment.

One example of evidence that purchasers of baby products value services in different amounts is that prices in the absence of RPM policies do not, in fact, converge, but instead vary to reflect retailers' widely differing provision of services. Dr. Comanor did no statistical work to demonstrate the application of this theory to this case. Dr. Myslinski showed, however, that in three real-world situations where there was no resale price maintenance in effect, BRU did not

---

8   Indeed, Dr. Comanor has not defined a relevant market at all, which provides yet another basis to deny class certification. *See Rodney*, 146 Fed. Appx. at 788-89 ("Rodney's failure to properly define the relevant market also weighs against finding that certification is proper.").

lower its price despite the fact that internet retailers sold those same products for prices substantially lower than BRU's prices, and class members continued to buy from BRU at full manufacturers' suggested resale price. Myslinski Decl. ¶¶ 151-163 (A-63-68).[9] This evidence refutes Dr. Comanor's theory that BRU would lower its prices in the absence of resale price maintenance policies and that, if it did not, consumers would cease purchasing from BRU and instead buy from internet sellers.

In rebuttal, Dr. Comanor attempts to dismiss these real-world examples on the ground that they involved periods of temporary relaxation of the manufacturer's policy. Comanor Tr. (SA-175, SA-184, SA-279). Dr. Comanor is totally wrong. Each of Dr. Myslinski's three examples is probative on this point. *See* Myslinski Reply Decl. ¶ 23 (SA-8). The Medela example involves a product on which there has been no price policy in effect since 2002, and thus clearly was not "temporary." Myslinski Decl. ¶ 55 (A-21-22). Similarly, the BabyBjorn example involves an analysis of pricing at the time when Baby Swede was BabyBjorn's distributor, and Baby Swede to this day does not employ resale price maintenance.[10] Finally, the Britax example involves years in which even the internet retailer plaintiffs freely admitted that Britax did not enforce any price policy. Myslinski Reply Decl. ¶ 23 (SA-8). Plaintiffs' rank speculation that defendants may have been secretly enforcing price policies during these periods, or employing them even if they were not written down, Pls.' Reply 47, smacks of desperation.

---

[9]  Plaintiffs' claim that Dr. Myslinski did no statistical work, Pls.' Reply 33, 35 n.29, is nonsense. Dr. Myslinski analyzed BRU pricing data as well as data from internet retailers in reaching his conclusion that Dr. Comanor's assumption that BRU would uniformly lower its prices in the absence of resale price maintenance policies is inconsistent with market realities. Myslinski Decl., Apx. 3.

[10]  The retailer plaintiffs conceded that they were free to discount BabyBjorn products after Baby Swede became the distributor. *See* Maniar Tr. 284:15-19; 299:10-20; Weiss Tr. 310:11-14; 367:5-13; Kiefer Tr. 291:5-12.

Their "theory" is neither embraced by Dr. Comanor nor supported by any citation to any evidence and thus does not rebut Dr. Myslinski's evidence.

Dr. Comanor's attempt to demonstrate that BRU's prices were uniform to assist with his impact theory is fatally flawed.  His study compares average prices for certain products for a given week across the geographic areas in which BRU divides the country.  Comanor Rebuttal ¶¶ 41-44.  He reports that a high percentage of the weekly average prices for BRU's reporting areas were within 5 or 10 percent of the average price for the 16 reporting areas for the given week.  He concludes that these data show a "striking degree" of price uniformity across BRU distribution regions.  *Id.* ¶ 44.  This finding is critical to his attempt to demonstrate that there is a plausible method of showing class-wide impact because "so long as most buyers pay the same prices, these expected effects [higher prices] will be present on a class-wide basis."  Comanor Rebuttal ¶ 4; *see also* Comanor Tr. (SA-149).

Dr. Comanor's study is not a reliable method of predicting BRU pricing strategy in the absence of minimum resale price maintenance policies.  First, Dr. Comanor's analysis suffers from several conceptual defects.  Dr. Comanor looked at prices when RPM policies were in effect, but measuring prices when RPM policies are present does not say anything about BRU's "but for" prices in the absence of RPM.  Myslinski Reply Decl. ¶¶ 71-72 (SA-38-39).  Dr. Comanor provides nothing but his own ipse dixit to conclude that in the absence of such policies, prices would be lower but not "less uniform."  Comanor Tr. (SA-150).  In addition, Dr. Comanor looked only at geographic price dispersion, and did not attempt to consider dispersion over time.  Myslinski Reply Decl. ¶ 73 (SA-39).  Thus, if BRU's prices varied between January and February of a year, Dr. Comanor would still report zero price variance because he does not evaluate prices over time.  *Id.*  Moreover, Dr. Comanor only measured price variances across

average BRU area prices, and thus he does not measure price variance among individual BRU consumers. *Id*. ¶ 74 (SA-39). Dr. Comanor simply is not measuring anything that would bear on BRU's "but for" pricing.

Second, Dr. Myslinski shows that Dr. Comanor committed several statistical errors that render his study useless. Because Dr. Comanor does not weight the price data by volume, and because he calculates the price variance from the average price rather than from MSRP, his study presents highly distorted results. Myslinski Reply Decl. ¶ 75 (SA-40). Dr. Myslinski illustrates the effect of these choices:

> [Dr. Comanor] looked at the average price paid for a particular product in each of the 16 BRU reported areas, calculated the simple average of the 16 average prices and then measured the variance of each of the area averages from the overall average. For example, suppose that the average price paid for Stroller X in areas 1 through 15 was $100 and $80 in area 16. The simple average price would be $98.75 [$1580/16]. By Dr. Comanor's method of measuring price uniformity, 94 percent of customers were within 2 percent of the average, and so he would conclude there was a high degree of uniformity. But now let's suppose that there were 50 sales in each of the areas 1 through 15 at $100 and 500 sales in area 16 at $80 and we calculated a weighted average instead of a simple average of the 16 areas. Then the average price would be $92. By calculating the weighted average, the price variance results change dramatically-100 percent of the customers paid a price more than 5 percent from the average and 40 percent of the buyers paid a price more than 10 percent from the average.

*Id*.

Dr. Myslinski similarly explains that Dr. Comanor's results are meaningless because he calculated deviations from the average price, rather than from the MSRP. Dr. Myslinski shows that, by averaging the prices together, Dr. Comanor distorts the results towards reducing price dispersion. Myslinski Reply Decl. ¶ 76 (SA-40). Dr. Comanor's error of relying on averages allows him to claim that the data show little price dispersion, when in fact the data are consistent with substantial price dispersion. *Id*. "By using the average, Dr. Comanor's results can shed no light on how much price variability there was in BRU sales." *Id*.

Finally, even accepting Dr. Comanor's results, Dr. Comanor himself actually offered no explanation of whether his results are significant or not. When asked at his deposition what level of price uniformity provides an appropriate statistical standard, Dr. Comanor could not provide an answer. Comanor Tr. (SA-168). As Dr. Myslinski explains, Dr. Comanor's study shows that his version of price "uniformity" for BabyBjorn Original carriers shows just 66 percent of observations within 5 percent of the weekly average. Myslinski Reply Decl. ¶¶ 77-79 (SA-41-42). Either such wide price dispersion means that those products fall outside Dr. Comanor's assumptions about class-wide impact, or he is making a "dubious" assumption that price dispersion for 34 percent of buyers is somehow minor and does not undermine his theory. *Id.* ¶ 79 (SA-41-42). Either way, Dr. Comanor has offered no methodology that would explain whether his results are meaningful or not for purposes of determining class-wide impact. *Id.*

Moreover, Dr. Comanor has contradicted his own study. He concedes that prices may not be uniform, Comanor Tr. (SA-133), and that consumers may continue to buy from BRU even if it is selling at full price. *Id.* (SA-200-201). Thus, Dr. Comanor's rebuttal report does not present any evidence that he has a method that will show impact on class members using common proof.

### 5. Dr. Comanor's Rebuttal Does Not Contain Any Method That Will Use Common Evidence To Show The Effect Of The Alleged Conspiracies On The Price Setting Mechanism In Any Relevant Market

An important element of a rule of reason claim is whether plaintiffs can demonstrate injury to competition in a relevant market. Because plaintiffs bear the burden to demonstrate that common issues predominate as to each element of their claims, they bear the burden now to demonstrate that they can prove injury to competition in a relevant market using common proof. *Hydrogen Peroxide*, 2008 U.S. App. Lexis 26871, at *15 ("If proof of the essential elements of

the cause of action requires individual treatment, then class certification is unsuitable." (quotation and citation omitted)).  In their 80-plus pages of briefing, plaintiffs devote exactly one paragraph to this central issue.  Pls.' Reply 50.  They claim, in their trial plan, that they will use common evidence to show both the conspiracy and "its effect on the price setting mechanism in the industry."  Pls.' Reply Ex. 12, at 3.  But, nowhere in their brief nor in Dr. Comanor's report do they make that showing.[11]

Dr. Comanor simply assumes that all RPM causes higher prices for the product subject to the restraint and that this price effect constitutes harm to competition in a relevant market.  Even if the former were true, the latter does not follow.  The Supreme Court has held that higher prices for one brand are insufficient to establish harm to competition in a relevant market.  *Leegin*, 127 S. Ct. at 2718.

Here, the issue of harm to competition in a relevant market is not susceptible to common, class-wide proof, in part because plaintiffs' proposed classes include products that would necessarily be part of different relevant markets.  For example, proof of harm to competition in a market for strollers would not establish harm to competition with respect to high chairs or car seats.  Dr. Comanor tries to dodge this issue by assiduously avoiding taking any position on what the relevant market(s) might be in this case.  But sticking one's head in the sand is no substitute for a methodology to prove harm to competition in a relevant market on a class-wide basis with common proof.

---

[11] The "trial plan" that plaintiffs submitted is nothing of the sort.  It simply declares that plaintiffs will prove their claims using common evidence, but does not grapple with the insurmountable problems of proving a relevant market, market power, injury to competition and damages using evidence common to their proposed class(es).  *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D. Mich. 2001) (generalized evidence is evidence that proves or disproves an element on "a simultaneous, class-wide basis").

Dr. Comanor did not address the issue of injury to competition in a relevant market in his opening report. In his first deposition, he argued that prices for all products in each relevant market would be higher as a result of the conspiracy because other market participants would price higher in reaction to the higher prices for defendant's products. Comanor Tr. (A-3601-02, A-3575, A-3580). He admitted that he had not studied the market relationships that would prove that this theory would work in the real world. Comanor Tr. (A-3583-84). He also admitted that, in order to assess whether there was an adverse effect in a relevant market, he would have to know something about the structure of the relevant market, but he had not performed any such inquiry. Comanor Tr. (A-3599-3600, A-3614). He could not opine as to what market share any defendant would need in a relevant market to satisfy his theory that such a dominant defendant could injure competition. Comanor Tr. (A-3593).

At his second deposition, Dr. Comanor also said that the alleged conspiracies would have an effect on all products in each relevant market, Comanor Tr. (SA-127), but he did not explain how that would happen and he declined to express any opinion on what the relevant markets might be. And, he admitted that the statistical work that he had done to show that BRU was the largest customer for the products of several defendants "doesn't really address the issue of whether the products that are substitutable [for them] would also raise their prices as a result" of the resale price maintenance policies of the defendants. *Id.* (SA-130-131). Thus, Dr. Comanor and plaintiffs have not presented any evidence that they can use common proof to establish an essential element of their claim, and their motion must fail.

## C.    A Class Action Would Not Be Manageable

Plaintiffs' decision to abandon their broader proposed class in favor of six subclasses necessarily includes a concession that a single trial would not be manageable. Plaintiffs would need to prove at least six separate conspiracies, how each conspiracy injured competition in a

relevant market in which that manufacturer defendant operated, how injury to competition in each separate market injured consumers in that market, and what damages flowed from the injury to competition in each market.   That would require multiple trials, as plaintiffs acknowledge.  Pls.' Reply 27.  No single trial could resolve these issues.  Not only would the proof of each conspiracy and proof of injury to competition in each market rest on six different bodies of evidence, but also the Court would have to issue endless limiting instructions explaining what evidence was admissible against which defendant and for what purpose, rendering a single trial (or even six separate trials, each involving multiple products and/or multiple relevant markets) hopelessly complex.

## III.   PLAINTIFFS HAVE FAILED TO PROPOSE A WORKABLE METHODOLOGY TO PROVE DAMAGES ON A CLASS-WIDE BASIS

### A.   Plaintiffs Must Demonstrate That The Methods They Have Identified For Proving Damages Will Work In This Case

Under *Hydrogen Peroxid*e, plaintiffs must prove, by a preponderance of the evidence, that a viable methodology exists with which to prove damages on a class-wide basis using the testimony, documentary evidence and data available in this case.  *Hydrogen Peroxid*e, 2008 U.S. App. Lexis 26871, *3, *9-13.   A mere promise or "threshold" showing, or a statement by plaintiffs of an "'intention' to try the case in a manner that satisfies the predominance requirement" is insufficient.  *Id*. at *47.  Instead, plaintiffs must show that reliable methods exist for proving damages and that these methods may be employed using the evidence in this case to produce valid results.  *See id*. at *22, *52-54 (where defendants' expert disputed class expert's opinion that "sufficient reliable data" exists to allow him to employ benchmark or regression analysis, court's failure to resolve these differences "was erroneous").

**B.      Plaintiffs' Proposed Methodologies To Calculate Damages Are Fatally Flawed And Are Contrary To Real-World Evidence**

After offering no evidentiary support or explanation for his general theories of damages until his rebuttal report, Dr. Comanor now asserts that he can prove damages either by using a benchmark or by comparing prices "before and after" the alleged conspiracies.  But, to determine the damages sustained by each class member using either method, Dr. Comanor will first have to establish the actual prices paid for baby products by each class member, and then employ one of these methodologies to estimate the prices that would have been charged by BRU in the "but for" world, or the world that would have existed in the absence of the conspiracies.  *See* Comanor Rebuttal at ¶ 72.  Dr. Comanor has failed to demonstrate that he can accomplish either part of this analysis using the evidence available in this case.

**1.      Plaintiffs Have No Method Of Proving The Actual Prices Paid By Class Members Given The Unavailability Of Evidence**

Evidence showing the price that each class member paid for the baby product he or she purchased is generally unavailable.[12]  Although Plaintiffs assert that they can simply look at suggested retail prices for each time period, they concede that BRU store prices for the same products vary.  *See* Comanor Rebuttal ¶ 44 and Exhibit B (showing significant price variation among BRU stores even when estimating prices using an averaging method that would mask individual variation).  Further, individual variation exists even among the class representatives. While some paid the MSRP, plaintiff Julie Lindemann got a 15% discount on her purchase of a BabyBjorn carrier by using a store coupon.  Lindemann Tr. (SA-359).  Plaintiff Yossi Zarfati got a $20 discount on his purchase of a Maclaren stroller.  Zarfati Tr. (SA-372).  In addition, from

---

[12]   This is important because even certain class representatives have no recollection and no evidence of what  price they paid for their baby product. *See, e.g.*, Grogan Tr. (A-3999 – A-4000); Bozzo Tr. (SA-357).

time to time, BRU had sales on the relevant products.  Plaintiffs have identified no method for determining when a consumer purchased a baby product using a store coupon or purchased a product on sale.  *See also* Myslinski Decl. ¶ 180 (A-75-76); Myslinski Reply Decl. ¶ 65 (SA-32-33) (plaintiffs' theory fails to account for transactions at lower "actual" prices).  In short, plaintiffs have failed to demonstrate that evidence exists from which they can establish the actual prices paid by class members for their baby products.  *See Butt v. Allegheny Pepsi-Cola Bottling Co.*, 116 F.R.D. 486, 492 (E.D. Va. 1987) (lack of computerized transaction records would require individualized inquiry).

Unable to prove actual prices paid by putative class members, plaintiffs conveniently assume, contrary to the evidence cited above and in the record, that all class members paid the MSRP on all Baby Products that they purchased from BRU.  As illustrated by Dr. Myslinski, this contrivance systematically overstates any supposed overcharges.  Myslinski Reply Decl. ¶ 65 (SA-32-33).  It would result, for example, in Yossi Zarfati being awarded treble damages as if he paid the MSRP even though he received a $20 discount.  It would result in Julie Lindemann being credited with having paid full price when she testified that she received a 15% discount.  Plaintiffs have thus identified no formulaic means of determining the prices actually paid for Baby Products by putative class members.  Accordingly, the only method available would be to individually inquire of each one.  Such individual inquiry negates the predominance of common questions under Rule 23(b)(3) and requires denial of plaintiffs' Motion for Class Certification.

      **2.**      **Plaintiffs Have No Viable Method Of Proving The Prices That BRU Would Have Charged In The "But For" World**

Moreover, in addition to their inability to prove the actual prices paid, plaintiffs have no methodology for determining BRU's "but for" price for each baby product at each point in time during the class period.  Previously, Dr. Comanor provided no evidence to support his hypothesis

that, in the absence of the alleged conspiracies, prices would converge upon the internet price. Defs.' Opp. 39-41. Now, in direct conflict with his price convergence theory, he concedes that some consumers "want to buy from brick and mortar [stores] and [are] willing to pay the higher price" to do so. Comanor Tr. (SA-200-201). Dr. Comanor further concedes that, in the "but for" world, BRU "might find some non-price methods to compete." *Id.* (SA-211-212). He could not say whether BRU's response to internet price competition would be the same for each baby product. *Id.* Nor, at the time of his second deposition, could he identify *any* economic methods or tools he could employ for determining what BRU's response to internet price competition might be for a given product. *Id.* (SA-213-215). Yet, without an economic method for showing how BRU would have responded to internet price competition in the "but for" world, Dr. Comanor has no way of determining BRU's "but for" price.

Further, Dr. Comanor's "but for" world ignores the benefits class members receive from services made possible by resale pricing policies. The ABA Report on Antitrust Damages, upon which Dr. Comanor relies in ¶ 72 of his Rebuttal, states that, even if liability were proved in a resale price maintenance case, there would be no viable damage methodology where, as here, the defendant retailer provides services upon which lower-cost retailers may free-ride:

> If a customer sues a dealer in a vertical price fixing arrangement that increases efficiency, such as by eliminating the free rider problem, even though the defendant will likely be liable[13], *the customer will not be able to assert a sensible theory of damages.* Although price will be higher than would have prevailed absent the agreement, the package of products and service sold will also be different and better. Indeed, an efficiency-enhancing restriction will result in greater consumer surplus than would have been enjoyed absent the restraint. *The restraint, therefore, far from causing injury, bestowed a benefit upon the plaintiff.*

---

[13] This ABA Report was last published when a resale price maintenance agreement was still a *per se* violation of the antitrust laws and liability was therefore presumed.

American Bar Association, Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 199-200 (1996) (emphases added and removed). Dr. Comanor concedes that BRU offers services not offered by an internet retailer, like a convenient store location (and the ability to examine and test a product), a liberal return policy and a convenient gift registry. Comanor Tr. (A-3819-23). But he has yet to offer a methodology that accounts for the value of these services to each class member.[14] *See Funeral Consumers Alliance, Inc. v. Service Corp. Int'l*, No. 05-3394 (S.D. Tex. Nov. 24, 2008) (Memorandum and Recommendation) (Attachment A) (recommending denial of class certification because individualized purchasing habits meant that "proof of impact on any one individual plaintiff would not be probative of, much less prove, impact on, or liability to, any other plaintiff").

Finally, because Dr. Comanor has yet to identify a suitable benchmark, he cannot know whether such a benchmark is available. Dr. Comanor attests that it is important to have a comparable benchmark. Comanor Tr. (SA-199). But he concedes that he has yet to identify one. Although his Rebuttal Report suggests Amazon, Dr. Comanor testified that this was meant only as an illustration, that he was not even sure whether Amazon is actually a reseller of baby products, and that he is "not necessarily" planning to use Amazon as a benchmark.[15] *Id*. (SA-195). Moreover, Dr. Myslinski, unlike Dr. Comanor, investigated the suitability of Amazon as a benchmark and found that BRU could not survive on Amazon's gross margins. Rather, "[i]f those gross margins are applied to BRU income statements for any of the most recent four years, the results are annual operating losses…." Myslinski Reply Decl. ¶ 44 (SA-19). Plaintiffs have

---

[14] Indeed, it is possible that, in the absence of retail pricing policies, these services would be reduced or disappear altogether, leaving class members who prefer these services to a lower price worse off.

not demonstrated any advantage to the manufacturer defendants in putting bricks and mortar stores out of business and relying solely upon internet retailers to distribute their products. *Id.* at ¶¶ 44-46 (SA-19-20). In short, Dr. Comanor presented no evidence that Amazon would be a suitable benchmark, and does not know whether any such benchmark exists. Comanor Tr. (SA-195-199). Consequently, plaintiffs have failed to identify, let alone to validate, a viable method for determining damages using the evidence in this case.[16]

### C. Plaintiffs Have Failed To Meet Their Burden Of Validating A Workable Method Of Proving Damages On A Class Wide Basis

The Third Circuit's decision in *Hydrogen Peroxid*e is consistent with cases from other jurisdictions which have required class plaintiffs to validate a viable, formulaic methodology for proving damages. *See, e.g., Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 Fed. Appx. 296, 300 (5th Cir. 2004) (rejecting class certification where plaintiffs did not prove "a reliable formula for damages" that would "yield statistically significant results"); *Allied Orthopedic Appliances, Inc. v. Tyco*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) (denying certification where plaintiffs' expert failed to "conduct any meaningful economic analysis that could persuade the Court that" any benchmark "could serve as a basis for a workable damage formula"); *In re Medical Waste Servs. Antitrust Litig.*, 2006 WL 538927, at *8 (D. Utah Mar. 3, 2006) ("A concrete, workable formula must be described before certification is granted."); *Rodney*, 146 Fed. Appx. at 791 (rejecting benchmark method utilizing individual variables that would require an "analysis of the distinct characteristics" of numerous airline routes).

---

[15] Dr. Myslinski presents a detailed analysis, supported by the evidence, showing why Amazon and other internet retailers would not be suitable benchmarks. Myslinski Reply Decl. ¶¶ 44, 65-67 (SA-19, SA-32-34).

[16] Dr. Comanor also testified that he had not yet identified any "before and after" periods that he could use for an analysis of damages. Comanor Tr. (SA-224).

Plaintiffs' attempts to distinguish these cases are unavailing because plaintiffs have yet to demonstrate a workable benchmark or useable "before and after" period for measuring damages. In fact, they have yet to show even that pricing and market data is available in this case from which to determine the actual prices paid by class members, let alone the "but for" prices they must substantiate as part of a damage model.  Plaintiffs should not be heard to argue that they, unlike the plaintiffs in the cited cases, will be able to overcome flaws in their damage model when they have yet to propose a damage model that will yield reliable damage estimates using the evidence available in this case.

Furthermore, the factual distinctions that plaintiffs attempt miss the larger point, namely, that they have failed to meaningfully address, let alone validate, a method to overcome the complexities inherent in proving damages on a class wide basis.  *See Piggly Wiggly,* 215 F.R.D. at 531 (predominance "destroyed solely by the complexity of determining damages when that determination does not lend itself to a mathematical calculation that can be applied to all the class members").  Plaintiffs have failed to meet their burden under Rule 23 of demonstrating a workable methodology for determining damages on a class wide basis.

## IV.   THE NAMED PLAINTIFFS WILL NOT FAIRLY AND ADEQUATELY REPRESENT THE CLASS

### A.   Class Plaintiffs Are Inadequate Because Of The Inherent Conflicts In The Aggregated Classes They Propose, Their Close Relationships To Class Counsel, And Their Vulnerability To Unique Defenses

Plaintiffs have failed to meet their burden of showing, by a preponderance of the evidence, that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In the one affirmative statement they offer on the subject, Plaintiffs merely declare that each class representative is adequate because each "has the same interest in establishing BRU's and the respective Manufacturer Defendants' liability because

each … paid artificially-inflated prices for the Baby Products as a result of a common illegal RPM scheme." Pls.' Mem. at 11; *see also* Pls.' Reply at 20. But this assertion is transparently untrue. Each class representative has an interest in establishing only that the price of the Baby Product he or she purchased was inflated due to an illegal RPM scheme. Each would be at best indifferent, and at worst, antagonistic to litigating claims involving other products because to do so would deplete scarce litigation resources, decrease the likelihood of a settlement, and dilute the funds available to meet any judgment. The balance of plaintiffs' response does not seek to affirmatively establish the qualifications of any class representative but rather to diminish the importance of their conflicts and other shortcomings. These efforts are unpersuasive, and fail to establish the adequacy of any proposed class representative.

### 1.    The Evidence Reveals Unaligned And Competing Interests Among The Proposed Class Representatives And Putative Class Members

As previously noted, the adequacy requirement of Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006). "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Products*, 521 U.S. at 625-26 (*quoting East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). In *Amchem Products*, the Supreme Court refused to certify a settlement class despite a showing of adequate assets to fund the settlement. The Court found that the named class representatives could not meet the adequacy requirement of Rule 23(a)(4):

> named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of

> exposure only plaintiffs in ensuring an ample, inflation protected fund for the future.

*Amchem Products*, 521 U.S. at 626.   Significantly, though the plaintiffs and defendants supported the settlement, the adequacy issue was litigated by objectors.   They successfully maintained that class counsel and the class representatives had conflicts of interest and, in proposing an aggregated class, had failed to adequately represent the interests of class members whose injuries had become manifest.   *Id.* at 607.

Incredibly, here, all of the classes proposed by plaintiffs are aggregated classes, and not one of the proposed class representatives purchased all of the products included in any one class. Plaintiffs propose a giant class composed of all consumers who purchased one of the defendant manufacturers' products from BRU.   Accordingly, they lump together purchasers of BabyBjorn infant carriers, Medela breast pumps, Peg Perego high chairs, Britax car seats and so forth.   They do so even though the alleged vertical conspiracies between BRU and each manufacturer are separate conspiracies requiring separate proofs, and the proposed class representatives all represent purchasers of different products.   Plaintiffs offer not a clue as to why a purchaser of a BabyBjorn infant carrier would have an interest in proving a vertical conspiracy between BRU and Medela, a manufacturer of breast pumps, and vice-versa.   To the contrary, each class representative will only have an interest in proving that the product he or she purchased was the subject of an alleged price-fixing conspiracy.

In fact, class members will have an interest in showing that only their products were over-priced due to an illegal conspiracy.   The inclusion of purchasers of other products will drain scarce litigation resources (particularly the time of class counsel, the Court, and the jury); each class member would prefer counsel, the Court, and the jury to focus solely on their claim.   The inclusion of purchasers of other products will make settlement less likely since it will raise the

cost of settlement for each defendant, particularly BRU, and, as *Amchem Products* showed, increase the likelihood that any settlement will be subject to a meritorious challenge.  Finally, unlike *Amchem Products*, plaintiffs here have made no effort to satisfy their burden of showing that defendants have sufficient assets to satisfy any judgment.  Clearly, to the extent there is a deficiency, purchasers of different products of different manufacturers will have adverse interests when it comes to realizing their claims.

A further conflict exists between those class members who purchased from BRU believing it offered the lowest price, or buying on sale or with a coupon, and those who purchased at BRU, knowing its prices were higher, because they valued the services BRU provided, such as convenience, a liberal return policy, and a gift registry.  Although plaintiffs label these arguments "speculative," their expert, Dr. Comanor, disagrees.  He concedes that BRU offers services not offered by an internet retailer, like a convenient store location (and the ability to examine and test a product), a liberal return policy, and a convenient gift registry. Comanor Tr. (A-3819-23).  He further concedes that some consumers "want to buy from brick and mortar [stores] and [are] willing to pay the higher price" to do so.  Comanor Tr. (SA-200-201).  These statements are buttressed by one of the proposed class representatives, Lawrence McNally, who testified that he would have purchased his BabyBjorn carrier from BRU even if the product had been available at a lower price elsewhere because he wanted immediate delivery. McNally Tr. (SA-361-364).  Accordingly, even among purchasers of the same product, the testimony that some will give that they prefer to pay higher prices at BRU in exchange for the convenience and service "tugs against the interest" of others in showing that these things have no value at all.

Plaintiffs simply miss the point of *Alston v. Virginia High School League, Inc*., 184 F.R.D. 574 (W.D. Va. 1999), and *Langbecker v. Electronic Data Sys. Corp.,* 476 F.3d 299 (5th Cir. 2007). The point of these cases is that a proposed class representative is not an adequate representative of another person who suffered no injury. The evidence in the record indicates that certain members of the proposed class suffered no injury because they valued the convenience and services that BRU provided. Plaintiffs have offered no adequate class definition to obviate this problem.

Plaintiffs' proposed subclasses are also aggregated classes that fail to resolve all of the inherent conflicts in their giant class. Plaintiffs propose subclasses consisting of all consumers who purchased a single defendant manufacturer's products from BRU, *e.g.*, all purchasers of a Peg Perego product from BRU. But this subclass, as defined in respect to Peg Perego, aggregates purchasers of strollers, car seats, high chairs and motorized toys into a single class. Similar peculiarities exist with respect to each defendant manufacturer since each has sold more than one product through BRU. As with the giant class, each class representative will have an interest in proving only that his or her purchase was at an inflated price due to an unlawful conspiracy. Each will be antagonistic to the claims of purchasers of other products to the extent their inclusion in the class will drain litigation resources, diminish settlement prospects, and deplete settlement assets. In fact, no proposed class representative purchased all of any one defendant manufacturer's products, so each would necessarily be purporting to represent class members who purchased different products and possessed antagonistic interests.[17]

---

[17] The fact that the putative class representatives seek to represent purchasers of products they themselves did not buy also makes their claims atypical under Rule 23(a)(3). *See Am/Comm Systems, Inc. v. AT&T Co.*, 101 F.R.D. 317, 321 (E.D. Pa. 1984) ("although the representatives' claims arise out of the same conduct and are based on the same legal theory as the proposed members' claims, the representatives' claims are not typical of the proposed

Consequently, the proposed class representatives are inadequate also to represent the proposed subclasses.

### 2. The Personal And Professional Relationships Of The Class Representatives To Class Counsel Disqualify Them

Federal courts have repeatedly found that a "close relationship" between a class representative and class counsel, such as a familial, business, or close social relationship, may compromise the ability of a class representative to adequately represent the class, particularly in a settlement context in which the class counsel stands to gain far more than individual class members. *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 95 (7th Cir. 1997); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1254 (11th Cir. 2003). As shown in defendants' Opposition, several class representatives here have "close relationships" with class counsel that may compromise their independence and their willingness to stand up to class counsel where necessary. One is a sister of class counsel (Hall), several are close personal friends (Bozzo, Grogan, Lindemann, Nuttall, Otazo, McDonough, Trzupek and Zarfati) and two have had employment relationships which appear to have extended into the period of this lawsuit (Bozzo and Sullivan). Defs.' Opp. at Ex. B. Another, Sara Shuck, is receiving free legal services from class counsel. *Id.*

These close relationships not only compromise the class representatives' independence but also their credibility, thereby subjecting them to unique defenses. Plaintiffs have not contradicted the evidence presented by defendants of these close relationships, nor have they offered any evidence to substantiate the independence of any of these class representatives. Their attempts to distinguish the cases cited by defendants miss the point. Both *Susman* and

---

members' claims since proof of the representatives' claims would not necessarily prove all the members' claims"); *In re Microsoft Corp. Antitrust Litig.*, 214 F.R.D. 371, 374 (D. Md. 2003) ("The liability and damage issues presented by claims arising out of these separate markets are not the same, and the claims of any plaintiff who has made a purchase in one of

*London* stand for the principle that a close relationship between a class representative and class counsel undermine the adequacy of the class representative by compromising the ability of the class representative to exercise independent judgment on behalf of the class.   Neither case purports to be limited to its precise facts.  The relationships shown by the evidence in this case are similar to the ones discussed in *Susman* and *London* and present similar concerns.[18]   Because plaintiffs have failed to meet their burden of proving the adequacy and independence of the above-identified class representatives, their motion for class certification should be denied.

        **3.**      **The Proposed Class Representatives Are Subject to Unique Defenses That Will Preoccupy the Class**

Many of the proposed class representatives are subject to unique defenses that will preoccupy them at trial and destroy the required typicality of the representatives' claims.  *See Beck*, 457 F.3d at 296, 300; *Gary Plastic Packaging Corp. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990); *J.H. Cohn & Co. v. Am. Appraisal Assocs.*, 628 F.2d 994, 999 (7th Cir. 1980).   One is a sister of class counsel (Erin Hall), several are close personal friends (Bozzo, Grogan, Lindemann, Nuttall, Otazo, McDonough, Trzupek, and Zarfati), and two have had employment relationships which appear to have extended into the period of this lawsuit (Bozzo and Sullivan).   As shown in defendants' initial brief, three proposed class representatives are subject to unique statute of limitations defenses (Bozzo, Grogan, and Nuttall).   Although plaintiffs argue that defenses going to the merits may not be considered at the class certification stage, the *Beck* court held that the nature of the defense is not

---

the markets cannot be said to be typical of the claims of a plaintiff who has made a purchase in one of the other markets.").

[18]   The fact that these proposed class representatives have demonstrated so little involvement and such a superficial knowledge of the claims in this case exacerbates these concerns.  *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008); *see* Defs.' Opp. at Ex. B.

controlling; rather, the question is whether "a unique defense will play a significant role at trial." *Beck*, 457 F.3d at 300.  Defendants have submitted evidence showing that Bozzo, Grogan, and Nuttall purchased a BabyBjorn carrier more than four years prior to the filing of this antitrust claim.  Consequently, there is no question that the statute of limitations defense will be an important focus of the trial on their claims.

Furthermore, many of the proposed class representatives are subject to unique attacks on their standing because of the dubious nature of their proof of purchase (Bozzo, Grogan, McNally, Sullivan, and Ragsdale[19]), their purchase of a Baby Product immediately before this suit was filed (Otazo), their purchase of a Baby Product at a discount or when no pricing policy was in effect (Lindemann, Zarfati, Ragsdale, and Trzupek), their purchase of a product specially manufactured exclusively for BRU (Zarfati), their purchases for reasons other than price (McDonough, McNally, and Sullivan), and their bias given their close personal or business relationships with class counsel (Bozzo, Grogan, Hall, Lindemann, Nuttall, Otazo, McDonough, Shuck, Sullivan, Trzupek, and Zarfati).  In response to these contentions, plaintiffs merely assert that the proposed class representatives' claims are "typical" and that they will fairly and adequately represent the interests of the class.  These assertions are not evidence; they amount to wishful thinking.  The unique defenses applicable to these class representatives are likely to

---

[19]  Plaintiffs cite *Wolgin v. Magic Marker Corp*., 82 F.R.D. 168 (E.D. Pa. 1979), for the proposition that Ragsdale's claim is typical of other class members even though she claims to have purchased her BabyBjorn carrier long after BabyBjorn's pricing policy had lapsed.  But *Wolgin* was a securities fraud case in which the court found that persons who purchased after an asserted fraud could use additional evidence to show that the fraud continued through the date of their purchases.  Here, by contrast, plaintiffs have no evidence that any BabyBjorn product was subject to a pricing policy when Ragsdale made her purchase.

become an important focus at trial.  For these reasons, too, plaintiffs have failed to meet their burden of showing adequacy.[20]

## V.    CONCLUSION

For the foregoing reasons, this Court should deny plaintiffs' motion for class certification.

February 20, 2009                                    Respectfully submitted,


                                                       /s/ Margaret M. Zwisler
                                                      Margaret M. Zwisler
                                                      E. Marcellus Williamson
                                                      Alexander Maltas
                                                      Jason D. Cruise
                                                      LATHAM & WATKINS LLP
                                                      555 11th St. NW, Suite 1000
                                                      Washington, DC  20004
                                                      (202) 637-2200

                                                      *Counsel for Britax Child Safety, Inc.*

                                                      *Submitted on behalf of all defendants*

---

[20]   The fact that the proposed class representatives are subject to unique defenses also makes their claims uncommon and atypical under Rule 23(a)(2) and Rule 23(a)(3).  *See General Telephone Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982).