**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 01-cv-1451-REB-PAC
(Consolidated with Civil Action Nos. 01-cv-1472-REB-PAC, 01-cv-1527-REB-PAC, 01-cv-1616-REB-PAC, 01-cv-1799-REB-PAC, 01-cv-1930-REB-PAC, 01-cv-2083-REB-PAC, 02-cv-0333-REB-PAC, 02-cv-0374-REB-PAC, 02-cv-0507-REB-PAC, 02-cv-0658-REB-PAC, 02-cv-0755-REB-PAC, 02-cv-0798-REB-PAC and 04-cv-0238-REB-PAC)

In re QWEST COMMUNICATIONS INTERNATIONAL, INC. SECURITIES LITIGATION

**DECLARATION OF PROFESSOR MICHAEL A. PERINO IN SUPPORT OF OBJECTORS ELDON GRAHAM, HAZEL FLOYD, MARY M. HULL AND THE ASSOCIATION OF U.S. WEST RETIREES**

I, MICHAEL A. PERINO, declare and state:

1.  I have been retained as an expert by Objectors Eldon Graham, Hazel Floyd, Mary M. Hull, and the Association of U.S. West Retirees to provide an opinion on the reasonableness of the fee request of Lead Counsel, Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin" or "Lead Counsel"), in the above-captioned action.  In connection with a $400 million partial settlement entered into on November 21, 2005, Lerach Coughlin has requested a fee award of 24%, or $96 million.  In my opinion, based on my review of the papers filed in connection with this motion and my extensive study of fee awards in securities class actions, the requested fee is well outside the range of fees awarded in similar class actions and is therefore excessive.  For this reason, the proposed fee should not, in my opinion, be entitled to a presumption of reasonableness even though it was apparently agreed to by the union pension fund serving as co-lead plaintiff in this case.  In my opinion, a fee award of less than 20% would be significantly more consistent with fee awards in cases of this type and magnitude.

**BACKGROUND AND QUALIFICATIONS**

2.  I am a Professor of Law at St. John's University School of Law in Jamaica, New York, where I teach Securities Regulation, Securities Litigation, and Business Organizations.  I have also been the Justin W. D'Atri Visiting Professor of Law, Business and Society at Columbia Law School, a Visiting Professor at Cornell Law School, a Lecturer in Law at Stanford Law School, and the Co-Director of the Roberts Program in Law, Business, and Corporate Governance at Stanford Law School.  Among my primary areas of research are securities regulation and litigation.

3. As my curriculum vitae (Exhibit A) indicates, I have written extensively on securities class action lawsuits. I am the author of the leading treatise on securities litigation under the Private Securities Litigation Reform Act (the "PSLRA"). SECURITIES LITIGATION AFTER THE REFORM ACT (CCH 2000). I have written numerous articles on securities class actions, including: (1) *Did the Private Securities Litigation Reform Act Work?*, 2003 U. ILL. L. REV. 913; (2) *Fraud and Federalism: Preempting Private State Securities Fraud Causes of Action*, 50 STAN. L. REV. 273 (1998); (3) *Securities Litigation Reform: The First Year's Experience (A Statistical and Legal Analysis of Class Action Securities Fraud Litigation Under the Private Securities Litigation Reform Act of 1995)*, Working Paper No. 140, John M. Olin Program in Law and Economics Working Paper Series, Stanford Law School (February 1997) (with Joseph A. Grundfest); and (4) *The Pentium Papers: A Case Study of Institutional Investor Activism in Litigation*, 38 Ariz. L. Rev. 559 (1996) (with Joseph A. Grundfest).

4. I have testified in Committee hearings in the United States Senate and the United States House of Representatives on securities litigation matters. Indeed, Congress relied on the findings contained in two of my articles when it passed the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), which preempted certain securities class actions premised on state law. The U.S. Securities and Exchange Commission has also retained me as a securities regulation expert,[1] I have been qualified

---

[1] In September 2002, the SEC retained me to write a report and recommendations on the adequacy of arbitrator conflict disclosure requirements in NASD and NYSE securities arbitrations. REPORT TO THE SECURITIES AND EXCHANGE COMMISSION REGARDING ARBITRATOR CONFLICT DISCLOSURE REQUIREMENTS IN NASD AND NYSE SECURITIES ARBITRATIONS (Nov. 4, 2002) (available at http://www.sec.gov/pdf/arbconflict.pdf).

and testified in court as an expert on securities-related matters,[2] and I have served as an expert for several large public pension funds, including the Public Employees Retirement Association of Colorado, the New York State Common Retirement Fund, and the Minnesota State Board of Investment, seeking to serve or serving as lead plaintiffs in securities class actions.[3]

5.     For nearly two years, I have been engaged in an in-depth, empirical study of attorneys' fees in securities class actions.  Through that research, I have produced a dataset of 525 reported and unreported federal district court fee decisions in securities class actions.  This broad dataset, which covers the time period from 1994 through 2006, permits a detailed analysis of the determinants of fee awards in securities class actions. My work in this area has already yielded one working paper that has been presented at several academic conferences.  *See* Michael A. Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions* (February 2006), available at http://ssrn.com/abstract=870577.  I have also presented the result of my research to the Contingent Fee Task Force of the American Bar Association Section on Tort and Insurance Practice.

6.     My opinion in this matter is based on my extensive research on attorneys' fees and on the following documents filed in connection with this motion: (1) Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses, dated February 27, 2006 (the "Lead Counsel Brief"); (2) Declaration of Michael J. Dowd in

---

[2] *Daly v. U.S. Bancorp Piper Jaffray*, Cause No. DV-02-14 and related cases (Montana Second Judicial District Court, Silver Bow County September 3, 2003); *Paone v. Dean Witter Reynolds, Inc. et al.*, 99 Civ. 6099 (Pennsylvania Court of Common Pleas, Lackawanna County August 5, 2003).

[3] *In re Mckesson HBOC, Inc. Sec. Litig.*, No. C-99-20743-RMW (N.D. Cal.); *In re Oxford Health Plans, Inc. Sec. Litig.*, 97 Civ. 8023 (CLB); *In re Mercury Finance Co. of Illinois*, 1:97-cv-03035 (N.D. Ill.).

Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, and Award of Attorneys' Fees and Reimbursement of Expenses, executed February 27, 2006 (the "Dowd Declaration"); (3) Declaration of Michael J. Dowd Filed on Behalf of Lerach Coughlin Stoia Geller Rudman & Robbins LLP in Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses, executed February 27, 2006; (4) Declaration of Robert Tessier, executed February 16, 2006 (the "Tessier Declaration"); (5) Declaration of Clifford Mosher, executed February 21, 2006; (6) Declaration of Tejinder Singh, executed February 20, 2006; (7) Declaration of Satpal Singh, executed February 21, 2006; (8) Notice of Objections of Graham, Floyd, Hull and Association of U.S. West Retirees, dated March 6, 2006; (9) Reply Brief in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds and Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, dated April 28, 2006; (10) Declaration of H. Lee Sarokin in Support of Plaintiff's Motion for Attorneys' Fees and Reimbursement of Expenses, executed April 25, 2006 (the "Sarokin Declaration"); (11) Declaration of Jim R. Carrigan in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, executed April 21, 2006 (the "Carrigan Declaration"); (12) Declaration of Layn R. Phillips in Support of Motion for Final Approval of Class Action Settlement, executed April 14, 2006; and (13) [Proposed] Partial Final Judgment and Order of Partial Dismissal with Prejudice, filed April 28, 2006 (the "Proposed Partial Final Judgment").

**THE FEE REQUEST IN THIS CASE IS WELL OUTSIDE THE RANGE OF FEES AWARDED IN SIMILAR CLASS ACTIONS**

7.      I agree with Lerach Coughlin that a fee award based on a percentage of the total settlement is and should be the preferred method for awarding fees in common fund cases. Lead Counsel Brief at 7-14. Indeed, the PSLRA mandates that "attorneys' fees and expenses … shall not exceed a reasonable percentage of the amount" recovered for the class. 15 U.S.C. § 78u-4(a)(6). Where I part ways with Lead Counsel is with respect to what a reasonable percentage should be in a case of this magnitude.

8.      Lerach Coughlin portrays the $400 million settlement as an "outstanding result" for the class[4] that is among the largest securities class action settlements ever achieved. Lead Counsel Brief at 1. Unfortunately, to justify its 24% fee request, Lead Counsel does not compare its request to the fees awarded in similar cases; it instead relies on the fees awarded in more typical and much smaller securities class actions. *Id.* at 17-19. These comparisons are inapt precisely because this is an atypical case, with a settlement that is at least an order of magnitude larger than the average securities class

---

[4] There is arguably some basis to question this characterization. First, a significant number of class members, including a number of sophisticated institutional investors, have opted out of the settlement to pursue individual litigation against Qwest. *See* Proposed Partial Final Judgment at Exhibit 1. Second, while the $400 million settlement is undoubtedly large, analysis of whether it represents an outstanding recovery for the class must consider, among other things, the potential damages available in the case. Unfortunately, in preparing this declaration I did not have available to me a copy of any expert reports on damages. However, recent work by Cornerstone Research, an economic consulting group, shows that a more easily calculated measure, which it calls Maximum Dollar Loss ("MDL") is highly correlated with damages. MDL is calculated as the dollar value decrease in the defendant firm's market capitalization from the trading day on which its market capitalization peaked during the class period to the trading day immediately following the end of the class period. Laura E. Simmons and Ellen M. Ryan, *Post-Reform Act Securities Settlements: 2005 Review and Analysis* 6 (Cornerstone Research 2006).

Using the class period provided in the notice, I calculated the MDL for Qwest to be $84.97 billion, making the settlement as a percentage of MDL just 0.5%. For cases settled through 2004 with MDLs in excess of $5 billion, Cornerstone finds that median settlements as a percentage of MDL were 0.4%. For cases settled in 2005, the figure was 0.2%. *Id.* Thus, the settlement here appears to be on par with settlements in similarly sized cases, suggesting that the fee award should also be on par with the fees awarded in those cases.

- 6 -

action settlement. *See* Laura E. Simmons and Ellen M. Ryan, *Post-Reform Act Securities Settlements: 2005 Review and Analysis* 2 (Cornerstone Research 2006) (finding that through 2004, mean and median post-PSLRA settlements were $21.1 million and $6.3 million, respectively).

9. Instead, the proper comparison is to fees awarded in similar large settlements because existing research shows that settlement size is the single most important determinant of fee size. This relationship is seen in Figure 1, which shows the tight relationship between settlement size and fee awards in my dataset of 525 fee awards.[5] The fitted line in Figure 1 demonstrates that 95% of the variation in fee size is explained by settlement size. Other researchers have found a similar relationship between fees and settlements. *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27, 52-52 (2004) (finding that settlement size explains up to 94% of the variation in fee size in the sampled class action settlements).

---

[5] In Figure 1, both the fee and the settlement are in log-transformed constant 2005 dollars. Such transformations are frequently used in statistics to show the relationship between variables, particularly in skewed distributions such as this one, in which there are many relatively small settlements and a few substantially larger ones. As the leading statistics text for lawyers emphasizes, "No information is lost by such transformations, nor is the purpose to distort the facts." Michael O. Finkelstein and Bruce Levin, *Statistics for Lawyers* 409-14 (2d ed. 2001).

**Figure 1**
**The Relationship Between Fees and Settlements in Securities Class Actions**



Note: Based on a sample of 525 federal district court fee decisions from 1994 through 2006. Fees and settlements in log-transformed constant 2005 dollars.

10. To be sure, as Judge Sarokin notes in his declaration, individual judges will vary from a precise mathematical formula in some cases. *See* Sarokin Declaration at ¶ 13. But, as shown in Figure 1, that variation tends to be in the direction of awarding lower fees, not higher ones. As Eisenberg and Miller note, "To the extent cases depart from the pattern, they tend to do so by having low fee amounts. That is, the data points most distant from the central pattern tend to lie below, not above, the pattern." 1 Journal of Empirical Legal Studies at 52. This is the same pattern shown in Figure 1. Lerach Coughlin's requested fee is precisely the opposite—it is well above the fitted line and at the extreme range of fee awards in similarly sized cases.

11.     Lerach Coughlin argues that the "requested fee percentage is … consistent with and in fact less than percentages awarded in securities class action cases from this Circuit." Lead Counsel Brief at 17.  While the cases assembled have fee awards that are indeed higher than the fee requested here, as Figure 1 shows that is only part of the story. In effect, Lead Counsel ignores the overwhelming relationship between fee awards and settlement size in carefully selecting the cases it uses to draw this comparison.  The mean and median size of the settlements cited in Lead Counsel's brief is $13.8 million and $7.8 million, far smaller than the $400 million settlement in this case.  Simply put, these much smaller cases provide the wrong comparison for determining the appropriate fee in a settlement this large.

12.     To be sure, Lerach Coughlin does include an equally carefully selected group of cases with settlements in excess of $100 million in an attempt to show that fee awards in large cases are equivalent in size, on a percentage basis, to fee awards in smaller cases.  Lead Counsel Brief at 19-21.  But, a more comprehensive analysis of the data on class action fee awards demonstrates that no such equivalence exists.  There can be little doubt that, on average, fee awards as a percentage of settlement decline with increasing settlement values.  *See* Eisenberg and Miller, 1 Journal of Empirical Legal Studies at 54-55.  Indeed, these declining percentages are perfectly consistent with the underlying economic rationale for class actions—aggregating small claims in a single action to achieve economies of scale.

13.     Figure 2 clearly shows this inverse relationship between percentage fee awards and settlement size for my dataset of 525 fee decisions in securities class actions. For cases that settle for $10 million or less, mean and median fee awards range from

approximately 27% to 30%. But, with increasing settlement size, fee awards as a percentage of recovery decline substantially. **In cases with settlements in excess of $150 million,** *i.e.*, **those that are most similar to the Qwest settlement, fee awards as a percentage of settlement size are substantially smaller, with mean and median awards of about 15% and 18%, respectively.**[6] Indeed, Lead Counsel's fee request is more than one standard deviation above the mean fee award for cases of this magnitude. It thus represents a substantial departure from the norm and therefore, in my opinion, warrants careful scrutiny from the Court.

---

[6] In suggesting that fees as a percentage of settlement size are consistent even in large cases, Lerach Coughlin relies on a 1996 study by National Economic Research Associates ("NERA"). Lead Counsel Brief at 19. Reliance on this study is misplaced for two reasons. First, the original NERA study relied on fee requests rather than fee awards. My research has shown that fee requests are not an accurate reflection of the fees court's ultimately award. *See* Michael A. Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions* 20 and Table 2 (February 2006), available at http://ssrn.com/abstract=870577. Second, in a more recent NERA study from 2005, NERA identifies the same declining fee structure discussed here. *See* Elaine Buckberg, Todd Foster, Ronald I. Miller, *Recent Trends in Shareholder Class Action Litigation: Are WorldCom and Enron the New Standard?* 7 (NERA July 2005). Thus, while it is possible that fee awards may once have been consistent across settlement size, available empirical evidence strongly suggests that this is not the case today.

**Figure 2**
**Comparison of Qwest Fee Request to Mean and Median Fee Awards in Securities Class Action Settlements**

| Settlements in Millions (Observations) | Mean | Median |
|---|---|---|
| < $1 (36) | 29.16% | 30.00% |
| $1-5 (172) | 28.57% | 30.00% |
| $5-10 (103) | 26.89% | 29.85% |
| $10-25 (110) | 26.82% | 27.98% |
| $25-75 (60) | 23.17% | 25.00% |
| $75-150 (26) | 21.98% | 22.08% |
| > $150 (18) | 15.15% | 17.99% |
| Qwest Fee Request | 24.00% | |

Note: Based on a sample of 525 federal district court fee decisions from 1994 through 2006.

14. This same inverse relationship is found in the Tenth Circuit as well. There are fourteen Tenth Circuit fee awards in my dataset.[7] All but one of those cases involved settlements that were substantially smaller than the Qwest settlement, with mean and median settlement values of $6.9 million and $5.9 million. Mean and median fee awards in those cases were 28.31% and 30%, slightly higher, but generally in line with, the figures for the entire dataset. The one case in my database from the Tenth Circuit that approaches the magnitude of the Qwest settlement is *In re Sprint Corp. Sec. Litig.*, 01-4080-CM (D. Kan., December 16, 2003). In that $50 million dollar settlement, the court

---

[7] A list of these cases appears in Exhibit B.

- 11 -

awarded lead counsel in the case, Milberg Weiss Bershad Hynes & Lerach,[8] a fee of 17.5%. A copy of that decision appears as Exhibit C. The *Sprint* case is not cited in Lerach Coughlin's moving brief.

**THE FEE AGREEMENT IN THIS CASE IS NOT ENTITLED TO A PRESUMPTION OF REASONABLENESS**

15. In justifying its fee request, Lead Counsel relies heavily on the presence in this case of the New England Health Care Employees Pension Fund ("New England"), a union pension fund. Declaration of Robert Tessier at ¶ 2. Lead Counsel argues that New England is the kind of institutional investor that Congress sought to encourage to become lead plaintiffs in securities class actions and that the court should defer to the fee arrangement that such an institution negotiates. Lead Counsel Brief at 2-4. My research, however, suggests that no such deference is warranted because union-affiliated funds, like New England, have no statistically significant impact on fee awards. *See* Perino, *Markets and Monitors* at 24.

16. It is worth noting in this regard my disagreement with the Judge Jim R. Carrigan, who contends that the objections are merely the product of "grossly unfair" hindsight. In opining that the fee agreement negotiated by New England is fair, Judge Carrigan asserts that this court:

> should look at the risks, disadvantages, and expenses faced by Lead Counsel as of the time when they filed the case in July 2001. At that time, there was no SEC investigation. The United States Attorney's office had not even begun to focus on Qwest. Rather, it was Lead Counsel who identified the fraud at Qwest. It was Lead Counsel who agreed to assume the enormous risk of undertaking this case on a purely contingent basis. There was no guarantee of ever being repaid for their extraordinary

---

[8] Milberg Weiss is the predecessor firm to Lerach Coughlin.

- 12 -

> investment of time, talent, effort and money. The only certainty was that any payday was uncertain.

Carrigan Declaration at ¶ 15.

17.     The primary difficulty with this argument is that the negotiated fee arrangement was not negotiated in July 2001, but much later. According to Judge Sarokin's declaration, "the fee arrangement was negotiated by independent counsel representing [New England] *within ten months of* [Lerach Coughlin's] appointment as Lead Counsel." Sarokin Declaration at ¶ 18. Learch Coughlin was appointed Lead Counsel in late September 2001. Dowd Declaration at ¶ 56. Ten months later, in July 2002, the *Wall Street Journal* had published articles detailing Qwest's attempts to use economically insubstantial swap transaction to boost revenues and earnings; the company had fired its CEO, demoted its CFO, and announced that it would restate its financial results for 1999, 2000, and 2001; and it was public knowledge that the SEC and U.S. Department of Justice had launched civil and criminal probes of the company. Dowd Declaration at ¶¶ 37-42. Under these circumstances, the case presented a far smaller risk of non-recovery than Judge Carrigan, or Lead Counsel, suggest. *See* Lead Counsel Brief at 4 (asserting that the litigation was "extremely risky").

18.     These facts also tend to undermine Lead Counsel's argument that the negotiated fee structure is entitled to deference because it used increasing percentages to "incentivize counsel to achieve the maximum result possible for the Class…" Lead Counsel Brief at 17. Under the negotiated fee structure, Lead Counsel receives 15% on any recovery from $0-25 million, 20% on any recovery from $25-50 million, and 25% for any recovery above $50 million. The problem with this structure is that the first two tiers are set at unreasonably low levels for a case of this type and magnitude. Indeed, at the

time the fee was apparently negotiated, there were plentiful examples of securities cases with similar allegations that had settled for far more than $50 million. *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) (describing $3.18 billion dollar settlement entered into in December 1999 in case involving accounting fraud and SEC and criminal investigations); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) ($193 million partial settlement in case involving extensive financial restatements and SEC and criminal investigations); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) ($111 million settlement in accounting fraud case); *In re Dollar General Corp. Sec. Litig.*, Civ. Action No. 3:01-0388 (M.D. Tenn.) ($162 million settlement in accounting fraud case with governmental investigations) (Exhibit D); *In re Informix Corp. Sec. Litig.*, No. C 97-1289 CRB (N.D. Cal. Nov. 2, 1999) ($132 million dollar settlement in accounting fraud case with governmental investigations). Under these circumstances, it is questionable whether this fee structure creates the incentives Lead Counsel suggests.

19.     Even if this Court were to agree with Lead Counsel that the fee negotiated here is entitled to a "presumption of reasonableness," *see In re Rite-Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 n.10 (3d. cir. 2005) (quoting *In re Cendant Corp Litig.*, 264 F.3d 201, 284 (3d. Cir. 2001), there is more than sufficient evidence from other recent class action settlements to rebut any such presumption. Union-affiliated funds, like New England, stand in sharp contrast to public pension funds, which are generally viewed as the most capable monitors of class counsel. *See* Elliott J. Weiss and John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale Law Journal 2053 (1995). As shown in Figure 3,

when public pension funds serve as lead plaintiffs in large cases, fee awards are substantially lower than the fees awarded in cases without public pension fund participation and are substantially lower than the request in this case.  Mean and median few awards in settlements of $75 million or more with public pension lead plaintiffs are 16.49% and 18.73%, respectively.  Indeed, the 24% fee requested in this case is even higher than the mean and median fees that union-affiliated lead plaintiffs have negotiated in the same subset of large cases.  In those cases, mean and median fee awards were 18.52% and 20%, respectively.



**Figure 3**
**Comparison of Qwest Fee Request to Mean and Median Fee Awards in Securities Class Action Settlements Greater Than $75 Million With and Without Public Pension Lead Plaintiffs**

Note:  Based on a sample of 525 federal district court fee decisions from 1994 through 2006.

20. A particularly notable example of the effect of public pension funds on fees is the $473 million partial settlement in *In re Dynegy, Inc. Sec. Litig.*, H-02-1571

(S.D. Tex., July 8, 2005).[9] Although that case was similar in size to Qwest, the lead plaintiff there was a public pension fund, the Regents of the University of California, and the lead counsel was Lerach Coughlin. In that case, Lerach Coughlin moved for and was awarded a fee of just 8.7257% of the settlement, nearly a third of the fee that it seeks here. A copy of the fee award appears in Exhibit E. The *Dynegy* case is not cited in Lerach Coughlin's moving brief.

21.   My findings with respect to the impact of public pension funds on attorneys' fees are also consistent with fee requests in recent large securities class action settlements involving public pension funds that are not yet included in my dataset. Consider, for example, the Public Employees Retirement Association of Colorado, which served as lead plaintiff in the securities litigation involving Royal Ahold NV. That case recently settled for $1.1 billion and lead counsel has requested a fee of just 15% of the settlement fund. *See In re Royal Ahold Sec. and "ERISA" Litig.*, MDL Docket No. 1539 (D. Md.) (Exhibit F). Public pension funds serving as lead counsel in other recent large settlements have negotiated fees that are substantially smaller than the fee request here. *See, e.g.*, *In re Tenet Healthcare Corp. Sec. Litig.*, No. CV-02-8462-RSWL (Rzx) (C.D. Cal.) (lead plaintiff State of New Jersey Division of Investment negotiated fee of 14.771% of $216.5 million partial settlement) (Exhibit G); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, MDL Docket No. 1500, 02 Civ. 5575 (SWK) (S.D.N.Y.) (lead plaintiff Minnesota State Board of Investment negotiated fee of 7% of $2.65 billion settlement) (Exhibit H).

---

[9] There was an earlier $1,050,000 settlement with Arthur Andersen LLP in the litigation.

- 16 -

## CONCLUSION

22. For these reasons and based on my extensive research of fees in securities class actions, it is my opinion that the fee request in this case is well outside the range of fees awarded in substantially similar cases. In my opinion it is therefore excessive and not entitled to any presumption of reasonableness. In my opinion, a fee award of less than 20% would be significantly more consistent with fee awards in cases of this type and magnitude.

I declare under penalty of perjury under the laws of the United States of America that the foregoing states my true and correct opinions.

Executed on May 15, 2006, in Jamaica, New York.

_____
Michael A. Perino

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May, 2006, a true and correct copy of the above and foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and a courtesy copy was emailed to counsel of record in accordance with the January 5, 2006 Class Notice as follows:

Keith F. Park, Esq.
Michael J. Dowd, Esq.
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
mikeD@lerachlaw.com
*Lead Counsel for Plaintiffs*

Alfred Levitt, Esq.
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., N.W., Suite 800
Washington, DC 20015
Tele: 202-895-7567
Fax: 202-237-6131
alevitt@bsfllp.com
*Counsel for Settling Defendant Qwest*

John Freedman, Esq.
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004-1202
john_freedman@aporter.com
Tele: 202-942-5316
Fax: 202-942-5999
*Counsel for Defendant Arthur Andersen LLP*

and a copy of the same was sent via email to OBJECTORS - Association of U S WEST Retirees, Eldon H. Graham, Hazel A. Floyd and Mary M. Hull.

*s/ Curtis L. Kennedy*