## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL M. MCDONOUGH, *et al*., | |
| *Plaintiffs*, | |
| v. | No. 2:06-cv-00242-AB |
| TOYS "R" US, INC., d/b/a BABIES "R" US, *et al.*, | |
| *Defendants*. | |
| ARIEL ELLIOTT, *et al*., | |
| *Plaintiffs*, | |
| v. | No. 2:09-cv-06151-AB |
| TOYS "R" US, INC., d/b/a BABIES "R" US, *et al.*, | |
| *Defendants*. | |

## REPLY TO PLAINTIFFS' RESPONSE TO OBJECTIONS
## TO THE PROPOSED SETTLEMENT AGREEMENT AND ORDER

Representing Kevin Young, *Objector*:

Daniel Greenberg (Arkansas Bar No. 2007-193)
    *Admitted pro hac vice*
CENTER FOR CLASS ACTION FAIRNESS LLC
GREENBERG LEGAL SERVICES
55 Fontenay Circle
Little Rock, AR  72223
Tel. (501) 588-4245
dngrnbrg@gmail.com

Christopher M. Arfaa (Pa. Bar No. 57047)
    *Appearing as local counsel*
LAW OFFICES OF CHRISTOPHER M. ARFAA, P.C.
150 N. Radnor Chester Rd., Suite F-200
Radnor, PA  19087
Tel. (610) 977-2001
Fax (610) 977-0043
carfaa@arfaalaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

  I.    Class Counsel Should Not Collect a Commission on Expenses of Notice or Administration. .................................................................................................. 1

  II.   Class Counsel's Fee Request Lies Outside of Judicial and Statistical Norms. ............... 3

  III.   Class Counsel's Fee Request Repeatedly Misstates Other Surveys of Fee Awards in Class Actions. ................................................................................ 6

  IV.   Class Counsel Misstates and Overstates the Relevance of Lodestar Cross-check Analysis to This Case. ..................................................................... 9

  V.   Class Counsel Is Incorrect About Both Young's Objection and the Nature of the Pre-Settlement Class Certification to This Court ........................................ 13

  VI.   Settlement Resources Should Be Directed To Uncompensated Class Members Before They Are Directed to *Cy Pres* Awards. ..................................... 14

  VII.   Class Counsel's Argument That It Is Required to Betray the Interests of the Class Immediately in Order To Protect the Interests of the Class in a Hypothetical Future Is Not Convincing. ....................................................... 16

  VIII.   Class Counsel Failed To Meet Its Notice Requirements. .............................. 19

  IX.   Class Counsel's *Ad Hominem* Attacks on Young and Greenberg Are Both Irrelevant and False. .................................................................................. 20

  X.   The Objector Wishes to Withdraw Section VII From His Original Objection. ............ 22

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Create-A-Card Inc., v. Intuit, Inc.,*
    No. C 07-06452 WHA, 2009 WL 3073920 (N.D. Cal. Sept. 22, 2009) ........2

*Gunter v. Ridgewood Energy Corp.*,
    223 F.3d 190 (3d Cir. 2000) ........................................................................12

*In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.,*
    No. 05-232, 2008 WL 4974782 (E.D. Pa. Nov. 21, 2008)............................12

*In re AT & T Corp.*,
    455 F.3d 160 (3d Cir. 2006) ........................................................................12

*In re Cendant Corp. Litig.,*
    264 F.3d 201 (3d Cir. 2001) ........................................................................12

*In re Diet Drugs Prods. Liab. Litig.,*
    582 F.3d 524 (3d Cir. 2009) ...................................................................9, 12

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995) ....................................................................9, 14

*In re HP Inkjet Printer Litig.,*
    No. 5:05-cv-3580 JF, 2011 WL 1158635 (N.D. Cal. Mar. 29, 2011) ............2

*In re Primus,*
    436 U.S. 412 (1978).....................................................................................22

*In re Prudential Ins. Co. America Sales Practices Litig.,*
    148 F.3d 283 (3d Cir. 1998) ..........................................................................2

*In re Rite Aid Corp. Securities Litigation*,
    396 F. 3d 294 (3d Cir. 2005) ........................................................... 9, 11-12

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ........................................................................8

*Schwartz v. Dallas Cowboys Football Club, Ltd.,*
    157 F.Supp.2d 561 (E.D. Pa. 2001) ...............................................................2

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
    No. Civ.A. 03-4578,
    2005 WL 1213926 (E.D. Pa. May 19, 2005)..................................................12

## RULES AND STATUTES

15 U.S.C. § 77z-1(a)(6)...................................................................................2

15 U.S.C. § 78u-4(a)(6) ..................................................................................2

42 U.S.C. § 1983 .............................................................................................9

Fed. R. Civ. P. 23 ....................................................................................*passim*

Fed. R. Civ. P. 23(e) ...............................................................................14, 21

Fed. R. Civ. P. 23(h) ......................................................................................2

Private Securities Litigation Reform Act .......................................................2

U.S. Const. Am. I............................................................................................22

## OTHER AUTHORITIES

Notes of Advisory Committee on 2003 Amendments to Rule 23(h) .......................2

American Law Institute,
    *Principles of the Law of Aggregate Litigation* § 3.07 (2010) ......................15

Susan Beck,
    "Man on a Class Action Mission,"
    *The American Lawyer – Litigation 2011* (Spring 2011) ...............................21

Alba Conte, 1 *Attorney Fee Awards* § 2.05 .............................................................2

Federal Judicial Center,
    *Manual for Complex Litigation (Fourth)* § 21.71 (2004) ...............................2

Brian T. Fitzpatrick, *The End of Objector Blackmail?*,
    62 VAND. L. REV. 1623 (2009) ....................................................................17

Denise Martin (et al.),
    *Recent Trends IV: What Explains Filings and Settlements in*
    *Shareholder Class Actions*, STAN J.L. BUS. & FIN. (1996) ........................ 6-8

Declaration of Michael Perino,
    *In re Qwest Comm. Int'l, Inc. Sec. Litig.*, No. 1:01-cv-01451-REB-
    KLM (D. Colo. May 15, 2006) (Dkt. No. 1011) ...........................................8

Michael Perino,
    *Markets and Monitors: The Impact of Competition and Experience on*
    *Attorneys' Fees in Securities Class Actions*,
    St. John's Legal Studies Research Paper No. 06-0034 .................................8

Thomas E. Willging (et al.), *Empirical Study of Class Actions in Four*
    *Federal District Courts* (Fed. Judicial Ctr. 1996)..........................................6

Rachel M. Zahorsky,
    "Unsettling Advocate," ABA J. (Apr. 2010) ................................................21

## INTRODUCTION

Class counsel fails to address the essential points of Young's objection, spending much more time on irrelevant and false *ad hominem* attacks on Young's counsel. Young is confident that the Court will see past these diversionary tactics. The settlement's *cy pres* provisions are impermissible, and must be restructured to put class members' interests first. Even if the Court were inclined to approve the settlement without this necessary amendment, the request for payment to the attorneys – $13.97 million when the class will receive less than $20.4 million – is disproportionately high as a matter of law. Ironically, even as class counsel complains that the methodology and argument of one report Young cited to support this contention was "completely out of place," it attempts to rebut it with an older study that uses the same supposedly "out of place" methodology. If the settlement is approved, the award to class counsel should be scaled down to reflect the actual benefit realized by the class.

## ARGUMENT

I.   **Class Counsel Should Not Collect a Commission on Expenses of Notice or Administration.**

Young's original objection summarized several reasons why class counsel should receive no commission on the costs of notice. Class counsel labels Young's arguments "meritless," but does not explain why. Instead, class counsel goes into some detail demonstrating the obvious. Class counsel's brief emphasizes uncontroversial and undisputed facts: that class counsel must pay for notice, that this obligation of class counsel is stated in Rule 23, that class counsel has a constitutional duty to provide notice, that class counsel has in this particular case provided notice, and so forth. Not one of these propositions is in question. But the

argument in Young's brief that class counsel should not receive a commission on notice is never addressed by class counsel's flourishing of the irrelevant: the fact that class counsel's representation creates certain duties of payment does not transform the expenses it is liable for into class benefits.

A simpler way of putting this is that class counsel should only ask for a share of the money the class actually receives. As noted in the Young Objection, "'[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed.' " *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 338 (3d Cir. 1998) (quoting Conte, 1 *Attorney Fee Awards* § 2.05, at 37). "In determining the appropriate amount of attorneys' fees to be paid to class counsel, the principal consideration is the success achieved by the plaintiffs under the terms of the settlement." *Schwartz v. Dallas Cowboys Football Club, Ltd.,* 157 F.Supp.2d 561, 579 (E.D. Pa. 2001). The "key consideration in determining a fee award is reasonableness in light of the benefit *actually conferred*" (emphasis in original). *In re HP Inkjet Printer Litig.,* No. 5:05-cv-3580 JF, 2011 WL 1158635, at *10 (N.D. Cal. Mar. 29, 2011) (quoting *Create-A-Card Inc., v. Intuit, Inc.,* No. C 07-06452 WHA, 2009 WL 3073920, at *3 (N.D. Cal. Sept. 22, 2009)). It is startling to see class counsel accuse a proposition of being "meritless" after being supplied four different judicial holdings which support it. *See also* Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71 (2004) ("the fee awards should be based only on the benefits actually delivered"); Notes of Advisory Committee on 2003 Amendments to Rule 23(h), *citing* 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class") (Private Securities Litigation Reform Act).

In short, when class counsel labels Young's concern – that class counsel should be compensated based on what it gets for the class – "meritless," class counsel has supplied nothing but an analysis-free insult that masquerades as an argument. Young's objection to class counsel's overcompensation scheme remains unaddressed.

II.     **Class Counsel's Fee Request Lies Outside of Judicial and Statistical Norms.**

Class counsel seeks an award of $13.97 million for itself, which, if awarded, will result in class recovery being capped below $20.4 million because of deductions for notice and administration expenses, and likely much lower than that because of caps in the *cy pres* and allocation provisions of the settlement. This figure works out to over 40% of the class recovery, and is impermissibly high.

Class counsel responds to Young's argument that the proposed settlement lies outside of judicial and statistical norms by citing one case – one data point – to support its sizable fee request. (Plaintiffs' Response to Objections, at 8.) That defense fails. The Young Objection provided numerous grounds which demonstrated that class counsel's fee request was outside judicial and statistical norms; class counsel opted to ignore much of this evidence and sneer at the rest. These grounds included:

- the 25% benchmark relied on by certain courts inside this District;
- the sizable dissimilarities between the 11 settlements that class counsel originally relied on in its motion for attorneys' fees, including both the relatively unobjectionable nature of those 11 settlements and the fact that class counsel requests an award roughly two and a half times the size of the average award in those cases;

- the material misstatements of central elements of several of those 11 settlements which class counsel supplied this Court – misstatements that exaggerated the award percentages that class counsel received in prior cases;

- the evidence that, as settlements grow larger, the appropriate percentage for the award grows smaller;

- the strong support for a 25% benchmark in many circuits outside this one, which demonstrated the emptiness of class counsel's claim that its request for one-third of the common fund was "consistent with awards nationwide"; and

- the evidentiary support for a significantly lower fee award in a nationwide survey of securities class action settlements. (*See* Young Objection, pp. 8-13.)

With the exception of the citation of one case and a cursory discussion of the securities settlement data in a brief footnote, class counsel's response entirely ignored this extensive array of facts and arguments – facts and arguments which demonstrate that class counsel's proposed settlement is outside of statistical and judicial norms.

Class counsel does attempt in a footnote to refute the data on securities class action settlements furnished as an appendix to the Young objection. (Plaintiffs' Response to Objections, at 8 n. 11.) Class counsel's attempt to pack its refutation into a footnote results in a paragraph that is honeycombed with errors. Class counsel claims the data cited in the Young Objection "focused exclusively on awards in exceptionally large settlements." This is simply wrong; the data covered all settlement sizes. (*See* Young Objection, at 11.) Class counsel then states that the Young objection "acknowledges that this data is ***not applicable*** to other class actions," (emphasis in original) which is certainly an incorrect attribution and, as

discussed immediately below, likely an insupportable conclusion. Finally, class counsel then accuses Young of making a "policy argument" that is "completely out of place," namely that this Court should "buck precedent." This paraphrase of the Young objection is indefensible. Contrary to class counsel's claim, the Young Objection argues that the securities settlement data is meaningful and relevant information; furthermore, it is the very opposite of "buck[ing] precedent" to follow the consensus of what other courts have done in awarding attorneys' fees.

The relevance of the securities class action settlement data is very simple. In general, one cannot refute a claim about judicial and statistical norms by providing one cherry-picked counterexample which lies outside them. An outlying data point does not refute a statistical trend. Statistical norms involve (for instance) the calculation of means and medians that describe large numbers of events; those norms cannot be accurately depicted by one anecdote, even if that anecdote strikes class counsel as a persuasive example.

Perhaps there are reasons that the data from securities settlements are not relevant here; but if so, class counsel has not supplied them. As noted in the original objection, securities cases are riskier because they are more difficult to win and they are typically directed by more knowledgeable clients. Certainly, securities settlements are different, but it is far from obvious why those differences are especially relevant: in each respect, these differences seem to support the argument that a non-securities settlement ought to create a percentage payment for class counsel that is lower, not higher.

In short, there is good reason to believe that the wide array of arguments and evidence contained in the Young Objection should guide this court to lower the excessive fee requested by class counsel. This array includes the data from securities settlements the Young Objection furnished – and, as discussed

immediately below, even class counsel's initial fee request provides a good deal of support for reliance on the securities settlement data.

III.   **Class Counsel's Fee Request Repeatedly Misstates Other Surveys of Fee Awards in Class Actions.**

Class counsel claims that its original fee request produced "cases and articles showing that the average fee award is 32% of the common fund." (Plaintiffs' Response to Objections, at 9.) But this is incorrect: class counsel's description of its own research cannot be relied upon. Its fee request supplied exactly two articles which allegedly supported its theory that the average fee award is 32% of the common fund. (Motion for Award of Attorneys' Fees, at 9.) Neither of those articles supports class counsel's claims.

The first survey class counsel relies upon, Thomas E. Willging (et al.), *Empirical Study of Class Actions in Four Federal District Courts* (Fed. Judicial Ctr. 1996)*,* notes that (as class counsel originally admitted) "Median rates ranged from 27% to 30%" in the four examined districts. Willging, at 69. Curiously, class counsel neglects to include the average fee award that the Willging report supplies: that average fee award ranged from 24% to 30%. Willging, at 72, 145. To state the obvious, as compared to the one-third fee class counsel requests in this case, the Willging figures – both the mean and the median – are smaller than the 40% sought here.

The second survey class counsel relies upon, Denise Martin (et al.), *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions*, STAN J.L. BUS. & FIN. (1996), contains the sentence "Regardless of case size, fees average approximately 32 percent of the settlement." But this statement applies only to securities class action settlements – and securities class action settlements

before the PSLRA reforms ensuring better oversight of class counsel. That is because the Martin survey analyzed shareholder settlements only; it did not analyze the larger dataset of class action settlements generally. The careful reader of this brief will perhaps at this point discern that the method of analysis class counsel relies on here – the use of data from shareholder class action settlements as a proxy for the larger dataset of class action settlements as a whole – is flatly incompatible with the same class counsel's intemperate and categorical denunciation of the Young Objection's reliance on a study using precisely the same methodology. (Class counsel's denunciation, at Plaintiffs' Response to Objections, at 8 n. 11, is described at some length in the section immediately above.)

To review the bidding: this means that class counsel has supplied no evidence whatsoever to support its claims about average fee awards. Instead, class counsel has relied on one survey that provides support for sharply lower attorneys' fees than the Plaintiffs' Response to Objections represents, and another survey that analyzes only a select portion of the settlement data. Further, class counsel has inaccurately represented to this court that this second survey's figures reflect the entire population of class action settlements. When the Young Objection relied on a study using precisely the same methodology to approximate the universe of class action settlements (while, in contrast to class counsel's brief, emphasizing that the dataset was relevant but not dispositive), class counsel then complained that the study the Young Objection supplied was "unrelated" to the matter at hand, that the data was "***not applicable***" to other class actions, that the Young Objection's data constituted a request to "buck precedent," and that its method was "completely out of place." (Plaintiffs' Response to Objections, at 8 n. 11 (emphasis in original).) Because class counsel's use of securities settlement data in its original fee request implicitly vouched for its relevance, this remarkable stream of criticisms of the

7

Young Objection's use of settlement data was not simply overheated but (by class counsel's own logic) entirely insupportable. To say the least, the justification for class counsel's extraordinary set of double standards remains elusive. It would be unwarranted to see class counsel's increasingly long list of insupportable claims as intentional misrepresentation, but it certainly qualifies as argumentation that is so sloppy and careless that it is something like an insult to this process and this Court.

To summarize: the Young Objection provided a wide-ranging set of arguments and evidence which demonstrated the excessiveness of class counsel's fee request. In its response brief, class counsel chose to ignore most of the arguments for a significantly lower fee award that the Young Objection supplied. The one substantive criticism class counsel made of the Young Objection's approach – that securities settlement data is a bad proxy for settlement data generally – appears fatally undercut by class counsel's own reliance on precisely the same analytical method in its original fee request.[1] This objector hopes that class counsel's willingness to ignore multiple varieties of statistical evidence and

---

[1] For the purposes of this Court's deliberations over attorneys' fees, the Perino report attached to the Young Objection appears superior to the Martin study referenced by class counsel. This is true, among other reasons, because the Perino study covers a more extensive and a more recent period of time. *See* Declaration of Michael Perino, *In re Qwest Comm. Int'l, Inc. Sec. Litig.*, No. 1:01-cv-01451-REB-KLM (D. Colo. May 15, 2006) (Dkt. No. 1011) at 11, fig. 2 (survey period is 1994-2006). *Cf.* Denise Martin (et al.), *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions*, at 2 (survey period is 1991-98). Moreover, because Perino's work focuses on the effect of sophisticated class representatives, it has the unique benefit of providing a market-based cross-check for class counsel fees. Michael Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions*, St. John's Legal Studies Research Paper No. 06-0034; *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718-19 (7th Cir. 2001) (endorsing market-based compensation as means of determining attorneys' fees).

legal argument (and, indeed, its willingness to ignore elementary standards of logical consistency), all of which cast doubt on the appropriateness of its current fee request, is not shared by this Court.

## IV. Class Counsel Misstates and Overstates the Relevance of Lodestar Cross-check Analysis to This Case.

Class counsel suggests that the lodestar cross-check law of this circuit somehow requires this Court to rely on lodestar analysis "as a means of assessing whether the percentage-of-recovery award is too high or too low."[2] (Plaintiffs' Response to Objections, at 8 (quoting *In re Diet Drugs*, 582 F.3d 524, 545 (3d Cir. 2009)).) In fact, there is no such requirement. The case class counsel cites, *In re Diet Drugs*, gives courts discretion to use a lodestar analysis in their calculations, but it certainly does not demand it. In that case, the court holds that assigning a percentage of recovery to plaintiffs is a superior method: "the District Court correctly applied the method better designed to 'reward[ ] counsel for success and penalize[ ] it for failure.'" 582 F.3d at 541 (quoting *In re Gen'l Mots. Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 819 (3d Cir.1995)). Mechanical reliance on lodestar analysis would undermine this judicial goal. While lodestar analysis is appropriate in a 42 U.S.C. § 1983 action where the class benefits are amorphous and intangible, *cf. id.* at 540-41, the real purpose of the cross-check is to act as a ceiling to prevent windfall awards. *In re Rite Aid Corp. Securities Litigation*, 396 F. 3d 294, 306-07 (3d Cir. 2005).

---

[2] At least, that seems to be the import of the ambiguous (or, perhaps, mysterious) charge by class counsel that the Young Objection "ignores the law in this Circuit" with respect to lodestar analysis. *See* Plaintiffs' Response to Objections, at 8.

Class counsel's firm is an entrepreneurial, risk-taking business run by sophisticated, educated businesspeople; it makes consequential choices for business reasons. Its decisions – to file suit, to invest resources, and ultimately to settle – are like any other risky investment with an uncertain return. Relatedly, class counsel's statement that "the Young Objection fails to consider the risk of nonpayment that Class Counsel accepted" (Plaintiffs' Response to Objections, at 9), is of very little weight. These are precisely the sort of risks that are routinely and voluntarily undertaken by sophisticated, entrepreneurial businesspeople. The travails class counsel describes involving court holdings that are unfavorable to class counsel's interests are simply a cost of doing business – a cost that, in principle, class counsel has already chosen to bear. Despite the fact that class counsel did not like a holding that jeopardized its interests here, that misfortune underscores the correct operation of a sound principle of judicial policy: namely, that the percentage of recovery method, as noted above, just is a more effective mechanism for rewarding counsel for success and penalizing it for failure. A lodestar cross-check serves certain purposes, but the weight of authority cannot justify the use of the lodestar to prop up the floor of class counsel's compensation.

Class counsel complains that it prosecuted the case "**_at a loss_**" and that it only seeks a "**_fraction_**" of its lodestar. (Plaintiffs' Response to Objections, at 9 (emphasis in original).) That is the nature of contingent litigation where one might receive multipliers of lodestar above one for success: one cannot complain of the possibility of payments below lodestar when it is that very risk that justifies multipliers above one in successful cases. Moreover, compensation below lodestar is not necessarily at a loss: markups for billing rates for associates and document-review attorneys are often several multiples of the marginal cost. And nothing required class counsel to bring a relatively unsuccessful case; if class counsel had a more lucrative opportunity than this litigation, they surely would have taken it.

Class counsel's argument here is apparently that because lodestar compensation would be above what class counsel requests, it would be wrong for the court to push compensation lower than what class counsel actually asks for. But the law of the Third Circuit does not support class counsel's argument. The purpose of the lodestar cross-check is to signal the court that there is a danger of overcompensation – that is, to hoist a red flag when the size of attorneys' fees approaches windfall levels. The (footnoted) sentence that class counsel relies to explain the operation of a lodestar cross-check rests on a citation to another case, *In re Rite Aid Corp. Securities Litigation*, 396 F. 3d 294 (3d Cir. 2005). *Rite Aid* explains that the "lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." *Id*. at 306. That case underscores not only that "the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award," but also that "the lodestar cross-check does not trump the primary reliance on the percentage of common fund method." *Id*. at 307. In other words, lodestar is a ceiling, not a floor. In short, class counsel is mistaken when it suggests that there is a limited range of acceptable multipliers. (*Cf*. Plaintiffs' Response to Objections, at 8 ("This is **well below** the range accepted in the Third Circuit.") (emphasis in original).) In contrast, *Rite Aid* suggests that, so long as there is no abuse of discretion, lodestar analysis cannot prevent the court from reducing attorneys' fees. *See Rite Aid* at 307.

Class counsel may wish that lodestar analysis provided a floor under which its fee was not allowed to go, but that is not the law: a lodestar cross-check may be "sensible," *id*. at 305, but although class counsel is allowed to determine the lodestar's mass, only a court can assign the lodestar any weight. In fact, this circuit's "law of the lodestar" emphasizes *Rite Aid's* attention to preventing

windfalls, not class counsel's suggestion that a fractional lodestar argues against any downward adjustment of attorneys' fees. *See, e.g., Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ.A. 03-4578, 2005 WL 1213926, at *15 (E.D. Pa. May 19, 2005) ("The purpose of the lodestar cross-check echoes the second goal of the Court's analysis of motions for attorneys' fees: the avoidance of 'windfall fees.' The lodestar cross-check is performed to ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple.") (internal citations omitted); *In re Cendant Corp. Litig.,* 264 F.3d 201, 285 (3d Cir. 2001) ("The goal of [the lodestar cross check] is to ensure that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a "windfall" to lead counsel"; lodestar not to be used "in the first instance," but is rather a "possible … cross-check"); *In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.,* No. 05-232, 2008 WL 4974782, at * 16 (E.D. Pa. Nov. 21, 2008); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 199 (3d Cir. 2000). In short, class counsel's flourishing of its lodestar should do nothing more than alert this court to the rule that is explained in the *Diet Drugs* case that it references: namely, that the percentage of recovery approach is better designed to reward attorneys for success and punish them for failure. *In re Diet Drugs*, 582 F. 3d. 524, 541 (3d Cir. 2009)). *See also In re AT&T Corp.,* 455 F.3d 160, 164 (3d Cir. 2006) ("The lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method"). Class counsel emphasizes that it only asks for a fraction of its lodestar – but because it is not entitled to its entire lodestar, the relevance of this calculation is less than clear. In litigation as in life, it's a hard truth that sometimes you're rewarded not for how long you've worked but instead for the results you got.

V.      **Class Counsel Is Incorrect About Both Young's Objection and the Nature of the Pre-Settlement Class Certification to This Court.**

Class counsel argues that the Young Objection is at fault for failing to describe the circumstances of this case correctly (Plaintiffs' Response to Objections, at 5), particularly with respect to the question of pre-settlement class certification. Specifically, class counsel states that the Young Objection alleged that this settlement was reached prior to class certification (Young Objection, at 3); class counsel's response is that a minority subclass was certified before certification, which allegedly makes Young's argument "inaccurate" and "unhelpful."

True: the McDonough Subclass was certified prior to settlement. But the Elliott Subclass was not. The claims of the Elliott subclass (which, to repeat, appears not to have been certified prior to settlement) apparently constitute about 57% of the settlement's total value.[3] Furthermore, that uncertified subclass includes a claim against Kidsline for 21% of the entire settlement value, a claim that was dismissed in the earlier attempted McDonough certification.

The alleged error in the Young Objection was induced by an inaccurate portion of the text of the Settlement Agreement itself.   Section III of that agreement begins: "Plaintiffs and Defendants stipulate, solely for settlement purposes, to the certification of the Settlement Subclasses." (Settlement Agreement, at 13.) Furthermore, "Defendants shall not oppose Plaintiffs' filing of any motion…to…conditionally certify for settlement purposes only the Settlement

---

[3] That figure is based on calculations which rely on data from the table which describes the relief that each subclass may expect to receive, *available at* http://www.babyproductsantitrustsettlement.com/faq.php – it assumes roughly equivalent purchasing frequencies over the last decade.

Subclasses, consisting of the McDonough and the Elliott Subclasses." (*Id.*) Indeed, the settling parties moved for certification of the settlement classes on January 21, 2011 (Dkt. No. 698), a motion granted by this Court ten days later (Dkt. No. 706). The Settlement Agreement had been arrived at previously, and thus the Young Objection correct noted that the settlement was pre-certification.

Perhaps the Court finds the details of the parties' squabbling over the dates of subclass certification less than compelling. But this dispute should not obscure a significant point. A court will encounter "special difficulties … with its duties under Rule 23(e) in approving settlements where negotiations occur before the court has certified the class." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F. 3d 768, 805 (3d Cir. 1995). This is a family of cases where courts must "be even more scrupulous than usual." *Id*. In any case, class counsel's nitpicking that one subclass was actually certified, but not another, is irrelevant to the fundamental point that was originally expressed by the Young Objection: that the circumstances of this particular settlement, even assuming a spotless schedule of subclass certification, require especially piercing judicial scrutiny.

VI. **Settlement Resources Should Be Directed To Uncompensated Class Members Before They Are Directed to *Cy Pres* Awards.**

Class counsel alleges that the Young Objection criticized its proposed *cy pres* allocation of funds on the grounds that class members should be eligible to be compensated for more than 100% of their losses. (Plaintiffs' Response to Objections, at 10.) But class counsel's description of this portion of the Young Objection is flatly incorrect.

14

Young's primary concern about the settlement's *cy pres* proposals remains unaddressed: the settlement gives priority to *cy pres* allocations even while certain class members remain almost entirely uncompensated. (Young Objection, at 16.) Young has already made his position clear on *cy pres* possibilities once the class is compensated: "A *cy pres* distribution which would only become operational once all class members have been fully compensated is, as such, unobjectionable." (*Id.*) The most objectionable part of the settlement's *cy pres* scheme is that it may end up being charitable with class members' money: its intended operation apparently leaves some members of the class benefited by no more than $5.00. (*Id.*) Class member compensation should have priority over *cy pres* allocation. *See* American Law Institute, *Principles of the Law of Aggregate Litigation,* § 3.07 (2010).

Regrettably, class counsel's response misses the significance of this ground-level concern entirely: instead, it once again spills a great deal of ink to no purpose by providing elementary, uncontroversial, and irrelevant citations concerning basic *cy pres* principles. (Plaintiffs' Response to Objections, at 10-11.)

Class counsel's response also fails to deal with two separate and independent *cy pres* issues raised in the Young Objection: first, the importance of public notice of the identity and publicity of *cy pres* recipients; second, the importance of compensating class counsel only for the benefits it derives for the class, not for the benefits it derives for *cy pres* recipients. With respect to providing class notice of the identity of cy pres recipients, class counsel argues in response that such notice would require advance knowledge of such matters as the size of the Final Excess Amount. (Plaintiffs' Response to Objections, at 8.) This is, of course, not true: the settling parties could have committed themselves in advance to a schedule of *cy pres* beneficiaries that would be contingent on the size of the Final Excess

Amount.[4] Class counsel then tries to answer Young's other concern – that compensation should be determined only by the benefits class counsel procures for the class – by suggesting that there is no way to tell whether the settlement's future *cy pres* allocations will benefit the public. But this is a non sequitur: if the *cy pres* funds do not benefit the class directly, then class counsel deserves no compensation for procuring them. (*See* Young Objection, at 20, and cases cited therein.) In short, class counsel has been completely non-responsive to the *cy pres* concerns raised in the Young Objection, which themselves are sufficient grounds for objection.

## VII.   Class Counsel's Argument That It Is Required to Betray the Interests of the Class Immediately in Order To Protect the Interests of the Class in a Hypothetical Future Is Not Convincing.

Class counsel argues that a quick-pay provision was necessary in order to combat any incentive for or appearance of improper self-dealing when negotiating with professional objectors. (Plaintiffs' Response to Objections, at 12.) Class counsel's argument amounts to the proposition that, in order to maintain the appearance of loyalty to the class in the future, they must immediately compromise

---

[4] Class counsel also suggests that giving notice to the class of the identity of *cy pres* beneficiaries would be infeasible in part because the Court has a role in choosing those beneficiaries. It is Young's position that this difficulty illuminates the imprudence (or, even, the danger) of crafting a settlement agreement that places the court's neutrality in question or gives that court anything like a personal or private interest in the settlement's implementation. If the determination of *cy pres* beneficiaries involves giving the Court's preferences on these matters more respect or deference than a private party would ordinarily receive, this should set off alarm bells for those who are wary of conflicts between the public and private roles of a government official.

their loyalty to the class in the present.[5] There are, of course, easier and more ethical ways to deal with professional objectors: class counsel could ask this Court for an injunction prohibiting objectors from settling the objection without court approval, thus preventing any professional objectors from abusing the court system to extort money for themselves.

Brian Fitzpatrick, author of *The End of Objector Blackmail?,* 62 VAND. L. REV. 1623 (2009), is far more equivocal about the benefit of quick-pay provisions than one might gather from Plaintiffs' brief. Fitzpatrick writes:

> [I]nsofar as quick-pay provisions are valuable to class counsel, one might expect that the defendants who must agree to the provisions would be able to extract something in return—perhaps a smaller total settlement amount. If this is the case, then class members might be harmed by the provisions to some extent. Moreover, quick-pay provisions are not without risks to class members even if class counsel do not trade away some portion of their recoveries: if class counsel are, for some reason, unable to repay the attorneys' fees they have received early, class members may be left without any way to recover them. For these reasons, it cannot be said with certainty that quick-pay provisions are a net benefit to class members.

*Id*. at 1647. Class counsel is incorrect when it suggests that Fitzpatrick endorses the deployment of such provisions. (Plaintiffs' Response to Objections, at 12.) Ultimately, Fitzpatrick concludes that the limitations of quick-pay provisions "render them a suboptimal solution." Fitzpatrick, at 1666.

———————————

[5] Indeed, that is not the only respect in which class counsel's argument leads to unacceptable consequences. Perhaps, in the future, some ingenious class counsel will issue an even more inventive argument: namely, that he or she is entitled to be paid long before any settlement agreement is finalized, since such early payment would immunize class counsel from the corrupting specter of self-interest which he or she so intently desires to escape.

It is a fact that class counsel must issue an irrevocable letter of credit as security for its earlier payment. But a fact of larger significance is that class counsel has granted itself settlement terms far more favorable than those extended to the class that class counsel is charged to represent. The Court should share Objector Young's curiosity about what the defendants were offered in order to induce this settlement provision – a provision that is extremely favorable to the interests of class counsel. This provision creates a binding duty on defendants, but it is a duty that (unlike, say, a larger settlement amount) apparently benefits class counsel rather than the class.

It is regrettable that class counsel also chooses to engage in name-calling and attacks on the character of the objector and his attorney. Class counsel suggests that Objector Kevin Young or his counsel will seek to extort money from the settling parties – something that no attorney associated with the Center for Class Action Fairness has ever done, and a practice contrary to its program's and its attorneys' expressed policy and mission. There is no justification for and no evidence to support class counsel's accusations. If, however, notwithstanding the unblemished track record of the Center in refusing to settle its previous objections, the Court is concerned that the Center has a secret motive to seek "compensat[ion] in return for allowing the settlement to proceed," the Center is willing to demonstrate its good faith by stipulating to an injunction forbidding it or Mr. Young from receiving compensation (other than court-ordered compensation) for withdrawing Mr. Young's objection.

To ensure against professional objectors' potential use of leverage to extract a settlement, class counsel guaranteed themselves payment before their clients would ever see any compensation. The speculative concerns that class counsel expresses in its response seem dwarfed by its actual, non-hypothetical, and quite self-interested betrayal of the interests of the entire class. Regrettably, class

counsel's dream logic here is all too reminiscent of the apocryphal soldier in Vietnam who explained that he had to destroy the village in order to save it. This Court should take the opportunity to reject this abuse of the class action system and declare quick-pay provisions unreasonable as a matter of both law and ethics.

## VIII. **Class Counsel Failed To Meet Its Notice Requirements.**

Class counsel states that it corrected its failure to meet its notice obligations almost as soon as it discovered its error. (Plaintiffs' Response to Objections, at 11.) That correction took place on June 6, 2011 (see *id.*), which was the final day to object or opt out from the settlement. Objector Kevin Young commends class counsel for correcting its error. As noted in the Young Objection, class counsel failed to meet its commitment to post its requests for fees and various expenses at the settlement website once those requests had been filed; it is not clear how this commitment (or this information) could have any value to members of the class unless those requests had been placed on the website substantially prior to the June 6 deadline. (Young Objection, at 20.) It is not unreasonable to believe that this data might have had assisted some class members in their deliberations to object or opt out if it had been timely available;[6] Young renews his objection.

---

[6] Class counsel notes that Young's counsel clearly had access to the motions at issue before June 6. (Plaintiffs' Response to Objections, at 11.) Moreover, it is certainly true that, as class counsel suggests, these motions can be viewed by everyone who has access to the ECF/PACER system. (*See id.*) Some do not.

IX.   **Class Counsel's *Ad Hominem* Attacks on Young and Greenberg Are Both Irrelevant and False.**

Roughly a third of class counsel's brief that ostensibly attends to the Young Objection is actually devoted to disparaging the character and motives of Young's attorney, Daniel Greenberg, and even another attorney who works with Mr. Greenberg, Theodore H. Frank, who has not made an appearance in this case. Class counsel's personal attacks are irrelevant, false, or both.

Class counsel alleges that attorney Daniel Greenberg and his colleagues at the Center for Class Action Fairness LLC (hereinafter "the Center") "make a living by filing boilerplate objections in the hope that they will be compensated in return for allowing the settlement to proceed." (Plaintiffs' Response to Objections at 2.) This is false. As the original Objection noted (Section IX), the Center, as a matter of policy, "refuses to engage in *quid pro quo* settlements to extort attorneys; the Center has never settled an objection." Neither Mr. Young's attorney nor any attorney associated with the Center has ever done business or been compensated in the manner that class counsel alleges. The Center is a nonprofit program of the registered 501(c)(3) Donors Trust Inc. and is funded entirely through charitable donations and court-awarded attorneys' fees.[7]

Class counsel alleges that objector Young is represented by "an ideological group on a mission to disrupt and destroy the class action process" and that its "goal is to eliminate Rule 23 rights regardless of the underlying merits of the action." (Plaintiffs' Resp. to Objections at 3, 4.) Class counsel provides no evidence to support this claim. Nor can it. The Center's founder, Theodore H.

---

[7] Oddly, class counsel refers to the Center as a "supposed" nonprofit. (Plaintiffs' Resp. to Objections at 4.) There is no need for the innuendo: the Center is a nonprofit program.

Frank, recently reiterated his support for the class action process in an interview with *The American Lawyer*. Susan Beck, "Man on a Class Action Mission," *The American Lawyer – Litigation 2011* (Spring 2011) at 16. The Center's mission is to represent aggrieved consumers and shareholders *pro bono*; it has won millions of dollars for class members in multiple cases. *Id. See also, e.g.,* Rachel M. Zahorsky, "Unsettling Advocate," *ABA Journal* (April 2010) ("'What [the Center] is doing is something very necessary: being there to protect classes from potentially collusive settlements between businesses and lawyers,' says Todd Zywicki, a George Mason University law professor.").

Class counsel piles its rhetoric even higher by saying that the Center favors "tort reform," attributing bad intent to the Center's attorneys by adding that this phrase is "often interpreted as the reduction of the number of class actions prosecuted in the United States." (Plaintiffs' Response to Objections at 4.) The passive voice in that last phrase hides the lack of any supporting authority for the proposition. If the goals or motives of the Center's attorneys are for some reason at issue, they should at least be discussed fairly. In the courtroom, the Center's goals and motives are to help class members receive appropriate representation, and to object when class members do not. Providing *pro bono* assistance to legitimately aggrieved objectors strengthens the American class action system; the Center's activities have nothing to do with "a mission to disrupt and destroy the class action process" or "to eliminate Rule 23 rights" except in  class counsel's persecution fantasies. In any event, Rule 23(e) permits "***any*** class member" to object; notably, there is no restriction upon the rights of class members to retain attorneys with popular or unpopular political views.

Class counsel also demonstrates an unattractive expertise in the art of innuendo. In particular, it suggests that a blog post in which the Center invited potential class members to contact it "could raise questions" and that the

21

subsequent revision of that post demonstrates some sort of impropriety. (Plaintiffs' Response to Objections at 4 n.7.) The reason that class counsel does not actually raise questions about the blog post itself is that there are no legally cognizable questions to raise. The Center's speech criticizing an inflated attorneys' fees request did not violate any rules of professional conduct and was fully protected by the First Amendment. *See In re Primus*, 436 U.S. 412 (1978) (solicitation of prospective litigants by nonprofit organizations that engage in litigation is "a form of political expression" and "political association" that constitutes expressive and associational conduct entitled to First Amendment protection). The Center's removal of that language signaled no misconduct; rather, it signaled the fact that a client had already retained the Center.

Class counsel criticizes the Center for having a "stated ideological agenda." (Plaintiffs' Response to Objections at 6.) The stated ideological agenda they refer to, apparently, is the agenda of Center attorneys to protect the interests of unrepresented class members from conflicts of interest. (Young Objection at 27.) This Objector can only respond to class counsel's claim by suggesting that the Center's "stated ideological agenda" is one which class counsel would do well to adopt.

X.   **The Objector Wishes to Withdraw Section VII From His Original Objection.**

Attorney Daniel Greenberg would like to take the opportunity here to withdraw one substantial portion of the Young Objection, and furthermore to take the opportunity to apologize to the Court, the parties and their counsel, and to the public for the mistaken inclusion of that portion and for another relatively minor error in the Young Objection.

First, I withdraw Section VII from the Young Objection in its entirety. I misunderstood one clause of the Settlement Agreement, and as a consequence I drew some faulty inferences in Section VII of the original Young Objection. The remainder of the Young Objection, as originally filed and as reiterated and emphasized in this brief, stands.

Second, I mistakenly suggested that I was the objector, and not the objector's attorney, in one sentence of the 10,000-word Young Objection. My mistaken one-word omission did not change the argument or analysis contained in the objection, and this one-word mistake can be excised from the brief completely without changing its argument in any respect.[8]

The plaintiffs (or, alternatively, the plaintiffs' attorneys) have suggested in their brief that these mistakes have some kind of larger meaning with respect to the quality of the representation that my client has received. (*See, e.g.*, Plaintiffs' Response to Objections, at pp. 5-6.) I take full responsibility for these errors. It has been suggested to me that an advocate should never admit error, and of course there is a case that at least one of these errors is essentially typographical and inconsequential. In any case, I hope this Court will not agree with the rather aggressive claim of class counsel that my errors make the entire Young Objection "for all intents and purposes, an inaccurate argument." (Plaintiffs' Response to Objections at 5.) But errors are errors, and I apologize for including a section of the brief that did not live up to my standards.

---

[8] To state the obvious, it is a convention in many contexts to refer to the same entity as either the plaintiff or as the plaintiff's attorney, or as either the defendant or as the defendant's attorney, or as either the objector or as the objector's attorney. But class counsel's charge is fair enough: in this context, it was a mistake.

Finally, I would like to thank the Court for giving the parties permission to submit an additional round of briefing: I think the additional briefing has clarified several matters and will likely save the parties some time in the courtroom.

## CONCLUSION

The *cy pres* provisions of the settlement have not been adequately noticed to the class, and impermissibly put the interests of third parties ahead of class counsel's putative clients. If the settlement cannot be reformed to allocate funds to claiming class members ahead of third-party charities, it must be rejected.

Class counsel is requesting just short of $14 million out of under $34.4 million (and quite likely much lower) for itself; this figure of over forty percent of class benefit is far too high, and should be reduced to, at most, 25% of class benefit actually realized.

Dated: June 20, 2011

Respectfully submitted,

*/s/ Daniel Greenberg*
Daniel Greenberg (AR BAR 2007-193)
   *Admitted pro hac vice*
GREENBERG LEGAL SERVICES
CENTER FOR CLASS ACTION FAIRNESS LLC
55 Fontenay Circle
Little Rock, AR  72223
Tel. (501) 588-4245
DnGrnbrg@gmail.com

*/s/ Christopher M. Arfaa*
Christopher M. Arfaa (Pa. Bar No. 57047)
   *Appearing as local counsel*
LAW OFFICES OF CHRISTOPHER M. ARFAA, P.C.
150 N. Radnor Chester Rd., Suite F-200
Radnor, PA  19087
Tel. (610) 977-2001
carfaa@arfaalaw.com

4823-7667-5081, v. 1