## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

CAROL M. McDONOUGH, et al.,                :
    Plaintiffs,                               :
                                   :
                                   :        CIVIL ACTION
            v.                       :
                                   :        NO. 06-242
TOYS "R" US, INC. d/b/a BABIES "R"          :
US, et al.,                                :
    Defendants.                              :

---

ARIEL ELLIOTT, et al.,                     :
    Plaintiffs,                              :
                                   :        CIVIL ACTION
            v.                       :
                                   :        NO. 09-6151
TOYS "R" US, INC. d/b/a BABIES "R"          :
US, et al.,                                :
    Defendants.                              :
                                   :
                                   :

### ORDER

**AND NOW**, this 4 day of January 2012, it is **ORDERED** that the Attached

Memorandum amends the Memorandum filed on December 21, 2011 (ECF No. 788).

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:            Copies **MAILED** on _____ to:

O:\ABB 2012\L - Z\McDonough 2012-1-3 order amended order.wpd

1

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CAROL M. MCDONOUGH, *et al.*, | ) | No. 2:06-cv-0242-AB |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOYS "R" US, INC., d/b/a Babies "R" Us, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ARIEL ELLIOTT, *et al.*, | ) | No. 2:09-cv-06151-AB |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOYS "R" US, INC., d/b/a Babies "R" Us, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

January 4, 2012                                                                   **Anita B. Brody, J.**

**<u>AMENDED MEMORANDUM</u>**

Following five years of antitrust class action litigation between consumers, a baby product

retailer, and baby product manufacturers, class counsel have brought before me petitions for final

approval of the settlement agreement (Doc. No. 737);[1] for attorneys' fees, expenses, and special

incentive awards for class representatives (Doc. No. 738); for final approval of the plan of

---

[1] Defendants include Toys "R" Us, Inc.; Babies "R" Us, Inc.; Toys "R" Us-Delaware, Inc.; Babybjörn, AB; Britax Child Safety, Inc.; Kids Line, LLC; Maclaren USA, Inc.; Medela, Inc.; Peg Perego U.S.A., Inc.

allocation (Doc. No. 739);[2] and for an updated notice of correction regarding Defendant Regal

Lager, Inc.'s payment to the settlement fund (Doc. No. 782).[3]  After holding a final fairness

hearing on July 6, 2011 and reviewing the post-hearing submissions, I will now approve the final

settlement agreement and allocation plan, as well as sign the updated notice of correction.  I will

also grant class counsel's request for attorney fees, reimbursement of expenses and incentive

awards for class representatives.

## I.    Background

A class of consumers (collectively, "Plaintiff Consumers") brought this class action,

*McDonough, et al. v. Toys "R" Us, Inc., et al.* (06-cv-242), against Babies "R" Us, Inc.

("BRU"), a leading national retail chain in the baby products market, and a number of other baby

product manufacturers (collectively, "Defendant Manufacturers") for violating Sections 1 and 2

of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2.[4]  In *McDonough*, consumers alleged that BRU

conspired with Defendant Manufacturers to restrict competition by requiring all retailers to sell

their goods at or above a minimum resale price.  As a result, consumers alleged that they paid

inflated prices for baby products produced by Defendant Manufacturers.[5]

On July 15, 2009, I granted class certification under *Federal Rule of Civil Procedure*

*23(b)(3)* and created subclasses based on the different products the consumers purchased and the

---

[2] This Memorandum and related Orders apply to *McDonough, et al. v. Toys "R" Us, Inc., et al.* (06-cv-242) and *Elliot, et al. v. Toys "R" Us, Inc., et al.* (09-cv-6151).  For the sake of clarity, the internal "Doc." References refer to the listings on the *McDonough* docket.

[3] Class counsel initially filed a Motion to Enforce Settlement Agreement Against Regal Lager (Doc. No. 725), but Regal Lager has since made its full payment to the settlement fund.

[4] During a telephone conference on May 13, 2009, counsel for the Plaintiff Consumers stated that they were no longer pursuing claims under § 2 of the Sherman Anti-Trust Act.

[5] In a separate but related matter, on-line retailers Babyage.com, Inc. ("BabyAge") and The Baby Club of America, Inc. ("Baby Club") (collectively, "Plaintiff Retailers") filed an antitrust suit against BRU and Defendant Manufacturers for conspiring to impose Resale Price Maintenance ("RPM") Agreements (05-cv-06792).  The RPM Agreements allegedly prevented Plaintiff Retailers from discounting items and in some instances caused Defendant Manufacturers to terminate their contracts with them.  On March 3, 2006, I consolidated the Consumer Class Action and Plaintiff Retailers cases for purposes of discovery (Doc. No. 17).  Plaintiff Retailers retained separate and independent counsel for the duration of the litigation.

timeframe of those purchases. Doc. No. 585. I did not permit subclass periods to extend beyond the date when the case was first filed, so additional consumers filed a related suit on December 28, 2009 (*Elliott et al. v. Toys "R" Us, Inc., et al.* (09-cv-6151)). On January 31, 2011, I issued an order preliminarily approving settlement that set the parameters of the *Elliott* subclasses and consolidated the two cases. Doc. No. 706. In that preliminary settlement, I also approved the form, substance, and publication procedures for the class notice. In addition to informing putative class members of the proposed settlement and their rights to object or opt-out, the notice also informed class members of a final fairness hearing scheduled for July 6, 2011. At the hearing, counsel for Plaintiff Consumers made their case for the settlement and defense counsel had no objections. Doc. No. 783. Ten members of the class, however, filed objections to various aspects of the settlement with the Court, and two of them made oral presentations at the hearing. I will address all of those objections.[6] Following the hearing, I ordered class counsel to provide legal bills and other documentation in support of their pending motions for *in camera* review. Doc. No. 775. After considering the parties' positions and the claimants' objections, in conjunction with class counsel's legal bills and supporting documentation, I approve the settlement agreement and related motions for the following reasons.

## II.    Final Approval of Settlement

According to *Federal Rule of Civil Procedure 23(e)*, "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." In other words, "a class action cannot be settled without the approval of the court and

---

[6] That number includes the objection filed by Maria Sierotowicz (Doc. No. 732), who admitted to not being a member of the class, and the objection filed and then withdrawn by Shawn Golden (Doc. No. 769). Counsel for Objectors Kevin Young and Alison Lederer appeared before the Court at the final fairness hearing on July 6, 2011. Attorney Mark W. Ford, counsel for Joint Objectors Kelly Spann, Jennifer Popiel, and Mathilda Fenton, was denied the opportunity to speak and terminated from the docket due to his administration suspension from practicing law in the state of Pennsylvania. Doc No. 772.

a determination that the proposed settlement is 'fair, reasonable and adequate.'" In re Prudential

Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 316 (3d Cir. 1998) (quoting In re G.M.

Trucks Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785 (3d Cir. 1995)).

The Third Circuit applies a nine prong test, known as the *Girsh* factors, when determining

the fairness, adequacy, and reasonableness of a proposed class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the
> class to the settlement; (3) the stage of the proceedings and the amount of discovery
> completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the ability of the defendants
> to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in
> light of the best possible recovery; (9) the range of reasonableness of the settlement fund
> to a possible recovery in light of all the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and ellipses

omitted).  In more recent decisions, the Third Circuit has suggested an expansion of the nine-

prong test when appropriate to include what are now referred to as *Prudential* considerations,

such as:

> the maturity of the underlying substantive issues, as measured by experience in
> adjudicating individual actions, the development of scientific knowledge, the extent of
> discovery on the merits, and other facts that bear on the ability to assess the probable
> outcome of a trial on the merits of liability and individual damages; the existence and
> probable outcome of claims by other classes and subclasses; the comparison between the
> results achieved by the settlement for individual class or subclass members and the
> results achieved-or likely to be achieved-for other claimants; whether class or subclass
> members are accorded the right to opt out of the settlement; whether any provisions for
> attorneys' fees are reasonable; and whether the procedure for processing individual
> claims under the settlement is fair and reasonable.

In re Prudential, 148 F.3d at 323; see also, In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350

(3d Cir. 2010).  District courts "must make findings as to each of the *Girsh* factors, and the

*Prudential* factors where appropriate," and "cannot substitute the parties' assurances or

conclusory statements for [their] independent analysis of the settlement terms."  In re Pet Food,

629 F.3d at 350-51.

Here, the *Girsh* factors and relevant *Prudential* considerations weigh in favor of settlement approval.

### a. The Complexity, Expense, and Likely Duration of the Litigation

If this matter were to proceed to trial, the litigation would be lengthy. Antitrust class actions are particularly complex to litigate and therefore quite expensive. See In re Auto, Refinishing Paint Antitrust Litig., 2008 U.S. Dist. LEXIS 569, at *14 (E.D. Pa. Jan. 3, 2009) ("This litigation, *like most antitrust cases*, has been exceedingly complex, expensive, and lengthy.") (emphasis added). "'An antitrust class action is arguably the most complex action to prosecute . . .'" In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (quoting In re Motorsports Merchandise Antitrust Litig., 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000)). See also In re Shopping Carts Antitrust Litig., MDL No. 451, 1983 U.S. Dist. LEXIS 11555, at *17 (S.D.N.Y. Nov. 18, 1983) (noting that "antitrust price fixing actions are generally complex, expensive, and lengthy"). Parties reached this settlement just as they were preparing to conduct six separate, consecutive jury trials in which they would have had to address disputed contractual agreements between manufacturers, distributors, and retailers. Both sides would have likely called several expert witnesses to the stand and would have had to address disputed business practices over a number of years. Thus this factor counsels in favor of settlement as private resolution of the parties' conflict reduces expenses and avoids delay.

### b. The Reaction of the Class to the Settlement

Over 1,281,636 known class members received notice of the settlement via direct mail. A short-form notice was published in nationally circulated consumer magazines and there was "banner" advertising on highly trafficked websites. Additionally, an informational website specifically tailored to the settlement (www.babyproductsantitrustsettlement.com) and a toll-free

hotline (1-888-292-8492) were established to provide notice and support to class members.  Pls.'

Motion Final Approval Settlement, Finegan Decl. Ex. 1, at ¶ 7.

The notice established a June 6, 2011 deadline for class members to opt-out of the settlement

or to file objections.  By that date, class members filed forty-one timely exclusion requests and

ten objections with the Court.  Jose C. Fraga Aff. ¶ 3.  One of the objections, however, was

withdrawn (Golden Objection (Doc. No. 769)), and one was submitted by an individual who was

not a member of the class (Sierotowicz Objection (Doc. No. 732)).  A named plaintiff submitted

one of the other objections to argue for higher incentive awards for the class representatives

(Zarfati Objection (Doc. No. 743)).[7]  Of the seven remaining objections, the two common themes

were that the settlement was too low and that the notice was inadequate.  By comparison,

thousands of claims were filed without objection.  By May 15, 2011 – ten weeks prior to the final

claim filing deadline – the Garden City Group (notice and settlement administrator) had already

received 3,142 claims online, 12,233 claims by mail, and 128 claims by fax for a total of

approximately 15,493 claims.  Finegan Decl. Ex. 1, at ¶ 17.  By the time of the final fairness

hearing, class members had submitted approximately 41,000 claims.  Final Fairness Hearing Tr.

35, July 6, 2011.  Although courts routinely infer support for a settlement from the absence of a

large number of objectors, courts "must be cautious about 'inferring support from a small

number of objectors to a sophisticated settlement.'"  Ikon Office Solutions, Inc. Sec. Litig., 194

F.R.D. 166, 179 (E.D. Pa. 2000) (citing In re Gen. Motors Corp., 55 F.3d at 812).  Nonetheless,

the limited number of objections reveals some measure of the strength and depth of the

opposition.

The most significant and detailed objection was submitted by the Center for Class Action

Fairness on behalf of class member Kevin Young (Doc. No. 749) and deals almost exclusively

---

[7] See infra Section VI for a discussion of the incentive award objection.

with matters related to class counsel's request for attorney fees and reimbursement of expenses, as well as the proposed allocation order.[8]  I will address those objections in the appropriate sections of the opinion.

In regard to the adequacy of notice objections, Allison Lederer argues that the notice should have included the specific amounts the individual Defendants would have to pay – as opposed to only providing the aggregate number of $35,500,000.  Lederer Objection 4-5.  However, the notice included the proposed percentage allocations for each Defendant Subclass, which were proportionately consistent with the damage calculations of Plaintiffs' expert Dr. Martin Asher. See Order Prelim. Approving Settlement and Providing Notice Ex. 1, ¶ 5; Pls.' Mot. Final Approval Settlement, Asher Decl.  This is sufficient information for an intelligent prospective class member to decide if the proposed allocation is appropriate.  Furthermore, I have already addressed the adequacy of notice issue in my January 31, 2011 order, which held that the form and method of notification utilized in this case met the due process requirements of *Federal Rule of Civil Procedure 23*.  Doc. No. 706.  Therefore, I find that Lederer's objection is without merit.

Without requesting leave from this Court, Ms. Lederer filed a reply in support of her objection that reiterates the above complaint and also argues that the more than $35 million settlement was too low ("Second Lederer Objection").  Ms. Lederer claims that class counsel failed to take into account prejudgment interest.  But prejudgment interest from the date of injury is not available to antitrust plaintiffs.  See 15 U.S.C. § 15(a).  Ms. Lederer incorrectly cites to a district court case involving copyright infringement.  In the antitrust context, prejudgment interest is only available from the date the case was filed, and only then when defendants have

---

[8] In addition to submitting an initial objection, Young also filed a reply to class counsel's response (Doc. No. 766) and an additional objection five months after the final fairness hearing (Doc. No. 786).  I address the initial objection and reply in the section on attorneys' fees.  See infra Section VII for a discussion of the belated objection.

acted in bad faith.  <u>See</u> <u>id.</u>  Therefore, class counsel could not have anticipated whether or not Defendants would act in bad faith – which they have not.

Although they do not focus on prejudgment interest or provide any specific reasoning to support their objections, Clark Hampe and Clyde Padgett also argue that the settlement is inadequate.  I address their objections below in subsection h., which deals with the range of reasonableness of the settlement.

In sum, there were limited filings for exclusion and even fewer objectors.  Lederer's objections addressing the adequacy of the settlement were meritless.  As a result, the reaction of the class to the proposed settlement counsels in favor of approval.

### c. The Stage of the Proceedings and the Amount of Discovery Completed

These proceedings advanced to a sufficiently late stage prior to settlement that the related *Girsh* and *Prudential* factors also weigh in favor of approval.  Explaining the rationale behind the third *Girsh* factor, the Third Circuit wrote in *Prudential*:

> The parties must have an "adequate appreciation of the merits of the case before negotiating."  To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken.

<u>In re Prudential</u>, 148 F.3d at 319 (quoting <u>In re G.M.</u>, 55 F.3d at 813).  Over the past five years, parties have conducted extensive discovery that has included the review of over one million pages of documents, more than thirty depositions, and the exchange of expert reports.  By the time settlement negotiations began in earnest, discovery had already closed and the parties were preparing for trial.  The arms-length negotiations also involved in-person mediation before Professor Eric Green.  Therefore, the parties had already gained a thorough understanding of the strengths and weaknesses of their cases, and this settlement represents an informed resolution of the matter.  This factor weighs in favor of the settlement agreement.

### d. The Risks of Establishing Liability and Damages

These two *Girsh* factors are closely related, so I will address them together. In addition to the inherent risk in any trial, counsel would need to establish liability under the Supreme Court's recent *Leegin* decision. See Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877 (2007). This case hinges on the alleged Resale Price Maintenance ("RPM") agreements between BRU and Defendant Manufacturers that prevented other retailers from selling the Manufacturers' products at a discount. At the time of filing, such an agreement constituted a *per se* violation of the Sherman Antitrust Act. Yet in the midst of the litigation, the Supreme Court overturned nearly a century of precedent to rule that RPM agreements are no longer *per se* violations. See id. (overturning Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373 (1911)). Such a change meant that the RPM agreements would now be analyzed under a rule-of-reason test and *Plaintiff* would "bear[] the initial burden of showing that the alleged [agreements] produced an adverse, anticompetitive effect." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 315 (3d Cir. 2010) (citing Gordon v. Lewistown Hosp., 423 F.3d 184, 2010 (3d Cir. 2005)). Defendants, therefore, could argue that the challenged agreements constituted reasonable restraints on trade and were thus legal. See Leegin, 551 U.S. at 885-86.

Even if Plaintiffs could establish liability, they would not have had an easy time proving damages because there was no universal price "mark-up." The alleged RPM agreements did not necessarily remain constant over the years. The dispute over damages would likely have resulted in an expensive battle of the experts and there is no way to know how a jury would have responded to intricate economic data. Therefore, these two factors counsel in favor of settlement.

### e. The Risks of Maintaining the Class Action through the Trial

Although I already certified the *McDonough* classes in this case, class certification is subject to review and modification at any time during the litigation. See Zenith Lab., Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 512 (3d Cir. 1976). Since the commencement of this litigation, the Third Circuit and the Supreme Court have handed down seminal opinions that make it more difficult for district courts to grant class certification. See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008) (requiring district courts to "make a definitive determination that the requirements of *Rule 23* have been met before certifying a class"); Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011) (creating a higher "commonality" threshold for class action certification under *FRCP 23(a)(2)*). Following the Third Circuit's *Hydrogen Peroxide* opinion, I refused to extend the subclass periods beyond the initial filing of the *McDonough* suit. See McDonough v. Toys "R" Us, Inc., 638 F. Supp. 2d 461, 474 (2009). This decision led to the subsequent *Elliott* filing – in which class members sought certification for additional subclasses. I have not issued a separate class certification opinion regarding the *Elliott* subclasses, which are now being certified as part of the settlement agreement. But the dispute over extending the time periods for the additional subclasses would at the very least lead to lengthy delays and higher expenses.

These relatively recent higher court opinions are still being interpreted and therefore present a challenge to class counsel and increase the likelihood of unfavorable appellate review. The Supreme Court did not even announce the *Wal-Mart* decision until after class counsel filed the motion for final settlement approval, and the Third Circuit issued a precedential opinion interpreting the *Hydrogen Peroxide* requirements after that. See Behrend v. Comcast Corp., 655 F.3d 182 (3d Cir. 2011). Therefore, this *Girsh* factor counsels in favor of the settlement.

    **f.   The Ability of the Defendants to Withstand a Greater Judgment**

This factor is neutral. The ability of defendants to withstand a greater judgment generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011). That does not appear to be the case. I have not been presented with any evidence indicating that BRU or Defendant Manufacturers are at risk of insolvency. Yet it is impossible to predict the future finances of consumer product companies, especially in this economic climate. Although the matter has now been resolved, Defendant Regal Lager delayed payment on its proposed settlement contribution due to a lack of funds. Even if solvency could be assured, I would follow my district court colleagues within the Third Circuit who "regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts." Bredbenner v. Liberty Travel, Inc., 2011 U.S. Dist. LEXIS 38663, at *42 (D.N.J. Apr. 8, 2011) (citing McCoy v. Health Net, Inc., 569 F. Supp. 2d 448, 462 (D.N.J. 2008); Weber v. Gov't Emples. Ins. Co., 262 F.R.D. 431, 446 (D.N.J. 2009)). Therefore, this *Girsh* factor neither supports nor undercuts the parties' settlement.

### g. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

Without providing much in the way of explanation, Objectors Clarke Hampe and Clyde Padgett argue that the proposed settlement does not fall in the range of reasonableness. Padgett argues that the case should not be settled "on the cheap" due to the significant evidence of anti-trust violations, and Hampe simply declares that the "total settlement is inadequate." Padgett Objection 4 (Doc. No. 746); Hampe Objection 2 (Doc. No. 752).

But these last two *Girsh* factors, often analyzed in conjunction, confirm that the parties' settlement should be approved. "'The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is

grossly inadequate and should be disapproved.'" In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 263 (D.N.J. 2000) (citation omitted). Rather, the recovery percentage '"must represent a material percentage recovery to plaintiff,' in light of all the risks considered under *Girsh*." Id.

Here, the settlement amount represents approximately 24 percent of estimated actual damages. Pls.' Motion Final Approval Settlement 16. I have previously found a 15 percent recovery to be reasonable. See In re Corel Corp. Sec. Litig., 293 F. Supp. 2d 484, 489-90 (E.D. Pa. 2003). And other Judges on this Court have upheld far smaller settlements. In *Nichols v. Smithkline Beecham Corp.*, Judge Padova upheld a settlement in the range of 9.3-13.9 percent of damages. No. 00-6222, 2005 U.S. Dist. LEXIS 7061, at *52 (E.D. Pa. Apr. 22, 2005). He found that percentage range to be "consistent with those approved in other complex class action cases." Id. (citing In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 257 (D. Del. 2002)). In a securities class action, the Third Circuit upheld a settlement in the 36-37 percent range, noting that it "far exceed[ed] recovery rates of any case cited by the parties." In re Cendant Corp. Litig., 264 F.3d 201, 241 (3d Cir. 2001). In upholding the settlement, the Third Court specifically pointed to the trial court's application of a range of recoveries from 1.6-14 percent. Id. (citing In re Cendant Corp., 109 F. Supp. 2d at 263).

Although this matter does not bear any uniquely heightened risks of litigation, there is always an inherent risk in proceeding with litigation – not the least of which is the inevitable delay associated with it. In *In re G.M. Trucks Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, the Third Circuit warned "against demanding too large a settlement . . . after all, settlement is a compromise, yielding of the highest hopes in exchange for certainty and resolution." 55 F.3d 768, 806 (3d Cir. 1995). With that caution in mind, I agree with class counsel and find that the $35,500,000 figure is reasonable.

### h. *Prudential* Considerations

In *Prudential*, the Third Circuit explained that due to a "'sea-change in the nature of class actions' after *Girsh* was decided thirty-five years ago, it may be helpful to expand the *Girsh* factors" to add additional topics for the district courts to take into consideration when reviewing a proposed settlement agreement.  In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010) (citing In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283 (3d Cir. 1998)).  Here, the relevant *Prudential* factors lend additional support for approving this settlement.  The underlying substantive issues are mature in light of the experience of the attorneys, extent of discovery, posture of the case, and mediation efforts undertaken.  See In re Prudential, 148 F.3d at 323.  Additionally, class members have the right to opt-out of the settlement, and the claims administrator has sufficient discretion to ensure that the individual claims are handled in a responsible and just manner.  See id. (as applied to Settlement Agreement ¶¶ 18, 31; Final Fairness Hearing Tr. 22, July 6, 2011).  Additionally,  as I will discuss in the next section, the "provisions for attorneys' fees are reasonable."  Id.

## III.    Attorneys' Fees & Expenses

Although there are separate objections to the request for attorneys' fees and for the reimbursement of expenses, I will address both topics together for the sake of clarity and simplicity.

Class counsel requests attorneys' fees in the amount of $11,833, 333.33, which represents 33-1/3 percent of the gross settlement amount.  They also request reimbursement of out-of-pocket litigation expenses in the amount of $2,229,775.60.  *Federal Rule of Civil Procedure 23(h)* states: "In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement."  The proposed

settlement agreement provides for the award of attorneys' fees and expenses.  Settlement

Agreement ¶ 26.  Nonetheless, "a thorough judicial review of fee applications is required in all

class action settlements."  In re Prudential, 148 F.3d at 333 (quoting In re G.M., 55 F.3d at 819).

    Courts generally use one of two methods for assessing attorneys' fee requests: the lodestar

method or the percentage-of-recovery method.  Id.  The former is "more commonly applied in

statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial

litigation in cases where the expected relief has a small enough monetary value that a

percentage-of-recovery method would provide inadequate compensation."  Id.  The latter

method, on the other hand, is "generally favored in cases involving a common fund . . . ."  Id.

Either way, "it is sensible for a court to use a second method of fee approval to cross-check its

initial fee calculation."  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005).

This case involves a common fund, and therefore the percentage-of-recovery method is

appropriate.  However, the lodestar method is also relevant as a cross-check.

### 1.  Common Fund

    "[I]n the traditional common fund situation . . . the district court . . . should attempt to

establish a percentage fee arrangement agreeable to the Bench and plaintiff's counsel."  Report

of the Third Circuit Task Force on Court Awarded Attorney Fees, 108 F.R.D. 237, 255 (1985).

In order to make that determination, the Third Circuit has identified ten factors for the Bench to

consider.  These include:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or
> absence of substantial objections by members of the class to the settlement terms and/or
> fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the
> complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of
> time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the
> value of benefits attributable to the efforts of class counsel relative to the efforts of other
> groups, such as government agencies conducting investigations, (9) the percentage fee
> that would have been negotiated had the case been subject to a private contingent fee

arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

In re Diet Drugs Prod. Liab. Litig., 582 F.3d 524, 541 (3d Cir. 2009) (citing Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000); In re Prudential, 148 F.3d at 336-40). These *Gunter/Prudential* factors are not exhaustive, and a district court should consider "'any other factors that are useful and relevant with respect to the particular facts of the case.'" In re Diet Drugs, 582 F.3d at 541 n.34 (quoting In re AT&T Corp. Sec. Litig., 455 F.3d 160, 166 (3d Cir. 2006)).

### a.   The Size of the Fund Created and the Number of Persons Benefitted

The settlement is for $35,500,000 and class members submitted approximately 41,000 claims by the July 6, 2011 final fairness hearing. The deadline for submissions, however, was August 1, 2011 so class members likely submitted additional claims after the hearing. Given the disparity in potential awards – based on the individual subclasses with differently priced products and nature of the supporting documentation – it is difficult to predict how much each claimant will receive. Yet even if there were 45,000 claimants, and all were receiving twenty percent of the purchase price (as proposed for those with proper documentation) of a $300 baby product (e.g., Peg Perego stroller), the total amount of awards would only run to $2,700,000. That would still leave plenty of funding to allow for the award of treble damages ($2,700,000 x 3 = $8,100,000), which is the maximum amount permitted under the antitrust laws. Thus, class members are likely to enjoy the maximum benefit from the size of the fund.

In general, as the size of the settlement fund increases the percentage of the award decreases. See In re Prudential, 148 F.3d at 339. "The basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" Id. (citing In re First Fidelity Bancorporation

Sec. Litig., 750 F. Supp. 160, 164 n.1 (D.N.J. 1990)).  But this case does not involve a settlement

award that is so large as to necessitate an automatic reduction in the percentage award.  The

*Prudential* recovery was in excess of $1 billion, and the Third Circuit cited to the trial court's

analysis of settlements above $100 million for establishing the inverse relationship principle.

See In re Prudential, 148 F.3d at 339 (referencing In re Prudential, 962 F. Supp. 572, 585 (D.N.J.

1997)).  At $35,500,000, this proposed settlement fund is big enough to benefit the class

members but not large enough to qualify for a mega-fund reduction in fees.  Therefore, the size

of the fund and the number of people who will receive the maximum damages militate in favor

of approving this fee petition.

### b.   The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel

Although the absolute number is small, the objections almost exclusively focus on class

counsel's fee request.  As noted above, the court received ten objections.  One, however, was

withdrawn and another was submitted by an individual who was not a member of the class.  A

named plaintiff objecting to the quantity of the incentive award for class representatives

submitted another.  Of the remaining seven objections, six take issue with the thirty-three and a

third percent award of attorneys' fees.

In a joint filing, Kelly Spann, Jennifer Popiel, and Mathilda Fenton object to class counsel's

failure to post the attorneys' fees request on the settlement website before the June 6, 2011

deadline for filing objections.  Alison Lederer and Kevin Young echo that objection.  As

discussed below in greater detail in the section on "Costs," class counsel did not live up to its

obligations under the class notice to post this information on the website as soon as they filed the

motion for fees.  On May 24, 2011, class counsel filed the motion for attorneys' fees and costs

on ECF/Pacer, but counsel did not post it on the website until the deadline had passed.  Although

not as severe as their failure to post their request for reimbursement of costs – since the notice at least informed prospective class members that counsel intended to seek a third of the settlement in attorneys' fees – I would still like to admonish class counsel for its blatant oversight.

In addition to the notice issue, the objectors focus on the percentage request itself. Clyde Padgett sums up the general sentiment of the objections when he writes: "[A] request for 33 1/3 percent of the settlement fund is excessive." Padgett Objection (Doc. No. 746). Christopher Pericone adds: "The argument that a flat 33 1/3% contingency fee is reasonable or customary simply does not hold water. . . . I am sure that 33 1/3% would be considered by many to be exorbitant." Pericone Objection. Kevin Young, the most vociferous objector, argues that the Court should apply a 25% benchmark in calculating attorneys' fees and that the benchmark percentage should include attorneys' fees *and* expenses. Young Objection 8. For a discussion of the appropriate percentage, see *infra* subsection g.

Although I address the percentage-based objections below, I note that these detailed objections – especially those that highlight class counsel's delayed posting of the attorneys' fee motion on the settlement website – somewhat counsel against approving the proposed settlement.

### c.   The Skill and Efficiency of the Attorneys Involved

The three co-lead counsel firms, Hagens Berman Sobel Shapiro, LLP ("HBSS"), Spector Roseman Kodroff & Willis, P.C. ("SRKW"), and Wolf Haldenstein Adler Freeman & Herz, LLC ("Wolf Haldenstein") are experienced plaintiffs' firms that have done extensive work in the antitrust field. HBBS is a regular on the *National Law Journal*'s annual "hot" list of the leading plaintiffs' firms in the country. It has served as lead counsel in some of the largest antitrust matters in U.S. history, including a multi-billion dollar settlement against Visa and MasterCard. SRKW spearheaded the *In re Linerboard* antitrust litigation that settled for more than $200

million and is one of the highest antitrust settlements in the Third Circuit Court of Appeals.  See 321 F. Supp. 2d 619 (E.D. Pa. 2004).  The firm also served as lead counsel in *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999), and *Stop and Shop Supermarket Co. v. Smithkline Beecham Corp.*, 2005 U.S. Dist. LEXIS 9705 (E.D. Pa. May 19, 2005), two major antitrust matters within the Third Circuit.  Wolf Haldenstein has similarly served as co-lead counsel in major class action lawsuits throughout the country.  See, e.g., In re DRAM Litig., No. 02-1486-PJH (N.D. Cal. Aug. 15, 2007); In re MicroStrategy Sec. Litig., 150 F. Supp. 2d 896 (E.D. Va. 2001).  All three firms have brought their considerable experience to bear in reaching this settlement.  Also, the fact that plaintiffs' counsel obtained this settlement in the face of formidable legal opposition further evidences the quality of their work.  This factor weighs in favor of approval.

### d.  The Complexity and Duration of the Litigation

I have already addressed this matter above in my Section II discussion of the *Girsh* factors. In addition, class counsel had to address three significant changes in the law handed down by higher courts at different stages of this five-year litigation.  Besides dealing with the Supreme Court's *Leegin* decision and the Third Circuit's *Hydrogen Peroxide* decision (both discussed above), counsel had to undertake several rounds of briefing to respond to the Supreme Court's evolving pleading standards.  Following the 2006 filing of this case, the Supreme Court decided *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which heightened the pleadings standards for plaintiffs and required additional briefing.  The Supreme Court's decisions made the case more complex and extended the duration of the litigation, weighing in favor of approval.

### e.  The Risk of Nonpayment

In every class action in which class counsel bring a case on a contingency basis, there is always some risk of nonpayment. However, the risk here is minimal. As noted above in my discussion of the sixth *Girsh* factor, "The Ability of the Defendants to Withstand a Greater Judgment", the risk of nonpayment is at best a neutral consideration. In *In re Rite Aid Corp.*, the Third Circuit dealt with this factor by considering the risk of the defendants going out of business. See 396 F.3d 294, 304 (3d Cir. 2005). Regal Lager, one of the defendant manufacturers, initially said that it did not have the money to make its settlement payment. Bengt Lager Decl. (Doc. No. 729). And as noted above, no company is safe in this troubled economy. But there was otherwise no indication that any of the companies were in danger of insolvency and therefore the risk of nonpayment was fairly minimal. This is a neutral factor.

### f.   The Amount of Time Devoted to the Case by Plaintiffs' Counsel

In class counsel's declarations they provide summaries of the amount of time spent on this matter. SRKW, HBSS, and Wolf Haldenstein, the three co-lead counsel firms, logged 20,945.50, 13,561.75, and 16,846.65 hours respectively. Spector Decl.; Fegan Decl.; Fait Decl. In total, class counsel devoted 81,200.82 hours to this litigation. Such a large number of hours represents a substantial commitment to this litigation and weighs in favor of approving the fee request. The record of this litigation also indicates that the time spent by plaintiffs' counsel was necessary for the successful prosecution of this case considering both the complexity involved and the defense mounted by defendants.

### g.   The Awards in Similar Cases

As I noted in *In re Corel*, this District's fee awards generally range between nineteen and forty-five percent of the common fund. See In re Corel Corp., Inc. Sec. Litig., 293 F. Supp. 2d 484, 497 (E.D. Pa. 2003) (Brody, J.) (referencing In re Smithkline Beckman Corp. Sec. Litig.,

751 F. Supp. 525, 533 (E.D. Pa. 1990)); see also Bredbenner v. Liberty Travel, Inc., 2011 U.S.

LEXIS 38663, at *59 (D.N.J. Apr. 8, 2011) ("In common fund cases, fee awards generally range

anywhere from nineteen percent to forty-five percent of the settlement fund.") (citing In re G.M.,

55 F.3d at 822). And just as I held in In re Corel, the thirty-three and a third percent fee request

in this complex case is within the reasonable range. See id.; see also, Cullen v. Whitman Med.

Corp., 197 F.R.D. 136, 150 (2000) (Brody, J.) (citing Judge O'Neill's award of one-third of the

settlement fund for attorney's fees in Perod, No. 98-CV-6787).

    As noted above, Objector Kevin Young advocates a twenty-five percent benchmark for

attorneys' fees, and he is supported by academic studies that have found medians of twenty-five

percent for such fee awards. See, e.g., Brian T. Fitzpatrick, An Empirical Study of Class Action

Settlements and their Fee Awards, 7 J. Empirical Legal Stud. 811 (2010) (analyzing 688 class

action settlements in 2006 and 2007 and finding a mean of 25% and a median of 25.4% for the

award of attorneys' fees). Objector Allison Lederer also cites a study by Theodore Eisenberg &

Geoffrey P. Miller in which the scholars analyze 689 class action settlements from 1993-2008

and find a mean award of twenty-three percent for attorneys' fees. See Attorney Fees and

Expenses in Class Action Settlements: 1993-2008, 7 J. Empirical Legal Stud. 248 (2010). The

academy, however, is only one source of data, and lower medians do not preclude higher

percentage awards for attorneys' fees. Of course, each award must be made on a case-by-case

basis.

    I am also more inclined to follow the case law within the Third Circuit. In In re Ravisent

Techs., Inc. Sec. Litig., for example, Judge Surrick noted that "courts within this Circuit have

typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses." 2005 U.S.

Dist. LEXIS 6680 (E.D. Pa. Apr. 18, 2005) (referencing In re CareSciences, Inc. Sec. Litig., Civ.

A. No. 01-5266 (E.D. Pa. Oct. 29, 2004) (awarding one-third recovery of $3.3 million settlement fund, plus expenses). Mr. Young is correct that the lack of objections was a factor for Judge Surrick in approving the fee award. See id. at *39. Mr. Young is also correct that courts within this Circuit sometimes combine fees and costs when approving the one-third figure. Judge Surrick, in fact, did that in the above case. See also Godshall v. Franklin Mint Co., 2004 U.S. Dist. LEXIS 23976 (E.D. Pa. Dec. 1, 2004). Yet that is not always the case, and the competing case law citations by class counsel and Objector Young do not provide a definitive answer.[9] *In re Pet Foods Prods. Liab. Litig.* provides a perfect example of this tension surrounding counsel fees. 629 F.3d 333, 361 (3d Cir. 2010). The majority did not even review the thirty-one percent award of attorneys' fees since it was not appealed and the judges did not see anything inherently wrong with the award. Yet in a partial concurrence and dissent, Judge Weis raised the issue *sua sponte* and faulted the majority for not remanding the fee issue for additional briefing and consideration. Judge Weis, however, did not say that the thirty-one percent was necessarily unreasonable but rather observed that "[t]here appears to be a perception in many district courts that the twenty-five percent 'benchmark' is an appropriate place to begin the fee analysis for most common fund purposes." Id. at 361 (Weis, J., concurring and dissenting). He then qualified that benchmark by stating that it should not be "the end of the discussion" but rather "a beginning point for determining whether a particular fee is reasonable." Id.

In the end, this factor neither supports nor undercuts the proposed fee award and is neutral. But as discussed below, this factor – in conjunction with the lodestar cross-check – weighs in favor of approval.

---

[9] For an example of the complicated matter of calculating expenses, see *Lachance v. Harrington* in which the court deducted litigation expense from the gross settlement fund before applying the attorneys' fee percentage but did not deduct the cost of administering notice. 965 F. Supp. 630, 649 (E.D. Pa. 1997).

**h.  The Value of Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups**

Class counsel was not assisted by a government investigation.  In *Prudential*, the Third Circuit singled this factor out for important consideration by district courts.  See In re Prudential, 148 F.3d at 338.  The appeals court remanded the trial court's fee award for wrongly "credit[ing] class counsel with creating the entire value of the settlement" and overlooking the considerable contributions of a multi-state life insurance task force.  Id.  Yet this case is more similar to *In re AT&T*, in which the Third Circuit found that "class counsel was not aided by the efforts of any governmental group, and the entire value of the benefits accruing to class members is properly attributable to the efforts of class counsel."  In re AT&T, 455 F.3d at 173.  The Federal Trade Commission ("FTC") did not initiate an investigation of potential antitrust violations by Toys "R" Us in the baby products market until two years after class counsel brought this suit.  See Joseph Pereira, Toys "R" Us Faces a U.S. Antitrust Inquiry, Wall St. J., Oct. 17, 2009, at A3 (quoting a Toys "R" Us spokesman as saying that the FTC began looking into the issue in late 2008, about a year before the *Wall Street Journal* first reported on the governmental investigation).  As part of its investigation, the FTC requested documents from HBSS attorney Elizabeth Fegan.  See id.  Although the FTC had issued a 1998 order barring Toys "R" Us from engaging in anticompetitive tactics, that consent decree signed by Toys "R" Us did not address the company's growing involvement in the baby product industry.  The FTC, moreover, settled for a relatively paltry amount of $1.3 million, which is far less than the amount Toys "R" Us (via Babies "R" Us) contributed to the $35,500,000 settlement agreement.  Compare Press Release, Federal Trade Commission, Toys "R" Us to Pay $1.3 Million Penalty for Violating FTC Order (Mar. 29, 2011), http://www.ftc.gov/opa/2011/03/toysrus.shtm with Settlement Agreement Ex. H.  This factor supports the approval of class counsel's fee request.

### i. The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Arrangement at the Time Counsel was Retained

It is extremely difficult to determine what fee would have been negotiated at the outset of the litigation. I can only look to my colleagues who have attempted to apply this factor, even though I recognize that the contingent fee can only be "based on the particular facts and circumstances of the specific litigation under consideration." In re United States Bioscience Sec. Litig., 155 F.R.D. 116, 119 (E.D. Pa. 1994). After appointing a Special Master to study the award of attorneys' fees in a class action securities suit, Judge Dalzell approved of the Special Master's recommendation that a thirty percent fee award was an appropriate estimate of what would have been negotiated. See id. (citing Report and Recommendation of Special Master Judge Arlin M. Adams). Judge Katz noted that in private contingency fee cases, "plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery." In re Ikon, 194 F.R.D. at 194. But Judge Katz was referring to tort matters, in particular.

In the end, I do "not give great weight to this hypothetical exercise." In re Prudential, 148 F.3d at 340. Although this is not a proposed settlement in the range of *Prudential*'s $1 billion, this is still a significant sum of money that should not be subjected to such arbitrary calculations. Therefore, this factor is neutral and will not be considered to count for or against the proposed fee request.

### j. Any Innovative Terms of Settlement

In the absence of any innovative terms, this factor neither weighs in favor or against the proposed fee request.

### k. Summation

I recognize that the *Gunter/Prudential* factors "'need not be applied in a formulaic way' because each case is different, 'and in certain cases, one factor may outweigh the rest.'" In re AT&T, 455 F.3d at 166 (citing In re Rite Aid, 396 F.3d at 301). This case, however, does not "involve[e] [an] extremely large settlement award[]," and therefore I am not as inclined to "give some of these factors less weight in evaluating a fee award." In re AT&T, 455 F.3d at 166. In sum, after "'engag[ing] in a robust assessment[] of the fee award reasonableness factors,'" I have determined that five of the ten *Gunter/Prudential* factors count in favor, one against, and four are neutral. Id. (citing In re Rite Aid, 396 F.3d at 302). Therefore, the majority support approval of the fee award. The lodestar cross-check, moreover, militates in favor of approval.

### 2. Lodestar

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." In re Rite Aid, 396 F.3d at 305.

### a. Number of Hours & Hourly Rate

As of May 6, 2011, class counsel and staff informed the Court that they had spent a total of 81,200.82 hours working on this case. Motion for Award of Attorneys' Fees, Expenses, and Incentive Awards for Named Plaintiffs (hereinafter "Award Motion"), Exs. 1 & 2. At last count, fifteen different law firms worked on the Plaintiffs' side of the case. Letter to the Court, July 21, 2011. Per my Order on July 6, 2011, class counsel submitted copies of their time and expense records for *in camera* review. Each firm also submitted a sworn declaration affirming the veracity of the records and supporting documentation. The five years of litigation involved, amongst other work, preparing the complaint and consolidated amended complaint, responding

24

to dispositive motions (including motions to dismiss and motions for summary judgment), handling a multi-day class certification hearing, and participating in mediation and extensive settlement negotiations. The law firms charged different amounts based on their average billable rates and the individual attorney or staff member working on the assignment. For example, the established plaintiff's firm HBBS charged hourly rates for attorneys ranging from $315 to $725.

Taking into account the varied rates, the lodestar requires multiplication of the hours reasonably worked by the reasonable billing rates. I found that the raters were reasonable and recognize that the equation results in a total lodestar of $31,839,355.33.

### b.  Lodestar Multiplier

"After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier." In re Diet Drugs Prod. Liab. Litig., 582 F.3d 524, 539 (3d Cir. 2009) (citing In re Rite Aid, 396 F.3d at 305-06). The Third Circuit explained that "multipliers may reflect the risks of non-recovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for extraordinary result. By nature they are discretionary and not susceptible to objective calculation." In re Prudential, 148 F.3d at 340. The lodestar multiplier is calculated by dividing the attorneys' fees sought by class counsel ($11,833,333.33) by the total amount of hours class counsel devoted to the litigation times class counsel's hourly rates ($31,839,355.33). Here, that calculation comes to a negative multiple of .37. Therefore, class counsel will only be receiving 37% of what they would have received at their regular billing rates. I have previously approved a positive multiplier of 2.04, in which counsel received twice what they would have earned under their regular billing rates. The Third Circuit, moreover, has recognized that "'multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'" Cullen v. Whitman Med.

Corp., 197 F.R.D. 136, 150 (2000) (Brody, J.); In re Cendant Corp. Prides Litig., 243 F.3d 722,

742 (3d Cir. 2001) (citing In re Prudential, 148 F.3d at 341). Therefore, a negative multiple of

.37 is well under the generally acceptable range and provides strong additional support for

approving the attorneys' fees request. Thus I will award counsel thirty-three and a third percent

of the common fund, for a total of $11,833,333.33, in attorneys' fees.

**3. Costs**

The total request for reimbursement of expenses comes to $2,229,775.60. Ms. Fegan, of

HBBS, submitted an accounting of the Baby Products Litigation Fund that was jointly funded by

the lead counsel firms and provided the expenses necessary to litigate the case. Each Plaintiff's

firm also provided a separate declaration outlining its expenses and individual contributions to

the fund. A non-exhaustive list of these expenses can be broadly divided into the following

seven categories: "(1) Professional Expert and Consulting Services; (2) Document Review On-

Line Website; (3) Foreign Translation Services; (4) Deposition Transcript, Video and Other

Deposition Related Costs; (5) Hearing Materials; and (6) Mediation-related Costs." Fegan Decl.

2. A very large percentage of these litigation costs are attributable to expert witness costs.

Given the economic complexity of class action antitrust cases, such high costs are to be

expected.

Although the bulk of the objections were directed at the request for attorneys' fees, I

acknowledge the Lederer, Padgett, and Young objections to the reimbursement of expenses. Ms.

Lederer takes issue with the costs she believes were not incurred exclusively for this case. Thus

she has no problem with the "long distance phone, fax, copies, travel and the like." Second

Lederer Objection 4. But she objects to what she perceives as general "overhead" costs, such as

"Lexis, Westlaw and/or Online Library Research," "Secretarial Overtime," and "Public

Relations." Lederer Objection 8.  Ms. Lederer also objects to what she deems "undisclosed"

costs for experts and consultants.  For example, Ms. Lederer singles out SRKW's bill for

$276,080.00 for "Experts/Consultants/Investigators."  Id.  The firm, which served as co-lead

class counsel, explains in the Plaintiffs' joint response to the objections, that it paid "Dr. Martin

Asher, Econ One, Navigant Consulting, DoeLegal, Lansultants, CT Legal Solutions, and

Avantstar $276,098.00 in connection with discovery, Electronically Stored Information,

economic calculations, and the preparation of an alternate damages report."  Pls.' Resp.

Objections 16.  As noted above, "'[t]here is no doubt that an attorney who has created a common

fund for the benefit of the class is entitled to reimbursement of . . . *reasonable* litigation expenses

from that fund.'"  Ikon, 194 F.R.D. at 192 (citing Lachance v. Harrington, 965 F. Supp. 630, 651

(E.D. Pa. 1997) (emphasis in original).  These expenses, such as the Westlaw/Lexis research

bills, are all incurred on a case-by-case basis and necessary for any competent handling of a case.

In addition to objecting to specific costs, Lederer – joined by Padgett and Young – takes

issue with the lack of notice regarding class counsel's request for reimbursement of costs.

Lederer 9; Padgett 2; Young 20.  The Objectors are correct that the initial class notice only stated

that class counsel *intended* to seek "fees of up to 33 1/3% of the settlement, plus reimbursement

of expenses that they incurred in litigation and administering the settlement fund."  Class Notice

§ V, at ¶ 2 (Doc. No. 713-3).  In a decision addressing this issue, the Ninth Circuit held that the

plain text of *Federal Rule of Civil Procedure 23(h)* "requires that any class member be allowed

an opportunity to object to the fee 'motion' itself, not merely to the preliminary notice that such a

motion will be filed."  In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988 (9th Cir. 2010)

(citing F.R.C.P. 23(h)).[10]  The Ninth Circuit, however, was dealing with a trial judge that had set

the objection deadline for class members before class counsel's deadline for filing its fee motion.

See id. at 993.  Here, I issued a preliminary approval order on January 31, 2011 that included the

following deadlines:

- Papers in support of final approval of the settlement and any application for incentive awards, attorneys' fees, and expenses due **May 24, 2011**
- Comments in support of, or in objection to, the settlement and/or fee application due **June 6, 2011**

Doc. No. 706.  In spite of these deadlines, class counsel failed to post a copy of their Awards

Motion on the class settlement website – as they promised to do so in the Court-approved class

notice.  Although the Motion was available on ECF/PACER on May 24, 2011, it could only be

accessed for a fee.  Class counsel admit that they did not post it on the website until at least the

June 6, 2011 deadline for filing objections.  Pls.' Resp. Objections 11.

This oversight by class counsel was unfortunate but not fatal.  That being said, I do not

believe this error merits denying class counsel's Awards Motion.  By the time of the final

fairness hearing in Court, on July 6, 2011, any concern on this issue could have been raised.

Ultimately, I recognize that "[a]ttorneys who create a common fund for the benefit of a class are

entitled to reimbursement of reasonable litigation expenses from the fund."  In re Aetna, Inc.

Sec. Litig., 2001 WL 20928, at *13 (E.D. Pa. Jan. 4, 20010).  And despite the objections, I find

these expenses to be adequately documented, proper and reasonable.  Therefore, I will award

counsel a reimbursement of these expenses from the gross amount of the settlement fund.

---

[10] *Federal Rule of Civil Procedure 23 (h)* states: "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply . . . Notice of the motion must be served on all parties *and, for motions by class counsel, directed to class members in a reasonable manner*." (emphasis added).

IV.     **Incentive Awards for Class Representatives**

The named class representatives seek approval of the modest amount of $2,500 incentive awards for their contributions to the case, and I will approve those awards.

Class counsel note that all of the named plaintiffs "kept informed of the litigation and communicated with class counsel as necessary to assist with the effective prosecution of the case." Id. Such awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." In re Southern Ohio Correctional Facility, 175 F.R.D. 270, 272 (S.D. Ohio 1997). As a matter of practice, "courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." Id. (citing numerous cases in which incentive awards were granted). I agree with my colleagues who have held that "[r]easonable payments are permissible to compensate named plaintiffs for the expenses they incur during the course of class action litigation." First State Orthopaedics v. Concentra, Inc., 534 F. Supp. 2d 500, 524-25 (E.D. Pa. 2007) (referencing Nichols v. SmithKline Beecham Corp., 2005 U.S. Dist. LEXIS 7061, at *80 (E.D. Pa. 2005); Godshall v. Franklin Mint Co., 2004 U.S. Dist. LEXIS 23976 (E.D. Pa. 2004)).

There are two contradictory objections to the incentive awards. Named Plaintiff Yossi Zarfati argues that $2,500 is too low while Clyde Farrel Padgett, a member of the Britax and Maclaren subclasses, objects that it is too high. Zarfati Objection (Doc. No. 743); Padgett Objection (Doc. No. 746). Zarfati provides an itemized timesheet and alleges that he spent more than thirty-eight hours on the case. He explains that he took time away from his personal and professional commitments to assist with the case. Zarfati takes particular issue with the fact that class counsel allegedly filed the Motion for Preliminary Approval with the $2,500 cap without

discussing it with him.  According to Zarfati, he was in the midst of discussing the appropriate incentive amount with counsel when counsel went ahead and filed without ever getting back to him about the possibility of raising the amount to $5,000 or $10,000.  Padgett, on the other hand, argues that there is no explanation as to how counsel reached the $2,500 figure and that the quantity is far too high for so many named plaintiffs.

I do not find that the competing objections merit altering the proposed incentive awards. Zarfati's private status as a lawyer does not permit him to expect an hourly rate for his work on the case.  Zarfati, moreover, is the only class representative who objects to the $2,500 award. Padgett, however, takes a far too narrow view of the class representatives' contributions to the case and may not know that "courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."  Cullen v. Whitman Medical Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000) (citation omitted).

## V.    Plan of Allocation

Class counsel seek approval of the proposed plan of allocation, which they set forth in their Motion for Entry of Proposed Allocation Order.  Doc. No. 739.  I will sign the proposed Order, which provides specific guidelines for divvying up the settlement fund.  When assessing proposed plans of allocation, courts utilize the same standard for determining whether to approve the settlement itself.  Therefore, the proposed plan needs to be fair, reasonable and adequate.  In re Cendant Corp. Litig., 264 F.3d 201, 248 (3d Cir. 2001).  "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable."  In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 184 (E.D. Pa. 2000).  I find that the proposed plan is fair, reasonable, and adequate, especially as claimants are expected to receive

the maximum amount they would have received if they had opted for trial and won.  Pls.' Resp.

Objections 21.

Even so, I want to acknowledge the following objections and briefly respond to them.  The

key portion of the proposed plan sets a percentage allocation from the settlement fund for each

subclass.  Doc. No. 739-1.  The percentages range from twenty-eight percent for the Britax

Settlement Class to three percent for the Peg Perego Car Seats Settlement Class.

In a joint objection filed by Kelly Spann, Jennifer Popiel, and Mathilda Fenton, the Objectors

specifically take issue with the proposed allocation percentages.  Id.  The joint objection alleges

that the percentage breakdown is evidence of class counsel's conflict of interest because each

subclass seeks to maximize its payout while class counsel represents all of them together.

The joint objection, however, does not provide any evidence of a conflict of interest but

rather alleges that each subclass requires separate counsel without providing any credible legal

support.  But it is only necessary "to appoint separate counsel for each subclass where an actual

conflict of interest exists."  Alberton v. Commonwealth, 264 F.R.D. 203, 208 (E.D. Pa. 2010)

(Robreno, J.) (referencing Metts v. Houstoun, No. 97-4123, 1997 U.S. Dist. LEXIS 16737, at *4

(E.D. Pa. Oct. 24, 1997) (Shapiro, J.) ("While plaintiffs' counsel seeks to represent three

subclasses, there appears to be no conflict of interest among the classes that would disqualify the

same counsel from representing all three.") (internal citation omitted)).  Based on the amount of

the settlement fund ($35,500,000 minus attorneys' fees) and its allocation, there is no reason to

believe that subclass members would have received any additional funds if they had been

represented by independent counsel.  Class counsel, moreover, hired Dr. Martin Asher, an

independent economics expert, to calculate the appropriate percentage allocations.  Pls.' Resp.

Objections 21; Asher Aff. (Doc. No. 737-3).  Dr. Asher's methodology yielded estimates all

within less than one percentage point of the numbers proposed in the allocation order.[11] Dr.

Asher had no independent interest in allocating one subclass a greater percentage than any other

subclass. He based his calculations on BRU transaction-level data, which contained BRU's sales

of Settlement Subclass products within the relevant timeframes.[12] Asher Aff. (Doc. No. 737-3).

Additionally, at the time of class certification, there were five separate subclasses, and that

was before the addition of the *Elliott* subclasses. Therefore, the appointment of counsel for each

subclass would have meant the selection of at least six different firms that would have driven up

attorneys' fees and reduced the amount of the settlement available to class members. Thus, such

a decision would have further dissipated the funds and run contrary to the interest of the class.

The settlement agreement was completely satisfactory and there was no basis for complaint.[13]

Class counsel did a very good job obtaining a high settlement, and any other steps that might

have been taken may have jeopardized that settlement. See also In re Corrugated Container

Antitrust Litigation, 643 F.2d 195, 208 (5th Cir. 1981) ("'[S]o long as all class members are

united in asserting a common right, such as achieving the maximum possible recovery for the

class, the class interests are not antagonistic for representation purposes.'") (citation omitted).

Greg Bryan, a member of the Britax Settlement Subclass, objects to the proposed allocation

plan on the basis of the plan's alleged failure to account for the remainder of additional funds

---

[11] Dr. Asher's methodology involved "calculat[ing] estimated damages associated with each Settlement Subclass as a percentage of the total estimated damages associated with each of the Settlement Subclasses combined," which "yield[ed] allocation percentages that [were] appropriately weighed by the amount of total estimated damages accounted for by each of the Settlement Subclasses." Asher Aff. ¶ 7.

[12] Independent counsel for each subclass may have tried to argue that the estimated overcharge was higher than the settlement agreement's 20% standard. But Asher "estimated the overcharge associated with Medela Pump In Style Breast Pumps to be 21% and the overcharge associated with Britax Car Seats to be 15%. For the remaining subclass products, [he] utilized the average of these two overcharges, which was 18%." Asher Aff. (Doc. No. 737-3). Therefore, the proposed 20% (which will then be trebled to calculate the total amount of damages awarded to each class member with proper documentation) is more than reasonable.

[13] Objector Clark Hampe also claims that each subclass requires its own counsel. Hampe Objection (Doc. No. 752). But I would not have certified the subclasses in the first place and allowed counsel to proceed if I believed there was a credible conflict of interest before the Court.

following payment to all subclass members. Bryan Objection 1.[14] The proposed settlement agreement, however, explicitly provides for the "Final Excess Amount" (as defined in the allocation order) to be "distributed *cy pres*." Settlement Agreement ¶ 22 (Doc. No. 699-1).

The *cy pres* doctrine "'originated to save testamentary charitable gifts that would otherwise fail.'" Klier v. Elf Atochem N.A., Inc., 658 F.3d 468, 474 (5th Cir. 2011) (citing In re Airline Ticket Comm'n Antitrust Litig., 307 F.3d 679, 682 (8th Cir. 2002)). But the doctrine has also been applied within the context of class-action suits, in which a "*cy pres* distribution is designed to be a way for a court to put any unclaimed settlement funds to their 'next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class.'" Klier, 658 F.3d at 474 (citing Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007)).

In his lengthy objection, Kevin Young argues that there should be no *cy pres* distribution due to the likely disparity in payment to the different subclass members.[15] He argues that "[t]here is no defensible reason to have **any** *cy pres* distribution in this settlement until reasonable measures are taken to ensure that the class members are completely compensated." Young Objection 17. Young, however, appears to misread the proposed final settlement agreement and allocation order. As noted above, the $35,500,000 settlement is divided into different subclass funds based on the manufacturer and/or product. The funds will range in value since they are comprised of different percentages of the settlements. Yet in the event that one fund is not exhausted due to a lack of claims, the excess funds will carry over to another subclass fund. The *cy pres* allocation will only come into play if all of the claimants in all of the subclasses receive the maximum award legally available to them (in this case, the value of the claim plus treble damages, as

---

[14] The Bryan objection was mailed directly to the Court and was never filed on ECF.
[15] Objector Clyde Padgett also argues that "[t]here is no need for a *cy pres* distribution in this case." Padgett Objection (Doc. No. 746).

permitted under antitrust law) and there is still excess settlement money.  Settlement Agreement ¶ 22.

    More specifically, the allocation order creates three different categories of claimants:

- Claimants who submit a valid, sworn and timely Claim Form with valid proof of purchase and purchase price
    - Entitled to an "Initial Authorized Payment" from the appropriate subclass settlement fund(s) in the amount of twenty percent of the actual purchase price of the product or $5.00, whichever is greater
- Claimants who submit a valid, sworn and timely Claim Form with valid proof of purchase
    - Entitled to an "Initial Authorized Payment" from the appropriate subclass settlement fund(s) in the amount of twenty percent of the estimated retail price of the product or $5.00, whichever is greater
- Claimants who submit a valid, sworn, and timely Claim Form
    - Entitled to a "Single Payment" of $5.00 from the appropriate subclass settlement fund(s).

Proposed Allocation Order ¶ 6.  Young takes particular issue with the fact that the maximum amount the third category of claimants can receive is $5.00.  Young believes that such claimants should receive additional funds instead of permitting a *cy pres* distribution.  This category of claimants, however, does not need to submit anything more than a sworn affidavit.  And I agree with class counsel that "class members who lack documentation of purchase price or proof of purchase would be sorely disadvantaged and perhaps be unable to prove damages at an individual trial."  Pls. Sur-Reply 15 (Doc. No. 770).  Additionally, as noted at the final fairness hearing, the fund's administrator will have discretion to award the full twenty percent of the average or estimated retail price, possibly trebled.  A picture or even BRU stamp on the product may be sufficient.  Final Fairness Hearing Tr. 29-30, July 6, 2011.  The standards are fairly low, and I want to avoid encouraging fraud by awarding additional money to those without any form of documentation whatsoever.  Therefore, Young's concern over the lack of funds available to this category of claimants is misplaced and not grounds for rejecting the *cy pres* distribution.

Five months after the final fairness hearing, Young also objected to the *cy pres* allocation by submitting a recent Fifth Circuit decision that reversed a district court's grant of a *cy pres* award in a class action settlement. See Klier, 658 F.3d 468. That decision, however, is inapplicable because it called for a *cy pres* distribution before all of the subclass members were compensated in full. Unlike here, the Appellate Court was dealing with a settlement agreement bereft of a spillover clause. There was no mechanism allowing for excess funds to move from one subclass to the next before distribution to third-party non-profit groups. The Fifth Circuit's case also involved a personal injury class action suit in which one of the subclasses was not seeking economic damages subject to the antitrust limits of treble damages. The Appellate Court pointed out that the excess funds from the subclass entitled to medical monitoring should have been applied to the subclass that had suffered serious personal injury. Here, I am dealing with a proposed settlement more analogous to the one approved and upheld by the First Circuit in which the *cy pres* distribution only applied after all eligible class members were not only compensated in full but actually received treble damages. See In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d 24 (1st Cir. 2009).

Finally, Young argues that the settlement agreement should name the potential future *cy pres* beneficiary organizations. Young 19. Young, however, provides no legal support for his claim that adequate notice depends upon identification of hypothetical *cy pres* recipients. According to the settlement agreement, in the event that a *cy pres* distribution is necessary, "the parties will jointly identify up to four (two by Plaintiffs and two by Defendants) not-for-profit organizations exempt from federal taxation." Settlement Agreement ¶ 22. Therefore, I will retain the right to approve *cy pres* recipients and will ensure that they serve the underlying interests of the class members.

## VI.   Conclusion

For the reasons set forth above, I will grant Plaintiffs' Motion for Final Approval of Class

Action Settlement and Certification of Settlement Subclasses.  I will also grant Plaintiffs' Motion

for Award of Attorneys' Fees, Expenses, and Incentive Awards for Named Plaintiffs.  Finally, I

will enter the Proposed Allocation Order and dismiss this case with prejudice pursuant to the

parties' agreement.

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to:

36