# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL M. MCDONOUGH, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TOYS "R" US, INC., d/b/a Babies "R" Us, *et al.*, <br> Defendants. | No. 2:06-cv-0242-AB |
| ARIEL ELLIOTT, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TOYS "R" US, INC., d/b/a Babies "R" Us, *et al.*, <br> Defendants. | No. 2:09-cv-06151-AB |

**DECLARATION OF PLAINTIFFS' CLASS COUNSEL IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF FOURTH AMENDED SETTLEMENT AND PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND INCENTIVE AWARDS FOR CLASS REPRESENTATIVES**

WILLIAM G. CALDES, of Spector Roseman Kodroff & Willis, P.C.; ELIZABETH

FEGAN of Hagens Berman Sobol Shapiro LLP; and FRED T. ISQUITH of Wolf Haldenstein

Adler Freeman and Herz LLC under penalty of perjury, declares as follows:

1.     We have served as counsel for the Class Plaintiffs ("Plaintiffs") in this action.  By

Order dated March 3, 2006, Hagens Berman Sobol Shapiro LLP; Spector Roseman Kodroff &

Willis, P.C.; and Wolf Haldenstein Adler Freeman and Herz LLC were appointed Co-Lead

Counsel for Plaintiffs (together with all Plaintiffs' counsel of record referred to as "Class

Counsel").  We make this Declaration in support of Plaintiffs' Motion for Final Approval of

Fourth Amended Settlement with Defendants Toys "R" Us, Inc., Babies "R" Us, Inc., Toys "R"

Us-Delaware, Inc., BabyBjörn AB, Britax Child Safety, Inc., Kids Line, LLC, Maclaren USA,

Inc., Medela, Inc., Peg Perego U.S.A., Inc., and Regal Lager, Inc. ("Motion for Final Approval"), and Plaintiffs' Motion for Award of Attorneys' Fees, Expenses, and Incentive Awards for Named Plaintiffs ("Motion for Fees and Expenses"). We have personal knowledge of the matters set forth in this Declaration, and, if called as witnesses, we could and would testify competently thereto.

## I.     **PRELIMINARY STATEMENT**

2.     The purpose of this Declaration is to summarize the factual and procedural history of this litigation, including the investigation and filing of this action, discovery, class certification proceedings, summary judgment proceedings, trial preparation, settlement negotiations, and appellate proceedings.

3.     Court-appointed Class Counsel has directed this litigation on behalf of the Plaintiffs from its outset. Class Counsel undertook an extensive investigation of the claims asserted in this litigation before filing complaints against Defendants.

4.     This complex class action has been vigorously prosecuted for over eight (8) years by Class Counsel, who have expended over 84,950.77 attorney hours in doing so. Class Counsel investigated the facts, developed the theory of liability and filed the initial complaints, without the benefit of any governmental proceeding or investigation.

5.     Class Counsel drafted and filed comprehensive and detailed Complaints and Amended Consolidated Complaints on behalf of Plaintiffs in both the *McDonough* and *Elliott* cases.

6.     Class Counsel had to respond to material changes in the law concerning the standard of review for antitrust violations relating to Resale Price Maintenance ("RPM") (*Leegin*), the standard of review for motions to dismiss (*Twombly*) and the standard of review for class certification (*Hydrogen Peroxide*). Plaintiffs prevailed against the Defendants' motions to

dismiss and successfully argued for the certification of the *McDonough* Subclasses despite these fundamental changes and Defendants' extensive litigation relating to these recent decisions.

7.    Class Counsel designed and implemented an extensive class, merits and expert discovery effort, including submitting numerous interrogatories and document requests, conducting more than thirty (30) depositions of Defendants' experts and employees, reviewing and organizing over one million (1,000,000) pages of documents produced in discovery, and undertaking efforts to qualify the relevant documentary and testimonial evidence as admissible for trial. In addition, Class Counsel represented Plaintiffs at their depositions and responded to Defendants' discovery directed to Plaintiffs.

8.    Class Counsel also responded to several motions for summary judgment and judgment on the pleadings.

9.    Class Counsel twice submitted memoranda in opposition to Defendants' motions to dismiss. The first motions to dismiss were filed before the Supreme Court issued *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Leegin Creative Leather Products Inc. v. PSKS Inc.*, 551 U.S. 877 (2007). After the *Twombly* and *Leegin* decisions the Court granted Defendants' motions to dismiss without prejudice and Plaintiffs re-pled their complaint to conform to the dictates of *Twombly*. The Court then denied Defendants' second motions to dismiss.

10.    In support of Plaintiffs' motion for class certification, Class Counsel retained and worked with expert economists to analyze and present the economic issues in the litigation; marshaled the evidence to present the facts and expert testimony; challenged the evidence and expert economic testimony proffered by Defendants in opposition to class certification during three rounds of briefing and three rounds of expert reports due to the newly interpreted decision in *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3rd Cir. 2008); and successfully argued the motion before this Court during a three day hearing.

11.  Class Counsel drafted memoranda which defeated Defendants' petitions to the United States Court of Appeals for the Third Circuit for review of this Court's class certification decision pursuant to Federal Rule of Civil Procedure 23(f).

12.  Class Counsel then worked with expert economists with respect to the preparation of liability and damages reports, which were served in December 2009. Class Counsel also prepared those expert economists for depositions, and defended a three-day deposition of one of those experts, William S. Comanor, Ph.D., in May 2010.

13.  After the Court granted Defendants' motion for separate trials in March 2010, Class Counsel began preparation for several trials, with the first scheduled to begin in January 2011.

14.  The extent of the work performed and directed by Class Counsel is further evidenced by more than 860 entries in the Court's docket for this case.

15.  Class Counsel also attended many Court hearings, both in the Court's Chambers and via teleconference.

16.  After over eight years of hard-fought litigation, Class Counsel successfully negotiated a settlement of $35,500,000.00 with Defendants to benefit Class Members.

17.  This substantial settlement was achieved for the benefit of Plaintiffs' Classes without the aid of any corresponding investigation or adjudication of Defendants' liability by the U.S. Department of Justice or any other federal government entity.[1]

18.  Consistent with the trend of recent awards, Class Counsel are requesting a total fee award of 33 1/3% of the total settlement funds available to Class Members, plus any interest accrued on that amount. The current estimated amount of the requested fee is $11,833,333.33.

---

[1] In fact, the Federal Trade Commission ("FTC") commenced an investigation apparently well after Plaintiffs had begun litigating this case, *see* "Toys 'R' Us Faces Federal Antitrust Inquiry," WALL STREET JOURNAL, October 17-18, 2009, and settled with Toys "R" Us, Inc. for significantly less money than Class Counsel obtained on behalf of the Subclasses, even when only taking into account Toys "R" Us, Inc.'s contribution to the Settlement Fund.

Class Counsel are also requesting reimbursement of expenses of $2,283,482.10, which were incurred in prosecuting this Litigation, but have not been reimbursed.

## II.     <u>HISTORY OF THE LITIGATION</u>

### A.     <u>Pleadings and Motions</u>

19.   Without the benefit of any federal governmental proceeding or investigation, Class Counsel investigated the baby products industry, developed the theory of liability and, on January 19, 2006, the first class action complaint in the *McDonough* litigation was filed in this Court alleging antitrust violations in the baby products industry against Defendants.

20.   As illustrated below this was a heavily fought and litigated case that dealt with several decisions impacting relevant legal standards as the case proceeded, which led to multiple filings to address those decisions.

21.   Class Counsel, filed the First Amended Consolidated Complaint ("ACC") before this Court on February 8, 2006. Class Counsel named Toys "R" Us, Inc., doing business as Babies "R" Us, Toys "R" Us – Delaware, Inc., and Babies "R" Us, Inc. (referred to collectively herein as "BRU"), as Defendants. Class Counsel filed their ACC on behalf of a class consisting of all persons and entities who purchased one or more baby product manufactured by BabyBjörn AB ("BabyBjörn"), Britax International Ltd. ("Britax"), Kids Line Inc. ("Kids Line"), Medela Inc. ("Medela"), Peg Perego USA ("Peg Perego"), or Maclaren USA Inc. ("Maclaren") directly from BRU from 1999 through the present.

22.   The ACC did not name BabyBjörn, Britax, Kids Line, Medela, Peg Perego, or Maclaren as co-defendants, but as co-conspirators. Class Counsel, upon further investigation, decided to add BabyBjörn, Regal Lager, Inc. ("Regal Lager"), Britax, Kids Line, Medela, Peg Perego, and Maclaren as co-defendants in addition to BRU. Plaintiffs requested leave to file a Second Amended Consolidated Complaint ("ACC2").

23. On March 3, 2006, the Court appointed Hagens Berman Sobol Shapiro LLP; Spector Roseman Kodroff & Willis, P.C.; and Wolf Haldenstein Adler Freeman and Herz LLC as Co-Lead Counsel.

24. Also on March 3, 2006, the Court granted Class Counsel's request to file the ACC2.

25. On March 10, 2006, Class Counsel filed the ACC2 on behalf of the same class described in the ACC but in addition to naming BRU as a defendant also named BabyBjörn, Regal Lager, Britax, Kids Line, Medela, Peg Perego, and Maclaren (referred to collectively herein as the "Baby Product Manufacturers," and collectively with BRU as the "Defendants") as co-defendants. The ACC2 alleged, *inter alia*, that Defendants violated federal antitrust law based upon allegations that BRU, a dominant, multi-brand retailer, conspired with the Baby Product Manufacturers to enter into, maintain, and enforce minimum RPM agreements with other retailers of baby products ("Retailers").[2] The Baby Product Manufacturer-Retailer Agreements prevented the Retailers, on penalty of termination (*i.e.*, being refused supply), from charging prices that were lower than the agreed minimum prices for certain baby products manufactured by the Defendants.

26. Shortly after being appointed by the Court, Class Counsel entered into negotiations with counsel for Defendants to promptly and efficiently prosecute this litigation. On May 15, 2006, the Court set a case schedule and ordered fact discovery to commence.

27. On May 24, 2006, all Defendants filed motions to dismiss the ACC2. Also on that date, Britax filed a motion for summary judgment. The Court granted a stipulation that placed the motions to dismiss and the motion for summary judgment on the same briefing schedule. On

---

[2] The agreements between BRU and the Baby Product Manufacturers that the Baby Product Manufacturers would impose minimum resale price maintenance agreements upon the Retailers shall hereinafter be referred to as the "BRU-Baby Product Manufacturer Agreements." The agreements between the Manufacturer Defendants and the Retailers to maintain minimum resale prices shall hereinafter be referred to as the "Baby Product Manufacturer-Retailer Agreements." Where appropriate, both types of agreements shall be referred to collectively as "the Agreements."

July 10, 2006, Plaintiffs filed their response in opposition to Defendants' motions to dismiss and Britax's motion for summary judgment. On August 3, 2006, Defendants filed their replies to Plaintiffs' opposition to their motions to dismiss and for summary judgment. On August 11, 2006, with leave of the Court, Plaintiffs filed a sur-reply to Defendants' replies to Plaintiffs' opposition to Defendants' motions to dismiss and Britax's motion for summary judgment.

28. On September 28, 2006, and October 4, 2006, Medela and Maclaren respectively wrote to the Court concerning their motions to dismiss Plaintiffs ACC2; Plaintiffs responded to those letters. In further response, on November 3, 2006, Plaintiffs filed for leave with the Court to file the Third Amended Consolidated Complaint ("AAC3"), which Defendants opposed on December 4, 2006.

29. On November 29, 2006, Plaintiffs filed a motion for leave to file a supplemental response in opposition to Britax's motion for summary judgment. On December 7, 2006, Britax filed a motion for leave to file a reply to Plaintiffs' supplemental response in opposition to their motion for summary judgment. On December 13, 2006, the court granted both Plaintiffs' and Britax's motions for leave to file additional briefs regarding Britax's motion for summary judgment.

30. On December 14, 2006, the Court entered an Order granting Plaintiffs' motion for leave to file the ACC3, and the ACC3 was filed contemporaneously with that decision. In that same Order, the Court also denied Defendants' motions to dismiss the ACC2 and denied Britax's motion for summary judgment.

31. On January 23, 2007, BabyBjörn filed a motion for summary judgment which Plaintiffs opposed on February 22, 2007. On March 15, 2007, BabyBjörn replied to Plaintiffs' opposition to their motion for summary judgment and Plaintiffs' filed a sur-reply in opposition on April 9, 2007. On May 25, 2007, the Court denied BabyBjörn's motion for summary

judgment.

32.   On May 21, 2007, the Supreme Court decided *Twombly*, which addressed the proper standard of review for motions to dismiss, directly impacting this case.

33.   On May 24, 2007, Regal Lager filed a motion for judgment on the pleadings based upon the *Twombly* decision. On June 8, 2007, all of the other Defendants filed motions for judgment on the pleadings also based upon the *Twombly* decision. On July 26, 2007, Plaintiffs filed their opposition to Defendants' motions for judgment on the pleadings. On August 15, 2007, Defendants filed their replies to Plaintiffs' opposition and on September 7, 2007, Plaintiffs filed their sur-reply in opposition to Defendants' motions for judgment on the pleadings.

34.   On July 10, 2007, in another decision that directly impacted this case, the Supreme Court decided *Leegin*, overruling *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911), and redefining the standard of review for antitrust violations relating to RPM.

35.   On October 10, 2007, the Court granted Defendants' motions for judgment on the pleadings without prejudice, and set a schedule for Plaintiffs to file an amended complaint in order to address the recent *Twombly* and *Leegin* decisions.

36.   On November 2, 2007, Plaintiffs filed the Fourth Amended Consolidated Complaint ("ACC4").

37.   On November 30, 2007, Defendants filed their motions to dismiss the ACC4 and on January 4, 2008, Plaintiffs filed their opposition. On February 8, 2008, Defendants filed their reply in support of their motion to dismiss and on March 4, 2008, Plaintiffs filed their sur-reply in opposition. On April 23, 2008, oral argument was heard by the Court. On May 20, 2008, the Court denied Defendants' motions to dismiss.

38.   On June 3, 2008, Kids Line filed a motion for reconsideration under Fed. R. Civ. Proc. 59(e) in response to the Court's motion to dismiss order. On June 4, 2008, all Defendants

filed a motion for interlocutory appeal under 28 U.S.C. § 1292 (b). On June 17, 2008, Plaintiffs filed their opposition to Kids Line's motion for reconsideration, and on June 18, 2008, Plaintiffs filed their opposition to Defendants' motion for interlocutory appeal. On June 27, 2008, Defendants filed their replies to Plaintiffs' opposition to their motions for reconsideration and interlocutory appeal. On July 3, 2008, the Court denied Defendant Kids Line's motion for reconsideration, and on July 15, 2008, the Court denied Defendants' motion for interlocutory appeal.

39.   On September 16, 2008, Plaintiffs filed their motion for class certification. On November 17, 2008, Defendants filed their opposition to class certification. On January 9, 2009, Plaintiffs filed their reply in support of class certification.

40.   On January 16, 2009, the Third Circuit decided *Hydrogen Peroxide*. As a result of the *Hydrogen Peroxide* decision the Court ordered an additional round of briefing to address this new decision.

41.   On February 20, 2009, Defendants filed their reply in opposition to class certification addressing *Hydrogen Peroxide*. On March 27, 2009, Plaintiffs filed their sur-reply in support of class certification addressing *Hydrogen Peroxide*, and on April 29, 2009, Defendants filed a sur-reply in opposition to class certification. Starting on May 27, 2009, the Court held a three day class certification hearing. On July 15, 2009, the Court granted and denied in part class certification for the Plaintiffs.

42.   On July 29, 2009, Defendants (except Regal Lager) filed a joint petition to appeal the Court's class certification decision to the Third Circuit under Fed. R. Civ. Proc. 23(f). That same day, Regal Lager filed a separate petition appealing the Court's class certification decision to the Third Circuit under Fed. R. Civ. Proc. 23(f). On August 10, 2009, Plaintiffs filed their oppositions to the Defendants' joint 23(f) petition, as well as Regal Lager's separate 23(f)

petition. On August 17, 2009, the Defendants (except Regal Lager) filed a motion for leave to file a reply in support of their 23(f) petition. On September 3, 2009, the Third Circuit denied Defendants Fed. R. Civ. Proc. 23(f) petition for appeal. The above described class certification proceedings are more fully detailed *infra*, at II.C.

43. On August 14, 2009, Plaintiffs filed a motion for leave to file a fifth amended consolidated complaint ("ACC5") in order to add two new class representatives, which was opposed by the Defendants. On October 6, 2009, Plaintiffs' motion for leave to file the ACC5 was denied by the Court.

44. On December 28, 2009, Class Counsel filed the *Elliott* class action complaint on behalf of purchasers of certain baby products manufactured by the Baby Product Manufacturers and sold at BRU who were not members of the certified subclasses. Prior to the settlement, no further action was taken in the *Elliott* litigation.

45. On November 23, 2009, Regal Lager once again filed a motion for judgment on the pleadings, which Plaintiffs opposed on December 31, 2009. On January 4, 2010, Regal Lager filed a reply in support of its motion for judgment on the pleadings. On March 24, 2010, the court again denied Regal Lager's motion for judgment on the pleadings.

46. On December 4, 2009, Defendants (except Regal Lager) filed a motion to sever the cases or in the alternative to have separate trials by Baby Product Manufacturer. That same day, Regal Lager filed a motion for separate trials. On January 29, 2010, Plaintiffs filed their opposition to Defendants' motions to sever or for separate trials, and on February 19, 2010, the Defendants filed their replies in support of severance or separate trials. On March 12, 2010, the Court denied Defendants' motion to sever and granted their motion for separate trials.

47. As is apparent from the litigation described above, Class Counsel successfully opposed an inordinate amount of motions by the Defendants.

## B.    Discovery Proceedings

### 1.    Discovery Directed To Defendants

48.    From the outset of this litigation, Class Counsel pursued document and testimonial discovery in a thorough and efficient fashion.

49.    Beginning on May 19, 2006, and continuing throughout the litigation discovery of defendants included numerous document requests, interrogatories, and depositions.  Class Counsel also served subpoenas for documents and/or deposition testimony on third parties, including Dwight Anderson and Amazon.com, Inc.

50.    The parties held a series of meetings and telephone conferences to resolve specific disputes relating to Plaintiffs' discovery requests.

51.    As a result, Defendants produced more than one million (1,000,000) pages of documents to Plaintiffs, in addition to a large amount of electronic data regarding Defendants' sales, all of which was organized, reviewed and evaluated by Class Counsel and their retained economic experts.

52.    Class Counsel interviewed various electronic discovery consultants and retained one to coordinate and facilitate the discovery efforts.  To that effect, Class Counsel organized initial training sessions and were in constant contact with the consultant throughout the case on many discovery and evidentiary matters.

53.    Defendants' massive document production was organized, analyzed and substantively reviewed by an experienced team of attorneys and paralegals over a period of many months.  Class Counsel painstakingly reviewed documents with the understanding that price-fixing conspirators often attempt to conceal their conduct, so that it was unclear which documents would provide relevant information or lead to other avenues of inquiry.  Important documents were identified and categorized into subject matter files for expeditious retrieval by

Class Counsel and their experts when preparing for class certification proceedings, depositions, summary judgment proceedings, and ultimately trial.

54. Important documents were organized into a factual narrative crucial to proving the existence and impact of Defendants' price-fixing conspiracy. For example, Plaintiffs analyzed documents reflecting: (1) inter-Defendant contacts; (2) restrictions or limitations on the pricing of the Defendants' baby products due to RPM; and (3) the impact of the Defendants' RPM policies on revenues and prices.

55. Plaintiffs noticed and took over thirty (30) depositions of representatives of different Defendants and third parties.

56. In preparation for each of these depositions, Class Counsel prepared and utilized witness files, including deposition exhibits, culled from documents reviewed on the electronic database created by Class Counsel.

57. Following each deposition, the attorney(s) who conducted it prepared memos on the deposition, which were circulated and discussed in order for Class Counsel to be informed for upcoming depositions. In addition, Class Counsel held regular and frequent telephone conference calls during which testimony was reviewed, important information was circulated, and strategies, including emerging lines of examination for upcoming depositions, were discussed.

58. In connection with their deposition program, Class Counsel submitted a motion to the Court requesting permission to take additional depositions over the allotted number in the Court's Case Management Order. Defendants opposed the request and the Court held a conference with the parties. As a result, the Court allowed some of the requested additional depositions and disallowed others.

59. Throughout the discovery period, Plaintiffs worked closely and amicably with

Defendants to ensure that the process worked as well as it could. To that effect, the parties conferred through many conferences, phone calls, e-mails and letters. The parties also participated in numerous status conferences and conference calls held by the Court to discuss and resolve discovery issues, including several motions to compel, in an effort to see that the case proceeded without undue delay.

60. Class Counsel's mastery of the law and the facts encouraged Defendants to seriously consider settlement. As a result of Class Counsel's thorough and efficient review of Defendants' documents and deposition testimony, Class Counsel marshaled the evidence needed for the class certification, summary judgment and trial preparation phases of this litigation. Indeed, when settlement negotiations with Defendants for the Initial Settlement began in mid-2010, Class Counsel had already evaluated all of the documents produced in the litigation, as well as all deposition transcripts. Class Counsel's timely and exhaustive efforts to understand the evidence substantially increased the settlement value of this action and, therefore, the benefit to the Class.

## 2. Discovery Directed to Plaintiffs

61. Defendants served discovery on Plaintiffs beginning on June 2, 2006, and continuing throughout the litigation. Defendants served numerous document requests, interrogatories, requests for admissions, and deposition notices on Plaintiffs. Class representatives responded to Defendants' discovery requests and produced comprehensive and detailed information about their purchases of baby products.

62. Defendants noticed and conducted depositions of all *McDonough* class representatives, Plaintiffs' class certification expert, and one of Plaintiffs' damages and liability experts.

63. The class representatives were deposed about their purchases of baby products, as well as the case itself. Defendants were trying to demonstrate that the class representatives were not typical of other members of the class within the meaning of Fed. R. Civ. P. 23(a)(3), that they were not adequate representatives of the class within the meaning of Fed. R. Civ. P. 23(a)(4), and that they did not suffer damages as a consequence of the alleged conspiracy.

### C.     Class Certification

64. Class certification was vigorously contested and involved extensive briefing, expert testimony, and a full-blown three-day evidentiary hearing beginning on May 27, 2009.

65. Plaintiffs filed a motion for class certification on September 16, 2008, which demonstrated that: (1) the Class was so numerous that joinder of all members was impracticable; (2) numerous questions of law and fact common to Class Members existed, including that the price-fixing claims asserted involved the same central and common element, namely, whether Defendants acted in concert to raise the price of the Baby Product Manufacturers' baby products, and, if so, the effect or impact of that conspiracy; (3) Plaintiffs' claims were typical of the claims of the putative Class Members, in that all claims were based on the same legal theories; (4) the proposed class representatives would fairly and adequately represent the interests of the Class, and were represented by experienced litigators who would actively and diligently pursue the litigation to its conclusion; (5) common questions of law and fact predominated over any questions affecting only individual Class Members; and (6) the certification of a class action was superior to other available methods for the fair and efficient adjudication of the claims.

66. Plaintiffs moved for certification of the following class:

All persons nationwide who purchased products manufactured or distributed by Maclaren U.S.A., Inc., BabyBjorn AB, Britax Child Safety, Inc., Kids Line, LLC, Medela, Inc., or Peg Perego U.S.A., Inc. from Toys "R" Us, Inc. d/b/a Babies "R" Us, Babies "R" Us, Inc., or Toys "R" Us-Delaware, Inc. for the period January 1, 1999 to the present.

67.    In the alternative, if the Court determined that subclasses were appropriate,

Plaintiffs moved for certification of the following subclasses:

*Medela Purchaser Subclass*:  All persons who purchased products manufactured by
Medela from BRU for the period July 1, 2000 to the present;

*Baby Bjorn/Regal Lager Purchaser Subclass*:  All persons who purchased products
manufactured by BabyBjorn from BRU for the period February 2, 2000 to December 31,
2005;

*Britax Purchaser Subclass*:  All persons who purchased products manufactured by Britax
from BRU for the period January 1, 1999 to the present;

*Kids Line Purchaser Subclass*:  All persons who purchased products manufactured by
Kids Line from BRU for the period January 1, 1999 to the present;

*Maclaren Purchaser Subclass*:  All persons who purchased products manufactured by
Maclaren from BRU for the period October 1, 1999 to the present;

*Peg Perego Purchaser Subclass*:  All persons who purchased products manufactured by
Peg Perego from BRU for the period January 1, 1999 to the present.

68.    In support of their motion for class certification, Plaintiffs offered an expert report

by William S. Comanor, Ph.D.  Dr. Comanor's class certification report, among other things,

comprehensively analyzed and described the structure and nature of the baby product market;

discussed Defendants' business and pricing practices; and concluded that the economic effects of

Defendants' price-fixing conspiracy could be established on a class-wide basis through the use of

common proof.  Dr. Comanor also opined on the BRU's dominance in the market for baby

products, the existence and scope of Defendants' RPM policies, and the impact of RPM imposed

at the behest of a dominant retailer as compared with RPM independently adopted and enforced

by a manufacturer.  Plaintiffs' moving papers and Dr. Comanor's class certification report

demonstrated that purchasers of the Baby Product Manufacturers' baby products at BRU, as a

group, would be affected by the alleged price-fixing conspiracy and that a class-wide method of

determining damages existed.

69. Shortly after the filing of Plaintiffs' class certification motion, Plaintiffs provided to Defendants all materials relating to Dr. Comanor's report required by Fed. R. Civ. P. 26(a)(2). Defendants first deposed Dr. Comanor on October 22, 2008.

70. On November 17, 2008, Defendants served a joint memorandum in opposition to Plaintiffs' class certification motion. Defendants supported their opposition with a Declaration from economist Dr. William C. Myslinski. Among other things, Defendants argued that injury to Class Members and harm to competition could not be established on a class-wide basis through common proof. Class Counsel first deposed Dr. Myslinski on December 11, 2008.

71. On January 9, 2009, after taking Dr. Myslinski's deposition, Plaintiffs responded to Defendants' arguments in their reply memorandum in support of their class certification motion, which was accompanied by Dr. Comanor's reply report concerning class certification. Defendants deposed Dr. Comanor on his reply report on February 4, 2009.

72. On February 20, 2009, Defendants filed their reply in opposition to class certification, addressing the recently issued *Hydrogen Peroxide* decision. Defendants reply was accompanied by Dr. Myslinski's reply report concerning class certification. Class Counsel deposed Dr. Myslinski on his reply report on March 13, 2009.

73. On March 27, 2009, after taking Dr. Myslinski's deposition, Plaintiffs responded to Defendants' reply arguments in their sur-reply memorandum in support of their class certification motion, which was accompanied by Dr. Comanor's sur-reply report concerning class certification. Defendants deposed Dr. Comanor on his sur-reply report on April 15, 2009.

74. On April 29, 2009, Defendants filed their sur-reply in opposition to class certification. Defendants reply was accompanied by Dr. Myslinski's sur-reply report concerning class certification. Class Counsel deposed Dr. Myslinski on his sur-reply report on May 13, 2009.

75.    In preparation for the three day class certification evidentiary hearing beginning on May 27, 2009, Class Counsel traveled to Los Angeles for two-and-a-half days of meetings with Dr. Comanor.  During several days prior to the hearing, Class Counsel reviewed exhibits and demonstratives to identify the most persuasive evidence for use at the hearing.  At the hearing, Class Counsel effectively argued in support of their motion.

76.    In a memorandum and Order dated July 15, 2009, this Court certified Litigation Subclasses and appointed Co-Lead Counsel as Class Counsel.  In its Order, the Court dismissed certain class representatives for lack of standing, and also dismissed Kids Line on the same grounds.  Based upon its reasoned analysis, the Court amended Class Counsel's proposed subclass definitions and certified the following subclasses:

> *Medela Purchaser Subclass*:  All persons who directly purchased any Medela Pump In Style breast pump from Babies "R" Us within the U.S. for the period July 1, 1999, to January 19, 2006;

> *Baby Bjorn/Regal Lager Purchaser Subclass*:  All persons who directly purchased any BabyBjörn baby carrier distributed by Regal Lager from Babies "R" Us within the U.S. for the period February 2, 2000, to April 30, 2005;

> *Britax Purchaser Subclass*:  All persons who directly purchased any Britax car seat from Babies "R" Us within the U.S. for the period January 1, 1999, to January 19, 2006;

> *Maclaren Purchaser Subclass*:  All persons who directly purchased any Maclaren stroller from Babies "R" Us within the U.S. for the period October 1, 1999, to January 19, 2006;

> *Peg Perego Stroller Purchaser Subclass*:  All persons who directly purchased any Peg Perego stroller from Babies "R" Us within the U.S. for the period July 1, 1999, to January 19, 2006.

77.    Shortly after the class certification Order was issued, Defendants (except Regal Lager) jointly petitioned the United States Court of Appeals for the Third Circuit to review this Court's certification of the subclasses pursuant to Federal Rule of Civil Procedure 23(f).  Regal Lager filed a separate petition with the United States Court of Appeals for the Third Circuit to review this Court's certification of the subclasses pursuant to Federal Rule of Civil Procedure

23(f). On August 10, 2009, Plaintiffs filed an opposition to Defendants' petition, arguing, *inter alia*, that this case did not meet the standard for interlocutory appeal pursuant to Rule 23(f). On September 3, 2009, the Third Circuit denied Defendants' Rule 23(f) petition.

78. On August 14, 2009, following this Court's certification of the subclasses, Plaintiffs submitted a proposed form of notice, to which Defendants objected. Per this Court's Order, Class Counsel and Defendants met and conferred extensively regarding the form and substance of notice to the certified subclasses, resulting in a joint filing with this Court on November 17, 2009, highlighting areas where the parties disagreed. The Court, taking suggestions from the Plaintiffs and Defendants, issued an Order attaching an approved form of notice on December 11, 2009. Revisions to the approved notice were accepted by this Court on January 14, 2010.

**D.      Expert Discovery**

79. Class Counsel retained two expert economists, William S. Comanor, Ph.D. and Dr. Martin A. Asher, Ph.D., to prepare merits reports in connection with this litigation. Dr. Comanor was retained to opine upon both liability and damages, while Dr. Asher was retained to opine solely upon damages.

80. Class Counsel worked with Drs. Asher and Comanor with respect to the preparation of liability and damages reports, which were served in December 2009.

81. Class Counsel then prepared Drs. Asher and Comanor for depositions, and defended a three-day deposition of Dr. Comanor in May 2010.

82. Dr. Asher was prepared to be deposed in late-May 2010, but settlement negotiations intensified, leading to a three-day mediation with Professor Eric Green that took place a week prior to Dr. Asher's scheduled deposition. Because those negotiations resulted in the settlement described *infra*, at II.E., Dr. Asher's deposition never took place.

**E.      Initial Settlement**

83.  Plaintiffs' extensive discovery and litigation efforts described above placed Class Counsel in a position to meaningfully assess the facts of this case, the relevant strengths and weaknesses of the claims asserted, and the relative culpability of the Defendants.  The settlement reached with the Defendants was finalized only after Class Counsel had conducted an extensive investigation of the underlying facts.  Class Counsel's discovery and litigation efforts thus put them in a position to negotiate and maximize recovery for the benefit of the Subclasses.

84.  The initial settlement with the Defendants, which totals $35.5 million, represents an excellent recovery for the benefit of the Subclasses.

85.  The initial settlement was obtained after prolonged and difficult negotiations with Defendants, each of which is represented by highly capable and experienced counsel.

86.  Plaintiffs reached an agreement in principle with the Defendants on May 19, 2010, after three days of intense negotiations during mediation with Professor Eric D. Green.  Under the terms of the initial settlement, the Defendants collectively agreed to pay $35,500,000.00 for the benefit of the Subclasses.   The parties informed the Court of the agreement shortly thereafter.

87.  Over the course of the next four months, Class Counsel and Defendants' counsel engaged in continued, rigorous, and contentious negotiations, on several occasions again enlisting the assistance of Professor Green, ultimately culminating in the execution of a Memorandum of Understanding by the parties on September 29, 2010.  Again, the parties informed the Court of the progress made towards the ultimate settlement of the litigation.

88.  From the end of September until the end of January, Class Counsel and Defendants' counsel negotiated the terms of the Initial Settlement Agreement, as well as the form of notice, the notice plan, the proposed allocation order, and the form of the proposed preliminary and final approval orders.  On January 21, 2011, the parties executed the Initial Settlement Agreement and

submitted it to the Court for preliminary approval. On January 31, 2011, the Court granted preliminary approval of the initial settlement, and ordered the dissemination of notice.

89.     Subsequently, in February 2011, the parties amended the Settlement Agreement twice to change the deadline by which payment to the settlement escrow account had to be made by Defendants, ultimately providing thirty-two days from the Court's Order preliminarily approving the initial settlement for the Defendants to make their payments.

90.     In April 2011, after Regal Lager failed to make its $260,000.00 contribution to the settlement escrow account, Class Counsel moved to enforce the Initial Settlement agreement against Regal Lager.

91.     In June 2011, the Court granted Plaintiffs' motion to enforce the Initial Settlement against Regal Lager, and ordered Regal Lager to make its contribution to the settlement escrow account, plus interest.

**F.     Approval Proceedings of the Initial Settlement**

92.     In May 2011, Class Counsel moved for final approval of the Initial Settlement Agreement, and also moved for the award of fees, expenses and incentive awards.

93.     In June 2011, the parties responded to objections to the Initial Settlement Agreement.

94.     On July 6, 2011, the Court held a fairness hearing on the Initial Settlement, in which it heard argument from Class Counsel, counsel for Babies "R" Us, and counsel for objectors.

95.     On December 21, 2011, the Court granted Plaintiffs' motion for final approval, Plaintiffs' motion for entry of the proposed allocation order, and Plaintiffs' motion for the award of fees, expenses and incentive awards. On January 4, 2012, the Court entered an Amended Memorandum and Opinion granting Plaintiffs' motion for final approval.

**G.     Appeal of the Approval of the Initial Settlement**

96.     In January 2012, three objectors appealed the Court's grant of final approval of the Initial Settlement and the Court's grant of Plaintiffs' motion for the award of fees, expenses and incentive awards.

97.     In February and March 2012, Class Counsel worked with counsel for Defendants and counsel for one of the objectors to specify the contents of the joint appendix for the appeal. The parties agreed on the contents of the appendix in late March 2012.

98.     In April 2012, two of the three objectors that appealed the Court's final approval of the Initial Settlement elected not to brief their objections on appeal, instead electing to simply join the appellate briefing of the third objector.

99.     On June 6, 2012, Class Counsel filed a response in opposition to the objector's brief.

100.    On September 19, 2012, Class Counsel argued the appeal before the Third Circuit.

101.    On February 19, 2013, the Third Circuit entered a Judgment vacating the District Court's Final Judgment and remanding the case for further proceedings.

**H.     Third and Fourth Amended Settlements**

102.    After the Third Circuit decision, Class Counsel immediately began the process of negotiating an amended Settlement to provide for new terms relating to the allocation of the settlement fund, including direct distributions to all identifiable class members. Those negotiations continued for several months and culminated in the Third Amended Settlement, which was agreed to by Plaintiffs and Defendants in December 2013. The parties then filed for preliminary approval of the Third Amended Settlement on December 18, 2013.

103.    Subsequent to the filing of preliminary approval papers, the Court inquired with Class Counsel and counsel for the Defendants regarding a few specific, discreet concerns the

Court had with the Third Amended Settlement and requested that the parties consider modifying the agreement to address those concerns. Class Counsel began negotiating further with the Defendants.

104. The parties' negotiations resulted in the Fourth Amended Settlement Agreement, which was executed on May 13, 2014. The parties submitted the Fourth Amended Settlement to the Court for preliminary approval on May 13, and on May 14, 2014, the Court granted preliminary approval of the initial settlement, and ordered the dissemination of notice.

### III.    ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

105. Class Counsel are requesting a total fee award of 33 1/3% of the total settlement funds available to Class Members, plus any interest accrued on that amount. At this point, the current estimated amount of the requested fee is $11,833,333.00. A fee award of 33 1/3% of the total settlement funds, plus any interest accrued on that amount, is well within the range of awards approved by this Court and others in this Circuit for class action cases.

106. The request for an award of attorneys' fees and reimbursement of expenses was anticipated and described in the Notice.

107. The requested fee is fair and reasonable. Throughout the case, Class Counsel functioned as a team. The duplication of effort was avoided by the delegation and division of responsibility. Class Counsel's experience in class action and antitrust cases allowed them to identify the complex issues involved in the litigation and to formulate strategies to efficiently and successfully prosecute this large case. Moreover, Class Counsel's readiness, willingness and ability to pursue the case through trial and appeals were valuable in reaching the Amended Settlement agreement.

108. Class Counsel faced significant risks in pursuing the litigation, and recovery was far from assured. Class Counsel conducted their own comprehensive investigation of the baby

22

product industry and developed their own theory of liability and damages, without the assistance of a federal investigation, government indictments, or the cooperation of amnesty applicants under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004.

109. Class Counsel received no compensation during the eight (8) plus years that the litigation has been pending. Their fees have been entirely contingent and dependent upon a successful result and an award by this Court.

110. Each Plaintiffs law firm has submitted to Class Counsel a signed declaration setting forth the total hours expended and the lodestar for each partner, associate and paralegal. The cumulative lodestar value of the time of all Class Counsel that has been submitted to Class Counsel, based on historic rates, is $33,886,857.65.

111. The requested attorneys' fee award of approximately $11,833,333.33, plus any interest accrued thereon, represents a negative multiplier of approximately .34 of the total reported lodestar, which is well within the range of the prevailing multipliers awarded by the courts in cases of this type.

112. Class Counsel also request reimbursement of the expenses incurred by them in connection with the prosecution of this litigation for which they have not been reimbursed.

113. Class Counsel incurred a total of $2,283,482.10 in costs and expenses in the prosecution of this litigation.

114. Each Plaintiffs' law firm has submitted to Class Counsel a signed declaration setting forth their total expenditures incurred in connection with the prosecution of this litigation. The declaration submitted by each firm attests to the accuracy of, and provides the basis for, their expenses. Each firm requesting reimbursement of expenses has averred that the expenses are reflected in books and records maintained by the firm.

115.  It is respectfully submitted that these expenditures are reasonable and necessary.

We declare under penalty of perjury that the above statements are true and correct.


Dated: AUGUST 15, 2014

WILLIAM G. CALDES

ELIZABETH FEGAN

FRED ISQUITH