UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL M. MCDONOUGH, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TOYS "R" US, INC., d/b/a/ Babies "R" Us, *et al.*, <br><br> Defendants. | C.A. No. 2:06-cv-0242-AB |
| ARIEL ELLIOTT, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TOYS "R" US, INC., d/b/a Babies "R" Us, *et al.*, <br><br> Defendants. | No. 2:09-cv-06151-AB |

**MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF FOURTH AMENDED SETTLEMENT WITH DEFENDANTS TOYS "R" US, INC., BABIES "R" US, INC., TOYS "R" US-DELAWARE, INC., BABYBJÖRN AB, BRITAX CHILD SAFETY, INC., KIDS LINE, LLC, MACLAREN USA, INC., <u>MEDELA, INC., AND PEG PEREGO U.S.A., INC.</u>**

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ..................................................................................................1

II.  BACKGROUND ...................................................................................................2

    A.   Background of the Litigation..............................................................2

    B.   The Settlement Negotiation Process and Appeal.......................................4

III. MATERIAL TERMS OF PROPOSED AMENDED SETTLEMENT ............................5

    A.   Class Benefits......................................................................................5

    B.   The Class Notice Plan Has Been Implemented ........................................9

    C.   Claims, Requests for Exclusion and Projected Distribution.....................9

IV.  ARGUMENT......................................................................................................10

    A.   The Proposed Amended Settlement is Fair, Reasonable and Adequate
        and Should be Approved by the Court..................................................10

        1.   The complexity, expense and likely duration of the litigation..................11

        2.   The reaction of the Class to the Settlement. ...............................13

        3.   The stage of the proceedings and the amount of discovery completed. ....13

        4.   Fourth & fifth factors: the risks of establishing liability and damages......14

        5.   The risks of maintaining the class action through the trial. .......................15

        6.   The ability of the Defendants to withstand a greater judgment.................16

        7.   Eighth & ninth factors: reasonableness of the settlement in light
            of the best possible recovery and in light of all the attendant risks
            of litigation.................................................................................16

        8.   Tenth factor: the degree of direct benefit to the Class. ............................17

    B.   The Court Should Also Approve the Proposed Allocation Plan, Which
        is Fair, Reasonable and Adequate .......................................................19

V.   CONCLUSION...................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re American Bank Note Holographics, Inc.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)...................................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................................8

*In re Automotive Refinishing Paint Antitrust Litig.*,
    2004 U.S. Dist. LEXIS 29161 (E.D. Pa. Sept. 27, 2004) .....................................15, 18, 21, 24

*In re Baby Prods. Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013)................................................................................... *passim*

*Babyage.com, Inc. v. Toys "R" Us, Inc.*,
    558 F. Supp. 2d 575 (E.D. Pa. 2008) .......................................................................................8

*Beecher v. Able*,
    575 F.2d 1010 (2d Cir. 1978)..................................................................................................26

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................................8, 16

*In re Cendant Corp. Litig.*,
    264 F.3d 201 (3d Cir. 2001)......................................................................................15, 18, 19, 21

*In re Chambers Dev. Sec. Litig.*,
    912 F. Supp. 822 (W.D. Pa. 1995).....................................................................................20, 21

*In re Diet Drugs Prods. Liab. Litig.*,
    2000 U.S. Dist. LEXIS 12275 (E.D. Pa. Aug. 28, 2000)........................................................21

*In re Domestic Air Transp. Antitrust Litig.*,
    148 F.R.D. 297 (N.D. Ga. 1993)..............................................................................................18

*Girsch v. Jepsen*,
    521 F.2d 153 (3d Cir. 1975)................................................................................... *passim*

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008)..........................................................................................8, 17, 20

*Int'l Union, UAW v. Ford Motor Co.*,
    2006 U.S. Dist. LEXIS 70471 (E.D. Mich. July 13, 2006), *aff'd*, 497 F.3d 615 (6th
    Cir. 2007) ..................................................................................................................................19

*Klier v. Elf Atochem N. Am., Inc.*,
   658 F.3d 468 (5th Cir. 2011) ...............................................26

*Lazy Oil Co. v. Witco Corp.*,
   95 F. Supp. 2d 290 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999) .........................20, 22

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
   551 U.S. 877 (2007)..............................................................8, 17

*In re Linerboard Antitrust Litig.*,
   296 F. Supp. 2d 568 (E.D. Pa. 2003) ...............................16, 22

*McDonough v. Toys "R" Us, Inc.*,
   638 F. Supp. 2d 461 (E.D. Pa. 2009) .................................7, 8

*In re Metro. Life Ins. Co. Sales Practices Litig.*,
   1999 WL 33957871 (W.D. Pa. Dec. 28, 1999)......................26

*Nichols v. SmithKline Beecham Corp.*,
   2005 U.S. Dist. LEXIS 7061 (E.D. Pa. April 22, 2005)..........22

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998).....................................15, 18, 20

*Rodriguez v. West Publ'g. Corp.*,
   2007 U.S. Dist. LEXIS 74849 (C.D. Cal. Aug. 10, 2007), *aff'd in part, rev'd in part on other grounds*, 563 F.3d 948 (9th Cir. 2009)....................................22

*In re Shopping Carts Antitrust Litig.*,
   1983 U.S. Dist. LEXIS 11555 (S.D.N.Y. Nov. 18, 1983) ......................16

*In re SmithKline Beckman Corp. Sec. Litig.*,
   751 F. Supp. 525 (E.D. Pa. 1990) .......................................19

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
   2005 U.S. Dist. LEXIS 9705 (E.D. Pa. May 20, 2005) .........22

*In re Vitamin C Antitrust Litig.*,
   2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012).......................25

*In re Vitamins Antitrust Litig.*,
   2000 U.S. Dist. LEXIS 8931 (D.D.C. Mar. 31, 2000)...........25

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004)......................22

2 McLaughlin on Class Actions § 6:23 (9th ed. 2012)..........................................21

# I.    INTRODUCTION

Plaintiffs in the McDonough and Elliott matters ("Plaintiffs") respectfully submit this memorandum in support of their motion for final approval of the Fourth Amended Settlement Agreement ("Amended Settlement" or "Fourth Amended Settlement")[1] reached with Defendants Toys "R" Us, Inc., Babies "R" Us, Inc., Toys "R" Us-Delaware, Inc. (collectively, "BRU" or "Babies "R" Us"), BabyBjörn AB ("BabyBjörn"), Britax Child Safety, Inc. ("Britax"), Kids Line, LLC ("Kids Line"), American Baby Products, Inc. f/k/a Maclaren USA, Inc. ("Maclaren"), Medela, Inc. ("Medela"), Peg Perego U.S.A., Inc. ("Peg Perego"), and Regal Lager, Inc. ("Regal Lager")[2] (collectively "Defendants").[3]

Following the Third Circuit's ruling vacating the Initial Settlement Agreement,[4] Plaintiffs and Defendants vigorously negotiated the Amended Settlement, which provides for 100% of the Net Settlement Fund to be distributed directly to the Settlement Classes. While the achievement of the $35.5 million common fund remains unchanged, the Amended Settlement maximizes the direct benefit to the Settlement Classes. In addition to payments to the estimated 21,077 class members who previously submitted or now submit valid and timely claims with valid contact information, the 1,135,378 class members identified in BRU's purchase records with valid

---

[1] All Capitalized Terms in this memorandum will have the same meaning as set forth in the Amended Settlement. A copy of the Amended Settlement is attached to the Motion for Final Approval ("Motion") as Ex. 1. "Exs. A-K" are references to exhibits to the Amended Settlement.

[2] The "Manufacturer Defendants" are BabyBjörn, Britax, Kids Line, Maclaren, Medela, Peg Perego, and Regal Lager.

[3] During the course of the initial settlement negotiations, Maclaren filed for bankruptcy. During the course of seeking approval of the Amended Settlement, Kids Line filed for bankruptcy. With regards to the Maclaren bankruptcy, Plaintiffs obtained a Stipulation and Order modifying the automatic stay imposed under section 362 of the Bankruptcy Code to permit the District Court to approve the Amended Settlement Agreement on a final basis. With respect to Kids Line, the parties executed such a stipulation and submitted it to the bankruptcy court on Friday, August 8, 2014, and anticipate that the bankruptcy court will enter it shortly.

[4] *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013).

addresses will receive a direct payment without having to file a Claim Form.[5]  Based on the

combination of claims and direct payments, the *entire* Net Settlement Fund will be distributed

directly to at least 1,156,455 Settlement Class Members in the first distribution.[6]

Importantly, there is no *cy pres* payment in the Amended Settlement.  Instead, to the

extent there are portions of the Settlement Fund remaining as a result of uncashed checks sent to

Settlement Class Members, such funds shall be paid to Defendants.[7]  Defendants will then issue

coupons in the Final Remaining Amount in a second distribution to Settlement Class Members

who received less than the maximum Enhanced Authorized Payment in the first distribution.[8]

This Amended Settlement does not change the Settlement Amount ($35,500,000), but

maximizes depletion of the Net Settlement Fund to the direct benefit of all known Settlement

Class Members.  For the reasons set forth below, the Amended Settlement and plan of allocation

are fair, reasonable, and adequate and should therefore be finally approved by the Court.

## II.    BACKGROUND

### A.    Background of the Litigation

The *McDonough* case commenced in January 2006 when certain consumers claimed that

BRU, which is alleged to be the nation's dominant baby product retailer, had conspired with the

Manufacturers to restrict competition in violation of federal antitrust law.  Plaintiffs alleged that,

in a series of overlapping illegal agreements with BRU, conceived and implemented to fend off

competition to BRU, the Manufacturer Defendants adopted or enforced resale price maintenance

---

[5] These numbers are estimated as of August 8, 2014, and may increase before the Claims Deadline of August 22, 2014.  The Claims Administrator will file an affidavit with the Court with the final numbers before the Fairness Hearing.

[6] *See* Amended Settlement, ¶¶ 18-21; Claim Form and Allocation Order, Exhibits D and F, ¶¶ 6(a), (b).  *See also* Declaration of Lael D. Dowd Concerning Final Implementation of Notice Program ("Dowd Decl."), attached as Ex. 2 to the Motion, ¶ 21.

[7] *See* Amended Settlement, ¶ 20; Ex. F, ¶¶ 13-15.

[8] *Id.*, Ex. F, ¶¶ 7, 11-12, 14-16, Ex. I.  A Notice, Publication Notice, Postcard Notice, E-Mail Notice and Claim Form was provided to the Settlement Class Members, informing them of these changes.  *See* Dowd Decl.

("RPM") or internet sales policies which had the effect of causing higher prices to consumers and diminishing competition among retailers.  As noted by the Court in its July 15, 2009, memorandum granting class certification, "[t]his case concerns how BRU responded to this competition" by internet and discounting competitors.[9]  In the litigation, Plaintiffs sought to recover the overcharges incurred by Plaintiffs and the putative classes due to Defendants' alleged violations of Section 1 of the Sherman Act.

Plaintiffs in the *McDonough* case zealously prosecuted this matter for five years, from 2006-2010, and have continued to work for the benefit of the Classes for the last four years, from 2010-2014.  During the course of active prosecution, Plaintiffs were faced with several rounds of pleadings testing the sufficiency of the complaints under new standards espoused by *Bell Atl. Corp. v. Twombly*[10] and *Ashcroft v. Iqbal*,[11] the Supreme Court's decision that RPM agreements are to be judged under the rule of reason, *Leegin Creative Leather Prods. v. PSKS, Inc.*,[12] and a Third Circuit decision on class certification standards, *In re Hydrogen Peroxide Antitrust Litig.*[13] This Court granted class certification, in part, of the *McDonough* subclasses after a three-day evidentiary hearing in mid-2009.[14]

Subsequent to the Court's decision to grant class certification, in part, as to the *McDonough* subclasses, the *Elliott* Plaintiffs filed suit specifically to cover those time periods and Defendants for which certification was not granted.[15]

---

[9] *See* Court's Opinion of July 15, 2009, at 4 (*McDonough* Dkt. No. 585); *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461, 466-67 (E.D. Pa. 2009).

[10] 550 U.S. 544 (2007).

[11] 556 U.S. 662 (2009).  *See Babyage.com, Inc. v. Toys "R" Us, Inc.*, 558 F. Supp. 2d 575 (E.D. Pa. 2008).

[12] 551 U.S. 877 (2007).

[13] 552 F.3d 305 (3d Cir. 2008).

[14] *McDonough*, 638 F. Supp. 2d at 491.

[15] *See Elliott* Complaint (Dkt. No. 1).

001897-12 711299 V1

Finally, in early 2010 in *McDonough*, the Court granted Defendants' motion to sever the trials by Defendant, and scheduled the first trial against BRU and Medela for January 2011.[16]

**B.     The Settlement Negotiation Process and Appeal**

It was not until after four years' worth of pleadings testing the sufficiency of the complaints, full class certification proceedings, and the Court's setting of a trial date that the parties engaged a mediator in an attempt to negotiate a settlement.  From May 2010 until the signing of the Initial Memorandum of Understanding on September 29, 2010, the parties engaged Professor Eric Green to help mediate these matters.  An Initial Settlement Agreement was signed on January 21, 2011.  On or about December 21, 2011, the District Court approved the proposed Initial Settlement Agreement and overruled all objections to the Initial Settlement.

On February 19, 2013, the Third Circuit vacated the District Court's approval of the Initial Settlement and remanded the case to the District Court.[17]  The Third Circuit reasoned that the District Court did not have sufficient information to determine whether the Initial Settlement conferred adequate direct benefit to the class claimants.[18]

The Third Circuit considered "for the first time the use of cy pres distributions in class action settlements."[19]  Although the Third Circuit joined the First and Ninth Circuits in generally approving the permissibility of *cy pres* provisions in class action settlements, the Court ultimately vacated the District Court's approval of the settlement, as well as the attorneys' fees awarded based on it, reasoning the District Court "did not know the amount of compensation that

---

[16] Dkt. No. 662.

[17] *See In re Baby Prods. Antitrust Litig.*, 708 F.3d at 170.

[18] *Id*. at 175.

[19] *Id.* at 168.

will be distributed directly to the class."[20]  The Third Circuit further cautioned "that direct distributions to the class are preferred over *cy pres* distributions."[21]

The Third Circuit stated that, on remand, the District Court should "reconsider the fairness of the settlement," stating:

> The parties may wish to alter its terms on remand to provide greater direct benefit to the class, such as by increasing the $5 payment or lowering the evidentiary bar for receiving a higher award.  After allowing them that opportunity, we ask the Court to make the factual findings necessary to evaluate whether the settlement provides sufficient direct benefit to the class.[22]

Following the Third Circuit's order, the parties vigorously renegotiated the Initial Settlement, with Plaintiffs particularly focused on ensuring direct distributions to the Subclasses. The final product of numerous rounds of negotiations is an Amended Settlement that is clearly fair, adequate, and reasonable, and complies with the Third Circuit's instruction to maximize the direct benefit to the Settlement Class Members.

### III.     MATERIAL TERMS OF PROPOSED AMENDED SETTLEMENT

#### A.     Class Benefits

Under the Amended Settlement, Defendants will provide significant, direct monetary benefits to Authorized Claimants in the Settlement Subclasses[23] defined as follows:

- "All persons who directly purchased any BabyBjörn baby carrier from Babies 'R' Us within the U.S. for the period February 2, 2000, to April 30, 2005" ("BabyBjörn Settlement Subclass");

---

[20] *Id*. at 172-73, 175.

[21] *Id*. at 173.

[22] *Id*. at 175-76.

[23] Excluded from the Settlement Class will be all persons who validly and timely requested exclusion from the Initial Settlement (and do not revoke that request for exclusion) or now request exclusion from the Class in accordance with this Court's order granting preliminary approval of the Amended Settlement and directing the dissemination of class notice. Amended Settlement, ¶ 31. As of August 8, 2014, there are 85 requests for exclusion. Dowd Decl., ¶ 34.  The Claims Administrator will provide an affidavit to the Court with the final number of exclusions after the August 22, 2014 opt-out deadline and before the Fairness Hearing.

- "All persons who directly purchased any Britax car seat from Babies 'R' Us within the U.S. for the period January 1, 1999, to January 1, 2011" ("Britax Settlement Subclass");

- "All persons who directly purchased any Maclaren stroller from Babies 'R' Us within the U.S. for the period October 1, 1999, to January 31, 2011" ("Maclaren Settlement Subclass");

- "All persons who directly purchased any Medela Pump In Style breast pump from Babies 'R' Us within the U.S. for the period July 1, 1999, to January 31, 2011" ("Medela Settlement Subclass");

- "All persons who directly purchased any Peg Perego stroller from Babies 'R' Us within the U.S. for the period July 1, 1999, to January 31, 2011" ("Peg Perego Stroller Settlement Subclass");

- "All persons who directly purchased any Peg Perego high chair from Babies 'R' Us within the U.S. for the period July 1, 1999, to January 31, 2011" ("Peg Perego High Chair Settlement Subclass");

- "All persons who directly purchased any Peg Perego car seat from Babies 'R' Us within the U.S. for the period July 1, 1999, to January 31, 2011" ("Peg Perego Car Seat Settlement Subclass");

- "All persons who directly purchased any Kids Line Product from Babies 'R' Us within the U.S. for the period January 1, 1999, to December 31, 2006" ("Kids Line Settlement Subclass").

Two distributions to Authorized Claimants will be made under the Amended Settlement.

In the first distribution, each Authorized Claimant who either files or previously filed a valid, sworn and timely Claim Form and who submits or has submitted documents that the Claims Administrator determines are valid proof of purchase and purchase price shall be entitled to a payment from the Individual Settlement Fund(s) for which he or she is eligible in the amount of 20 percent of his or her actual purchase price of each Settlement Product, subject to the pro rata

001897-12 711299 V1

reductions or enhancements.[24]  In addition, each Authorized Claimant (i) who files or previously

filed a valid, sworn, and timely Claim Form without proof of his or her actual purchase price, or

(ii) for whom BRU has provided records of a valid proof of purchase to the Claims

Administrator, shall be entitled to a payment from the Individual Settlement Fund(s) for which

he or she is eligible in the amount of twenty percent (20%) of the estimated retail price (the

"ERP") of each Settlement Product, subject to the pro rata reductions or enhancements.[25]

As of August 8, 2014, the Claims Administrator estimates that 1,156,455 Settlement

Class Members are eligible for payment under the Amended Settlement.[26] Payments to the

Settlement Class Members will exhaust the Net Settlement Fund.

To the extent there are portions of the Net Settlement Fund remaining as a result of

uncashed checks, unclaimed funds or otherwise, such funds shall be paid to Defendants ("Final

Remaining Amount").[27]  Upon such payment, coupons in a total cumulative amount up to the

Final Remaining Amount shall be issued and distributed to Authorized Claimants who have

cashed or deposited the portion of the Net Settlement Fund distributed to them, but who did not

receive the maximum Enhanced Authorized Payment as defined in the Allocation Order.[28]

In total, Defendants have paid $35.5 million in cash ("Settlement Amount") into an

escrow account as a designated Settlement Fund.[29]  The Settlement Amount, after payment of

certain fees and expenses, will be allocated among the Settlement Classes according to the

percentage of the total damages for which Plaintiffs allege each Defendant accounts.  Plaintiffs

---

[24] *See* Amended Settlement, ¶¶ 18-21; *see also* Claim Form and Allocation Order, Exs. D and F, ¶ 6(a), to the Amended Settlement.

[25] Ex. F, ¶ 6(b).

[26] Dowd Decl., ¶ 21.  A final calculation will be provided by the Claims Administrator before the Fairness Hearing but after the August 22, 2014 Claims Deadline.

[27] *See* Amended Settlement, ¶ 20, Ex. F, ¶¶ 13-15.

[28] *Id.*, Ex. F, ¶¶ 7, 11-12, 14-16, Ex. I ("Coupons").

[29] *See* Amended Settlement, § II ¶¶ 1(dd), 11.

engaged Dr. Martin Asher to calculate estimates of the appropriate allocation percentage for each Settlement Class; Dr. Asher's calculations resulted in allocation percentages in line with those proposed in Plaintiffs' Proposed Allocation Order.[30]  Plaintiffs thus request that the Court allocate the Net Settlement Fund among the Settlement Classes as follows:

- BabyBjörn Settlement Class:  6%

- Britax Settlement Class:  28%

- Maclaren Settlement Class:  7%

- Medela Settlement Class:  22%

- Peg Perego Stroller Settlement Class:  9%

- Peg Perego High Chair Settlement Class:  4%

- Peg Perego Car Seat Settlement Class:  3%

- Kids Line Settlement Class:  21%

("Individual Settlement Funds").[31]

Upon the Effective Date, all Settlement Subclass Members who have not requested exclusion from the class will be deemed to have released all claims against Defendants related to any and all claims, including under federal or state antitrust or unfair competition law, arising from or related to the wholesale or retail pricing, discounting, marketing, advertising, distribution or sale of BabyBjörn baby carriers, Britax car seats, Kids Line Products, Maclaren strollers, Medela Pump in Style breast pumps, Peg Perego strollers, Peg Perego car seats, or Peg Perego high chairs (the "Released Claims").[32]  Released Claims do not include entirely unrelated claims such as allegations of false advertising or misrepresentations relating to the performance of the

---

[30] *See* Declaration of Dr. Martin Asher ("Asher Decl."), attached as Ex. 3 to the Motion, ¶ 15.

[31] *See* Proposed Allocation Order, Ex. F, ¶ 3. Allocation of the Settlement Fund among the Settlement Classes is based on, among other things, the alleged percentage overcharge as calculated by Plaintiffs' damages experts per product, the relevant time period, the evidence developed to date, risks of litigation, and likelihood of recovery.

[32] *See* Amended Settlement, ¶¶ 1(aa), 10.

products purchased, personal injury, or breach of warranty or breach of contractual relationships relating to the performance of the products purchased.[33]

## B.     The Class Notice Plan Has Been Implemented

Pursuant to the Court's preliminary approval of the Amended Settlement, The Garden City Group, Inc. ("GCG") updated Class Members' addresses, provided notice of the Amended Settlement to class members in the form of E-Mail Notice to those Class Members for whom GCG had E-Mail addresses and Postcard Notice for those Class Members for whom GCG did not have E-Mail addresses, but for whom GCG had mailing addresses, issued Publication Notice, provided electronic addressing that links to a landing page www.babyproductsantitrustsettlement.com where an electronic downloadable version of the Notice and Claim Form was found, received exclusion requests, and responded to Class Member inquiries.[34] Upon the Effective Date, GCG will process Class Members' claims, issue settlement checks to Class Members, and conduct other activities relating to the settlement administration under the parties' supervision.[35]

## C.     Claims, Requests for Exclusion and Projected Distribution

The deadline for Claims and Requests for Exclusion is on August 22, 2014, after the filing of this memorandum. A final accounting will be provided at that time to the Court after GCG has analyzed and compiled the necessary information. For purposes of analysis however, Plaintiffs provide here estimated statistics, through July 31, 2014, for purposes of addressing the Third Circuit's concerns.

---

[33] *See* Amended Settlement, ¶ 10.
[34] *See* Dowd Decl., ¶¶ 14-20, 28.
[35] *See* Amended Settlement, § II ¶ 1(e).)

As of August 8, 2014, GCG has received 85 requests for exclusion from both the Initial Settlement and Amended Settlement. Moreover, there are 1,156,455 Settlement Class Members eligible for payment under the Settlement, including Settlement Class Members who submitted claims under the Initial and Amended Settlements as well as Settlement Class Members who will receive automatic distributions under the Amended Settlement based on BRU's data. Thus, the entirety of the Net Settlement Fund will be distributed to the estimated 1,156,455 Settlement Class Members reflected above.

## IV. ARGUMENT

### A. The Proposed Amended Settlement is Fair, Reasonable, and Adequate and Should be Approved by the Court

Rule 23 of the Federal Rules of Civil Procedure provides that a proposed class action settlement should be approved where the settlement is "fair, reasonable and adequate."[36] The Third Circuit has established a ten-factor test for determining whether a proposed settlement is "fair, adequate and reasonable."[37] These factors are:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

---

[36] FED. R. CIV. P. 23(e) (2). *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998); *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29161, at *5 (E.D. Pa. Sept. 27, 2004).

[37] *Girsch v. Jepsen*, 521 F.2d 153, 157 (3d Cir. 1975); *In re Baby Prods.*, 708 F.3d at 174.

(8)     the range of reasonableness of the settlement fund in light of the best possible recovery;

(9)     the range of reasonableness of the settlement fund in light of all the attendant risks of litigation;[38] and

(10)    the degree of direct benefit provided to the Class.[39]

As discussed below, when examined in light of the ten factors, the proposed Amended Settlement is fair, reasonable, and adequate and should therefore be approved by the Court.

### 1.      The complexity, expense and likely duration of the litigation

There is little doubt that this litigation has been complex, expensive and is well into its eighth year.  The Initial Settlement was achieved just as the parties began preparation for a series of six separate, consecutive jury trials, an undertaking of tremendous effort, complexity and expense.  The Amended Settlement was achieved after an appeal to the Third Circuit, and additional lengthy – and often contentious – negotiations.

"An antitrust class action is arguably the most complex action to prosecute …. The legal and factual issues involved are always numerous and uncertain in outcome."[40]  This litigation is no exception.  This case involves complex legal and factual issues relating to the contractual arrangements between manufacturers, distributors and retailers of several baby products over a span of many years.  Both the substantive law and procedural law – with respect to Rule 23(b)(3), the federal antitrust laws, and Rule 23(e) – changed during the pendency of this case.  Plaintiffs had already filed their opposition to Defendants' motions to dismiss on July 10, 2006,[41]

---

[38] *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 (3d Cir. 2001) (citing *Girsch*, 521 F.2d at 157).

[39] *In re Baby Prods.*, 708 F.3d at 174.

[40] *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (quoting *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000)) (internal citations and quotations omitted).  *See also In re Shopping Carts Antitrust Litig.*, 1983 U.S. Dist. LEXIS 11555, at *17 (S.D.N.Y. Nov. 18, 1983) (observing that "antitrust price fixing actions are generally complex, expensive and lengthy").

[41] Dkt. No. 119.

when the Supreme Court decided *Twombly*,[42] providing a supplemental interpretation for the pleading standard in antitrust cases which required additional briefing. The law governing retail price maintenance agreements also changed after the case was filed, from being judged under a *per se* rule to the rule of reason,[43] resulting in additional substantive motion practice. Further, as discussed below, the Third Circuit decided *Hydrogen Peroxide* while Plaintiffs' motion for class certification was *sub judice* in this case,[44] and the resulting change under Fed. R. Civ. P. 23 provoked new substantive briefing by Plaintiffs and Defendants, as well as expert discovery.

The parties engaged in lengthy discovery throughout the United States and elsewhere, engaged several economic experts, and briefed complex issues of both substantive and procedural law. The Court issued a significant opinion on class certification after a three-day hearing with live testimony from expert witnesses, and decided a thorny issue of trial procedure, separating the cases for trial by manufacturer. The case involved extensive briefing at every stage, from the motions to dismiss, discovery disputes and class certification, right up through the severance motion, after which the first trial date was set.

The Initial Settlement took months to establish even after an agreement in principle was reached at a three-day mediation. And the Initial Settlement was subject to a lengthy objection and appellate process. After the Third Circuit's decision, the parties again engaged in vigorous negotiations to ensure direct distributions to the Settlement Class Members.

As detailed in Plaintiffs' application for attorneys' fees and expenses, filed with the Court concurrently, as of July 31, 2014, Class Counsel report having already expended 84,950.77 hours on this litigation and incurred expenses totaling $2,283,482.10.

---

[42] 550 U.S. 544.

[43] *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007).

[44] *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008).

By settling their claims with Settling Defendants, both Plaintiffs and Settling Defendants will save significant resources that would have already been spent preparing for and conducting the six consecutive trails.  The first *Girsch* factor is clearly satisfied here.

### 2.     The reaction of the Class to the Settlement.

This factor "attempts to gauge whether members of the class support the settlement."[45]  It is common, however, for some class members to object to a proposed settlement and class settlements are often approved over the objections of many class members.[46]  As of this date, Class Counsel has received one objection.[47]  Since the objection deadline has not yet passed, it is premature to analyze this factor.

### 3.     The stage of the proceedings and the amount of discovery completed.

This factor "'captures the degree of case development that class counsel have accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating.'"[48]  "Generally, post-discovery settlements are viewed as more likely to reflect the true value of a claim as discovery allows both sides to gain an appreciation of the potential liability and the likelihood of success."[49]

Here, the parties completed full, extensive merits discovery, including the review of over one million (1,000,000) pages of documents produced by Defendants and third parties, over

---

[45] *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 318.

[46] *See, e.g.*, *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993) (approving settlement notwithstanding a large number of objectors).

[47] Settlement Class Member Chanel Barnett has submitted an objection to the requirement that she be required to submit proof of purchase.  She submitted a claim under the Settlement for four products.  However, two of those products are not eligible under the Settlement, because she purchased the products at strollers.com and Buy Buy Baby, neither of which are defendants in this litigation.  Plaintiffs will respond to the remainder of her objection when their responses to all objections are due on August 29, 2014.

[48] *In re Cendant Corp. Litig.*, 264 F.3d at 235 (quoting *In re GMC*, 55 F.3d at 813).

[49] *In re Auto. Refinishing*, 2004 U.S. Dist. LEXIS 29161, at *15 (citing *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 (3d Cir. 1993)).

thirty (30) depositions of fact witnesses, and the exchange of reports by and depositions of expert witnesses for class certification, and Plaintiffs' production of Rule 26(a)(2) expert reports for purpose of trial. There was also a three-day evidentiary hearing on Plaintiffs' motion for certification of the Subclasses. As of the time of the Initial Settlement, discovery had closed, the Court had set a trial date for the first trial, and the parties were preparing for trial and summary judgment motions. As a result, Class Counsel is clearly in a position to make an informed judgment as to the merits of the litigation and the likelihood of success.[50] The third *Girsch* factor is satisfied here as well.

4. **Fourth & fifth factors: the risks of establishing liability and damages.**

These *Girsch* factors "attempt[] to measure the expected value of litigating the action rather than settling it at the current time."[51] Plaintiffs believe that their case against Defendants is a strong one that would survive summary judgment, prevail at trial and win on appeal. However, all complex antitrust class actions have inherent risks, which have been demonstrated at every turn in this case. Defendants in this case are large entities with extensive resources and are represented by talented and experienced counsel. "As is true in any case, the proposed Settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution."[52]

In order to prove liability, Plaintiffs have the burden of showing that the agreements at issue constitute illegal resale price maintenance agreements, a task made all the more difficult by the Supreme Court's decision in *Leegin*, which was decided during the pendency of this Action.

---

[50] *See In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990) (noting that "[C]ounsel … are fully cognizant of the relative merits and deficiencies of their clients' positions. A settlement at this time represents, for both sides, a significant savings of trial and appeals costs.").

[51] *In re Cendant Corp. Litig.*, 264 F.3d at 238 (quoting *In re GMC*, 55 F.3d at 816).

[52] *Int'l Union, UAW v. Ford Motor Co.*, 2006 U.S. Dist. LEXIS 70471, at *67-68 (E.D. Mich. July 13, 2006) (internal quotation marks and citation omitted), *aff'd*, 497 F.3d 615 (6th Cir. 2007).

When the case commenced, resale price maintenance agreements of the kind alleged were a per se violation of the Sherman Act. After the Supreme Court's ruling, Defendants were able to assert additional defenses, including that the agreements were reasonable restraints on trade. In addition, assuming Plaintiffs were able to establish liability, they would also have to prove damages against Defendants, which is likely to become an expensive and uncertain "battle of the experts."[53]

These uncertainties and risks support the appropriateness of the Settlement.[54] The fourth and fifth *Girsch* factors are met here.

**5. The risks of maintaining the class action through the trial.**

This *Girsch* factor looks at the risks of going to trial. The Third Circuit has held that this factor is perfunctory "[b]ecause the district court always possesses the authority to decertify or modify a class that proves unmanageable … [t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement."[55] However, here, the Third Circuit changed the standard for class certification during the pendency of the class certification motion.[56] Though this Court's certification opinion was thorough and closely reasoned, the possibility of decertification here was no mere specter. The Court declined to certify the full scope of the classes originally proposed by Plaintiffs. As a result, the Elliott Plaintiffs filed additional litigation to seek certification of the unrepresented classes. Therefore, in the particular circumstances of this case, the sixth *Girsch* factor favors approval.

---

[53] *See Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997) (recognizing the value of settlement when the litigation is likely to become a complicated and costly battle of experts), *aff'd*, 166 F.3d 581 (3d Cir. 1999).

[54] *See In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995) ("A very large bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes.").

[55] *In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d at 321.

[56] *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305.

6.      **The ability of the Defendants to withstand a greater judgment.**

This factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement."[57]  However, this factor "does not require that the defendant pay the maximum it is able to pay."[58]

Here, many of the Settling Defendants are large and solvent entities.  However, two of the Defendants, Maclaren and Kids Line, have filed for bankruptcy during the pendency of the Initial Settlement and Amended Settlement.  Further, no defendant would agree to stand for any other defendant's share of the settlement, meaning that the financial health of the least stable defendant bears on the total recovery.  While Plaintiffs have successfully obtained stipulations to modify the automatic stays in those bankruptcy proceedings to allow the Amended Settlement to proceed, the bankruptcy filings highlight the inherent risks of any defendant withstanding a greater judgment over time.

7.      **Eighth & ninth factors: reasonableness of the settlement in light of the best possible recovery and in light of all the attendant risks of litigation.**

These two closely related *Girsh* factors "ask the court to analyze the settlement in light of the best and worst case scenarios."[59]  "This inquiry measures the value of the settlement itself to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case."[60]

The Settlement Amount in this case, over $35 million and representing approximately 24% of estimated actual damages, is on par with or superior to settlements in other recent

---

[57] *In re Cendant Corp. Litig.*, 264 F.3d at 240.

[58] *In re Diet (Phentermine, Fenfluramine, Dexfenfluramine) Drugs Prods. Liab. Litig.*, 2000 U.S. Dist. LEXIS 12275, at *188 (E.D. Pa. Aug. 28, 2000) (citing *In re Prudential Ins. Co.*, 148 F.3d at 321-22).

[59] *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29161, at *23.

[60] *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. at 839 (quoting *In re GMC*, 55 F.3d. 3d at 806).

antitrust class actions.[61]  Taking into consideration the risks of continued litigation, as well as the

fact that the Amended Settlement is the product of intensive arm's-length negotiations and

guidance from the Third Circuit, the Settlement falls within the range of reasonableness and

satisfies the final *Girsch* factors.

### 8. Tenth factor: the degree of direct benefit to the Class.

The final factor in assessing the reasonableness of a settlement "is the degree of direct

benefit provided to the class."[62]  "In making this determination, a district court may consider,

among other things, the number of individual awards compared to both the number of claims and

the estimated number of class members, the size of the individual awards compared to claimants'

estimated damages, and the claims process used to determine individual awards."[63]

As of August 12, 2014, there will be an estimated 1,156,455 Settlement Class Members

who receive Settlement Payments in the first distribution.  Of these Settlement Class Members,

21,077 Class Members have submitted valid and timely claims with valid contact information

under the Initial or Amended Settlements.  Moreover, 1,135,378 Settlement Class Members have

been identified in BRU's purchase records with valid addresses and will receive a direct payment

without having to file a Claim Form.[64]  Based on the combination of claims and direct payments,

---

[61] *See, e.g.*, *Rodriguez v. West Publ'g. Corp.*, 2007 U.S. Dist. LEXIS 74849, at *42-43 (C.D. Cal. Aug. 10, 2007) (approving settlement representing 30% of estimated damages), *aff'd in part, rev'd in part on other grounds*, 563 F.3d 948 (9th Cir. 2009); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 U.S. Dist. LEXIS 9705, at *29-30 (E.D. Pa. May 20, 2005) (noting that the settlement, which amounted to 11.4% of total damages to the settlement class "compare[s] favorably with the settlements reached in other complex class action lawsuits"); *Nichols v. SmithKline Beecham Corp.*, 2005 U.S. Dist. LEXIS 7061, at *52 (E.D. Pa. April 22, 2005) (approving settlement representing between 9.3% and 13.9% of damages); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 258 (D. Del. 2002) (approving settlement amounting to 33% of maximum possible recovery), *aff'd*, 391 F.3d 516 (3d Cir. 2004).  *See also In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d at 581 (approving settlement for approximately 36% of total damages during the class period and listing cases with substantially lower settlement percentages); *Lazy Oil Co.*, 95 F. Supp. 2d at 339 (noting cases approving settlements ranging from 0.2 to 16 percent of potential recovery).

[62] *In re Baby Prods.*, 708 F.3d at 174.

[63] *Id.*

[64] These numbers are estimated as of August 8, 2014, and may increase before the Claims Deadline of August 22, 2014.  The Claims Administrator will file an affidavit with the Court with the final numbers before the Fairness Hearing.

the entire Net Settlement Fund will be distributed directly to the Settlement Class Members in the first distribution.[65]

The Third Circuit also suggested that the Court consider additional data, such as the number of claims made, to determine the degree of direct benefit to the Class.[66] As reflected in the chart below, the entirety of the Net Settlement Fund will be distributed to the Class, as the estimated sum of the Initial Authorized Payments (before pro rata reduction) is $58,662,565.81.

### Estimated Claims (as of August 8, 2014)

| Settlement Class | Number of Claims Submitted by Settlement Class Members to Be Paid In Each Class | # Units For Which Overcharges Will Be Paid | Estimated Sum of Initial Authorized Payments (before pro rata reduction) | Net Settlement Fund Requested Allocation |
|---|---|---|---|---|
| Baby Bjorn Settlement Class | 38,356 | 38,620 | $733,690.54 | 6% |
| Britax Settlement Class | 389,842 | 459,096 | $21,145,089.43 | 28% |
| Kids Line Settlement Class | 261,846 | 432,027 | $3,371,168.83 | 21% |
| Maclaren Settlement Class | 175,020 | 186,929 | $10,614,749.46 | 7% |
| Medela Settlement Class | 228,369 | 240,972 | $14,411,602.45 | 22% |
| Peg Perego Car Seat Settlement Class | 429 | 505 | $20,012.74 | 3% |
| Peg Perego High Chair Settlement Class | 215 | 228 | $8,739.26 | 4% |
| Peg Perego Stroller Settlement Class | 112,654 | 119,556 | $8,357,513.10 | 9% |
| **Totals** | **1,206,731** [67] | **1,477,933** | **$58,662,565.81** | |

---

[65] *See* Amended Settlement, ¶¶ 18-21; Claim Form and Allocation Order, Exhibits D and F, ¶¶ 6(a), (b).  *See also* Dowd Decl., ¶ 21.

[66] *Id.*

[67] The number of claims is greater than the 1,156,455 Settlement Class Members who will receive Settlement Payments in the first distribution, because some Settlement Class Members filed claims in more than one Subclass.

Accordingly, this Court can be assured that the direct benefit to the Settlement Class Members is 100% of the Net Settlement Fund.

The Third Circuit also suggested that the district court "could condition approval of a settlement on the inclusion of a mechanism for additional payouts to individual class members if the number of claimants turns out to be insufficient to deplete a significant portion of the total settlement fund."[68] Here, the Settling Parties agreed that any funds remaining as a result of uncashed checks to Settlement Class Members in the first distribution will be returned to Defendants and reissued in the form of coupons to Settlement Class Members who cashed their checks and who did not receive the Maximum Enhanced Authorized Payments. Thus, there is a mechanism in the Settlement to ensure that Settlement Class Members will receive the full value of the Net Settlement Fund.

The Third Circuit also cautioned that "[b]arring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds."[69] This concern has been addressed, because there will be no payment to *cy pres* under the Amended Settlement.

Accordingly, this Court should grant Plaintiffs' motion for final approval and approve the Settlement as fair, adequate, and reasonable pursuant to Fed. R. Civ. P. 23.

**B.     The Court Should Also Approve the Proposed Allocation Plan, Which is Fair, Reasonable, and Adequate**

"'Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate,'"[70] under "'the particular circumstances of the

---

[68] *In re Baby Prods.*, 708 F.3d at 174.

[69] *Id.*

[70] *In re Auto. Refinishing*, 2004 U.S. Dist. LEXIS 29161, at *26 (quoting *In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 649 (D.N.J. 2004)).

case.'"[71] "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."[72] "'In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable.'"[73]

The allocation plan is straightforward and designed to compensate Settlement Subclass members based on the extent of their injuries resulting from Settling Defendants' alleged overcharges.[74] The allocation plan provides for the distribution of the Settlement Fund, including accumulated interest, after payment of counsel fees, expenses and incentive awards.[75] As discussed above, the Settlement Fund is to be allocated among the Settling Subclasses based on the alleged percentage overcharge as calculated by Plaintiffs' damages expert, per product. Each Settlement Subclass has been allocated that percentage of the overall Settlement Fund which that Subclass' damages represent in comparison to the total damages estimated to have been suffered by all of the Settlement Subclasses, the relevant time period, the evidence developed to date, risks of litigation and likelihood of recovery.[76] Each Settlement Subclass Member is eligible for reimbursement based on his or her purchases during the relevant time period of eligible products sold by Settling Defendants.[77] Allocation plans that, as here, provide for pro rata distributions have been routinely approved by the courts.[78]

Moreover, the Amended Settlement provides for direct distributions both to Settlement Class Members who filed Claims as well as for Settlement Class Members whose purchases

---

[71] *In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *7 (E.D.N.Y. Oct. 23, 2012) (quoting *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d at 518).

[72] *In re American Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001).

[73] *Id.* (quoting *In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 432 (E.D. Pa. 2001)).

[74] *See* Proposed Allocation Order, Ex. F.

[75] Proposed Allocation Order, ¶ 3.

[76] Asher Decl., ¶¶ 7, 14.

[77] Proposed Allocation Order, ¶¶ (a) – (h).

[78] *See, e.g., In re Vitamins Antitrust Litig.*, 2000 U.S. Dist. LEXIS 8931, at *32 (D.D.C. Mar. 31, 2000) ("Settlement distributions, such as this one, that apportions funds according to the relative amount of damages suffered by class members have repeatedly been deemed fair and reasonable.").

were reflected in BRU's records, subject to the terms of the Settlement. Indeed, "[i]n cases where the identity of class members and amounts at issue are known with a high degree of certainty … class counsel may request that settlement funds be distributed to class members without the necessity of submission of a claim form," which further "ensur[es] a higher level of class member participation in the recovery."[79] Finally, the Amended Settlement also provides for a second distribution for any unclaimed funds in the form of coupons to Settlement Class Members who did not receive the Maximum Enhanced Payment in the first distribution. Like a spillover provision, this second distribution ensures the full value of the Amended Settlement is distributed directly to the Class.[80] The Court should accordingly approve the allocation plan as fair, reasonable and adequate.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant final approval of the proposed Amended Settlement and proposed plan for allocation of proceeds.

---

[79] 2 MCLAUGHLIN ON CLASS ACTIONS § 6:23 (9th ed. 2012).

[80] *See, e.g.*, *Beecher v. Able*, 575 F.2d 1010, 1012, 1017 n.3 (2d Cir. 1978) (affirming district court's grant of equitable reallocation and denial of reversion subsequent to the entry of judgment approving settlement where "the actual number of claimants proved to be less than both sides estimated … the allocation plan itself made allowance for 'spillover' between the classes in the event that the amount allocated to a class exceeded the total of allowed claims"); *In re Metro. Life Ins. Co. Sales Practices Litig.*, 1999 WL 33957871, at *9 (W.D. Pa. Dec. 28, 1999) (granting final approval of settlement where "rather than a reduction, it is likely that all Class Members will receive an increase in their applicable relief based on the 'spillover' of excess funds from the CRP Total Fund"). *See also Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 478 (5th Cir. 2011) (holding "that the district court erred when it rejected the settlement administrator's request that the funds be reallocated to the members of Subclass A," where the case involved a distribution protocol which "is an affirmation that funds initially allocated to a particular subclass are to be used, in the end, for the interests of the entire settlement class").

Dated: August 15, 2014

Respectfully submitted,

s/ Elizabeth A. Fegan

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 West Lake Street, Suite 400
Oak Park, IL 60301
Tel.: (708) 628-4949
Fax: (708) 628-4950

Steve W. Berman
Anthony D. Shapiro
Ivy Arai Tabbara
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel.: (206) 623-7292
Fax: (206) 623-0594

Eugene A. Spector
William G. Caldes
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
   & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel.: (215) 496-0300
Fax: (215) 496-6611

Fred T. Isquith
Thomas H. Burt
WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLC
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600
Fax: (212) 545-4653

**CLASS COUNSEL FOR THE
SETTLEMENT SUBCLASSES**

001897-12 711299 V1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on August 15, 2014 a true and correct copy of the foregoing document was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

By: /s/ Elizabeth A. Fegan
      Elizabeth A. Fegan

001897-12 711299 V1