## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL M. MCDONOUGH, *et al.*, | ) No. 2:06-cv-0242-AB |
| Plaintiffs, | ) |
| v. | ) |
| TOYS "R" US, INC., d/b/a Babies "R" Us, *et al.*, | ) |
| Defendants. | ) |
| ARIEL ELLIOTT, *et al.*, | ) No. 2:09-cv-06151-AB |
| Plaintiffs, | ) |
| v. | ) |
| TOYS "R" US, INC., d/b/a Babies "R" Us, *et al.*, | ) |
| Defendants. | ) |

**January _21, 2015**                                                      **Anita B. Brody, J.**

I.     Background & Initial Settlement ................................................................................3

II.    Third Circuit Appeal .................................................................................................5

III.   Post-Appeal Settlement............................................................................................6

   A.   Settlement Terms ....................................................................................................6

   B.   Preliminary Approval..............................................................................................9

   C.   Exclusion Requests and Objections ........................................................................10

IV.    Final Approval of the Post-Appeal Settlement .........................................................11

   A.   Factors for Considering Final Approval ..................................................................11

   B.   *Girsh* Factors.........................................................................................................13

   C.   *Prudential* Considerations.....................................................................................23

   D.   *Baby Products* Considerations...............................................................................24

V.     Plan of Allocation ...................................................................................................26

A.  Standard of Review.........................................................................................26

B.  Proposed Plan...............................................................................................27

C.  Modification.................................................................................................27

VI.  Attorneys' Fees & Expenses for Class Counsel...........................................29

A.  Common Fund .............................................................................................30

B.  Lodestar........................................................................................................40

C.  Class Counsel's Fee Award .........................................................................43

D.  Costs.............................................................................................................43

VII.  Attorneys' Fees for Objectors ....................................................................44

A.  Authority for Granting Attorneys' Fees to Objectors ................................44

B.  Common Fund Award for Objector Young .................................................45

C.  Lodestar Cross-Check for Objector Young.................................................52

D.  Attorneys' Fees for Other Objectors ..........................................................53

VIII.  Incentive Awards for Class Representatives and Objectors.......................55

IX.  Conclusion ..................................................................................................56

# MEMORANDUM[1]

Following eight years of antitrust class action litigation between consumers, a baby product retailer, and baby product manufacturers, class counsel have filed petitions for final approval of the Post-Appeal Settlement Agreement ("P-A Settlement") (ECF No. 864);[2] for attorneys' fees, expenses, and special incentive awards for class representatives (ECF No. 863); and for final approval of the plan of allocation (ECF No. 865).  After holding a final fairness hearing on October 6, 2014, I will now approve the final settlement agreement and a modified allocation

---

[1] This Memorandum and related orders apply to *McDonough, et al. v. Toys "R" Us, Inc., et al.* (06-cv-242) and *Elliot, et al. v. Toys "R" Us, Inc., et al.* (09-cv-6151).  For the sake of clarity, the internal "ECF" References correspond to the listings on the *McDonough* docket.  Throughout this Memorandum I will refer to the final approval memorandum issued for the Initial Settlement of this class action lawsuit.  ECF No. 793 (amending memorandum of December 21, 2011, ECF No. 788, as reported at McDonough v. Toys "R" Us, Inc., et al., 834 F. Supp. 2d 329 (E.D. Pa. 2011)).

[2] Defendants include Toys "R" Us, Inc.; Babies "R" Us, Inc.; Toys "R" Us-Delaware, Inc.; Babybjörn, AB; Britax Child Safety, Inc.; Kids Line, LLC; Maclaren USA, Inc.; Medela, Inc.; and Peg Perego U.S.A., Inc.

plan.  I will also grant in part and deny in part class counsel's request for attorneys' fees, reimbursement of expenses and incentive awards for class representatives.  Finally, I will grant in part and deny in part Objector Kevin Young's request for attorneys' fees and an incentive award.

## I.      Background & Initial Settlement

On January 19, 2006, a group of consumers (collectively, "Plaintiff Consumers") brought this putative consumer class action for violations of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1, 2, against Babies "R" Us, Inc. ("BRU"), a leading national retail chain in the baby products market, and against a number of manufacturers of baby products (collectively, "Defendant Manufacturers").[3]  Plaintiff Consumers alleged that BRU conspired with Defendant Manufacturers to restrict competition by requiring all retailers to sell their goods at or above a minimum resale price.  Plaintiff Consumers alleged that as a result they paid inflated prices for baby products manufactured by Defendant Manufacturers.[4]

On July 15, 2009, I granted class certification under Federal Rule of Civil Procedure 23(b)(3) and created subclasses based on the different products the consumers purchased and the timeframe of those purchases.  ECF No. 585.  I restricted the subclass periods to the date when the case was first filed.  This restriction prompted additional consumers to file a related suit on December 28, 2009 (*Elliott, et al. v. Toys "R" Us, Inc., et al.* (09-cv-6151)).

---

[3] During a telephone conference on May 13, 2009, counsel for the Plaintiff Consumers stated that they were no longer pursuing claims under § 2 of the Sherman Anti-Trust Act.

[4] In a separate but related matter, on-line retailers Babyage.com, Inc. ("BabyAge") and The Baby Club of America, Inc. ("Baby Club") (collectively, "Plaintiff Retailers") filed an antitrust suit against BRU and Defendant Manufacturers for conspiring to impose Resale Price Maintenance ("RPM") Agreements (05-cv-06792).  The RPM Agreements allegedly prevented Plaintiff Retailers from discounting items and in some instances caused Defendant Manufacturers to terminate their contracts with them.  On March 3, 2006, I consolidated the Consumer Class Action and Plaintiff Retailers cases for purposes of discovery (ECF No. 17).  Plaintiff Retailers retained separate and independent counsel for the duration of the litigation.  The BabyAge case settled in 2011.

Shortly before trial was set to begin, the parties announced that they had reached a settlement (the "Initial Settlement").  The Initial Settlement created a $35.5 million common fund.  The parties estimated that after deduction of administrative expenses and attorneys' fees, the net settlement fund available to the class would total $21.5 million.  The settlement established claim procedures for class members and provided that any funds not claimed by class members would be distributed *cy pres* to charities of the parties' choosing, subject to the court's final approval. On January 31, 2011, I issued an order preliminarily approving the Initial Settlement that defined the *Elliott* subclasses, consolidated the two cases, and set August 1, 2011 as the claims deadline. ECF No. 706.  On July 6, 2011, I held a final fairness hearing.  Ten members of the class filed objections to various aspects of the settlement, and two objectors made oral presentations at the hearing.  Following the hearing, I ordered class counsel to provide legal bills and other documentation in support of their pending motions for *in camera* review.  ECF No. 775.  After considering the fairness, reasonableness, and adequacy of the settlement and reviewing class counsel's fee request, I approved the Initial Settlement agreement and related motions on December 21, 2011.  ECF No. 788.  I issued an amended opinion on January 4, 2012.  ECF No. 793.

At the close of the Initial Settlement claims process in August 2011, class members' claims, trebled, totaled approximately $3 million.  ECF No. 857 at 1-2 (Pls.' Mem. in Support of Mot. for Prelim. Approval of P-A Settlement).  This meant that an estimated $15.5 million would be distributed to *cy pres* beneficiaries.  Id.  Because the final fairness hearing for the Initial Settlement was held before the claims deadline passed, the parties and I were unaware that the claims rate would be so low and therefore the value of direct benefit going to class members would also be low in comparison to the approximately $18.5 million net settlement fund.

## II.      Third Circuit Appeal

In January 2012, after I approved the Initial Settlement and class counsel's fee request, three class members who objected to the Initial Settlement—Kevin Young, Allison Lederer, and Clark Hampe—appealed final approval of the Initial Settlement to the Third Circuit.[5]  Young raised three issues relating to *cy pres* on appeal: (1) that the settlement should distribute all of the funds to class members, rather than to *cy pres* recipients, to ensure full compensation for their losses; (2) that the court should have discounted the value of the *cy pres* distribution in determining class counsel's fee award; and (3) that the class notice was deficient because it did not identify the *cy pres* recipients.  Young's main concern was the significant and unanticipated size of the *cy pres* award.

On February 19, 2013, the Third Circuit vacated approval of the Initial Settlement.  In re Baby Prods. Litig., 708 F.3d 163, 169 (3d Cir. 2013) ("Baby Prods.").  The Third Circuit's primary reasoning was that at the time of final approval of the Initial Settlement, "the amount of compensation that [would] be distributed directly to the class" was unknown.  Id. at 175.  Thus, the Third Circuit concluded that in addition to the *Girsh* and *Prudential* analysis of the fairness of a class action settlement, a district court must consider "the degree of direct benefit provided to the class."[6]  Id. at 174 (citing Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975); In re Prudential Ins. Co. America Sales Practice Litig., 148 F.3d 283 (3d Cir. 1998)).  Additionally, the Third

---

[5] See ECF Nos. 794-799; McDonough v. Toys "R" Us, Inc., et al., 834 F. Supp. 2d 329 (E.D. Pa. 2011), *appeals docketed*, Nos. 12-1165, 12-1166, 12-1167.  Only Young briefed the appeal.  In re Baby Prods. Litig., 708 F.3d 163, 169 n.1 (3d Cir. 2013) ("Baby Prods.").

[6] As discussed below in Section IV, the Third Circuit explained:

> [A] district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards. . . . Making these findings may also require a court to withhold final approval of a settlement until the actual distribution of funds can be estimated with reasonable accuracy.

Baby Prods., 708 F.3d at 174.

Circuit vacated the fee award because it was based on the vacated final settlement, explaining that "the level of direct benefit provided to the class in calculating attorneys' fees" needs to be addressed.[7] <u>Id.</u> at 170.  The Third Circuit concluded that there was no error in the notice provided to the class about the *cy pres* recipient selection process.  <u>Id.</u>

The Third Circuit directed that on remand I "consider whether this or any alternative settlement provides sufficient direct benefit to the class before giving [my] approval."  <u>Id.</u> at 174.

### III.    Post-Appeal Settlement

Following the Third Circuit's ruling, the parties restructured the settlement to address the Third Circuit's concerns and "maximize the direct benefit to Settlement Class Members."  ECF No. 864 at 5 (Pls.' Mot. for Final Approval of P-A Settlement).

### A.  Settlement Terms

The Post-Appeal Settlement Agreement ("P-A Settlement"), ECF No. 864, Ex. 1, contains the following new provisions negotiated to cure the low claims rate and provide for maximum direct distribution to the class:

- The parties used the Babies "R" Us ("BRU") purchase records to identify more than 1.1 million class members and their purchase and contact information.

- The class members identified in BRU records were not required to go through the claims process or submit any proof of purchase.  These class members will receive checks following final approval of the settlement.

- Class members who purchased baby products but who were not identified in BRU records were permitted to submit new types of evidence.  The settlement relaxed the

---

[7] The Third Circuit also ruled that district courts have "discretion [to] reduce attorneys' fees based on the level of direct benefit provided to the class."  <u>Id.</u> at 182.

proof of purchase requirement by enabling a class member to submit a claim with two sworn corroborating affidavits.

- The settlement eliminated the *cy pres* distribution and substituted a reverter to the Defendants. Following a ninety-day check cashing period, any funds unclaimed by class members will go directly to the Defendants.

- Once the Defendants receive any unclaimed funds, they shall issue coupons to class members who cash their checks. Whether any coupons are issued depends on the size of the reverter. The coupons will be distributed to class members who provided email addresses and will only provide discounts on the baby products that are the subject of this class action. Because of the tentative and insubstantial nature of the coupon provision and the substantial restrictions on the coupons, this provision will not be considered in the analysis of benefits to the class.[8]

Most importantly, the Defendants agreed to share Babies "R" Us ("BRU") purchase records to identify more than 1.1 million claims. The use of BRU records dramatically increased the number of class members receiving compensation from the Initial Settlement to the P-A Settlement. Garden City Group ("GCG" or the "Claims Administrator") cross-checked the claims identified in BRU records with valid claims already submitted to eliminate duplicate claims. ECF No. 884 ¶ 18, Aff. of Susan Mancuso in Support of Pls.' Mot. for Final Approval of P-A Settlement ("Mancuso Aff."). 22,055 valid claims were submitted during the Initial Settlement and carried over to the P-A Settlement. Id. ¶ 19; P-A Settlement ¶ 18 (explaining that valid Initial Settlement claims remain valid under the P-A Settlement if the claims were accompanied by documentary proof of purchase). In addition, GCG received and processed

---

[8] This settlement is designed to distribute cash benefits to the class. Therefore, the coupon provision is not a primary or substantial part of the bargain.

1,810 new claim forms by the close of the P-A Settlement claims period.  Mancuso Aff. ¶ 21.

GCG also gave 6,801 class members who submitted invalid claims the opportunity to cure the

deficiencies in their claims.  Id. ¶¶ 28-30.  By the close of the deficiency resolution process on

October 2, 2014, GCG received 352 responses and approved 210 additional claims for settlement

benefits.  ECF No. 891, Supp. Aff. of Susan Mancuso ("Mancuso Supp. Aff.") ¶ 4.  There are

1,188,456 valid and timely claims to be paid from the Net Settlement Fund[9] following final

approval of the P-A Settlement.[10]  The vast majority of these claims were generated from BRU

records, meaning that most claimants did not submit claim forms or any proof of purchase

because the parties already had their purchase and contact information.

The P-A Settlement relaxed the proof of purchase requirements for class members.  In the

Initial Settlement, class members who lacked documentary proof of purchase could receive a

one-time, $5 capped payment by submitting a claim form.  Though these $5 claims are not valid

under the P-A Settlement, class members who lack documentary proof of purchase can still

submit claims using proof from other sources and are not restricted to the $5 capped payment.  In

particular, the parties agreed that a class member could submit corroborating sworn affidavits

from two other people attesting to the class member's purchase.  Class members identified in

BRU records or who submitted claims with valid proof of purchase but not proof of actual

---

[9] As defined in the P-A Settlement, the "Net Settlement Fund" is "the Settlement Fund net of any (i) Taxes, (ii) notice and administration costs pursuant to Paragraph 15, (iii) the attorneys' fee and expense award referred to in Paragraph 26, (iv) the incentive award to Plaintiffs referred to in Paragraph 26, and (v) the remaining administration expenses referred to in Paragraph 27." ECF No. 864 ¶ 1(v).  It is the total amount the class will receive in direct payments following final approval.

[10] See Final Fairness Hearing Tr. 7-8 (nearly 1.2 million class members will receive direct payments from settlement fund).  As of October 2, 2014, GCG reported that there were 1,188,375 valid and timely claims to be paid.  ECF No. 891, Supp. Aff. of Susan Mancuso ("Mancuso Supp. Aff.") ¶ 5.  GCG received an additional 137 deficiency responses that were untimely.  Id. ¶ 4.  GCG determined that 81 of those responses cured deficiencies and are eligible for settlement benefits if approved despite their untimeliness. Id.  I will approve the 81 additional claims for settlement benefits.  Therefore, the final number of approved claims is 1,188,456.  For ease of reference, I refer to the final number of claims as more than 1.1 million claims.

purchase price are eligible to recover up to twenty percent (20%) of the estimated purchase price of a baby product, to be trebled if sufficient funds exist in the Net Settlement Fund.  ECF No. 865 at 5 ¶ 6(a)-(c) (Proposed Allocation Order).  Class members with proof of actual purchase price can receive up to 20% of the actual purchase price of a product, to be trebled if sufficient funds exist in the Net Settlement Fund.  Id.

Next, the parties eliminated the *cy pres* distribution in the P-A Settlement and substituted a reverter to the Defendants.  The value of any checks not cashed by class members within ninety days of distribution will revert to the Defendants.

Finally, following reverter of unclaimed funds to the Defendants, claimants who cashed their checks and provided email addresses will receive coupons for discounts on the baby products that are the subject of the settlement.  The coupons will be valid at Babies "R" Us and Toys "R" Us stores.  ECF No. 864, Ex. 1-I (sample coupon).

**B.  Preliminary Approval**

On May 14, 2014, I issued an order preliminarily approving the P-A Settlement.  ECF No. 859.  The order set the parameters of the *Elliott* subclasses and consolidated the *McDonough* and *Elliott* cases.[11]  Id.  I set the claims and opt-out deadline for August 22, 2014.  Objections to and comments in support of the P-A Settlement were also due by August 22, 2014.  I set August 29, 2014 as the deadline for responding to any objections, and also scheduled a final fairness hearing for October 6, 2014.  This timeline ensured that all claims were filed and all class members identified before consideration of final approval of the P-A Settlement.

---

[11] I granted class certification to the *McDonough* subclasses on July 15, 2009.  McDonough v. Toys R Us, Inc., 638 F. Supp. 2d 461 (E.D. Pa. 2009).  For the same reasons I found class certification of the *McDonough* subclasses appropriate, I certify the *Elliott* subclasses here.  See id. at 473-91.

### C. Exclusion Requests and Objections

Class members filed a total of ninety-nine timely exclusion requests in connection with the Initial and P-A Settlements.  Mancuso Supp. Aff. ¶ 27.  Class members filed forty exclusion requests in connection with the Initial Settlement and sixty-one requests in connection with the P-A Settlement.  Id.  The class members who opted out of the Initial Settlement received notice of the P-A Settlement and had the opportunity to revoke their exclusions, but the terms of the settlement provided that their opt-outs otherwise remained valid.  Two class members who filed requests for exclusion from the Initial Settlement refiled requests.  The Claims Administrator eliminated those duplicate requests, for a total of ninety-nine exclusions.  Id.

Five alleged members of the class objected to approval of the P-A Settlement and/or class counsel's motion for attorneys' fees and expenses.  Kevin Young and Allison Lederer, two of the Objectors who appealed the Initial Settlement to the Third Circuit, filed objections to the P-A Settlement and class counsel's fee and expense application. Kim Morrison filed an objection to the P-A Settlement and class counsel's fee and expense request.  Susan House and Chanel Barnett also filed objections, but they did not submit valid claims.[12]  Only counsel for Objector Young appeared before the Court at the final fairness hearing on October 6, 2014.  None of the other objectors nor their counsel appeared.

---

[12] Susan House submitted a deficient claim form.  GCG contacted House and provided her with the opportunity to cure the deficiencies.  Mancuso Supp. Aff. ¶ 4(D).  House did not respond.  Id.  Chanel Barnett also submitted a deficient claim form.  GCG contacted Barnett and provided her with the opportunity to cure the deficiencies.  Id. ¶ 4(E).  In response, Barnett submitted the same deficient documentation.  Id.  Therefore, their objections will not be considered.  See City of Livonia Emps. Ret. Sys. v. Wyeth, No. 07-cv-10329, 2013 WL 4399015, at *1 (S.D.N.Y. Aug. 7, 2013) ("[A] class member who has no interest in the appropriation of a settlement fund must lacking standing to challenge the appropriation of that fund."); In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 340 (S.D.N.Y. 2005) (concluding that objector who "did not file a proof of claim . . . therefore does not have standing to bring her objections").  I note that their objections overlap with the issues raised by the other objectors.

## IV.     Final Approval of the Post-Appeal Settlement

"[A] class action cannot be settled without the approval of the court and a determination that the proposed settlement is 'fair, reasonable and adequate.'"  In re Prudential, 148 F.3d at 316 (quoting In re G.M. Trucks Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785 (3d Cir. 1995)).  Settlements are ultimately "private contracts reflecting negotiated compromises."  Baby Prods., 708 F.3d at 173 (citing Sullivan v. DB Invs., Inc., 667 F.3d 273, 312 (3d Cir. 2011)).  Therefore, "[t]he role of a district court is not to determine whether the settlement is the fairest possible resolution—a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly."  Id. at 173-74.  The district court's role is to "determine whether the compromises reflected in the settlement—including those terms relating to the allocation of settlement funds— are fair, reasonable, and adequate when considered from the perspective of the class as a whole."  Id. at 174.

### A.  Factors for Considering Final Approval

In the Third Circuit, courts must consider three sets of factors when determining the fairness, adequacy, and reasonableness of a proposed class action settlement: (1) the *Girsh* nine-prong test; (2) the considerations outlined in *Prudential*; and (3) the new requirements articulated in *Baby Products*.  District courts "must make findings as to each of the *Girsh* factors, and the *Prudential* factors where appropriate," and "cannot substitute the parties' assurances or conclusory statements for [their] independent analysis of the settlement terms."  In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350-51 (3d Cir. 2010).  I will also make findings as to the *Baby Products* direct benefit considerations.  Here, the *Girsh* factors, relevant *Prudential* considerations, and *Baby Products* analysis weigh in favor of settlement approval.

11

The Third Circuit directed district courts to consider the following nine factors in *Girsh v. Jepson*:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and ellipses omitted).

In more recent decisions, the Third Circuit has suggested an expansion of the nine-prong test when appropriate to include what are now referred to as *Prudential* considerations:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

In re Prudential, 148 F.3d at 323; see also In re Pet Food, 629 F.3d at 350.

In the *Baby Products* decision, the Third Circuit articulated an additional line of inquiry for district courts to use when analyzing a proposed class action settlement:

> one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class. In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards.

Baby Prods., 708 F.3d at 174.  The Third Circuit made clear that a district court must have specific details about the value of the settlement to class members.

**B.  *Girsh* Factors**

    i.  **The Complexity, Expense, and Likely Duration of the Litigation**

If this matter were to proceed to trial, the litigation would be lengthy.  Antitrust class actions are particularly complex to litigate and therefore quite expensive.  See In re Auto. Refinishing Paint Antitrust Litig., MDL No. 1426, 2008 U.S. Dist. LEXIS 569, at *14 (E.D. Pa. Jan. 3, 2008) ("This litigation, *like most antitrust cases*, has been exceedingly complex, expensive, and lengthy.") (emphasis added).  "An antitrust class action is arguably the most complex action to prosecute . . . ."  In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (internal quotation marks omitted); see also In re Shopping Carts Antitrust Litig., MDL No. 451, 1983 U.S. Dist. LEXIS 11555, at *17 (S.D.N.Y. Nov. 18, 1983) (noting that "antitrust price fixing actions are generally complex, expensive, and lengthy").  These same considerations of time and expense that supported approval of the Initial Settlement support approval here.  Following the Third Circuit's vacatur of the Initial Settlement, the parties restructured the settlement rather than proceed to trial.  They returned to the drawing board to change the settlement terms following the appeal.  Thus, this factor counsels in favor of settlement as private resolution of the parties' conflict reduces expenses and avoids delay.

    ii.  **The Reaction of the Class to the Settlement**

More than 1.1 million class members received notice of the P-A Settlement via direct mail and email.  Mancuso Aff. ¶¶ 22-26.  A short-form notice was published in nationally circulated consumer magazines and there was "banner" advertising on highly trafficked websites.  A press release was issued through PR Newswire in both English and Spanish and posted to PR

Newswire's Twitter accounts.  Id. ¶ 26.  Additionally, an informational website specifically tailored to the settlement (www.babyproductsantitrustsettlement.com) and a toll-free hotline (1-888-292-8492) were established to provide notice and support to class members.  ECF No. 864-2, Ex. 2 ¶ 9 (Dowd Decl.).

The notice established an August 22, 2014 deadline for class members to opt out of the settlement or to file objections.  Class members filed a total of ninety-nine timely exclusion requests.  Mancuso Aff. ¶¶ 10, 27.  Class members submitted three valid objections.[13]  Id. ¶ 27.

Allison Lederer and Kim Morrison filed objections to the reverter and coupon provisions, as well as to the attorneys' fees request.[14]  ECF Nos. 870, 876.  Kevin Young, who successfully appealed final approval of the Initial Settlement to the Third Circuit, filed the other objection. Young objects to the P-A Settlement only insofar as it does not provide for a fee award for his counsel and an incentive award for himself.  As explained in the section on objector attorney fees, this concern is irrelevant because no party disputes that Young is entitled to fee and incentive awards; I will award fees and an incentive award to Young for his significant work as an objector.  Young's remaining objection is to class counsel's fee and expense request.  ECF

---

[13] Two additional class members filed deficient claims and did not cure their deficiencies.  *See supra* note 12.

[14] Morrison's additional grounds for objection are without merit.  Morrison claims the notice was insufficient because there was no information about GCG's efforts to update addresses.  GCG used the United States Postal Service's National Change of Address database to confirm and update addresses. Mancuso Supp. Aff. ¶ 3.  Morrison also claims notice was insufficient because it did not provide the release nor the amount a class member could receive under the settlement.  However, the notice stated that the settlement involved a release and directed class members to the full settlement for more details. Dowd Decl., Exs. A & B.  The notice did not state the specific monetary amounts each class member could recover because the amounts would vary depending on how many class members sought relief. Morrison further argues that the opt-out process was unreasonably burdensome because a class member had to mail his or her exclusion request rather than complete the process online.  Mailing a request is not unreasonably burdensome.  As for Morrison's argument that the lack of an appeals process for claims rejected by GCG, the deficiency resolution process served as a check on GCG's discretion.  GCG notified thousands of claimants who submitted invalid claims and provided them with an opportunity to cure the problems with their claims through the deficiency process.  Mancuso Aff. ¶¶ 28-30; Mancuso Supp. Aff. ¶ 4.

No. 871 at 4.  At the Final Fairness Hearing on October 6, 2014, Young's counsel explained that "our only remaining objection is to the fees."  Final Fairness Hearing Tr. 20.

The overwhelming majority of class members neither opted out nor objected.  Although courts routinely infer support for a settlement from the absence of a large number of objectors, courts "must be cautious about 'inferring support from a small number of objectors to a sophisticated settlement.'"  In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 179 (E.D. Pa. 2000) (quoting In re G.M., 55 F.3d at 812).  Nonetheless, the limited number of objections reveals some measure of the strength and depth of the opposition.  Further, the most vociferous objector to the Initial Settlement, Kevin Young, takes issue only with class counsel's proposed fee award and his own ability to receive a fee award, not with the benefits provided to class members under the P-A Settlement.  ECF No. 871 at 1 (acknowledging that "the revised settlement provides a massive improvement in the direct benefit to class members"); Final Fairness Hearing Tr. 20.  Allison Lederer also objects to class counsel's fee request.  The adequacy of the settlement will be considered separately from class counsel's fee request.  The objections to the fee request will be addressed in the appropriate section below.  Lederer also objects to the reverter and coupon provisions, arguing that the reverter unfairly benefits the Defendants and the coupons do not provide meaningful compensation to class members.  ECF No. 870.  As discussed below, the reverter and coupon provisions of the settlement do not render the settlement unfair, unreasonable, or inadequate.

The Claims Administrator will distribute the Net Settlement Fund by mailing class members checks valid for 90 days.  Paragraph 13 of the proposed Allocation Order provides that any unclaimed money from these checks will revert to the Defendants:

> If after the Payment Period [90 days] there are any funds remaining in the Net Settlement Fund or any Individual Settlement Fund or in the Excess Amount or

any other funds to which the Settlement Fund was allocated or distributed after all payments ordered by the Court have been made ("Final Remaining Amount"), the Claims Administrator is directed to pay such Final Remaining Amount to Defendants as Defendants shall jointly instruct the Settlement Trustee and/or Claims Administrator.

ECF No. 864, Ex. F to Ex. 1.

The reverter to the Defendants will only come into play if some of the more than 1.1 million class members fail to cash their checks.[15]  P-A Settlement ¶ 20.  Objectors Allison Lederer and Kim Morrison object to a reverter of any unclaimed funds to the Defendants.  Lederer argues that because the Defendants agreed to the Initial Settlement without a reverter provision, there is no "compelling justification" for the restructured settlement to provide for a reverter when the size of the common fund remains the same.  ECF No. 870, at 3-4.  Morrison argues that the reverter (and coupons) constitutes a windfall to the Defendants.  ECF No. 876 at 2.  Although courts view reverter provisions with caution, "[t]he role of a district court is not to determine whether the settlement is the fairest possible resolution."  Baby Prods., 708 F.3d at 173-74.  A court must "determine whether the compromises reflected in the settlement—including those terms relating to the allocation of settlement funds—are fair, reasonable, and adequate when considered from the perspective of the class as a whole."  Id. at 174.  After the Third Circuit vacated approval of the Initial Settlement, that agreement ceased to exist.  The parties were free to take the case to trial.  Instead, they negotiated a new settlement, restructuring the allocation of the $35.5 million settlement agreement previously reached.  The parties could have increased or decreased the amount of the settlement fund.  No party had any obligation to settle again, let alone agree to any of the same terms embodied in the Initial Settlement.

---

[15] Final Fairness Hearing Tr. 15 (class counsel explaining that if all class members cash their checks that will exhaust the Net Settlement Fund, and that although some probably will not cash their checks, class counsel "have no idea how many").  The Defendants will then issue inconsequential coupons in a "total cumulative amount up to the Final Remaining Amount" to class members who cashed their checks and who provided email addresses.  ECF No. 865, Proposed Allocation Order ¶¶ 14-15.

Although the Federal Judicial Center describes reversion of unclaimed funds to defendants as a "hot button indicator" of potential unfairness of a class action settlement, this reverter is part of the compromise and does not render the P-A Settlement unfair or unreasonable.  Federal Judicial Center, Managing Class Action Litigation: A Pocket Guide for Judges 17, 19-20 (3d ed. 2010). By automatically approving so many class members for settlement benefits, the P-A Settlement represents a substantial improvement over the Initial Settlement, whose claims structure resulted in a low claims rate.[16]  Because the Claims Administrator will distribute the entire Net Settlement Fund directly to class members, the reverter provision does not detract from the adequacy of the other provisions to ensure maximum class recovery.

In the alternative, Lederer suggests that the Court require class counsel to provide an estimate of the amount of the reverter.  ECF No. 870 at 4.  Imposing such a requirement is infeasible and unnecessary.  Lederer argues that a substantial reverter is likely because many class members may have moved from the addresses on file with BRU.  ECF No. 886 at 3.  The Claims Administrator took appropriate measures to confirm and update class members' addresses.  Mancuso Supp. Aff. ¶ 3.  The Claims Administrator ran more than 1.1 million addresses through the Postal Service's Change of Address database and updated more than 200,000 addresses.  Id.  These efforts ensure that settlement checks will reach class members; there is no need to "validat[e] the accuracy of the addresses through a statistically relevant mailing to a sample" of class members following the notice process.  ECF No. 886 at 4.  The entire Net Settlement Fund will be distributed directly to these class members.  Therefore,

---

[16] See Federal Judicial Center, Manual for Complex Litigation (Fourth) § 21.66 (2004) ("There may be no need to require action by class members, as where the defendants' records provide a satisfactory, inexpensive, and accurate method for determining the distribution of a settlement fund."); Newberg on Class Actions § 12:18 (5th ed.) ("In some cases, class members need not file claims because the identity and relevant address of the class members, and the quantity of relief they are entitled to, is known.").

Lederer's related argument that the Court has insufficient information about the actual distribution of funds to class members is without merit.  ECF No. 886 at 2.

Ultimately, Lederer argues that the P-A Settlement presents the same issue that resulted in the vacatur of the Initial Settlement approval: the "actual allocation" of the settlement fund to class members is unascertainable.  Baby Prods., 708 F.3d at 169.  Here, the actual, direct distribution to the class is known: the Net Settlement Fund of $17,451,993.  Following final approval of the P-A Settlement, checks will issue in the cumulative amount of the entire Net Settlement Fund.  Because "the actual distribution of funds can be estimated with reasonable accuracy," there is no need to "withhold final approval of [the] settlement."  Id. at 174.

Finally, Lederer argues that the settlement should not provide coupons because they "will not provide meaningful compensation to class members and will not provide any deterrence to Defendants."  ECF No. 886 at 5-6.  The P-A Settlement is first and foremost a cash settlement. It cannot fairly be deemed a coupon settlement.  No class member will receive a coupon as his or her sole or primary recovery.  The "meaningful compensation" in this settlement will reach class members in the form of checks representing a percentage of their damages.  Therefore, the presence of a reverter and coupon provision does not detract from the fairness of the settlement as a whole.  In sum, the reaction of the class to the proposed settlement counsels in favor of approval.

### iii.  The Stage of the Proceedings and the Amount of Discovery Completed

The *Girsh* and *Prudential* Courts explained that the stage of the lawsuit and amount of discovery completed prior to settlement also must factor into the approval decision.  These factors weigh in favor of approval because the parties engaged in extensive discovery and trial

preparation prior to the Initial Settlement, and thus prior to the P-A Settlement.  Explaining the

rationale behind the third *Girsh* factor, the Third Circuit wrote:

> The parties must have an "adequate appreciation of the merits of the case before negotiating."  To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken.

In re Prudential, 148 F.3d at 319 (quoting In re G.M., 55 F.3d at 813); see also Bell Atl. Corp. v.

Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993) ("[P]ost-discovery settlements are more likely to reflect

the true value of the claim and be fair.").  During the five years leading to the Initial Settlement,

the parties conducted extensive discovery that included the review of over one million pages of

documents, more than thirty depositions, and the exchange of expert reports.  By the time Initial

Settlement negotiations began in earnest, discovery had already closed and the parties were

preparing for trial.  The arms-length negotiations also involved in-person mediation before

Professor Eric Green.  Therefore, the parties had already gained a thorough understanding of the

strengths and weaknesses of their cases, and this settlement represents an informed resolution of

the matter.  Following the Third Circuit's vacatur of the Initial Settlement, the parties

renegotiated the settlement rather than move forward with trial.  This factor weighs in favor of

approving the P-A Settlement.

### iv.  The Risks of Establishing Liability and Damages

The next two *Girsh* factors consider the risks of establishing liability and damages should the

case go to trial.  These two *Girsh* factors are closely related, so I will address them together.  In

addition to the inherent risk in any trial, counsel would need to establish liability under the

Supreme Court's *Leegin* decision.  See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551

U.S. 877 (2007).  *Leegin* impacts the allegations that the Resale Price Maintenance ("RPM")

agreements between BRU and Defendant Manufacturers prevented other retailers from selling

the Manufacturers' products at a discount.  At the time of filing this lawsuit, such an agreement constituted a *per se* violation of the Sherman Antitrust Act.  During the course of the litigation, the Supreme Court overturned nearly a century of precedent to rule that RPM agreements were no longer *per se* violations.  See id. (overturning Miles Med. Co. v. John D. Park & Sons Co., 220 U.S. 373 (1911)).  Such a change meant that the RPM agreements would now be analyzed under a rule-of-reason test and Plaintiff Consumers would "bear[] the initial burden of showing that the alleged [agreements] produced an adverse, anticompetitive effect."  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 315 (3d Cir. 2010) (citing Gordon v. Lewistown Hosp., 423 F.3d 184, 2010 (3d Cir. 2005)).  The Defendants could now argue that the challenged agreements constituted reasonable restraints on trade and were thus legal.  See Leegin, 551 U.S. at 885-86.  This became a substantial barrier to proving liability.

The dispute over damages would likely have resulted in an expensive battle of the experts and there was no way to anticipate a jury's response to intricate economic data.  Therefore, these two *Girsh* factors counsel in favor of settlement.

### v.  **The Risks of Maintaining the Class Action through the Trial**

Although I certified the *McDonough* classes in this case, class certification is subject to review and modification at any time during the litigation.  See Zenith Labs., Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 512 (3d Cir. 1976).  Since the commencement of this litigation, the Third Circuit and the Supreme Court have handed down seminal opinions that make it more difficult for plaintiffs to prevail on class certification.  See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008) (requiring district courts to "make a definitive determination that the requirements of Rule 23 have been met before certifying a class") (italics added); Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011) (creating a higher

"commonality" threshold for class action certification under Fed. R. Civ. P. 23(a)(2)).  Following the Third Circuit's *Hydrogen Peroxide* opinion, I refused to extend the subclass periods beyond the initial filing of the *McDonough* suit.  See McDonough v. Toys "R" Us, Inc., 638 F. Supp. 2d 461, 474 (2009).  This decision led to the subsequent *Elliott* filing—in which class members sought certification for additional subclasses.  I have not issued a separate class certification opinion regarding the *Elliott* subclasses, which are now being certified as part of the P-A Settlement.[17]  But the dispute over extending the time periods for the additional subclasses would at the very least lead to lengthy delays and higher expenses.

These relatively recent higher court opinions are still in the process of being interpreted.  Thus, they present a challenge to class counsel and increase the likelihood of unfavorable appellate review of class certification.  In fact, the Supreme Court had not announced the *Wal-Mart* decision until after class counsel filed the motion for final approval of the Initial Settlement.

Therefore, this *Girsh* factor counsels in favor of approving the P-A Settlement.

> vi.  **The Ability of the Defendants to Withstand a Greater Judgment**

The ability of the Defendants to withstand a greater judgment generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement."  Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011).  That does not appear to be the case.  I have not been presented with any evidence indicating that BRU or Defendant Manufacturers are at risk of insolvency.  Yet it is impossible to predict the future finances of consumer product companies.  Although the matter has now been resolved, Defendant Regal Lager delayed payment on its

---

[17] See *McDonough*, 638 F. Supp. 2d 461, for a discussion of the rationale for certifying the *McDonough* subclasses, which applies to the *Elliott* subclasses as well.

proposed settlement contribution due to a lack of funds.  Even if solvency could be assured, I

would follow my district court colleagues within the Third Circuit who "regularly find a

settlement to be fair even though the defendant has the practical ability to pay greater amounts."

Bredbenner v. Liberty Travel, Inc., 2011 U.S. Dist. LEXIS 38663, at *42 (D.N.J. Apr. 8, 2011)

(citing McCoy v. Health Net, Inc., 569 F. Supp. 2d 448, 462 (D.N.J. 2008); Weber v. Gov't

Emps. Ins. Co., 262 F.R.D. 431, 446 (D.N.J. 2009)).  Therefore, this *Girsh* factor is neutral and

neither supports nor undercuts approval of the P-A Settlement.

> vii.  **The Range of Reasonableness of the Settlement Fund in Light of the Best**
> **Possible Recovery and All of the Attendant Risks of Litigation**

The final *Girsh* factors consider whether the settlement fund is reasonable in light of the best

possible outcome had the plaintiffs prevailed at trial and whether, considering all of the attendant

risks of litigation, the amount of the settlement is reasonable.

These last two *Girsh* factors, often analyzed in conjunction, confirm that the P-A Settlement

should be approved.  "'The fact that a proposed settlement may only amount to a fraction of the

potential recovery does not, in and of itself, mean that the proposed settlement is grossly

inadequate and should be disapproved.'"  In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235,

263 (D.N.J. 2000) (citation omitted).  Rather, the recovery percentage "must represent a material

percentage recovery to plaintiff, in light of all the risks considered under *Girsh*."  Id. (internal

quotation marks omitted).

Here, the settlement amount represents approximately 24 percent of estimated actual

damages.  ECF No. 864-6 at 16.  I have previously found a 15 percent recovery to be reasonable.

See In re Corel Corp. Sec. Litig., 293 F. Supp. 2d 484, 489-90 (E.D. Pa. 2003).  Other Judges on

this Court have upheld far smaller settlements.  In *Nichols v. Smithkline Beecham Corp.*, Judge

Padova upheld a settlement in the range of 9.3-13.9 percent of damages. No. 00-6222, 2005 U.S. Dist. LEXIS 7061, at *52 (E.D. Pa. Apr. 22, 2005). He found that percentage range to be "consistent with those approved in other complex class action cases." Id. (citing In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 257 (D. Del. 2002)). In a securities class action, the Third Circuit upheld a settlement in the 36-37 percent range, noting that it "far exceed[ed] recovery rates of any case cited by the parties." In re Cendant Corp. Litig., 264 F.3d 201, 241 (3d Cir. 2001). In upholding the settlement, the Third Court specifically pointed to the trial court's application of a range of recoveries from 1.6-14 percent. Id. (citing In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d at 263).

Although this matter does not bear any uniquely heightened risks of litigation, there is always an inherent risk in proceeding with litigation – not the least of which is the inevitable delay associated with it. In *In re G.M.*, the Third Circuit warned "against demanding too large a settlement . . . after all, settlement is a compromise, yielding of the highest hopes in exchange for certainty and resolution." 55 F.3d at 806. With that caution in mind, I agree with class counsel and find that the $35.5 million figure is reasonable.[18] These two factors weigh in favor of approval.

### C. *Prudential* Considerations

In *Prudential*, the Third Circuit explained that due to a "'sea-change in the nature of class actions' after *Girsh* was decided thirty-five years ago, it may be helpful to expand the *Girsh* factors" to add additional elements for district courts to consider when reviewing a proposed settlement agreement. In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010) (quoting In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283 (3d Cir. 1998)). Here, the relevant *Prudential* factors, many of which are covered in the above discussion of the

---

[18] Further, there are no objections to the amount of the Settlement.

*Girsh* factors, lend additional support for approving this settlement. First, the underlying

substantive issues are mature in light of the experience of the attorneys, extent of discovery,

posture of the case, and mediation efforts undertaken. See In re Prudential, 148 F.3d at 323.

Second, class members had the right to opt-out of the settlement. See id. Next, the procedure for

processing individual claims is reasonable because the vast majority of claims were approved

without any effort on the part of class members. See id. Beyond the claims identified in BRU

records, the Claims Administrator has sufficient discretion to ensure that individually submitted

claims are handled in a responsible and just manner. See id. For example, the Claims

Administrator gave class members who submitted invalid claims the opportunity to fix their

claims through the deficiency resolution process. Mancuso Aff. ¶¶ 28-30, 37-38; Mancuso

Supp. Aff. ¶ 4. Finally, as discussed later in this memorandum, the "provisions for attorneys'

fees are reasonable." In re Prudential, 148 F.2d at 323.

### D. *Baby Products* Considerations

In *Baby Products*, the Third Circuit decision vacating approval of the Initial Settlement in

this lawsuit, the Circuit Court added a new set of factors for district courts to consider in

analyzing proposed class action settlements:

> We add today that one of the additional inquiries for a thorough analysis of
> settlement terms is the degree of direct benefit provided to the class. In making
> this determination, a district court may consider, among other things, [1] the
> number of individual awards compared to both the number of claims and the
> estimated number of class members, [2] the size of the individual awards
> compared to claimants' estimated damages, and [3] the claims process used to
> determine individual awards. Barring sufficient justification, *cy pres* awards
> should generally represent a small percentage of total settlement funds.
>
> . . . . Making these findings may also require a court to withhold final approval of
> a settlement until the actual distribution of funds can be estimated with reasonable
> accuracy. Alternatively, a court may urge the parties to implement a settlement
> structure that attempts to maintain an appropriate balance between payments to
> the class and *cy pres* awards. For instance, it could condition approval of a

> settlement on the inclusion of a mechanism for additional payouts to individual
> class members if the number of claimants turns out to be insufficient to deplete a
> significant portion of the total settlement fund.

Baby Prods., 708 F.3d at 174.

The P-A Settlement will provide a meaningful direct benefit to the class. First, it will pay 1,188,456 claims to a similar number of class members.[19] More than 1.1 million of these claims were automatically approved for settlement awards. Therefore, the number of awards closely parallels the number of claims. Also, the P-A Settlement does not contain a *cy pres* award.

Second, the parties agreed to base awards on damages of twenty percent of the actual or estimated purchase price of a given baby product. P-A Settlement Agreement; see ECF No. 864, Ex. 3 (Asher Aff.). Individual awards will be distributed on a *pro rata* basis, so that each claimant will recover the same percentage of his or her damages.[20]

Third, the claims process for the P-A Settlement presents no hurdle for the vast majority of class members, because Plaintiffs used BRU records to identify most of the class members. Those claimants do not have to submit any additional information to qualify for—and receive— benefits.[21] Claimants who were not identified in BRU's records will still recover if they submitted valid proof of purchase.

Based on the above information, the actual distribution of funds can be estimated with reasonable accuracy. The *Baby Products* analysis weighs in favor of approving the settlement.

---

[19] See Mancuso Supp. Aff. ¶¶ 4-5; *supra* note 10 (noting approval of 81 additional untimely claims through deficiency process).

[20] Because I will reallocate the Net Settlement Fund, as discussed in Section VIII, each claimant will receive approximately twenty-nine percent (29%) of his or her damages, or nearly six percent (5.8%) of the estimated or actual purchase price.

[21] The P-A Settlement's class member identification process improves on the Initial Settlement that suffered from a low claims rate and level of direct benefit to the class. See Newberg on Class Actions § 12:18 ("[T]he class is likely to receive more compensation and the defendant to be disgorged of more money the less class members have to do to receive money. Given the small claims nature of most class actions, direct payment to class members is optimal where possible.").

V.      **Plan of Allocation**

Class counsel seek approval of the proposed plan of allocation as set forth in their Motion for Entry of Proposed Allocation Order.  ECF No. 865.  For the reasons discussed below, I will modify the proposed allocation order and enter an appropriate one.

A.  **Standard of Review**

When assessing proposed plans of allocation, courts utilize the same standard for determining whether to approve the settlement itself.  Therefore, the proposed plan needs to be fair, reasonable and adequate.  Baby Prods., 708 F.3d at 174 (explaining that the district court "must determine whether the compromises reflected in the settlement—including those terms relating to the allocation of settlement funds—are fair, reasonable, and adequate when considered from the perspective of the class as a whole."); In re Cendant Corp. Litig., 264 F.3d at 248.  "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable."  In re Ikon, 194 F.R.D. at 184.  "A district court's 'principal obligation' in approving a plan of allocation 'is simply to ensure that the fund distribution is fair and reasonable as to all participants in the fund.'"  Sullivan v. DB Invs., Inc., 667 F.3d 273, 326 (3d Cir. 2011) (quoting Walsh v. Great Atl. & Pac. Tea Co., Inc., 726 F.2d 956, 964 (3d Cir. 1983)).

As a "fiduciary" to the subclasses, I must consider the fairness and adequacy of representation of the various subclasses.  In re Cendant Corp. Litig., 264 F.3d at 255 (explaining that traditionally the court is the "agent" who "oversee[s] the relationship between the class and its lawyers"); In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 307 (3d Cir. 2005).

### B.  Proposed Plan

Under the proposed P-A Settlement, class members with proof of actual purchase price can receive up to twenty percent (20%) of the actual purchase price of a baby product.  ECF No. 865 at 5 ¶ 6(a)-(c) (Proposed Allocation Order).  Class members who lack proof of actual purchase price but provide other documentary proof can receive up to 20% of the estimated purchase price of a baby product.  Id.  Class members identified in BRU records also can receive up to 20% of the estimated purchase price of a baby product.  Id.  All class members are eligible to receive treble damages if sufficient funds exist in the Net Settlement Fund.  The proposed Allocation Order designates a certain percentage of the Net Settlement Fund to be distributed to each subclass.  Based on these percentages, some subclasses would receive treble damages, while others would receive only a fraction of their damages.

### C.  Modification

When the *McDonough* subclasses were certified, it was unclear whether there would be any rationale for differential recoveries among the subclasses.  Now, at the time of final approval of a second settlement, it is clear that there is no evidentiary justification in the record for such a marked discrepancy in subclass recovery.  Approving the proposed allocation order without modification would permit wildly varying recoveries among class members even for similarly priced products.  The allegations in the case contain no analysis of degrees of fault among the Defendants.  All Defendants are accused of the same conduct.  There is no representation that the alleged illegal activity disproportionately impacted members of certain subclasses.  Thus, on final re-examination, it is more equitable to distribute the Net Settlement Fund on a *pro rata*

basis.  All class members should receive the same percentage of their damages.  Modification

best represents the interests of the subclasses and of the class as a whole.[22]

At the final fairness hearing, class counsel, defense counsel, and Objector Young's

counsel all agreed that I have the authority to reallocate the P-A Settlement Fund and that

reallocating the fund on a *pro rata* basis would be appropriate.[23]  Final Fairness Hearing

Tr. 8-13.  Paragraph 19 of the P-A Settlement provides (with emphasis added):

> Subject to approval by the Court, the Net Settlement Fund will be allocated to the
> Settlement Subclasses as set forth in the Allocation Order. *In the event the Court
> disapproves of or modifies the Allocation Order* except with respect to the
> payment of the Final Remaining Amount (as defined in the Allocation Order) to
> Defendants, *such disapproval or modification shall have no effect on the terms of
> the Settlement or the Effective Date*.

Pursuant to Paragraph 19, I will modify the allocation order to provide for a *pro rata* distribution

of the Net Settlement Fund to all class members.  This distribution will compensate each class

member for approximately twenty-nine percent (29%) of his or her damages.  In a settlement,

claimants generally cannot expect to receive the maximum amount they would have received had

they gone to trial and prevailed.  Settlement entails compromise, and it is reasonable for

claimants to receive a percentage of the maximum recovery they would have received had they

prevailed at trial.  In re G.M., 55 F.3d at 806.

With the modifications described above, I approve the allocation of the Net Settlement Fund.

---

[22] Objector Morrison raised a related concern about inequities in distribution of the settlement fund among
subclass members, albeit in the coupon context.  See ECF No. 876 at 2.  This modification addresses
Morrison's concern that some class members would receive full cash damages while others would receive
only a portion of their damages and be eligible for additional coupon benefits.

[23] All counsel, including counsel for Objector Young (the Center for Class Action Fairness, or "CCAF"),
agreed that no notice problem results from modifying the allocation order.  See Final Fairness Hearing Tr.
8-13.  The class notice summarized the settlement terms and directed class members to the settlement
website for the full terms.  Included in the full settlement terms is Paragraph 19 of the Allocation Order,
which explicitly gives me the authority to modify the proposed allocation without affecting the validity of
the settlement.  Therefore, there is no notice problem.

## VI.   Attorneys' Fees & Expenses for Class Counsel

Class counsel request attorneys' fees in the amount of $11,833,333.33, which represents 33-1/3 percent of the gross settlement amount.  ECF No. 863 at 1.  They also request reimbursement of out-of-pocket litigation expenses in the amount of $2,283,482.10.  Id.  Federal Rule of Civil Procedure 23(h) provides: "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  The proposed settlement agreement provides for the award of attorneys' fees and expenses.  P-A Settlement ¶ 26.  Nonetheless, "a thorough judicial review of fee applications is required in all class action settlements."  In re Prudential, 148 F.3d at 333 (quoting In re G.M., 55 F.3d at 819) (internal quotation marks omitted); see also Baby Prods., 708 F.3d at 178-80.

Courts generally use one of two methods for assessing attorneys' fee requests: the lodestar method or the percentage-of-recovery method.  In re Prudential, 148 F.3d at 333.  The lodestar method is more commonly the starting point in statutory fee-shifting cases.  Id.  The percentage-of-recovery method, on the other hand, is "generally favored in cases involving a common fund."  Id.  Either way, "it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation."  In re Rite Aid, 396 F.3d at 300.  This case involves a common fund, and therefore the percentage-of-recovery method is appropriate.  Though not "outcome determinative," the lodestar method is also relevant as a cross-check.  Baby Prods., 708 F.3d at 179-80 n.14 (noting that the "negative lodestar multiplier" in this case "suggests that class counsel would not be overpaid for their services if compensated as requested, but it also suggests that counsel has a significant financial incentive to cut its losses and settle the lawsuits").

As discussed throughout this Section, reducing class counsel's fee award is necessary.  For the reasons described below, I will award class counsel $11,090,833.33, or 31.2% of the gross settlement fund.

## A.  Common Fund

The Third Circuit has identified ten factors for courts to consider in deciding an appropriate percentage-of-recovery fee award for class counsel in a class action settlement involving a common fund.  The factors are:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

In re Diet Drugs Prod. Liab. Litig., 582 F.3d 524, 541 (3d Cir. 2009) (citing Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000); In re Prudential, 148 F.3d at 336-40)).  These *Gunter/Prudential* factors are not exhaustive, and a district court should consider "'any other factors that are useful and relevant with respect to the particular facts of the case.'"  In re Diet Drugs, 582 F.3d at 541 n.34 (quoting In re AT&T Corp. Sec. Litig., 455 F.3d 160, 166 (3d Cir. 2006)).

In *Baby Products* itself, the Third Circuit provided additional direction for district courts: "In evaluating a fee award [the district court] should begin by determining with reasonable accuracy the distribution of funds that will result from the claims process."  Baby Prods., 708 F.3d at 179.  The Third Circuit explained that this determination should precede the *Gunter/Prudential* analysis and the district court's application of its own experience.  Id.  The *Baby Products*

determination may require the district court "'to delay a final assessment of the fee award to withhold all or a substantial part of the fee until the distribution process is complete.'"  Id. (quoting Federal Judicial Center, Manual for Complex Litigation (Fourth) § 21.71 (2004)).

As discussed above, the entire Net Settlement Fund of $17,451,993.43 will be distributed to class members as a result of the P-A Settlement claims process.  Unlike the Initial Settlement, here the total value of claims and the exact amount that will be distributed to the class are known.  Because the P-A Settlement "adequately prioritizes direct benefit to the class," the *Baby Products* factor weighs in favor of approving the fee award and there is no need to delay assessment of the fee award until the distribution process is complete.  Id. at 178.

However, because counsel fulfilled their "responsibility" to obtain this direct benefit on the second try, I will decrease the fee award to recognize the efforts of Objector Young.  Id.  Next, the *Gunter/Prudential* factors will be analyzed with Objector Young's contributions in mind.

### i.  **The Size of the Fund Created and the Number of Persons Benefitted**

The size of the P-A Settlement is $35.5 million, the same gross amount as the Initial Settlement.  However, the settlement now compensates astronomically more class members in addition to approximately 24,000 class members who submitted valid claims.  Mancuso Aff. ¶¶ 19, 21; Mancuso Supp. Aff. ¶ 4; P-A Settlement ¶ 18.  The Claims Administrator identified more than 1.1 million claims from BRU data and approved these claims for settlement benefits without requiring class members to submit claim forms or documentary proof of purchase. Mancuso Aff. ¶¶ 18, 37-38.  In total, 1,188,456 claims will be paid following final approval of the P-A Settlement.[24]  The P-A Settlement maximizes the benefit to an enormous number of class members.

---

[24] See Mancuso Supp. Aff. ¶¶ 4-5; *supra* note 10 (noting approval of 81 additional untimely claims through deficiency process).

In general, as the size of the settlement fund increases, the percentage of the award decreases. See In re Prudential, 148 F.3d at 339 (citing In re First Fidelity Bancorporation Sec. Litig., 750 F. Supp. 160, 164 n.1 (D.N.J. 1990)).  But this case does not involve a settlement award that is so large as to necessitate an automatic reduction in the percentage award.  The *Prudential* recovery was in excess of $1 billion, and the Third Circuit cited to the trial court's analysis of settlements above $100 million for establishing the inverse relationship principle.  See In re Prudential, 148 F.3d at 339 (referencing In re Prudential, 962 F. Supp. 572, 585 (D.N.J. 1997)).  At $35.5 million, this proposed settlement fund is big enough to benefit the class members but not large enough to qualify for a mega-fund reduction in fees.  Therefore, the size of the fund and the number of people who will recover damages weigh in favor of approving this fee petition.

ii. **The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel**

The objections largely focus on class counsel's fee request as well as the reverter provision, which returns unclaimed funds to the Defendants.

Kevin Young argues that class counsel's fee request—the same as in the Initial Settlement—is unreasonably high.  ECF No. 871 at 1.  He argues: "The Rule 23(h) request made by class counsel remains outsized: a total [including expenses] of more than $14 million, or 39.7% of the $35.5 million gross settlement value, and an even higher percentage of the portions of the settlement that actually provide benefit to the class."  Id.  Young suggests that a 25% benchmark is appropriate for calculating attorneys' fees and that the benchmark percentage should include attorneys' fees *and* expenses.  Id. at 5.  Young renews his objection to class counsel's request for attorneys' fees calculated from the gross settlement fund.  He also asserts that attorneys' fees should be calculated after deducting administrative and legal expenses from the gross fund so

that counsel do not benefit from a double-counting of certain amounts.  Id.  Finally, Young

suggests that his appeal to the Third Circuit—which class counsel opposed—and the subsequent

restructuring of the settlement fund warrant reduction of class counsel's fee award because they

"fail[ed] to negotiate a proper settlement in the first place."  Id. at 1.  Objector Kim Morrison

argues that class counsel failed to provide an explanation of why they should receive one-third of

the settlement fund in attorneys' fees.[25]  ECF No. 876 at 4.  Without more detail from Objector

Morrison, I will consider the arguments Young raises about the reasonableness of class counsel's

request.  As discussed above, Allison Lederer argues that the reverter and coupon provision

unfairly benefits the Defendants and does not provide meaningful compensation to class

members.  ECF No. 870.  Although Lederer's objection does not counsel against approving the

settlement or the proposed fee award, Young's objection counsels against approving the

proposed fee award.

### iii.  The Skill and Efficiency of the Attorneys Involved

The three co-lead counsel firms, Hagens Berman Sobol Shapiro, LLP ("HBSS"), Spector

Roseman Kodroff & Willis, P.C. ("SRKW"), and Wolf Haldenstein Adler Freeman & Herz, LLC

("Wolf Haldenstein") are experienced plaintiffs' firms that have done extensive work in the

antitrust field.  HBBS has served as lead counsel in some of the largest antitrust matters in U.S.

history, including a multi-billion dollar settlement against Visa and MasterCard.  SRKW

spearheaded the In re Linerboard antitrust litigation that settled for more than $200 million and

is one of the highest antitrust settlements in the Third Circuit Court of Appeals.  See 321 F.

Supp. 2d 619 (E.D. Pa. 2004).  The firm also served as lead counsel in In re Flat Glass Antitrust

---

[25] Morrison also argues that the value of coupon benefits should be discounted when calculating class counsel's fee award.  ECF No. 876 at 4.  Because I find that the coupon benefits are insubstantial and inconsequential compared to the primary cash benefits provided by the P-A Settlement, I conclude that this argument lacks merit.  Morrison claims that class counsel failed to post its motion for attorneys' fees and costs on the settlement website.  Id.  Class counsel posted its motion on the site at the appropriate time.

*Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999), and *Stop and Shop Supermarket Co. v. Smithkline Beecham Corp.*, 2005 U.S. Dist. LEXIS 9705 (E.D. Pa. May 19, 2005), two major antitrust matters within the Third Circuit.  Wolf Haldenstein has similarly served as co-lead counsel in major class action lawsuits throughout the country.  See, e.g., In re DRAM Litig., No. 02-1486-PJH, 2007 WL 2416513 (N.D. Cal. Aug. 15, 2007); In re MicroStrategy Sec. Litig., 150 F. Supp. 2d 896 (E.D. Va. 2001).  All three firms have brought their considerable experience to bear in reaching this settlement.  Also, the fact that plaintiffs' counsel obtained this settlement in the face of formidable legal opposition further evidences the quality of their work.  This factor weighs in favor of approval of a fee award.

### iv.  **The Complexity and Duration of the Litigation**

The complexity and duration of the litigation has already been addressed in the section on the *Girsh* factors.  Importantly, class counsel had to address three significant changes in the law handed down by higher courts at different stages of this eight-year litigation.  Besides dealing with the Supreme Court's *Leegin* decision and the Third Circuit's *Hydrogen Peroxide* decision (both discussed above), counsel had to undertake several rounds of briefing to respond to the Supreme Court's evolving pleading standards.  Following the 2006 filing of this case, the Supreme Court decided *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which heightened the pleadings standards for plaintiffs and required additional briefing.  The Supreme Court's decisions made the case more complex and extended the duration of the litigation, weighing in favor of approval of a fee award.

### v.  **The Risk of Nonpayment**

In every class action in which class counsel bring a case on a contingency basis, there is some risk of nonpayment.  However, the risk here is minimal.  As noted above in the discussion

of the sixth *Girsh* factor, "The Ability of the Defendants to Withstand a Greater Judgment", the

risk of nonpayment is at best a neutral consideration.  In *In re Rite Aid Corp.*, the Third Circuit

dealt with this factor by considering the risk of the defendants going out of business.  See 396

F.3d at 304.  Regal Lager, one of the defendant manufacturers, initially said that it did not have

the money to make its settlement payment.  ECF No. 729 (Bengt Lager Decl.).  Regal Lager has

since satisfied its settlement payment obligation.  P-A Settlement Ex. H, ECF No. 858 (filed

under seal).  And as noted above, no company is ever completely safe.  But there was no

indication that any of the companies were in danger of insolvency and therefore the risk of

nonpayment during the pendency of this lawsuit was fairly minimal.  This is a neutral factor.

### vi.  The Amount of Time Devoted to the Case by Plaintiffs' Counsel

In class counsel's declarations they provide summaries of the amount of time spent on this

matter during the past eight years.  SRKW, HBSS, and Wolf Haldenstein, the three co-lead

counsel firms, logged 22,654.50, 14,295.70, and 17,849.15 hours respectively through July 31,

2014.  ECF No. 863, Ex. 2 (Spector Decl.; Fegan Decl.; Isquith Decl.).  In total, class counsel

devoted 84,950.77 hours to this litigation.  ECF No. 864, Ex. 1 ¶ 4 (Decl. of Plaintiffs' Class

Counsel).  Such a large number of hours represents a substantial commitment to this case and

weighs in favor of approving the fee request.  The total record of this litigation also indicates that

the time spent by Plaintiffs' counsel was necessary for the successful prosecution of this case

considering both the complexity involved and the defense mounted by the Defendants.

### vii.  The Awards in Similar Cases

As I noted in *In re Corel*, this District's fee awards generally range between nineteen and

forty-five percent of the common fund.  See In re Corel Corp., Inc. Sec. Litig., 293 F. Supp. 2d

484, 497 (E.D. Pa. 2003) (referencing In re Smithkline Beckman Corp. Sec. Litig., 751 F. Supp.

525, 533 (E.D. Pa. 1990)); see also Bredbenner v. Liberty Travel, Inc., 2011 U.S. LEXIS 38663,

at *59 (D.N.J. Apr. 8, 2011) ("In common fund cases, fee awards generally range anywhere from

nineteen percent to forty-five percent of the settlement fund.") (citing In re G.M., 55 F.3d at

822).  As I held in *In re Corel*, the fees I will award in this complex case are within the

reasonable range.  See id.; see also Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 150 (E.D.

Pa. 2000) (citing Judge O'Neill's award of one-third of the settlement fund for attorneys' fees in

*Perod v. McKenzie Check Advance of Pennsylvania*, No. 98-CV-6787 (E.D. Pa. Order June 5,

2000)).  In *In re Ravisent Techs., Inc. Sec. Litig.*, for example, Judge Surrick noted that "courts

within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus

expenses."  2005 U.S. Dist. LEXIS 6680 (E.D. Pa. Apr. 18, 2005) (referencing In re

CareSciences, Inc. Sec. Litig., Civ. A. No. 01-5266 (E.D. Pa. Oct. 29, 2004) (awarding one-third

recovery of $3.3 million settlement fund, plus expenses)).  The award in this case is within that

range.

Objector Kevin Young advocates a twenty-five percent benchmark for attorneys' fees, and he

supports his position by citing academic studies that have found medians of twenty-five percent

for such fee awards.[26]  ECF No. 871.  The academy, however, is only one source of data, and

lower medians do not preclude higher percentage awards for attorneys' fees.

Young further argues that the twenty-five percent benchmark should be calculated after

administrative fees are subtracted from the gross settlement fund.[27]  The Third Circuit teaches

---

[26] See, e.g., Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and their Fee Awards, 7
J. Empirical Legal Stud. 811 (2010) (analyzing 688 class action settlements in 2006 and 2007 and finding
a mean of 25% and a median of 25.4% for the award of attorneys' fees).

[27] Young notified the Court of a recent Seventh Circuit Court of Appeals decision in which the court held
that "[t]he ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed
to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman v. RadioShack
Corp.*, 768 F.3d 622, 630 (7th Cir. 2014).  As explained in the *Baby Products* decision, the Third Circuit

otherwise.  In *Baby Products* itself, the Third Circuit confirmed that courts may calculate attorneys' fees based on the gross settlement fund even where the settlement contains a reverter or *cy pres* provision.  708 F.3d at 177-79.  The Third Circuit explained that in *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), the Supreme Court "confirmed the possibility of using the entire fund as the appropriate benchmark, at least where each class member needed only to prove his or her membership in the injured class to receive a distribution."  Id. at 177.  The Third Circuit suggested that after calculating the fee award, a district court may decrease the award "[w]here . . . [it] has reason to believe that counsel has not met its responsibility to seek an award that adequately prioritizes direct benefit to the class."  Id. at 178 (citation omitted).

In the end, this factor supports the proposed fee award or is neutral.  But as discussed below, this factor—in conjunction with the lodestar cross-check—weighs in favor of approval.

### viii.  The Value of Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups

In *Prudential*, the Third Circuit explained the importance of considering the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups.  See In re Prudential, 148 F.3d at 338.  There, the Third Circuit remanded the trial court's fee award for wrongly "credit[ing] class counsel with creating the entire value of the settlement" and overlooking the considerable contributions of a multi-state life insurance task force.  Id.

Young and class counsel dispute whether this factor concerns only the role of government investigations.  In their fee application, class counsel explain that they were not assisted by the government or public agencies in the prosecution of this antitrust case.  ECF No. 863 at 8. Young argues that this factor does not solely concern government investigations, that much of

---

continues to support calculation of attorneys' fees from the gross settlement fund.  See 708 F.3d at 177-79.

the increased benefit to the class resulted from his efforts, and that class counsel's award should be reduced to recognize his contribution.  ECF No. 871 at 6-8.  Courts have not limited consideration of this factor to the efforts of government actors relative to class counsel.  Cf. In re Diet Drugs, 582 F.3d at 544 (explaining that district court considered efforts of lawyers in state court case when evaluating class counsel's fee award in related MDL litigation).  The entire value of P-A Settlement benefits accruing to class members cannot be said to be "properly attributable to the efforts of class counsel" alone.  In re AT&T, 455 F.3d at 173.  Although class counsel was not assisted by a government investigation,[28] Young's successful appeal forced class counsel to return to the negotiating table and restructure the settlement to more directly benefit class members.

This factor counts against the approval of class counsel's fee request. As discussed below, class counsel's fee award will be reduced to recognize the significant role of Young's counsel, attorneys from the Center for Class Action Fairness ("CCAF").  By objecting to and appealing final approval of the Initial Settlement, CCAF contributed to an improved outcome for class members.

ix. **The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Arrangement at the Time Counsel Was Retained**

It is extremely difficult to determine what fee would have been negotiated at the outset of the litigation.  Though a contingent fee can only be "based on the particular facts and circumstances of the specific litigation under consideration," reviewing other applications of this factor sheds some light on how to analyze it.  In re United States Bioscience Sec. Litig., 155 F.R.D. 116, 119 (E.D. Pa. 1994).  After appointing a Special Master to study the award of attorneys' fees in a

---

[28] See ECF No. 793 for additional discussion of this factor.

class action securities suit, Judge Stewart Dalzell approved of the Special Master's recommendation that a thirty percent fee award was an appropriate estimate of what would have been negotiated.  See id. (citing Report and Recommendation of Special Master Judge Arlin M. Adams).  Judge Marvin Katz noted that in private contingency fee cases (often involving tort claims), "plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."  In re Ikon, 194 F.R.D. at 194.

In this antitrust class action, class counsel's fee award falls within the 30-40 percent range. In the end, *Prudential* counsels courts not to give "great weight" to this factor; it is a "hypothetical exercise."  In re Prudential, 148 F.3d at 340.  This factor is neutral.

x.  **Any Innovative Terms of Settlement**

In the absence of any innovative terms, this factor neither weighs in favor or against the proposed fee request.

xi.  **Summation**

Because "each case is different," the *Gunter/Prudential* and *Baby Products* factors "'need not be applied in a formulaic way . . . . and in certain cases, one factor may outweigh the rest.'" In re Rite Aid, 396 F.3d at 301 (quoting Gunter, 223 F.3d at 195 n.1).  After "engag[ing] in [a] robust assessment[] of the fee award reasonableness factors," I conclude that four of the ten *Gunter/Prudential* factors count in favor, two against, and four are neutral.  Id. at 302 (citing Prudential, 148 F.3d at 340).  Additionally, as discussed above, the *Baby Products* direct benefit factor counts in favor of approval.  As discussed below, the lodestar cross-check also counts in favor of approval.  Although the majority of the factors support approval of the fee award or are neutral, I will consider the history of this case in determining the appropriate award.

Had the terms of the P-A Settlement been achieved at the outset, class counsel would be entitled to the full amount of their requested fee award.  Indeed, I approved the same award for the Initial Settlement when no one knew class members would claim so little of the Net Settlement Fund.  Class counsel worked incredibly hard throughout this litigation.  However, they did not obtain the maximum benefit for the class at the Initial Settlement stage.  None of the parties knew—nor did I know—that the Third Circuit would vacate the Initial Settlement due to its surprising results.  Only after Objector Young raised the *cy pres* issue to the Third Circuit did class counsel secure the maximum benefit for the class.  With this background, I will reduce class counsel's fee award by the amount I determine should be awarded to counsel for Objector Young.

### B.  Lodestar

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys."  In re Rite Aid, 396 F.3d at 305.

### i.    Number of Hours & Hourly Rate

As of August 22, 2014, class counsel and staff informed the Court that they had spent a total of 84,950.77 hours working on this case.  Id. Ex. 1 ¶ 4 (Decl. of Plaintiffs' Class Counsel).  At last count, eighteen different law firms worked on the Plaintiffs' side of the case.  ECF No. 863, Ex. 2 (Decl. of Plaintiffs' Class Counsel).  Per my Order filed on November 5, 2014, class counsel submitted copies of their time and expense records for their appeal and post-appeal work

in this litigation.[29]  ECF No. 889.  Each firm also submitted a sworn declaration affirming the

veracity of the records and supporting documentation.  ECF No. 863, Ex. 2 (Spector Decl.;

Fegan Decl.; Isquith Decl.).

The five years of litigation prior to the appeal involved, amongst other work, preparing the

complaint and consolidated amended complaint, responding to dispositive motions (including

motions to dismiss and motions for summary judgment), handling a multi-day class certification

hearing, and participating in mediation and extensive settlement negotiations.  Following

vacatur, class counsel participated in additional settlement negotiations that produced the P-A

Settlement.  The law firms charged different amounts based on their average billable rates and

the individual attorney or staff member working on the assignment.  For example, the plaintiffs'

firm HBBS charged hourly rates for attorneys ranging from $315 to $800.  ECF No. 863, Ex. 2,

at 3 (Fegan Decl.).

Taking into account the varied rates, the lodestar requires multiplication of the hours

reasonably worked by the reasonable billing rates.[30]  The rates were reasonable and the equation

results in a total lodestar of $33,886,857.65.

### ii.   **Lodestar Multiplier**

"After a court determines the lodestar amount, it may increase or decrease that amount by

applying a lodestar multiplier."  In re Diet Drugs, 582 F.3d at 539 (citing In re Rite Aid, 396 F.3d

---

[29] Class counsel submitted their pre-appeal time and expense records per my Order filed on July 6, 2011. ECF No. 775.  Pre-appeal, class counsel spent a total of 81,200.82 hours working on this case and their lodestar was $31,839,355.33.  ECF No. 738 at 2.

[30] I sampled time and expense records (pre- and post-appeal) for the following firms: Lockridge Grindal Nauen P.L.L.P.; Susman Heffner & Hurst LLP; SRKW; Reinhardt Wendorf & Blanchfield; and Seeger Weiss LLP.  The firms charged reasonable rates that varied based on each attorney's (and staff member's) position at the firm.  As the parties engaged in extensive discovery prior to settling the case, many associate attorneys logged considerable hours on document review.  Attorneys also submitted detailed records of time spent drafting complaints and motions, researching class certification, preparing class notice submissions, and responding to motions, to name but a few examples.

at 305-06).  The Third Circuit explained that "multipliers may reflect the risks of non-recovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for an extraordinary result.  By nature they are discretionary and not susceptible to objective calculation."  In re Prudential, 148 F.3d at 340.  The lodestar multiplier is calculated by dividing the attorneys' fees sought by class counsel ($11,833,333.33) by the total amount of hours class counsel devoted to the litigation times class counsel's hourly rates ($33,886,857.65).  Here, that calculation comes to a so-called "negative" multiplier of between .349 and .37.[31]

Therefore, if I approved the fee request, class counsel would only receive between 34.9% and 37% of what they would have received at their regular billing rates.  The Third Circuit has recognized that "'multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'"  Cullen, 197 F.R.D. at 150; In re Cendant Corp. Prides Litig., 243 F.3d 722, 742 (3d Cir. 2001) (citing In re Prudential, 148 F.3d at 341). Therefore, a negative multiple of .349 or .37 is well under the generally acceptable range and provides strong support for approving the fee request.  I note that the lodestar cross-check is not "outcome determinative."  Baby Prods., 708 F.3d at 179-80 n.14.  The Third Circuit cautioned that the negative multiplier in this case "suggests that class counsel would not be overpaid for their services if compensated as requested, but it also suggests that counsel has a significant financial incentive to cut its losses and settle the lawsuits."  Id.

---

[31] Objector Young argues that all time spent by class counsel on the appeal and on post-appeal negotiations should be excluded when calculating the appropriate fee award.  ECF No. 871 at 9-10 n.3. The hours class counsel worked on the appeal will not be compensated.  However, class counsel deserve to be compensated for their time spent negotiating the P-A Settlement.  If all appeal and post-appeal time is excluded, class counsel's requested multiplier is .37, compared to .349 if all time spent on the case is included.  Thus, the multiplier under consideration falls between these two figures.  The multiplier on the award granted is slightly below this range.

### C. Class Counsel's Fee Award

Based on the above considerations, I will award class counsel the net amount of

$11,090,833.33, or 31.2% of the gross settlement fund.[32]  Class counsel's award corresponds to a

negative multiplier of .327.  This reduction in class counsel's award is applied to avoid reducing

the class recovery and in recognition of the fact that at the outset, "this class action had the

potential to compensate class members significantly," but the Initial Settlement distribution

"arguably overcompensate[d] class counsel at the expense of the class."  Id. at 179.  Although

without class counsel's efforts there would be no settlement, let alone one that benefits more than

1.1 million class members, it was not until the current settlement that they maximized the

potential of this settlement for the class.

### D. Costs

In the Third Circuit, it is standard practice to reimburse litigation expenses in addition to

granting fee awards.[33]  See, e.g., In re AT&T, 455 F.3d at 169 (discussing district court's

approval of counsel's request for reimbursement of litigation expenses separately from counsel's

fee request).   "'There is no doubt that an attorney who has created a common fund for the benefit

of the class is entitled to reimbursement of . . . reasonable litigation expenses from that fund.'"

In re Ikon, 194 F.R.D. at 192 (quoting Lachance v. Harrington, 965 F. Supp. 630, 651 (E.D. Pa.

1997)); see also In re Aetna, Inc. Sec. Litig., 2001 WL 20928, at *13 (E.D. Pa. Jan. 4, 2010).

---

[32] Class counsel's award represents their requested award, minus $742,500 for Objector Kevin Young's attorneys' fees.  The reasons for granting this amount to Objector Young's counsel are explained in the appropriate section below, at pages 44-53.

[33] Thus, Young's argument that expenses should be combined with attorneys' fees for purposes of calculating class counsel's percentage fee award is unavailing.

The total request for reimbursement of expenses comes to $2,283,482.10 for expenses incurred from January 2006 through July 31, 2014.[34]  Mancuso Aff. ¶ 35.  Ms. Fegan, of HBBS, submitted an accounting of the Baby Products Litigation Fund that was jointly funded by the lead counsel firms and provided the expenses necessary to litigate the case.  ECF No. 863, Ex. 3. Each Plaintiffs' firm also provided a separate declaration outlining its expenses and individual contributions to the fund.  A non-exhaustive list of these expenses can be broadly divided into the following seven categories: "(1) Professional Expert and Consulting Services; (2) Document Review On-Line Website; (3) Foreign Translation Services; (4) Deposition Transcript, Video and Other Deposition Related Costs; (5) Hearing Materials; and (6) Mediation-related Costs." ECF No. 863, Ex. 3, at 2.  A very large percentage of these litigation costs are attributable to expert witness costs.  Given the economic complexity of class action antitrust cases, such high costs are to be expected.

The expenses incurred by class counsel were necessary for the competent handling of this case.  I find these expenses to be adequately documented, proper and reasonable.  Therefore, I will award counsel a reimbursement of $2,283,482.10 in expenses from the gross amount of the settlement fund.

## VII.   Attorneys' Fees for Objectors

### A.  Authority for Granting Attorneys' Fees to Objectors

"While an objector to a class action settlement is not generally entitled to an award of counsel fees, objectors are entitled to compensation for attorneys' fees and expenses if the settlement was improved as a result of their efforts."  In re Prudential Ins. Co. of Am. Sales Practices Litig., 273 F. Supp. 2d 563, 565 (D.N.J.), aff'd sub nom. In re Prudential Ins. Co. of

---

[34] Class counsel requested $2,229,775.60 in expenses during final approval of the Initial Settlement.  ECF No. 738 at 13.  Class counsel expended an additional $53,706.50 since the time the Initial Settlement was appealed.

Am. Sales Practice Litig., 103 F. App'x 695 (3d Cir. 2004) (internal quotation marks and citation omitted).  The Third Circuit has recognized the ability of district courts to award attorneys' fees to objectors who materially benefit a class.  In re Cendant Corp. Prides Litig., 243 F.3d at 744 (vacating district court's order denying attorneys' fees to objector who raised issues with class counsel's fee award and remanding for reconsideration).  See also Manual for Complex Litigation (Fourth) § 21.643 (2004) ("An objector who wins changes in the settlement that benefit the class may be entitled to attorney fees, either under a fee-shifting statute or under the 'common-fund' theory."); id. § 21.71.

### B.  Common Fund Award for Objector Young

The efforts of the Center for Class Action Fairness ("CCAF") on behalf of Objector Kevin Young undoubtedly led to an acceptable settlement.  CCAF requests a fee award of $1.485 million.  ECF No. 862 at 2.  CCAF attorneys spent 639.8 hours on this litigation and claim a lodestar of $324,665.  Id. at 16; ECF No. 862, Ex. 1 (Frank Decl. ¶ 44).  CCAF's request is based on the percentage-of-recovery theory and amounts to a multiplier of more than four on their lodestar.  Frank Decl. ¶ 47.  CCAF argues that their fee award should be paid from Class Counsel's award.  Id. at 13-14 (citing In re Ikon, 194 F.R.D. at 197 (objectors' "fees and costs will be taken from class counsel's award to avoid dilution of the settlement fund"); In re Prudential, 273 F. Supp. 2d at 573 (objectors' fees awarded from class counsel's award)).

Class counsel agree that CCAF should receive reasonable attorneys' fees, but argue of course that CCAF's award should come from the gross settlement fund rather than from class counsel's award.  ECF No. 872 at 10-12.  Class counsel argue that deducting CCAF's award from theirs would unfairly punish them when they achieved a significant benefit for the class at both the Initial and P-A Settlement stages.  Id.  Further, class counsel equivocate as to whether they seek

attorneys' fees for the last three years of litigation (the appeal and post-appeal negotiations). *Compare* ECF No. 863 at 2, 10-11 *with* ECF No. 872 at 10.  Class counsel also claim that the cases cited by CCAF involved agreements between class counsel and objectors' counsel that the latter's fees would come out of the former's award, whereas here there is no such agreement.  Id. at 10-12.

The Third Circuit has not specifically ruled on the appropriate method of calculating objector attorneys' fees in the unusual case in which such fees are appropriate.[35]  See generally In re G.M., 55 F.3d at 821 (explaining that "[o]utside the pure statutory fee case, the lodestar rationale has appeal where . . . the nature of the settlement evades the precise evaluation needed for the percentage of recovery method").

Both CCAF and class counsel suggest that the percentage-of-recovery method is appropriate to use in analyzing CCAF's fee request.  CCAF premised Objector Young's appeal on the disparate outcome of the Initial Settlement: due to a low claims rate, valid claims totaled approximately $3 million; the remaining $18.5 million would have been distributed to *cy pres* beneficiaries.  The P-A Settlement now provides for a Net Settlement Fund of nearly $17.5 million, which will be distributed in full directly to class members.  This settlement represents an improvement in direct class benefit of approximately $15 million.  CCAF contends that their

---

[35] District courts within the Circuit have generally considered the value added to the settlement, if any, by the objectors.  See, e.g., Dewey v. Volkswagen of America, 909 F. Supp. 2d 373, 396-97 (D.N.J. 2012), aff'd sub nom. Dewey v. Volkswagen Aktiengesellschaft, 558 F. App'x 191 (3d Cir. 2014) (awarding objectors 10.5% and 2.9% of the benefit conferred because both requests were "well within the range of acceptable percentages-of-recovery"); In re Prudential, 273 F. Supp. 2d at 565-67 (analyzing objectors' contribution using the *Gunter* factors); Spark v. MBNA Corp., 289 F. Supp. 2d 510, 513-14 (D. Del. 2003) (declining to award attorneys' fees because the objectors did not show that they "substantially enhanced the benefits to the class under the settlement" and therefore did not "overcome the presumption that they are not entitled to attorneys' fees").

efforts increased the direct benefit to the class by this amount.[36]  But CCAF attorneys did not

suggest the restructured settlement, nor did they participate in negotiations.  ECF No. 862 at 1-2,

11 (acknowledgment by Young that "he alone did not create the benefit by remodeling the class

settlement").  Nor was it certain that the parties would be able to reach a new settlement

agreement.  Following the Third Circuit's vacatur, the ability of class members to recover at all

was uncertain.  The parties could have negotiated a settlement with a lower value or decided to

try the case.  Ultimately, class counsel and Defendants negotiated a new settlement proposal.

Class counsel accessed BRU data to identify more than 1.1 million valid claims; these claims, in

addition to validly submitted claims, will be paid from the Net Settlement Fund.

CCAF requests an award of 9.9%, or $1,485,000 of the $15 million increased direct class

benefit.  ECF No. 862 at 2.  Class counsel suggest that CCAF should receive an award of

approximately $110,000, or one-third of their lodestar—the same "negative" multiplier class

counsel will receive.  ECF No. 872 at 12.

The propriety of a fee award for CCAF is analyzed through the *Gunter*/*Prudential* factors.

### i.  The Size of the Fund Created and the Number of Persons Benefitted

The Third Circuit vacated the Initial Settlement in large part due to CCAF's concern with

the settlement's *cy pres* distribution.  The Third Circuit's decision led class counsel and

Defendants to renegotiate the settlement to provide substantially more direct benefit to the class.

CCAF's efforts led to an exponential increase in the size of the class to more than 1.1 million

class members.  Now class members will receive a direct award of nearly $17.5 million.  CCAF

---

[36] The actual increase in direct benefit to the class from the Initial Settlement to the P-A Settlement is
approximately $14.45 million (approximately $3 million in Initial Settlement claims and $17,451,993.43
in P-A Settlement claims).  CCAF requested that I substitute the actual benefit for the $15 million figure
he uses in his brief.  ECF No. 862 at 3.  The $15 million figure will be used for ease of reference.  Using
the actual increased direct benefit to the class of approximately $14.45 million yields an even higher
percentage-of-recovery fee award for CCAF.

contributed to this improved outcome, though they did not alter the size of the fund.  Thus, this factor weighs in favor of granting a fee award to CCAF.

### ii.   The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel

No class members object to CCAF's fee request.  Class counsel object to the amount requested, but acknowledge that CCAF has earned a reasonable fee award.  ECF No. 872 at 7. This factor weighs in favor of granting a fee award to CCAF.

### iii.   The Skill and Efficiency of the Attorneys Involved

As class counsel acknowledge, "CCAF accomplished its goal of obtaining a reversal of this Court's decision to approve" the Initial Settlement.  ECF No. 872 at 7.  CCAF attorneys raised and briefed the *cy pres* issue, a matter of first impression in the Third Circuit.  They expended just 639.8 hours objecting to and appealing the Initial Settlement, demonstrating their efficiency in raising concerns with the adequacy and fairness of the settlement.  This factor counsels in favor of granting a fee award.

### iv.   The Complexity and Duration of the Litigation

As discussed above, CCAF raised a complex issue of first impression concerning *cy pres* awards in class action settlements.  However, CCAF became involved in this litigation less than four years ago, after class counsel engaged in extensive discovery and trial preparation.  By comparison, class counsel have extensively litigated this action since 2006.  Thus, although CCAF's work in this case involved a complex matter, the duration of its involvement somewhat counsels against granting a fee award.  On balance, this factor is neutral.

### v.   **The Risk of Nonpayment**

CCAF argues that a risk of nonpayment exists even with non-profit organizations, while class counsel argues that CCAF did not face the same type of risk as plaintiffs' firms did because it was funded by an anonymous charitable vehicle.  ECF No. 872 at 8.  At its inception, CCAF was funded by a charitable vehicle; it became a standalone entity in 2012 and obtained 501(c)(3) non-profit status in 2013.  Frank Decl. ¶ 47; ECF No. 880 at 7 n.2.  CCAF faced a risk of nonpayment because "unless they add value to the settlement, objectors generally are not compensated."  In re Prudential, 273 F. Supp. 2d at 570-71.  Had CCAF's appeal been unsuccessful, CCAF would not be compensated at all.  This factor counsels in favor of granting a fee award.

### vi.   **Amount of Time Devoted to the Case by Counsel**

Over three years, CCAF expended 639.8 hours on the case, less than one percent of the time expended by class counsel.  ECF No. 872 at 8.  CCAF efficiently worked to convince the Third Circuit to vacate approval of the Initial Settlement.  Although I commend class counsel for the enormous effort they put into this case, I recognize that the relatively small amount of time expended by CCAF attorneys cannot directly be compared to class counsel's total hours.  CCAF's time was "judiciously spent to increase the value of the settlement" to class members; this factor weighs in favor of granting a fee award.  In re Prudential, 273 F. Supp. 2d at 571.

### vii.  **The Awards in Similar Cases**

I am wary of placing too much emphasis on the awards in similar cases, because courts rarely award attorneys' fees to objectors.  The impact objectors have on class action settlements varies widely.  Thus, in reviewing the cases cited by CCAF and class counsel, it is difficult to

evaluate the motivating factors for each judge's decision to award objectors' fees.  This factor is neutral.

### viii. The Value of Benefits Attributable to the Efforts of Counsel Relative to the Efforts of Other Groups

CCAF undoubtedly contributed to the increased direct benefit to the class of approximately $15 million.  Nevertheless, class counsel were the primary architects of this litigation and settlement.  CCAF did not increase the amount of the settlement, although they did spur a change in allocation of the settlement to provide more direct benefit to the class. Ultimately, the two sets of attorneys played different roles in this litigation and the extent of their investment in the case differs markedly.  Recognizing the efforts of both CCAF and class counsel, this factor either is neutral or weighs in favor of granting a more modest fee award to CCAF.

### ix. The Percentage Fee that Would Have Been Negotiated Had the Case Been Subject to a Private Contingent Fee Arrangement at the Time Counsel Was Retained

As a non-profit organization, CCAF did not enter this case with a profit-seeking motive. CCAF sought to represent a suitable class member in order to object to the settlement.  This factor is neutral.

### x. Any Innovative Terms of Settlement

CCAF did not create the new settlement terms. This factor is neutral.

50

xi. **Summation**

Most of the *Gunter/Prudential* factors are positive or neutral, and weigh in favor of granting attorneys' fees to CCAF.  CCAF's requested fee award will be reduced to an appropriate level to account for the comparative role of class counsel throughout this litigation.

Review of the objectors' and parties' submissions, as well as the history of the litigation, shows that attributing the $15 million increase in direct benefit solely to CCAF would be unfair. It is true that without CCAF's efforts, the Initial Settlement would have been distributed as approved, and only a small number of class members would have recovered their damages in this litigation.  CCAF raised the issue of an outsized *cy pres* distribution in comparison to the class recovery.  Equally true is that class counsel renegotiated a settlement with terms that maximized the direct benefit to the class after the Initial Settlement claims process produced a surprising result.  Because of class counsel's efforts, more than 1.1 million class members will receive settlement checks.  After considering the roles of both class counsel and CCAF, I find that the full $15 million cannot fairly be attributed to CCAF's efforts.  However, at least half of that amount can be attributed to CCAF's efforts, because without CCAF's appeal, there would have been no opportunity to increase the direct class benefit.  CCAF's efforts propelled counsel part of the way toward fashioning a settlement that maximized direct class benefit.  An award of $742,500, half of the $1,485,000 amount requested by CCAF, is a more appropriate award reflecting their contributions to the class recovery.  Whether CCAF's award is based on $15 million or on half of that amount, the corresponding percentage of recovery ranges from 4.9% to 9.9% of the benefit conferred.  A fee award in this range is reasonable.  I have reduced class counsel's requested fee award by the amount of CCAF's award.

The lodestar cross-check confirms that this award is reasonable.

51

### C.  Lodestar Cross-Check for Objector Young

When using the lodestar method to calculate attorneys' fees, a district court "multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." In re Diet Drugs, 582 F.3d at 540.  CCAF became involved in this litigation in 2011, five years after the lawsuit was filed, after extensive discovery, and after the parties reached a settlement on the eve of trial.  According to their billing records, CCAF attorneys spent 649.8 hours on this case, compared to the approximately 84,000 hours class counsel devoted to the litigation.  After a review of the rates and hours worked that CCAF submitted for *in camera* review, 649.8 hours is a reasonable expenditure of time in light of the quality and quantity of CCAF's work and the results achieved.[37]  CCAF's lodestar of $324,665 is reasonable and supported by the necessary records.  ECF No. 862 at 16.

Although CCAF's investment of time and resources is not insignificant, it pales in comparison to class counsel's investment in this case.  Moreover, the roles of class counsel and CCAF differ in important ways.  "Ultimately, it is not fair to compare CCAF's limited role as counsel for an objector in this case to class counsel's central role as the architect of the lawsuit." Lonardo v. Travelers Indem. Co., 706 F. Supp. 2d 766, 814 (N.D. Ohio 2010).  Although CCAF attorneys invested a relatively limited amount of time in this case, they helped achieve excellent results for the class.  A lodestar enhancement will appropriately recognize these efforts.  A lodestar multiplier "is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." In re Rite Aid, 396 F.3d at 305-06.

CCAF's involvement justifies the use of a multiplier for a number of reasons.  CCAF raised and briefed an issue of first impression—the use of *cy pres* distributions in class action

---

[37] CCAF submitted its time records for *in camera* review by CCAF pursuant to my Order filed on November 5, 2014.  ECF No. 889.

settlements.  CCAF drew on its expertise in challenging the terms of class action settlements to object to the Initial Settlement and brief the *cy pres* issue in the Third Circuit.  CCAF efficiently and expertly briefed the issues, convincing the Third Circuit to vacate the Initial Settlement and set precedent with the *Baby Products* decision.  CCAF's efforts led the parties to negotiate a new settlement that vastly improves the outcomes for an enormous number of class members.  Additionally, because objectors do not commonly receive fee awards, CCAF faced a significant risk of nonpayment.

In this case, the percentage-of-recovery award of $742,500 corresponds to a multiplier of 2.28.[38]  As discussed above, I have previously approved a positive multiplier of 2.04, in which counsel received twice what they would have earned under their regular billing rates.  The Third Circuit, moreover, has recognized that "'multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'"  Cullen, 197 F.R.D. at 150; In re Cendant Corp. Prides Litig., 243 F.3d at 742 (citing In re Prudential, 148 F.3d at 341).  A multiplier of 2.28 appropriately recognizes the skill and efficiency with which CCAF sought to generate a settlement that maximizes benefit to the class.  Compared with the negative multiplier of .327 class counsel will receive for their work in this case, the multiplier of approximately 2.28 CCAF will receive is more than reasonable.

### D.  Attorneys' Fees for Other Objectors

District courts in this Circuit have rejected fee award applications where the benefit of counsel's input was not apparent or was patently lacking. For example, in *In re Prudential* the

---

[38] Awarding CCAF the full amount requested, $1,485,000, is equivalent to a 4.57 multiplier on its lodestar of $324,665.  ECF No. 862 at 16.  The $742,500 award corresponds to an average hourly billing rate of approximately $1,160.  While CCAF's efforts and success justify this high rate, a higher average would generate a conflict with class counsel's award, given their own extensive efforts and success in this litigation.  Class counsel's award corresponds to a negative multiplier of .327 and average hourly billing rate of approximately $136.

district court rejected objector fee applications of attorneys who did not "substantially participate in the objections made to the settlement or to the Court's award or fees to Class Counsel." 273 F. Supp. 2d at 565-66. Where counsel for an Objector admits in his fee application that he did not take a leading role and that he kept no time records, there is no basis upon which this Court can grant a fee request.

Objector Clark Hampe's attorney admits that he kept no time records in this case.  ECF No. 875, ¶ 7 (Bandas Decl.). The attorney's descriptions of his work for this case do not indicate what he did that was not duplicative of CCAF's actions. He offers merely that he has "acted as general counsel to the [sic] Clark Hampe and [he has] advised [Hampe] insofar as [Hampe's] appeal was concerned."  Id. ¶¶ 4-5.  By way of explanation, the attorney states that he evaluated Hampe's standing as a class member, analyzed the proposed settlement, assisted in the preparation and review of appellate pleadings, monitored and reviewed pleadings of other appellate counsel, and generally cooperated in CCAF's primary appeal to the Third Circuit. Id. He admits:

> I would have undertaken a much larger role in this case had I had the opportunity, but Ted Frank [Young's counsel] did not need much of my help, if any, and my work was focused on ensuring that my client's interests were served and benefitted from that work. With the reversal of the settlement approved by the District Court, I believe my client's interests as a class member have been properly served.

Id. ¶ 9.  Based on the foregoing declaration, Hampe's attorney is not entitled to a fee award for his role in objecting to the settlement.

Objector Lederer's attorneys spent 115.5 hours on the case.  ECF No. 866, Ex. 1 ¶¶ 8-11 (Decl. of W. Allen McDonald).  Although Lederer's attorneys submitted time records for *in camera* review, they did not explain how their efforts improved the settlement.  Lederer did not raise the *cy pres* issue in her objections to the Initial Settlement; only Young did.  ECF Nos. 745,

767 (Lederer); ECF No. 749 (Young).  Although Lederer (and Hampe) appealed final approval

of the Initial Settlement, only Young briefed the appeal.  Lederer's attorneys do not explain their

contributions to the appeal, although some of their time entries indicate that they participated in

developing the Third Circuit brief.  Even the declaration of Young's counsel in support of his fee

request is scant on the details of the other attorneys' participation in the appeal.  See Frank Decl.

¶ 45 ("Though the other objectors did not take the lead role in the Third Circuit, their cooperation

in presenting a united front was important to the success of the appeal.").  Beyond that brief

recognition, Young's counsel states that the objectors' cooperation reduced his lodestar and that

they "inform [him] that their total lodestar for participation in the Third Circuit proceedings was

$29,354 (Lederer) and $13,125 (Hampe)."  Id.  Lederer's attorneys are not entitled to a fee

award; the information submitted is insufficient to determine whether they "substantially

participate[d]" in the objection and appeal.  In re Prudential, 273 F. Supp. 2d at 565-66.

Although Young requests that "[t]he Court should decide how to allocate the requested

$1,485,000" among the objectors, I will deny a fee award to counsel for Lederer and Hampe.[39]

Frank Decl. ¶ 45.

## VIII.   Incentive Awards for Class Representatives and Objectors

The named class representatives seek approval of the modest amount of $2,500 in incentive

awards for their contributions to the case.  There are no objections to their request.

Incentive awards are "not uncommon in class action litigation and particularly where, as

here, a common fund has been created for the benefit of the entire class."  In re S. Ohio Corr.

Facility, 175 F.R.D. 270, 272 (S.D. Ohio 1997).  As a matter of practice, "courts routinely

---

[39] However, I echo the conclusion of Judge Alfred Wolin in In re Prudential: "While the Court does not
believe that a fee award is appropriate for these attorneys, the remaining attorneys who do receive fee
awards are not prohibited from distributing the awards as they see fit."  In re Prudential, 273 F. Supp. 2d
at 566 n.3.

approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." <u>Cullen</u>, 197 F.R.D. at 145 (citation omitted).  I agree with my colleagues who have held that "[r]easonable payments are permissible to compensate named plaintiffs for the expenses they incur during the course of class action litigation." <u>First State Orthopaedics v. Concentra, Inc.</u>, 534 F. Supp. 2d 500, 524-25 (E.D. Pa. 2007) (referencing <u>Nichols v. SmithKline Beecham Corp.</u>, 2005 U.S. Dist. LEXIS 7061, at *80 (E.D. Pa. 2005); <u>Godshall v. Franklin Mint Co.</u>, 2004 U.S. Dist. LEXIS 23976 (E.D. Pa. 2004)).  Class counsel note that the named *McDonough* plaintiffs were deposed and all of the named plaintiffs "communicated with Class Counsel as necessary to assist with the effective prosecution of the case."  ECF No. 863 at 13.  All of the named plaintiffs responded to discovery and reviewed the terms of the proposed settlement.  <u>Id.</u>  In light of the involvement of the named plaintiffs in this protracted litigation, I find that the requested incentive awards are reasonable and appropriate.  Therefore, I will grant an incentive award of $2,500 to each of the named class representatives.

Nor are there objections to an incentive award for Objector Kevin Young.  Young also provided services to the class.  Although Young did not participate in discovery, nor was he deposed, his objection provided a significant benefit to the class.  Young seeks a modest incentive award of $1,000, and I will grant his request.  I will not grant incentive awards to Objectors Lederer and Hampe because they have not demonstrated that their objections provided a benefit to the class.

## IX.    Conclusion

For the reasons set forth above, I will grant Plaintiffs' Motion for Final Approval of Class Action Settlement and Certification of Settlement Subclasses.  I will also grant in part and deny

in part Plaintiffs' Motion for Award of Attorneys' Fees, Expenses, and Incentive Awards for

Named Plaintiffs.  I will grant in part and deny in part Objector Kevin Young's Motion for

Attorneys' Fees and an Incentive Award.  Finally, I will modify and enter an appropriate

Allocation Order and dismiss this case with prejudice pursuant to the parties' agreement.

s/Anita B. Brody

_____

ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:        Copies **MAILED** on _____ to: